ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 3 0 2017

CLERK, U.S. DISTRICT COURT
By _____
Deputy

THOMAS E. PEREZ, Secretary of Labor,

    Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

    Defendant.

Civil Action No. 4:16-cv-1057-A

**BRIEF IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANT ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS**

ANDREW D. ROTH*
D.C. Bar No. 414038
ADAM BELLOTTI*
D.C. Bar No. 1020169
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St. N.W., Tenth Floor
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888
Email: aroth@bredhoff.com
Email: abellotti@bredhoff.com

SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Avenue, Suite 550
Dallas, TX 75214
Tel: (214) 637-0750
Fax: (214) 637-0730
Email: denison@baabdenison.com

Attorneys for Defendant Association
of Professional Flight Attendants

*Application for Admission
 Pro Hac Vice being filed herewith

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF THE CASE......................................................................................... 2

    A.   Count I.................................................................................................................... 3

    B.   Count II ................................................................................................................. 4

ARGUMENT ................................................................................................................... 4

I.     THE APPLICABLE LEGAL PRINCIPLES................................................................ 4

II.    THE SECRETARY'S COUNT I CLAIM FAILS AS A MATTER OF LAW .................. 5

III.   THE SECRETARY'S COUNT II CLAIM ALSO FAILS AS A MATTER OF LAW ....14

CONCLUSION................................................................................................................ 20

CERTIFICATE OF SERVICE ........................................................................................ 21

# TABLE OF AUTHORITIES

## CASES

*Apple Inc. v. The Superior Court of Los Angeles County,* 292 P.3d 883 (Cal. 2013) .................. 19

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ...................................................................................... 4, 5

*Bachowski v. Brennan,* 413 F. Supp. 147 (W.D. Pa. 1976) .............................................................. 7

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ........................................................................... 4

*Benjamin v. City of Watauga,* 841 F. Supp. 2d 1010 (N.D. Tex. 2012) ......................................... 5

*Bhd. of Locomotive Engr's v. Atchison, Topeka & Santa Fe R.R. Co.,* 516 U.S. 152 (1996) ...... 13

*Brennan v. Local 3489, United Steelworkers of Am.,* 520 F.2d 516 (7th Cir. 1975),
    *aff'd,* 429 U.S. 305 (1977) ....................................................................................................... 6

*Chao v. Allied Pilots Association,* No. 05-338, 2007 WL 518586 (N.D. Tex. Feb. 20, 2007) ...... 6

*Chao v. Local 743, Int'l Bhd. of Teamsters,* 467 F.3d 1014 (7th Cir. 2006) ................................ 11

*Donovan v. CSEA Local Union 1000, Am. Fed'n of State, Cty. & Mun. Emps.,*
    594 F. Supp. 188 (N.D.N.Y. 1984), *aff'd in part, rev'd in part on other grounds,*
    761 F.2d 870 (2d Cir. 1985) ............................................................................................. 7, 8, 9

*Easley v. Univ. of Tex. at Arlington,* 984 F. Supp. 2d 631 (N.D. Tex. 2013) ................................. 5

*Hodgson v. United Mine Workers of Am.,* 344 F. Supp. 17 (D.D.C. 1972) ..................................... 6

*K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281 (1988) ....................................................... 16, 17, 18

*Marshall v. Local Union 12447, United Steelworkers of Am.,* 591 F.2d 199 (3d Cir. 1978) ..... 6, 8

*Reed v. Jpmorgan Chase Bank,* No. 16-17, 2016 WL 1029542 (N.D. Tex. Mar. 8, 2016) ............ 5

*Reich v. Dist. Lodge 720, Int'l Ass'n of Machinists & Aerospace Workers,*
    11 F.3d 1496 (9th Cir. 1993) ..................................................................................................... 7

*Solis v. Communications Workers of America,* 766 F. Supp. 2d 84 (D.D.C. 2011) ............... 12, 13

*Wirtz v. Hotel, Motel & Club Emp. Union, Local 6,* 391 U.S. 492 (1968) ..................................... 1

*Wirtz v. Local 11, Int'l Hod Carriers' Bldg. & Common Laborers' Union of Am.,*
   211 F. Supp. 408 (W.D. Pa. 1962) ......................................................... 11, 12

## STATUTES, RULES AND REGULATIONS

29 U.S.C. § 401 *et seq.* ...................................................................... 1

29 U.S.C. § 402(k) ............................................................................. 5

29 U.S.C. §§ 481-483 ......................................................................... 1

29 U.S.C. § 481 ................................................................................ 2

29 U.S.C. § 481(a) ......................................................................... 3, 5

29 U.S.C. § 481(b) ............................................................................. 5

29 U.S.C. § 481(c) ...................................................................... 4, 14

29 U.S.C. § 482 ................................................................................ 2

Fed. R. Civ. P. 12(b)(6) ...................................................................... 4

Fed. R. Civ. P. 8(a)(2) ........................................................................ 4

29 C.F.R. § 452.110 ..................................................................... 1, 14

29 C.F.R. § 452.96 ....................................................................... 1, 2

Defendant Association of Professional Flight Attendants ("APFA"), a national labor union representing the flight attendants at American Airlines, hereby submits this brief in support of its Rule 12(b)(6) motion to dismiss the Complaint filed against it by Thomas E. Perez, in his official capacity as Secretary of the United States Department of Labor ("DOL").

## INTRODUCTION

The Secretary brings this action under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA" or "Act"), 29 U.S.C. § 401 *et seq.*, a nearly sixty-year-old federal statute that, to the extent relevant here, "safeguards democratic processes by prescribing . . . minimum standards for the regular periodic election of officers in labor organizations subject to its provisions," 29 C.F.R. § 452.96. The relief sought by the Secretary is the voiding of an officers election held by APFA on January 9, 2016 and the conduct of a new election under the Secretary's supervision. *See* Complaint ("Cplt.") ¶ 1. The Supreme Court has cautioned against "the disruptive effect of a voided election," *Wirtz v. Hotel, Motel & Club Emp. Union, Local* 6, 391 U.S. 492, 507 (1968) (internal quotation marks omitted), which obviously should not be ordered unless all applicable statutory requirements for granting such relief have been met.

As the DOL has acknowledged in a set of interpretative rules issued under Title IV of the LMRDA, 29 U.S.C. §§ 481-483, the Act "does not . . . prescribe in detail election procedures which must be followed" by covered labor unions, 29 C.F.R. § 452.96, but rather affords them a "wide range of discretion regarding the conduct of [their] elections," *id.* § 452.110.

Exercising the broad discretion afforded it by Congress under the LMRDA, the APFA chose to conduct its January 9, 2016 officers election "using an internet-based electronic voting system in which voters cast their votes using the internet and telephone." *See* Cplt. ¶ 20. Given that APFA's membership consists of flight attendants who commonly are away from their home

bases on business travel throughout the United States and abroad for long stretches of time, such an internet-based electronic voting system that permits APFA members to cast their votes remotely over the internet or by telephone is vastly superior to other available voting systems (*i.e.*, in-person or mail ballot voting) from the standpoint of promoting maximum voter participation in the "democratic process[ ]," 29 C.F.R. § 452.96, of electing APFA officers.

Notwithstanding the obvious advantages of an internet-based electronic voting system for a labor union like APFA and its "constantly on the go" membership, the Secretary seeks effectively to deny APFA its statutory right to utilize such a voting system by urging upon this Court a totally nonsensical reading of §§ 401(a) & (c) of the LMRDA as applied to the relatively new technology of internet-based electronic voting. For the reasons set out below, this Court should reject the Secretary's reading of the statute and dismiss this action for failure to state a plausible claim for relief against APFA.

## STATEMENT OF THE CASE

The Secretary of Labor has brought this action against APFA under § 402 of the LMRDA, 29 U.S.C. § 482, for a judgment declaring that the January 9, 2016 election of APFA's National President, National Vice President, National Secretary, and National Treasurer "is void," and directing APFA to conduct a new election for these four national offices "under Plaintiff's supervision." *See* Cplt. ¶ 1.

The Secretary claims an entitlement to such relief on the ground that APFA's conduct of the January 9, 2016 election "using an internet-based electronic voting system in which voters cast their votes using the internet and telephone," *id.* ¶ 20, violated § 401 of the LMRDA, 29 U.S.C. § 481, in two different respects. Those two alleged violations of § 401 are set out separately in Counts I and II of the Complaint, which we describe in turn below.

- 2 -

A.    Count I

Count I of the Complaint alleges that in conducting the January 9, 2016 election, APFA violated the requirement in § 401(a) of the LMRDA, 29 U.S.C. § 481(a), that national labor unions shall elect their officers "by secret ballot." (The Secretary does not refer to the statute's "secret ballot" requirement in Count I or anywhere else in the Complaint for that matter, but that undoubtedly is the statutory requirement the Secretary seeks to invoke in Count I.)

The factual allegations underlying the Secretary's Count I claim of a secret-ballot-requirement violation are set out in paragraphs 21-23 of the Complaint. In those paragraphs, the Secretary acknowledges that the third-party contractor that conducted the January 9, 2016 election on APFA's behalf, BallotPoint Election Services, used an internet-based electronic voting system that stored and maintained member identifying information and voting records on two separate computer servers. *See* Cplt. ¶¶ 21-22. That voting system nonetheless violated the statute's secret ballot requirement, the Secretary maintains, because member identifying information and voting records were stored and maintained on the two separate servers "in a way" that "could" (in some unspecified manner) "allow individuals with access to both of the servers" (presumably BallotPoint personnel) "to identify how a member voted." *See id.* ¶ 21.

Notably, the Complaint fails to allege that "[d]uring the course of its investigation [into the APFA's election]," *id.* ¶ 23, the DOL uncovered any evidence that BallotPoint personnel *did in fact* make an effort to identify how even a single APFA member voted; much less any evidence that BallotPoint personnel *did in fact* obtain such private voting information and then use that information in a way that would undermine the purposes (described *infra* p. 7) of the LMRDA's secret ballot requirement. Rather, the Secretary's secret-ballot-requirement-violation claim in this case rests entirely on the alleged fact that BallotPoint personnel, using technological

- 3 -

means unspecified in the Complaint, "could" theoretically have identified how at least some

APFA members voted, had BallotPoint personnel been so inclined.

>   B.   Count II

Count II of the Complaint alleges that in conducting the January 9, 2016 election, APFA

also violated § 401(c) of the LMRDA, 29 U.S.C. § 481(c), which provides, in pertinent part:

>   Adequate safeguards to insure a fair election shall be provided,
>   including the right of any candidate to have an observer at the
>   polls and at the counting of the ballots.

This Count II claim, in turn, appears to rest on the singular factual allegation in paragraph

24 of the Complaint that observers who were present at the January 9, 2016 election "were

limited to viewing a tally sheet projected from a personal computer connected to the voting

website and were not able to verify that the votes were recorded and tallied correctly."

# ARGUMENT

## I.   THE APPLICABLE LEGAL PRINCIPLES

On numerous occasions, this Court has stated the applicable legal principles in deciding a

Rule 12(b)(6) motion to dismiss as follows:

>   Rule 8(a)(2) of the Federal Rules of Civil Procedure . . . requires
>   that a complaint contain "a short and plain statement of the claim
>   showing that the pleader is entitled to relief," Fed. R. Civ. P.
>   8(a)(2), "in order to give the defendant fair notice of what the
>   claim is and the grounds upon which it rests," *Bell Atl. Corp. v.
>   Twombly,* 550 U.S. 544, 555 (2007) (internal quotation marks and
>   ellipsis omitted).  Although a complaint need not contain detailed
>   factual allegations, the "showing" contemplated by Rule 8 requires
>   the plaintiff to do more than simply allege legal conclusions or
>   recite the elements of a cause of action.  *Twombly,* 550 U.S. at 555
>   & n.3.  Thus, while a court must accept all of the factual
>   allegations in the complaint as true, it need not credit bare legal
>   conclusions that are unsupported by any factual underpinnings.
>   *See Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) ("While legal
>   conclusions can provide the framework of a complaint, they must
>   be supported by factual allegations.").

> Moreover, to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the facts pleaded must allow the court to infer that the plaintiff's right to relief is plausible. *Iqbal*, 556 U.S. at 678. To allege a plausible right to relief, the facts pleaded must suggest liability; allegations that are merely consistent with unlawful conduct are insufficient. *Id.* In other words, where the facts pleaded do no more than permit the court to infer the possibility of misconduct, the complaint has not shown that the pleader is entitled to relief. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*Reed v. Jpmorgan Chase Bank*, No. 16-17, 2016 WL 1029542, at **1-2 (N.D. Tex. Mar. 8, 2016); *accord e.g. Easley v. Univ. of Tex. at Arlington*, 984 F. Supp. 2d 631, 635 (N.D. Tex. 2013); *Benjamin v. City of Watauga*, 841 F. Supp. 2d 1010, 1013-14 (N.D. Tex. 2012).

Applying these legal principles, it is plain that the Secretary's Complaint fails to state a plausible claim for relief against APFA and should be dismissed—as we now show.

## II.   THE SECRETARY'S COUNT I CLAIM FAILS AS A MATTER OF LAW

As previously noted, § 401(a) of the LMRDA, 29 U.S.C. § 481(a), requires national labor unions like APFA to conduct their officer elections "by secret ballot"—with the term "secret ballot" being defined elsewhere in the statute as

> the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed.

*See* 29 U.S.C. § 402(k).[1]

What facts suffice to make out a violation of the LMRDA's secret ballot requirement in situations where a union has chosen to elect its officers using the relatively new technology of

---

[1] The LMRDA's secret ballot requirement also applies to local union officer elections under § 401(b) of the statute, 29 U.S.C. § 481(b), and most of the cases dealing with the secret ballot requirement involve local union elections, *see infra* pp. 6-9, 11-12.

internet-based electronic voting is an issue of first impression.[2]  However, there is a body of case

law involving the application of the secret ballot requirement in other voting contexts, and that

case law elucidates a number of guiding legal principles that dictate the rejection of the

Secretary's secret-ballot-requirement-violation claim in this case.

The Secretary has successfully alleged and established a secret ballot requirement

violation in a line of cases involving *in-person* voting in local union elections conducted under

ridiculously "loose" polling procedures that afforded union officials ample opportunity to see or

otherwise find out how union members cast their votes.[3]  Although these in-person voting cases

---

[2] To be sure, another Judge in this District dealt with this issue (albeit on very different facts) in
*Chao v. Allied Pilots Association*, No. 05-338, 2007 WL 518586 (N.D. Tex. Feb. 20, 2007), but
that decision was vacated in accordance with a settlement agreement between the parties, *see*
Dkt. No. 73 (June 13, 2007), and thus is of no precedential value here one way or the other.

[3] *See Hodgson v. United Mine Workers of Am.*, 344 F. Supp. 17, 30 (D.D.C. 1972) ("Frequently
ballots were marked on walls, chairs, window sills, the backs of other voters, and other places
other than a polling booth.  Sometimes this occurred under crowded conditions with members
voting at the Tellers' table in plain view of officials and observers, or in groups at the same table
or elsewhere in the polling place."); *Brennan v. Local 3489, United Steelworkers of Am.*, 520
F.2d 516, 521-22 (7th Cir. 1975) ("This election was conducted in a 60' by 20' room. . . .  A
small table for marking ballots was placed three feet in front of an elevated bench.  Two
members of the Election Committee were present throughout the 6:00 a.m. to 6:00 p.m. election.
Most of the voting occurred during the last two hours of the day, when the voters were 'jammed
together *** elbow to elbow.'  Up to 50 voters were in the room at one time.  Many voters
marked their ballots at the aforesaid table and could see each other's ballots as they were
marked.  Others marked their ballots against the walls, and their markings could also be observed
by voters several feet away.  No one was seen carrying a ballot to the back of the hall to vote,
and some members deliberately 'flaunted their votes.'  There was no encouragement of any
members to take steps to prevent others from seeing their ballots"), *aff'd*, 429 U.S. 305 (1977);
*Marshall v. Local Union 12447, United Steelworkers of Am.*, 591 F.2d 199, 201, 203 (3d Cir.
1978) ("[T]hree witnesses . . . testified that the election had been held in one room in an
American Legion Hall.  When a union member entered the room, he received a slip from the
teller and then waited in line to be admitted to the area of the same room which was reserved for
voting.  When his turn came, the member would surrender his slip, receive a ballot in return, and
proceed to one of the seven or eight tables in the room.  Each of these witnesses testified that he
received no instructions from the election officials as to where he should sit while marking his
ballot.  The tables were only a few feet apart, and each witness indicated that several other
people were sitting at his table while voting.  These witnesses also testified that there were no

obviously are not remotely on point here factually, they are nonetheless highly instructive from a legal standpoint.

The recognized purposes of the LMRDA's secret ballot requirement are twofold. First, to prevent union officials from retaliating against, coercing or intimidating union members based on who those members have voted for in a union election. *See Reich v. Dist. Lodge 720, Int'l Ass'n of Machinists & Aerospace Workers*, 11 F.3d 1496, 1500 (9th Cir. 1993); *Bachowski v. Brennan*, 413 F. Supp. 147, 150 (W.D. Pa. 1976). Second, to prevent union members from altering their planned voting behavior in the first place out of fear that union officials might find out who they voted for, leading to reprisals against them depending on the election's outcome. *See id.*; *Donovan v. CSEA Local Union 1000, Am. Fed'n of State, Cty. & Mun. Emps.*, 594 F. Supp. 188, 196 (N.D.N.Y. 1984) ("[t]he potential chilling effect" on union members' exercise of their voting rights "is at the heart of" the LMRDA's secret ballot requirement), *aff'd in part, rev'd in part on other grounds*, 761 F.2d 870 (2d Cir. 1985).

The ridiculously "loose" polling procedures used by the local union defendants in the in-person voting cases described at p. 6 n.3 *supra* struck at both of the purposes underlying the LMRDA's secret ballot requirement, and thus were rightly condemned by the courts in those cases as a violation of that requirement. First, by affording union officials ample opportunity to see or otherwise find out how union members cast their votes, those ridiculously "loose" polling procedures put union members in real jeopardy of being retaliated against by union officials who availed themselves of that opportunity. Second, given that voting took place in-person under

---

barriers on the tables to prevent them from observing how others were voting. . . . [T]here were sixteen cardboard boxes, two taped to each table, and arranged so that the voters could mark their ballots by using the boxes to shield their votes if they desired privacy. . . . The flow of voters into the voting area was not controlled. More members were permitted to vote at one time than there were boxes available to them for their individual use. Instructions were not given to voters that they must shield their ballots inside the boxes while they marked them.") (footnote omitted).

polling procedures that all union members could readily observe with the naked eye, union members would have been keenly aware of the risk that union officials might find out how they voted and retaliate against them based on that information, thereby exerting a "potential chilling effect" on the members' exercise of their voting rights.[4]

The Secretary also successfully alleged and established a secret ballot requirement violation in *Donovan v. CSEA Local Union 1000, supra,* a case involving a local union election conducted by *mail ballot* voting. In that election, the local union used perforated ballot forms, the top portion of which contained union member names and social security numbers, and the bottom portion of which was the actual ballot. 594 F. Supp. at 195. Members receiving perforated ballots were provided assurances that the top and bottom portions of their ballot form would be separated prior to the counting of their votes by an independent third party, but the district court concluded that those assurances were inadequate to assure members that their votes would remain anonymous, and thus inadequate to avoid "the potential chilling effect" on the members' exercise of their voting rights that lies "at the heart" of the Act's secret ballot requirement. *Id.* at 196. The court added: "[t]he problem here is even more acute since *a member of the union's election committee actually reviewed some ballots with voters' names*

---

[4] To be sure, union members in these cases could possibly have avoided or mitigated the risk of their votes being revealed by attempting to "hide" their votes as best they could under the circumstances. *See Marshall,* 591 F.2d at 205. But as the *Marshall* court observed, putting union members in the position of choosing whether or not to "hide" their votes was itself at odds with the underlying purposes of the secret ballot requirement:

> This choice must be made while partisans of the candidates, including the union officials conducting the election, may be observing [the member's] actions. In some cases, the very exercise of this choice in favor of a secret vote may identify the voter as a dissident or at the least may chill the exercise of the voter's free choice.

*Id.*

suggesting that voter fears [regarding] anonymity may not have been unrealistic." *Id.* at 197 (emphasis added).[5]

The facts alleged in support of the Secretary's secret-ballot-requirement-violation claim in this case involving *internet-based electronic* voting are, on their face, far removed from the facts found sufficient to sustain the Secretary's secret-ballot-requirement-violation claims in the above-described cases involving in-person and mail ballot voting. Indeed, so far removed that it is difficult even to fathom what statutory purposes the Secretary seeks to further through the assertion of a secret-ballot-requirement-violation claim in this case.

The Secretary's concern in asserting this claim cannot be that because member identifying information and voting records allegedly are stored on BallotPoint's servers "in a way" that "could" allow BallotPoint personnel to identify how APFA members voted in the January 9, 2016 election, *see* Cplt. ¶ 21, the BallotPoint electronic voting system put APFA members in fear that their votes would be revealed, thereby generating an impermissible "chilling effect" on the members' exercise of their voting rights of the kind found to invalidate the mail ballot voting procedure used by the union defendant in *Donovan v. CSEA Local Union 1000*, *supra*, 594 F. Supp. 188. That is so because the Secretary's Complaint does not allege that APFA members were aware at the time of the election of BallotPoint's alleged technological capabilities in this regard, so as to give rise to any such fear in the members' minds.

Rather, as best we can intuit, the Secretary's concern is that given BallotPoint's alleged technological capabilities in this regard, it was *theoretically possible* for APFA officials to determine *indirectly through BallotPoint* how at least some APFA members voted in the January

---

[5] The court further noted that 5,600 out of 51,000 members who voted failed to add their names to the top portion of their ballots, which the court took as a clear indication that many members did in fact harbor fear regarding the anonymity of their votes. *See* 594 F. Supp. at 196.

9, 2016 election, thereby exposing those APFA members to possible retaliation, coercion or intimidation based on their votes. That mere theoretical possibility, however, does not remotely justify a finding of a secret-ballot-requirement violation in this case.

In marked contrast to the situation presented in the in-person voting cases described at p. 6 n.3 *supra*, where the local union defendants' voting procedures were so ridiculously "loose" as to create a high likelihood that union officials would see or otherwise find out how at least some members had voted, the possibility of that happening under the BallotPoint internet-based electronic voting system used by APFA in the January 9, 2016 election is so remote as to be virtually non-existent. In order to induce labor unions to use BallotPoint's internet-based electronic voting system in conducting their officer elections, BallotPoint must be able to deliver a product that passes muster under the LMRDA. As the Secretary acknowledges in ¶¶ 21-22 of his Complaint, BallotPoint has taken a critical step in this regard by designing an internet-based electronic voting system that stores member identifying information and voting information on two separate computer servers—a design feature obviously calculated to ensure, in conformity with the Act's secret ballot requirement, that union members cannot be identified with their votes. The notion that BallotPoint, having designed its system in this way for this purpose, would then proceed to essentially "reverse engineer" that system to spit out private union member voting information and share that information with APFA officials in a position to retaliate against members based on their votes, defies common sense, which a district court is required to bring to bear in deciding a Rule 12(b)(6) motion to dismiss. *See supra* pp. 4-5. For if such a nefarious plot by BallotPoint personnel in collaboration with APFA officials were to be detected, and there is an inherent risk that it would be given the DOL's broad investigative

- 10 -

powers, *see e.g. Chao v. Local 743, Int'l Bhd. of Teamsters*, 467 F.3d 1014 (7th Cir. 2006), that

would be the death knell of BallotPoint's union officer election business.[6]

Given these common-sense considerations, it should come as no surprise that, insofar as

the Complaint indicates, the DOL did *not* uncover *a scintilla of evidence* "[d]uring the course of

its investigation" into APFA's election, Cplt. ¶ 23, that BallotPoint personnel and APFA officials

collaborated on such a nefarious plot.

Judging from the argument the Secretary has made in past cases, we assume that the

Secretary will respond to all this by asserting that the remoteness of the possibility that

BallotPoint and APFA officials engaged in such a nefarious plot that went undetected in the

DOL's investigation is of no legal moment; and that a secret-ballot-requirement violation must

be found under the statute if the facts disclose *any* possibility, however remote, that *any* voter

could be linked to his or her vote by *any* person through *any* imaginable means.  But this "any

possibility however remote" theory of what constitutes a violation of the LMRDA's secret ballot

requirement has no support in the statute, in the case law, or in reason.

According to our research, the only case involving a union election required to be held by

secret ballot under § 401 of the LMRDA in which the Secretary has explicitly staked out its "any

possibility however remote" theory is *Wirtz v. Local 11, Int'l Hod Carriers' Bldg. & Common

Laborers' Union of Am.*, 211 F. Supp. 408 (W.D. Pa. 1962).  *See id.* at 413 ("The Secretary

contends that the casting of numbered ballots created possibilities of voter identification, and

thus ran afoul of the requirement that the ballots be such that a voter's identity 'cannot' be linked

_____

[6] Beyond these common-sense considerations, the Secretary does not allege any facts (*e.g.*, prior
bad acts) that would justify the DOL's apparent suspicion that BallotPoint personnel and APFA
officials might have collaborated on such a nefarious plot.  Nor does the Secretary allege any
facts concerning how much time and expense would have been involved in connecting voters
with their votes had BallotPoint personnel been at all inclined to make such an effort.

with his cast ballot."). The district court rejected this theory and denied the relief (the voiding of the election and the conduct of a new one) sought by the Secretary, finding dispositive the "total lack of evidence" either that voter secrecy was "in fact" compromised or "that the members thought their votes could be detected." *Id.* at 412-13.

Much more recently, in *Solis v. Communications Workers of America*, 766 F. Supp. 2d 84 (D.D.C. 2011) ("*Solis v. CWA*"), the district court likewise rejected the Secretary's asserted "any possibility however remote" theory in a case involving a secret ballot requirement imposed by a union's own constitution rather than by § 401 of the LMRDA. Because it did not involve § 401 of the LMRDA, *Solis v. CWA* concededly is not squarely on point here. Nevertheless, it is highly instructive in pointing up the illogic of the Secretary's position in this case.

In *Solis v. CWA*, the international union defendant (CWA) held an election for certain officer positions in CWA Districts 1, 3, 7, and 9. *Id.* at 89. Owing to the voting methodology used, it was "theoretically possible" for vote counters "who had no direct involvement in the affairs of CWA Districts 1, 3, 7, or 9" to determine how at least some delegates had voted in the election. *Id.* at 102. The Secretary argued that this theoretical possibility *standing alone* was sufficient to invalidate the election in light of the secret ballot requirement in the CWA constitution, but the district court rejected the Secretary's argument. *Id.*

In doing so, the district court explained that while the CWA constitution "does not define the phrase 'secret ballot' at all," *id.* at 100, the secret ballot requirement hardly is a novel concept in the law. Rather, it is a well-known concept aimed specifically at achieving certain salutary purposes—including, at its core, preventing persons with "influence over the voters" from taking adverse actions against those voters based on their votes. *Id.* at 101. As previously discussed, *supra* p. 7, *this is a primary purpose of the LMRDA's secret ballot requirement as well.*

Construing the secret ballot requirement in the CWA constitution in a manner consistent with its purposes, the court held that the mere theoretical possibility that vote counters "who had no direct involvement in the affairs of CWA Districts 1, 3, 7, or 9" and "no incentive" to try and ferret out who delegates had voted for would nonetheless take the steps necessary to determine how delegates had voted did *not* warrant setting aside the election on secret-ballot-requirement-violation grounds. *Id.* at 102. That mere theoretical possibility, the court reasoned, "was sufficiently remote that it could not have practically undermined the secrecy of the ballot." *Id.*

The secret ballot requirement in § 401 of the LMRDA, no less than the secret ballot requirement in the CWA constitution, must be construed in a manner consistent with its purposes. *See e.g. Bhd. of Locomotive Engr's v. Atchison, Topeka & Santa Fe R.R. Co.*, 516 U.S. 152, 157 (1996) ("The purpose of the [Hours of Service Act] is to promote the safe operation of trains, and the statutory classification [at issue] must be understood in accord with that objective."). And, doing so yields *the same legal result* as that reached by the district court in *Solis v. CWA*. Insofar as the Secretary's factual allegations and reasonable inferences to be drawn from those factual allegations indicate, BallotPoint personnel have "no direct involvement in the affairs of" APFA and "no incentive" to try and ferret out who APFA members voted for in the APFA election. Rather, BallotPoint personnel have precisely the opposite "incentive" to take strong measures to ensure ballot secrecy. *Supra* p. 10. Thus, like in *Solis v. CWA*, the mere theoretical possibility that BallotPoint personnel "could" have taken unspecified steps to identify how at least some APFA members voted in the election, Cplt. ¶ 21, is "sufficiently remote that it could not have practically undermined the secrecy of the ballot," 766 F. Supp. 2d at 102.

- 13 -

In sum, from all angles, the Secretary plainly has failed to allege facts sufficient to make out a plausible secret-ballot-requirement-violation claim in this case. Count I of the Secretary's Complaint therefore fails as a matter of law and should be dismissed.

III.    THE SECRETARY'S COUNT II CLAIM ALSO FAILS AS A MATTER OF LAW

Section 401(c) of the LMRDA, 29 U.S.C. § 481(c), contains what the Secretary's interpretative rules accurately describe as "a general mandate" that in conducting their officer elections, unions shall provide "'[a]dequate safeguards to insure'" that the election is "'fair.'" *See* 29 C.F.R. § 452.110 (quoting § 401(c)). As noted earlier, § 401(c) further provides that these "adequate safeguards to insure a fair election" shall "includ[e] the right of any candidate to have an observer at the polls and at the counting of the ballots." *See supra* p. 4.

The Secretary's Count II claim in this case is stated in somewhat confusing terms, but the basis of that claim is readily determinable nonetheless. According to the Secretary's allegations in Count II, APFA violated § 401(c) in this case "by denying a candidate's right to have an observer in the January 9, 2016 election." *See* Cplt. ¶ 26. The confusion in this statement of the Secretary's Count II claim lies in the fact that § 401(c) does not speak in terms of a candidate's right to have an observer "in" a union election taken as a whole. Rather, § 401(c) speaks in terms of a candidate's right to have an observer at two specific stages of a union election: (1) "at the polls"; and (2) "at the counting of the ballots."

The Secretary's Count II claim cannot possibly rest on an asserted violation of the requirement in § 401(c) that candidates be afforded the right to have an observer "at the polls," inasmuch as APFA's January 9, 2016 election was not conducted in-person at a polling place, but rather was conducted remotely via internet and telephone voting. By process of elimination, the Secretary's Count II claim necessarily rests on an asserted violation of the requirement in

§ 401(c) that candidates be afforded the right to have an observer "at the counting of the ballots."
This assessment of the Secretary's Count II claim is supported by the factual allegation in
paragraph 24 of the Complaint that observers who were present at the January 9, 2016 election
"were limited to viewing a tally sheet projected from a personal computer connected to the
voting website and were not able to verify that the votes were recorded and tallied correctly."

The requirement in § 401(c) that candidates be afforded the right to have an observer "at
the counting of the ballots" was included in the LMRDA as originally enacted by Congress *in
1959*, several decades before the advent of the internet and the development of the technology
necessary to conduct a union election via the internet. As applied to *in-person* and *mail ballot*
voting, both of which obviously existed in 1959, this LMRDA observer requirement makes
perfect sense as a means of ensuring a fair election. Under both types of voting systems, union
members cast their votes on paper ballots and those votes *are counted manually by human vote
counters.* The requirement that candidates be afforded the right to have an observer *at such a
manual vote count* functions as an important safeguard against vote tampering (*e.g.*, the
alteration or destruction of ballots) or other election fraud that might subvert the voters' will and
thereby undermine union democracy, because it is far more difficult to engage in such vote
tampering or other election fraud under the watchful eye of an observer than in private.

Conversely, the requirement in § 401(c) that candidates be afforded the right to have an
observer "at the counting of the ballots" makes no sense at all as applied in the specific context
of internet-based electronic voting. Under an internet-based electronic voting system, union
members cast their votes over the internet or by telephone and those votes *are counted
electronically inside the workings of a computer server.* In this context, it is literally impossible
to afford candidates the right to observe "the counting of the ballots," inasmuch as it is literally

- 15 -

impossible (under current technology at least) to place a human being inside a computer server to act as an observer of the computer server's electronic vote counting processes.  In this context, then, it is necessary to rely on *different* safeguards to guard against vote tampering or other corrupt practices that might subvert the voters' will and thereby undermine union democracy— such as, for example, firewalls and other protections against "hacking" of the internet system.

These realities raise the legal question whether, as a matter of statutory interpretation, the requirement in § 401(c) that candidates be afforded the right to have an observer "at the counting of the ballots" should be read to apply in the specific context of internet-based electronic voting. For the reasons set out below, the answer to this question plainly is "no."  Accordingly, because the Secretary's Count II claim rests on an asserted violation of this observer requirement in § 401(c), that Count II claim fails as a matter of law and should be dismissed.

The proper analysis of this legal issue is framed by the separate opinions of Justice Brennan (joined in relevant part by three other Justices) and Justice Scalia (also joined in relevant part by three other Justices) in *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988).  As these two separate opinions commanding the votes of eight Justices in total make clear, it is by no means a foregone conclusion that all requirements contained in an old federal statute like the 1959 LMRDA should be read to apply to situations arising after the statute's enactment that the statute's drafters could not have anticipated, such as the development of new technologies like internet-based electronic voting.  Rather, there are two independent legal grounds for concluding that a requirement contained in an old federal statute should *not* be read to apply in the context of such unanticipated post-enactment developments.  As we now show, *both* of these independent legal grounds exist in the present context involving internet-based electronic voting, making this a clear-cut case for *non*-application of the LMRDA observer requirement at issue.

- 16 -

The most straightforward of these two independent legal grounds, discussed in Justice Scalia's separate opinion in *K Mart Corp.*, is where application of the statutory requirement at issue would be absurd. *See* 486 U.S. at 324 n.2. To illustrate the point, Justice Scalia dealt with a hypothetical 19th century statute "requiring agency inspection of 'all ovens' for their propensity to spew flames." *Id.* A court would be justified in reading such a requirement *not* to cover electric ovens first developed in the 20th century notwithstanding the clarity and breadth of the statutory term "all ovens," Justice Scalia explained, "because (1) electric ovens are incapable of spewing flames, (2) it is therefore absurd to inspect electric ovens for that propensity, and (3) it is a venerable principle that a law will not be interpreted to produce absurd results." *Id.*

Justice Scalia's reasoning and accompanying example fit the instant case like a glove. As previously noted, it is literally impossible to afford a candidate for union office the right to have an observer "at the counting of the ballots" in the context of a union election held using an internet-based electronic voting system. Accordingly, just as it is absurd to require the inspection of electric ovens for a propensity to spew flames, it is absurd to require that candidates be afforded the right to have an observer "at the counting of the ballots" in the context of a union election held using an internet-based electronic voting system. Applying "[the] venerable principle that a law will not be interpreted to produce absurd results," 486 U.S. at 324 n.2 (Scalia, J.), this Court should hold that the LMRDA is not properly read to require unions to afford candidates such an observer right in the internet-based electronic voting context.

Although we could rest our case with respect to Count II here, we would be remiss if we failed to show that Justice Brennan's separate opinion in *K Mart Corp.* identifies a second independent ground for *non*-application of the LMRDA observer requirement at issue that is every bit as compelling as the first ground set out above.

According to Justice Brennan, a second independent ground for not applying a requirement in an old statute in the context of post-enactment developments that the statute's drafters could not have anticipated is where application of that requirement would do nothing to further the legislative purpose behind that requirement. *See* 486 U.S. at 315-16. That is undeniably the situation here. As previously discussed, the evident legislative purpose behind the LMRDA requirement that candidates for union office be afforded the right to have an observer present "at the counting of the ballots" is to provide a safeguard against vote tampering or other election fraud that might subvert the voters' will and thereby undermine union democracy. But because it is literally impossible for unions to comply with such a requirement in the context of a union election held using an internet-based electronic voting system, a judicial ruling that such a requirement is nonetheless binding on unions in this context would, as a practical matter, do nothing to further the legislative purpose behind that requirement.

Rather, the *only* practical consequence of such a judicial ruling would be to force LMRDA-covered unions to abandon the use of internet-based electronic voting systems in electing their officers, owing to the impossibility of compliance with an observer requirement deemed applicable in the context of such elections. That result would directly undermine another LMRDA purpose elsewhere acknowledged by the DOL itself: *to wit*, that covered unions be afforded "a wide range of discretion" to use election procedures that, in the union's informed judgment, will maximize voter participation in the union's officer elections and thereby promote the Act's "democratic processes." *See supra* p. 1.

If, as Justice Brennan opined in *K Mart Corp.*, it would be wrong to apply a requirement contained in an old statute to an unanticipated situation arising after the statute's enactment where, as here, such an application would do nothing to further the legislative purpose behind

that requirement, then it would be doubly wrong to do so where, as here, such an application would *also* directly undermine one of the statute's other purposes.[7]

\*    \*    \*    \*

Having said this much, we hasten to add that a judicial ruling that the LMRDA observer requirement at issue does not apply in the context of internet-based electronic voting would produce no untoward consequences whatsoever from an LMRDA perspective. That is so because, in the event of such a judicial ruling, the "general mandate" in LMRDA § 401(c) that unions provide "[a]dequate safeguards to insure a fair election," *supra* p. 4, would continue to apply with full force in the context of internet-based electronic voting.

Needless to say, any reputable third-party contractor that conducts elections on behalf of unions via the internet (and the Secretary does not allege that BallotPoint is anything but reputable) will employ a plethora of safeguards (such as firewalls and other protections against "hacking" of the internet system) to ensure that the electronic counting of the vote is fair and accurate. Tellingly, however, the Secretary's Count II claim does not even acknowledge this

---

[7] Indeed, in light of these considerations, this is a much easier case than *Apple Inc. v. The Superior Court of Los Angeles County*, 292 P.3d 883 (Cal. 2013), in which the California Supreme Court held—in line with the legal conclusion urged by APFA here—that a provision in a California statute prohibiting retailers from recording customer personal identification information on credit card purchases did not apply to credit card purchases of a product (online digital downloads such as itunes) developed and made available for sale well after the statute's enactment. In so holding, the California Supreme Court wrestled with the fact that application of the provision at issue would further one of the statute's purposes (customer privacy) while undermining another (the protection of retailers against fraud), but ultimately concluded that a proper "accommodation" of these two conflicting legislative "interests" dictated the legal conclusion that the provision should not be read to apply to credit card purchases of online digital downloads. *See id.* at 896. As we have shown, application of the LMRDA observer requirement at issue in the context of internet-based electronic voting would serve to undermine one of the LMRDA's purposes without doing anything at all to further any other LMRDA purpose. That being so, there are no conflicting legislative "interests" that this Court must balance or "accommodat[e]" in order to reach the legal conclusion urged by APFA here, making this a much easier case than *Apple Inc.*

- 19 -

reality, much less assert any claim that the safeguards employed by BallotPoint in the January 9, 2016 election were inadequate to ensure a fair election, thereby placing APFA in violation of § 401(c)'s "general mandate" regarding the adequacy of safeguards. Instead, in bringing Count II, the Secretary is asking this Court to invalidate the January 9, 2016 election on the ground that in conducting that election by means of internet-based electronic voting, BallotPoint and APFA failed to employ one particular safeguard for ensuring a fair election that it was literally impossible for BallotPoint and APFA to employ under the circumstances. As we have shown, such a result would be both nonsensical and destructive of the LMRDA's purpose of affording unions broad discretion to utilize election procedures that will best serve their membership's interests and the interests of union democracy.

## **CONCLUSION**

For the foregoing reasons, APFA's motion to dismiss the Secretary's Complaint should be granted.

Respectfully submitted,

ANDREW D. ROTH*
D.C. Bar No. 414038
ADAM BELLOTTI*
D.C. Bar No. 1020169
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St. N.W., Tenth Floor
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888
Email: aroth@bredhoff.com
Email: abellotti@bredhoff.com

- 20 -

SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Avenue, Suite 550
Dallas, TX 75214
Tel: (214) 637-0750
Fax: (214) 637-0730
Email: denison@baabdenison.com

Attorneys for Defendant Association
of Professional Flight Attendants

*Application for Admission
 Pro Hac Vice being filed herewith

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30th day of January, 2017, the above and

foregoing document was served on Plaintiff's counsel of record electronically by email

transmission and by USPS, First Class mail, postage prepaid, as authorized by Federal Rule of

Civil Procedure 5(b), addressed to the following:

Brian W. Stoltz
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:     214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

SANFORD R. DENISON