ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2017 FEB 21  PM 2: 47

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

THOMAS E. PEREZ, Secretary of Labor
[now EDWARD HUGLER, Acting
Secretary of Labor*],

      Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

      Defendant.

Civil Action No. 4:16-CV-1057-A

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

JOHN R. PARKER
United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff,
the Secretary of Labor

* Thomas E. Perez, who was Secretary of Labor when this action was commenced, ceased to hold office as of January 20, 2017.  Accordingly, the current Acting Secretary of Labor, Edward Hugler, is "automatically substituted" as the plaintiff pursuant to Fed. R. Civ. P. 25(d).

## Table of Contents

I.    Background ..................................................................................................... 1

    A.    The LMRDA's ballot-secrecy and observer requirements. .......................... 2

    B.    The Secretary's complaint against the APFA. .............................................. 4

II.   Applicable Legal Principles under Rule 12(b)(6) .................................................. 6

III.  Argument and Authorities...................................................................................... 7

    A.    The Secretary's allegation that the voting system used in the APFA's
election allowed voters to be linked to their votes states a claim upon
which relief may be granted.  (Count I) ........................................................ 7

    B.    The Secretary's allegation that the voting system used in the APFA's
election did not permit observers to effectively observe the election
states a claim upon which relief may be granted.  (Count II) ...................... 20

IV.   Conclusion............................................................................................................. 25

# Table of Authorities

## Cases

*Am. Fed'n of Musicians v. Wittstein,*
    379 U.S. 171 (1964) ........................................................................................ 2

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................... 6, 7

*Bachowski v. Brennan,*
    413 F. Supp. 147 (W.D. Pa. 1976) ............................................................. 3, 4

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................ 6

*Brennan v. Local 3489,*
    520 F.2d 516 (7th Cir. 1975) ..................................................................... 9, 11

*Corn v. Blackwell,*
    4 S.E.2d 254 (S.C. 1939) .............................................................................. 16

*Crestview Genetics, LLC v. Young,*
    No. 4:16-CV-295-A, 2016 WL 4069883 (N.D. Tex. July 27, 2016) ....................... 6

*Donovan v. CSEA Local Union 1000,*
    594 F. Supp. 188 (N.D.N.Y. 1984) ................................................. 9, 10, 11, 12, 16

*Ellis v. Chao,*
    155 F. App'x 18 (2d Cir. 2005) .................................................................... 4, 21

*Hodgson v. United Mine Workers of Am.,*
    344 F. Supp. 17 (D.D.C. 1972) ................................................................... 9, 11

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ...................................................................................... 23

*Marshall v. Local 135,*
    No. 78-4280, 1980 WL 18743 (E.D. Pa. Sept. 16, 1980) ........................ 4, 21, 22

*Marshall v. Local Union 12447,*
    591 F.2d 199 (3d Cir. 1978) .............................................. 3, 9, 10, 11, 13, 16, 17

*Myers v. Hoisting & Portable Local 513,*
    653 F. Supp. 500 (E.D. Mo. 1987) ............................................................... 17

*Reich v. District Lodge 720,*
    11 F.3d 1496 (9th Cir. 1993) ................................................................ 3

*Solis v. Communications Workers of Am.,*
    766 F. Supp. 2d 84 (D.D.C. 2011) ................................................ 19, 20

*Wirtz v. Am. Guild of Variety Artists,*
    267 F. Supp. 527 (S.D.N.Y. 1967) .......................................................... 2

*Wirtz v. Hotel, Motel & Club Employees Union, Local 6,*
    391 U.S. 492 (1968) .............................................................................. 2

*Wirtz v. Local 11,*
    211 F. Supp. 408 (W.D. Pa. 1962) ........................................... 17, 18, 19

*Wirtz v. Local 153,*
    389 U.S. 463 (1968) .............................................................................. 2

## Statutes, Rules and Other Authorities

29 U.S.C. § 401 *et seq.* ........................................................................... 2

29 U.S.C. § 402(k) .............................................. 3, 7, 10, 11, 13, 16, 24

29 C.F.R. § 452.107(a) ......................................................................... 20

29 C.F.R. § 452.107(c) ............................................................... 20, 22, 25

29 U.S.C. § 481(a) ...................................................................... 3, 5, 7, 16

29 U.S.C. § 481(c) ........................................................................ 4, 5, 20

29 U.S.C. § 482 ....................................................................................... 4

29 U.S.C. § 482(b) ................................................................................. 4

Fed. R. Civ. P. 8(a)(2) ....................................................................... 1, 6

Fed. R. Civ. P. 12(b)(6) ...................................................................... 1, 6

Guidelines for the Use of Electronic Voting Systems in Union Officer Elections,
    76 Fed. Reg. 1559 (Jan. 11, 2011) ...................................................... 13

Tex. Election Code § 129.023 ............................................................... 25

Tex. Election Code § 129.023(c) ..................................................................... 25

Tex. Election Code § 129.023(f)(2) ............................................................... 25

This case arises out of a union officer election conducted by the defendant, the Association of Professional Flight Attendants (APFA). The plaintiff, the Secretary of Labor, received a complaint that the election was conducted in violation of federal law requiring, among other things, that union elections be by secret ballot and that candidates be permitted to have observers at the polls and at the counting of the ballots. After conducting an investigation, the Secretary found probable cause to believe such violations had occurred, and therefore filed this suit requesting that the election be voided and that a new supervised election be ordered.

The APFA has now moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Secretary has failed to state a plausible claim for relief. However, as explained below, the allegations in the Secretary's complaint—which are, generally, that the APFA's election was conducted using an internet-based voting system that allows voters to be linked with their votes (thus violating the secret-ballot requirement) and that did not permit observers to verify that votes were recorded and tallied accurately (thus violating the observer requirement)—are more than sufficient to pass muster under the applicable standards of Rule 8(a)(2) and Rule 12(b)(6). Accordingly, the APFA's motion should be denied.

## I.     Background

The APFA is the union for flight attendants employed by American Airlines. This suit concerns the APFA's January 9, 2016 election of union officers. As a national labor organization engaged in an industry affecting interstate commerce, the APFA is subject to the requirements of the Labor-Management Reporting and Disclosure Act of 1959

(LMRDA), 29 U.S.C. §§ 401 *et seq.*, including the LMRDA's provisions governing the conduct of union officer elections.

## A.    The LMRDA's ballot-secrecy and observer requirements.

The LMRDA was enacted by Congress with the intent of ensuring fair and democratic practices in unions.  In the 1950s, Congress investigated the nation's unions and found corruption in union leadership and disregard for the rights of rank-and-file members. *See Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 497–98 (1968) (*Local 6*); *Wirtz v. Local 153*, 389 U.S. 463, 469–71 (1968).  Through the LMRDA, Congress sought to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government." *Local 6*, 391 U.S. at 497.  Congress equated the interests of union members in democratic union elections with the public interest in general, and sought "to protect the public interest by assuring that union elections would be conducted in accordance with democratic principles." *Id.* at 496.

Recognizing that free and fair elections were essential to union self-government, Congress mandated various election safeguards in the LMRDA. *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 181–82 (1964); *Local 153*, 389 U.S. at 470; *see also Wirtz v. Am. Guild of Variety Artists*, 267 F. Supp. 527, 544 (S.D.N.Y. 1967) (noting that Congress intended that unions conduct democratic and scrupulously fair elections).  In doing so, Congress looked to the example of political elections, with the idea that union elections should be subject to the same type of safeguards that are commonly employed in political elections. *See Local 6*, 391 U.S. at 504 (noting that "Congress' model of

democratic elections was political elections in this country"); *Marshall v. Local Union 12447*, 591 F.2d 199, 205 (3d Cir. 1978) (explaining that the LMRDA requires unions to "take every reasonable precaution to ensure that the facilities available for balloting are used in a manner similar to their use in political elections in this country").

One of the principal election safeguards crafted by Congress in the LMRDA is the requirement that elections be conducted by secret ballot. Pursuant to 29 U.S.C. § 481(a), a union "shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot." The statute defines "secret ballot" as:

> the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed.

29 U.S.C. § 402(k). "By imposing the requirement of secrecy Congress meant to eliminate any form of potential coercion or intimidation which might occur if it could be learned in any manner how an individual voter had voted." *Bachowski v. Brennan*, 413 F. Supp. 147, 150 (W.D. Pa. 1976). Accordingly, the secret-ballot provision requires more than simply ensuring that ballots can be marked in a private setting shielded from the view of others; it also encompasses secrecy after members cast their ballots, including during the collection of ballots and the vote-tallying process. *See Reich v. District Lodge 720*, 11 F.3d 1496, 1500 (9th Cir. 1993) (explaining that "the LMRDA's secrecy mandate extends not only to the actual casting of ballots but also to any post-voting procedure designed to determine how individual union members voted or would have voted");

*Bachowski*, 413 F. Supp. at 150 (noting that "[t]he requirement of secrecy would seem to include not only the right to vote in secret . . . but also the right to secrecy *after the ballots are cast*," and that "[a]ny post-voting device by which it can be determined how a particular voter voted would be a violation of secrecy").

A second voting safeguard in the LMRDA is the right for candidates to have observers in the election process. Per 29 U.S.C. § 481(c), candidates in union elections must be permitted to "have an observer at the polls and at the counting of the ballots." As the Second Circuit has explained, "observer rights . . . are an important procedure that ensure free and fair union elections, which are themselves critical to protecting and promoting the interests of represented workers." *Ellis v. Chao*, 155 F. App'x 18, 20 (2d Cir. 2005). "Without observers, election officials could tamper with ballots in ways unknown to the complaining union members." *Marshall v. Local 135*, No. 78-4280, 1980 WL 18743, at *11 (E.D. Pa. Sept. 16, 1980).

## B.    The Secretary's complaint against the APFA.

Congress has directed the Secretary to investigate union members' complaints that the LMRDA has been violated, and, if the Secretary finds probable cause that a violation occurred, to bring a civil action against the union. *See* 29 U.S.C. § 482. In this case, as recounted in the Secretary's complaint, an APFA member protested the January 9, 2016 election with the union and then filed a timely complaint with the Secretary after exhausting the union's internal procedures. (Doc. 1, ¶¶ 8–12.) The Secretary investigated the complaint as required by 29 U.S.C. § 482(b). (Doc. 1, ¶ 19.) During the investigation, the Secretary determined the following facts (which are pleaded in the

complaint and should be accepted as true for purposes of the APFA's motion):

1. The election was conducted using an internet-based electronic voting system in which voters cast their votes using the internet or by telephone. (Doc. 1, ¶ 20.)

2. The electronic voting system uses two servers: one that stores union-member identifying information, and another that stores voting records, including the content of the members' votes. (Doc. 1, ¶¶ 21–22.)

3. There is a link between the two servers employed in the electronic voting system, and thus between voters and their votes, because the system is capable of sending an email message to the voter upon receipt of his vote, which message might either confirm that the vote was successfully cast or state that the attempted vote malfunctioned, and that the voter should therefore try to vote again. (Doc. 1, ¶ 22.)

4. In addition, by reviewing the information on the two servers, the Secretary was able to match the names of 4,082 voters to their votes, out of 9,355 total votes cast. (Doc. 1, ¶ 23.)

5. Candidates' observers were limited to viewing a tally sheet projected from a computer connected to the voting website, and were not able to verify that votes were recorded and tallied correctly. (Doc. 1, ¶ 24.)

6. The Secretary found probable cause to believe that violations of the LMRDA had occurred in the conduct of the APFA's election and had not been remedied. (Doc. 1, ¶ 19.)

Based on these facts, the Secretary filed a two-count complaint alleging that: (1) the APFA violated 29 U.S.C. § 481(a) by using an electronic voting method that permitted voters to be linked to their votes; and (2) the APFA violated 29 U.S.C. § 481(c) because the voting system did not permit observers to verify that votes were recorded and tallied accurately. (Doc. 1, ¶¶ 25, 26.) Now pending before the Court is the APFA's motion to dismiss, which, as explained herein, the Secretary urges should be denied.

## II.     Applicable Legal Principles under Rule 12(b)(6)[1]

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, in a general way,

the applicable standard of pleading.  It requires that a complaint contain "a short and

plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P.

8(a)(2), "in order to give the defendant fair notice of what the claim is and the grounds

upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

quotation marks and ellipsis omitted).  Although a complaint need not contain detailed

factual allegations, the "showing" contemplated by Rule 8 requires the plaintiff to do

more than simply allege legal conclusions or recite the elements of a cause of action.

*Twombly*, 550 U.S. at 555 & n.3.  Thus, while a court must accept all of the factual

allegations in the complaint as true, it need not credit bare legal conclusions that are

unsupported by any factual underpinnings.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009) ("While legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations.").

Moreover, to survive a motion to dismiss for failure to state a claim under Rule

12(b)(6), the facts pleaded must allow the court to infer that the plaintiff's right to relief

is plausible. *Iqbal*, 556 U.S. at 678.  To allege a plausible right to relief, the facts pleaded

must suggest liability; allegations that are merely consistent with unlawful conduct are

insufficient. *Id*.  In other words, where the facts pleaded do no more than permit the

court to infer the possibility of misconduct, the complaint has not shown that the pleader

---

[1] The summary of the applicable law in this section is taken from *Crestview Genetics, LLC v. Young*, No. 4:16-CV-295-A, 2016 WL 4069883, at *3 (N.D. Tex. July 27, 2016).

is entitled to relief. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## III.   Argument and Authorities

**A.   The Secretary's allegation that the voting system used in the APFA's election allowed voters to be linked to their votes states a claim upon which relief may be granted.  (Count I)**

With respect to ballot secrecy, the Secretary's complaint straightforwardly alleges that:  (1) the APFA's election was conducted using an internet-based electronic voting system that stores union-member identifying information and the record of cast votes on two servers; (2) the information stored on the servers allows particular votes to be connected to particular voters, thus allowing for voters to be identified with their voting choices, because the system can send an email to the voter upon receipt of his vote; and (3) the Secretary was in fact able to match the names of 4,082 voters to their votes during a post-election investigation, by reviewing the information on the two election servers. (*See* Doc. 1, ¶¶ 20–23.)  Given that the LMRDA's ballot-secrecy provision required the APFA to use a voting procedure in which each vote is "cast in such a manner that the person expressing such choice cannot be identified with the choice expressed," 29 U.S.C. §§ 402(k), 481(a), the facts alleged by the Secretary more than suffice to state a cause of action under the LMRDA.  In short, the complaint pleads facts showing that the APFA used a voting system that allowed for voters to be linked to their votes.  And the LMRDA proscribes such an arrangement.  Hence, a cause of action is stated.

The APFA raises several arguments in an attempt to reach a contrary result, but as

discussed below, all are unavailing.  Before addressing the specifics of the APFA's

arguments, though, it is worth noting that the APFA has not cited a single case from the

nearly 60 years the LMRDA has been on the books in which a ballot-secrecy claim

brought by the Secretary was dismissed on Rule 12(b)(6) grounds for failing to meet the

relatively low bar of simply pleading facts that would, if proven, establish a violation.

Instead, all of the ballot-secrecy cases cited by the APFA are either summary-judgment

cases or opinions detailing (or reviewing) a court's findings and conclusions after trial,

meaning that the APFA is relying on cases in which courts were considering arguments

in the context of a fully developed record with both sides having presented competing

evidence.  Here, where the parties have not presented any evidence to the Court or even

engaged in discovery, the Court's inquiry is necessarily different, and is limited to the

question of whether the factual allegations in the Secretary's complaint, accepted as true,

are such that the case should be allowed to proceed.

Now, on to the APFA's specific arguments.

1.     The APFA's first argument attempts to derive a general pleading rule for

LMRDA ballot-secrecy cases from the APFA's recounting of the facts of four cases cited

in footnote 3 and on page 8 of its brief.  (*See* Doc. 8 at 6 n.3, 8.)  Based on the facts of

these cases, the APFA appears to suggest that the ballot-secrecy requirement can be

violated in only two factual situations:  (1) during in-person elections that the APFA

characterizes as "conducted under ridiculously 'loose' polling procedures," such as when

voters are required to mark their ballots in plain view of others with no way to prevent

their voting choices from being seen; and (2) during a mail-ballot election in which voter-

identifying information is contained on the same form where the voting choice is

recorded. (Doc. 8 at 6–9.) According to the APFA, the facts of its own election are "so

far removed" from the facts of the cases in footnote 3 and page 8 of its brief that "it is

difficult even to fathom what statutory purposes the Secretary seeks to further through the

assertion of a secret-ballot-requirement-violation claim in this case." (Doc. 8 at 9.)

But there are several problems with the argument the APFA has formulated based

on the caselaw noted in its brief. First, none of the cases cited by the APFA purports to

establish a floor or minimum showing of "non-secrecy" that must have occurred in order

to give rise to an LMRDA cause of action. *See Hodgson v. United Mine Workers of Am.*,

344 F. Supp. 17, 30 (D.D.C. 1972); *Brennan v. Local 3489*, 520 F.2d 516, 521–23 (7th

Cir. 1975); *Marshall v. Local Union 12447*, 591 F.2d 199, 203–05 (3d Cir. 1978);

*Donovan v. CSEA Local Union 1000*, 594 F. Supp. 188, 195–97 (N.D.N.Y. 1984), *aff'd*

*in part, rev'd in part on other grounds*, 761 F.2d 870 (2d Cir. 1985). The APFA has not

identified any authority for the proposition that the facts of these cases represent the

exclusive scenarios under which an LMRDA ballot-secrecy claim arises.

Second, far from showing that the facts of the APFA's election somehow fall

outside the realm of the LMRDA, the caselaw cited by the APFA lends additional

support to the conclusion that the Secretary has stated an actionable ballot-secrecy claim.

In the *CSEA* case, for example, the union used a contractor to administer a mail-ballot

election, and the voting was conducted in such a way that the contractor could link voters

to their votes. *CSEA*, 594 F. Supp. at 195. This was possible because the contractor was

in possession of both voter-identifying information and each voter's voting choices, and

there was a link between them because the identification information was contained on a perforated portion of the same form where the vote was recorded. *Id.*

These facts are analogous to the facts of the APFA's election as pleaded in the Secretary's complaint. Like the union in *CSEA*, the APFA used a contractor to administer its election. (*See* Doc. 1, ¶ 20.) And like the contractor in *CSEA*, the APFA's contractor came into possession of linked voter-identifying and voting-choice information because of the way the voting was conducted. (Doc. 1, ¶¶ 21–23.) True, instead of having the voter-identifying information and voting choices recorded on separate portions of perforated paper as in *CSEA*, this information in the APFA's election was recorded electronically on separate computer servers. (*See* Doc. 1, ¶¶ 21–22.) But this is a distinction without a difference, as application of the LMRDA does not turn on the specific medium that the voting information is marked or stored on. Instead, the LMRDA's definition of "secret ballot" is broadly written to include votes cast "by ballot, voting machine, *or otherwise*." 29 U.S.C. § 402(k) (emphasis added). *CSEA* makes clear that when a voting process, by design, results in the election administrator holding linked voter-identifying and voting-choice information, the LMRDA's ballot-secrecy requirement is implicated.[2]

Also instructive is *Local Union 12447*, another case that the APFA relies on. *See* 591 F.2d at 199. There, the election was conducted by in-person voting and the court

---

[2] There was also evidence in *CSEA* that a union official actually reviewed some ballots with voters' names on them, but the court's opinion indicates that the fact that the voting system was even structured to allow such activity to occur was enough to give rise to a ballot-secrecy violation; the fact that an official did review some votes only made the problem "more acute." *CSEA*, 594 F. Supp. at 197.

specifically noted that there was no credible testimony that "anyone in fact observed how

voters marked their ballots." *Id.* at 203 n.10. Nonetheless, an LMRDA ballot-secrecy

violation was found on the basis that "because of the way the election was conducted, it

was *possible* to observe how some voters had marked their ballots." *Id.* Consistent with

the statutory mandate that secrecy requires that voters "cannot" be identified with their

votes, 29 U.S.C. § 402(k), the court explained that all the LMRDA requires is a showing

"that [the voting] method was deficient because voters *could* have been identified with

their choices," *Local Union 12447*, 591 F.2d at 203 n.10. Under this standard, the

Secretary's allegations about the APFA's election more than suffice to state a cause of

action. The Secretary has pleaded facts showing that voters could be identified with their

votes in the electronic voting system used by the APFA. (Doc. 1, ¶¶ 21–23.) As *Local

Union 12447* demonstrates, that would constitute a violation of the LMRDA.

Moreover, none of the cases cited by the APFA was decided in the context of a

Rule 12(b)(6) motion. *See United Mine Workers*, 344 F. Supp. at 32 (findings of fact and

conclusions of law after a trial); *Local 3489*, 520 F.2d at 523 (appellate review of district

court's fact findings and legal conclusions); *Local Union 12447*, 591 F.2d at 201 (same);

*CSEA*, 594 F. Supp. at 188–89 (summary judgment). Just as none of these cases purports

to establish a minimum level of "non-secrecy" that must be shown in order for the

Secretary to prevail on the merits of a ballot-secrecy claim, none purports to establish

pleading standards for LMRDA cases. Of course, non-Rule 12(b)(6) caselaw can be

useful in ascertaining what elements or facts must be pleaded in order to state a cause of

action. But to the extent the caselaw cited by the APFA is consulted for this purpose, it

supports the Secretary's claim in this case, as shown by the above discussion of *CSEA* and *Local Union 12447.*

Last, it should be noted that though a Rule 12(b)(6) motion is supposed to focus on the sufficiency of the plaintiff's pleadings, the APFA's arguments veer into speculative matters outside the scope of the complaint that are more in the nature of proposed factual findings than proper Rule 12(b)(6) argument.  For example, the APFA essentially invites the Court to conclude that the voting system employed in its election must have complied with the LRMDA because, according to the APFA, "[i]n order to induce labor unions to use [the APFA's contractor's] internet-based electronic voting system . . . , [the contractor] must be able to deliver a product that passes muster under the LMRDA." (Doc. 8 at 10.)  But the pleadings supply no basis for determining how the APFA's contractor "induces" unions to use its product, and one could just as easily posit that the system is marketed on the basis of other, non-LMRDA-related factors such as price or convenience.  In any event, the contractor's marketing pitch is irrelevant, because whether the voting system passes muster under the LMRDA is exactly what is at issue in this lawsuit.  It would be circular reasoning to assume that because a voting system exists and is marketed by a contractor, it therefore satisfies the LMRDA, and therefore its LMRDA compliance cannot ever be challenged in court.

Similarly, the APFA asks the Court to conclude, strictly on the basis of the Secretary's pleadings, that its contractor would never use its electronic system to "spit out" union member voting information, because engaging in such a "nefarious plot" would be against the contractor's own business interests.  (Doc. 8 at 10.)  This is far from

the only conclusion that might reasonably be drawn from the fact of a contractor relationship,[3] but even if assumed true, it would not defeat the Secretary's LMRDA claim. That is because it is not necessary to show that officials actually "took advantage" of a voting system's non-secrecy, by informing themselves of how specific voters voted, in order to establish a violation. *Local Union 12447*, 591 F.2d at 203 & n.10. The fact that the possibility of doing so even exists is what the LMRDA aims to proscribe. *See id.*

The APFA also argues that the facts of its case—and in particular the use of an internet-based electronic voting system—are too "far removed" from cases addressing in-person and mail-ballot voting, suggesting that the ballot-secrecy requirement is somehow inapplicable when voters cast their votes electronically over the internet. (Doc. 8 at 9.) But this argument ignores that Congress defined the term "secret ballot" to include votes cast "by ballot, voting machine, or otherwise," 29 U.S.C. § 402(k), thus expressly applying the secrecy mandate to all methods of voting. Moreover, the Secretary's considered judgment has long been that the LMRDA fully applies to internet-based electronic voting, and for that reason the Secretary has worked to issue sub-regulatory guidance on this topic, including guidance on preserving ballot secrecy and observer rights when using an electronic voting system. *See* Guidelines for the Use of Electronic Voting Systems in Union Officer Elections, 76 Fed. Reg. 1559, 1560 (Jan. 11, 2011) (requesting information from the public to assist the Secretary in issuing "guidelines in

---

[3] It is hardly implausible to think that a contractor might seek to curry favor with union officials, and entice them to use the contractor's services, by sharing voting information or otherwise employing the system to advantage the union officials who have the ability to steer business to the contractor.

describing minimum standards that electronic voting systems must meet to comply with the provisions of the LMRDA"); OLMS Compliance Tip: Electing Union Officers Using Remote Electronic Voting Systems, https://www.dol.gov/olms/regs/compliance/catips/ 2016/CompTip_RemoteElecVote.htm (Oct. 19, 2016).[4] Thus, to the extent the APFA suggests that the Secretary's position in this suit is that no internet-based electronic voting may ever be used by a union (no matter what features and safeguards the system has), the APFA is mistaken. (*See* Doc. 8 at 2 (asserting that the Secretary has advanced a "totally nonsensical reading" of the LMRDA that would "effectively . . . deny" the right to use an internet-based electronic voting system).) The Secretary's claim is simply that the particular system used by the APFA did not comply with the LMRDA.

2.      The APFA next characterizes the Secretary's complaint as evidencing only a "concern" that it was "theoretically possible" to determine how individual union members voted in the election, which the APFA contends "does not remotely justify a finding of a secret-ballot-requirement violation." (Doc. 8 at 9, 10 (emphasis removed).) According to the APFA, the Secretary is operating under a theory that the existence of any possibility of linking voters to their votes by "any imaginable means" is all that is required to trigger LMRDA liability. (Doc. 8 at 11 (emphasis removed).) After dismissively characterizing the Secretary's complaint as relying on such a "theoretically possible" or "any possibility however remote" theory, (Doc. 8 at 9, 11), the APFA argues

---

[4] As the compliance tip post-dates the APFA election at issue in this litigation, it is not relied on here for purposes of establishing the sufficiency of the complaint's allegations that the APFA's election did not comply with the LMRDA, but instead to show the consistency over time in the Secretary's position that the LMRDA generally applies to internet-based electronic voting.

that no cause of action is stated.  But this argument fails on two independent grounds, as it both (1) misrepresents the Secretary's claim, and (2) is contrary to the relevant law as set forth in the LMRDA.

First, regarding the nature of the Secretary's claim, the complaint does not merely assert that there is a "theoretical" or "remote" possibility that individual voters could be linked with their votes in the APFA's election.  Instead, the complaint pleads that such a link did in fact exist.  As stated in paragraph 22 of the complaint, the electronic voting system itself links information between the server where voter-identifying information is stored and the server where votes are recorded, because the server is capable of sending an email to a particular voter upon receipt of his or her vote, with information about whether the vote was successfully recorded or malfunctioned.  (Doc. 1, ¶ 22.)  In other words, the system itself "knows" that particular votes are attributable to particular voters. By analogy, imagine if there were some mechanism whereby a paper ballot, after being cast, could be removed from the ballot box and the voter then identified.  Even if this was done for an ostensibly salutary reason, like informing the voter that the ballot was smudged or not marked correctly and needed to be re-voted, there is no doubt that it would constitute a violation of ballot secrecy.  The election system used by the APFA can accomplish this same result electronically, by contacting a specific voter concerning his or her vote after it has been cast.  This fact, pleaded in the Secretary's complaint, is thus alone sufficient to support a cause of action under the LMRDA.

Moreover, in addition to noting the link between voters and their votes evident in the electronic voting system's email-to-voter function, the Secretary has also pleaded that

the information contained on the electronic voting system's two servers, when read in combination, permits voters to be matched to their votes.  (Doc. 1, ¶¶ 21–23.)  This is more than a "theoretical" or "remote" link between voters and their votes.  It is an actual link.  Indeed, it is precisely the type of link—having two sources of information in the hands of the election administrator that can be read in conjunction to reveal voter choices—that the *CSEA* court indicated would constitute a violation.  *See CSEA*, 594 F. Supp. at 195–96; *see also Corn v. Blackwell*, 4 S.E.2d 254, 255–56 (S.C. 1939) (in a non-LMRDA case, finding that ballot secrecy was violated in a political election, because ballots were numbered in a way that allowed them to be matched to a voter list).

Second, as a legal matter, the APFA's argument conflicts with the statutory text of the LMRDA and relevant caselaw.  The statute requires a "secret ballot."  29 U.S.C. § 481(a).  And that operative term is defined as a method of voting in which each vote is "cast in such a manner that the person expressing [the voting] choice *cannot* be identified with the choice expressed."  *Id.* § 402(k) (emphasis added).  The key inquiry is thus whether, under the voting method implemented by the union, voters "cannot," or instead "can," be linked to their voting choice.  Or, put another way, whether it is possible to link voters to their choices.  *See Local Union 12447*, 591 F.2d at 203 n.10 (explaining that the LMRDA's ballot-secrecy requirement is violated by a showing that, "because of the way the election was conducted, it was *possible* to observe how some voters had marked their ballots"); *see also* "Can" Definition, Merriam-Webster, www.merriam-webster.com/ dictionary/can (visited February 15, 2017) ("can" is "used to indicate possibility").

Conversely, the statute does not require a showing that union officials in fact took

advantage of the ability to link voters to votes by positively informing themselves of how specific members voted. *See Local Union 12447*, 591 F.2d at 203 n.10 (noting that there is no "additional requirement" that it be shown that someone actually "took advantage" of the ability to view others' votes). But the APFA's argument would effectively re-write the statute to require such a showing. The APFA may wish that the LMRDA permitted the "possibility" of linking voters to votes (especially if derided as a "theoretical" or "remote" possibility).[5] But that is contrary to the statute's use of the word "cannot."

Finally, the APFA cites *Wirtz v. Local 11*, 211 F. Supp. 408 (W.D. Pa. 1962), to argue that the Secretary is advancing a deficient "any possibility however remote" theory of liability. (*See* Doc. 8 at 11.) But the *Local 11* decision hurts rather than helps the APFA's case. In *Local 11*, the union distributed consecutively numbered ballots to voters as they entered the polling site. 211 F. Supp. at 412. As each voter received a ballot, his identity was also recorded, in numerical order, on a list kept by an observer for one of the opposition candidates. *Id.* The Secretary filed suit under the LMRDA, arguing that this voting method created a possibility of voter identification, since reading the observer's numerical list of voters in conjunction with the numbered ballots would reveal individual voters' voting choices. *Id.* at 412–13. In a result the APFA touts in its

---

[5] The APFA repeatedly faults the Secretary's complaint for not alleging that union officials and their contractor did in fact consult the information available in the election servers to link voters to their votes. (*E.g.*, Doc. 8 at 3–4, 10–11.) But since LMRDA ballot-secrecy violations have been found in situations where there was no evidence that the content of anyone's vote was actually determined, *e.g.*, *Myers v. Hoisting & Portable Local 513*, 653 F. Supp. 500, 510 (E.D. Mo. 1987) (setting aside an election result due to a ballot-secrecy violation, despite the fact that "no one testified that he saw how another voted"), there is certainly no requirement to plead such facts.

brief, the court rejected this claim. *Id.* However, a key component of the court's reasoning—which the APFA omits to mention—was that the numbered ballots and the numerical list of voters were not both in the possession of the officials who were conducting the election. *Id.* Instead, it was a crucial fact that the list of voters was compiled and kept by an opposition observer. *Id.* Notably, the court stated that "if the list were kept by the officials in charge of the election the ballots would not have been secret in that the person expressing a choice could have been identified with the choice expressed." *Id.* at 412. The court further explained it "agree[d]" that if such a list of voters "had been used by those responsible for the conduct of the election or against whom complaint is made the ballots would not have been, in fact, secret, and the possibility of voter identification in such case would vitiate the election." *Id.* at 413.

Here, the facts of the APFA's election as pleaded by the Secretary align with the alternate scenario that the *Local 11* court agreed would have constituted a violation of ballot secrecy in that case. That is because, unlike in *Local 11*, the election administrator in the APFA's election did possess both sources of information which, when read together, would allow voters' votes to be determined. The two servers used in the APFA's electronic voting system are equivalent to the ballots and numerical list at issue in *Local 11*, in that when consulted together they can be used to determine how particular voters voted. But unlike in *Local 11*, the two sources were not disbursed among multiple non-aligned parties, but instead they were always in the possession of union officials, through their contractor. As the *Local 11* court made clear, that amounts to a violation of ballot secrecy, because all of the information necessary to link voters to their votes was

"kept by the officials in charge of the election." 211 F. Supp. at 412.

      3.     The APFA last argues that its request for dismissal finds support in *Solis v. Communications Workers of America*, 766 F. Supp. 2d 84 (D.D.C. 2011) (*CWA*). (Doc. 8 at 12.) But the APFA's reliance on *CWA* is misplaced. First, as the APFA concedes, *CWA*'s holding is not on point because the court was not even considering the LMRDA's ballot-secrecy requirement, which did not apply to the type of election at issue. *CWA*, 766 F. Supp. 2d at 100. Thus, although the *CWA* court noted that the LMRDA's ballot-secrecy requirement is "construed . . . strictly" and prohibits "[a]ny post-voting device by which it can be determined how a particular voter voted," the court did not apply that standard. *Id.* at 99, 100 (internal quotation marks and citations omitted). Instead, the court considered whether the voting system used by the union violated a ballot-secrecy clause in the union's own constitution. *Id.* at 100. This required determining whether the union's (more lenient) interpretation of the secret-ballot requirement in its own constitution was permissible, under the "considerable deference" granted to union officials in interpreting their own constitution. *Id.* (internal quotation marks and citation omitted). That is not the same question presented in this suit.

      In addition, the *CWA* decision occurred on cross-motions for summary judgment and was based on the court's close analysis of the parties' evidentiary submissions. *See id.* at 87, 102. The election had been conducted using in-person voting on paper ballots, and it was contended that the union constitution's ballot-secrecy clause had been violated

because the paper ballots specified the voting "strength" of each ballot,[6] and thus a

voter's identity could potentially be determined by consulting a separate credentials list

that specified the "strength" of each voter by name. *Id.* at 102. In finding no ballot-

secrecy violation in this respect, the court found it significant that the evidence showed

that the people who counted the votes each only counted a limited number of ballots,

during a "rapid" process, and had not been distributed the credentials list that would have

allowed them to link specific votes to voters. *Id.* In contrast to these facts, the

Secretary's complaint alleges that the same electronic system that counted the votes in

the APFA's election stored and maintained the voter-identifying information in a manner

allowing votes to be linked to specific voters. (*See* Doc. 1, ¶¶ 20–23.) Thus, even if the

present case were subject to the less strict union constitution ballot-secrecy requirement

that the *CWA* court was construing, the result in that case is distinguishable and does not

mandate dismissal of the Secretary's complaint here.

**B.     The Secretary's allegation that the voting system used in the APFA's election did not permit observers to effectively observe the election states a claim upon which relief may be granted. (Count II)**

The LRMDA requires that union elections must provide candidates the right to

"have an observer at the polls and at the counting of the ballots." 29 U.S.C. § 481(c).

This right is interpreted practically and "encompasses every phase and level of the

counting and tallying process." 29 C.F.R. § 452.107(a); *see also id.* § 452.107(c)

(applying the observer requirement to mail-ballot elections). The intent of requiring

---

[6] This referred to the number of votes each voting delegate possessed. *CWA*, 766 F. Supp. 2d at 88.

unions to provide for observer rights is to ensure that union elections are fair and that the

ballots and results cannot be tampered with in unknown ways.  *See Ellis*, 155 F. App'x at

20; *Local 135*, 1980 WL 18743, at *11.

The Secretary's complaint alleges that the candidates' observers in the APFA's

election were denied this right when their role was limited to viewing a tally sheet

projected from a computer connected to the voting website, and they were not able to

verify that votes were recorded and tallied correctly.  (Doc. 1, ¶ 24.)  This situation would

be equivalent to an election conducted with paper ballots in which union officials went

behind closed doors to count the ballots, then simply emerged with a tally sheet

announcing the final election results, and permitted observers to view only the tally sheet.

The LMRDA does not allow union officials to adopt this kind of "just trust us" approach

to the counting of ballots.  As this equivalent situation highlights, observers in the

APFA's election were not allowed any way of verifying that the votes counted came from

eligible voters or that the numbers projected on the tally sheet conformed to the actual

content of the voted ballots.  Accordingly, the Secretary's allegations are sufficient to

state a claim that the APFA violated the LRMDA's observer requirement.

The APFA does not appear to argue that the Secretary's allegations fail to show

that observers in the APFA's election were not able to effectively observe the election

process.  Instead, the APFA argues that the LRMDA's observer requirement "makes no

sense at all as applied in the specific context of internet-based electronic voting," because

in an electronic voting system votes are counted inside a computer server and it would be

"literally impossible" for an observer to be physically placed inside a server.  (Doc. 8 at

15–16.)  According to the APFA, the Court should therefore hold that the requirement to

allow observers at the polls[7] and at the counting of the ballots simply does not apply to

elections conducted with internet-based electronic voting.  (Doc. 8 at 16.)

But for several reasons, the APFA's argument is a faulty one.  First, even

assuming the APFA were correct that there is no possible way to allow observers to

verify the counting of votes in the specific electronic voting system the APFA has opted

to use, it would not follow that the LMRDA's observer requirement is thereby simply

rendered inapplicable to the APFA's election.  Instead, since the LMRDA expressly

requires that observers be permitted, the logical consequence of the APFA's argument

would be that the APFA has failed to conduct an LMRDA-compliant election, and should

be required to conduct a new election in which effective observation can occur.

In effect, the APFA is arguing that it should be permitted to adopt a system that

excludes observers.  But this result was rejected in the *Local 135* case, in which the

union's election procedures and actions completely excluded challenging candidates'

observers from the polls and counting of ballots.  *See* 1980 WL 18743, at *3–5.  Under

the union's election process, candidates' observers had to submit certificates to observe

before the polls opened, but the election judges refused to open the doors in time for

---

[7] The APFA interprets the Secretary's complaint to exclude from Count II any allegation that candidates were denied the right to have observers "at the polls," but this is incorrect.  As explained below, the right to have observers "at the polls" is adaptable to elections conducted by means other than in-person voting. *See also* 29 C.F.R. § 452.107(c) (explaining what rights observers have in mail-ballot elections). Therefore, the fact that there was not a specific physical polling place in the APFA's election does not mean that the union was not obligated to allow candidates' observers to carry out the same type of observation activities that they would have been entitled to perform in an in-person election, such as verifying that all eligible voters are permitted to vote and that no ineligible voters are allowed to vote.

observers to submit their certificates. *Id.* at \*5. These actions made it impossible for observers to participate in the election process, which in turn created an opening for ballot tampering. *See id.* In the instant case, according to the APFA's own argument, it has created an analogous situation in which there can be no observers in the election process. If it would never be possible to have observers verify that votes are counted accurately using the APFA's electronic voting system, the "answer" is not that the LMRDA does not apply, but rather that the union failed to comply with the LMRDA.[8]

Moreover, the APFA is mistaken to suggest that Congress, in enacting the LMRDA's observer requirement, simply could not have anticipated any scenario except elections conducted using paper ballots "counted manually by human vote counters," such that the observer requirement should not apply in any other contexts.[9] (Doc. 8 at 15 (emphasis removed).) Even at the time the LMRDA was written in 1959, Congress was

---

[8] For this reason, the APFA's reliance on *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988), is unavailing. (*See* Doc. 8 at 16.) The hypothetical the APFA mentions from that case is a discussion of whether a fictional statute requiring an agency to inspect all ovens for their propensity to spew flames would apply to later-developed electric ovens that are incapable of spewing flames, with Justice Scalia arguing that the statute should not be interpreted to require such a result because it would be absurd to inspect electric ovens for something that they are incapable of doing. *K Mart*, 486 U.S. at 324 n.2 (Scalia, J., concurring). Here, in contrast, the relevant statute requires the union to design an election in which candidates may have observers at the polls and at the counting of ballots—something which the union very much *is* capable of doing, but that the union simply has chosen not to do. The APFA's position in this litigation is more akin to if there were a fictional statute requiring oven manufacturers to build ovens that did not spew flames, but one manufacturer designed an oven that did in fact spew flames because the manufacturer chose not to incorporate a gas regulator or other flame-controlling feature into its product. The manufacturer could not evade the statutory requirement by arguing that its product was incapable of not spewing flames, simply based on the way the manufacturer chose to design its product. Instead, the manufacturer would need to incorporate the necessary components into its design to allow it to meet the statutory standard. The same is true here with respect to the APFA's voting system.

[9] This is an additional reason the *K Mart* case does not support the APFA's argument—voting by methods other than paper ballots that are counted by human beings was not "unanticipated" by Congress.

aware that unions might use voting machines to conduct elections, because such

machines are specifically referenced in the statutory definition of "secret ballot." *See* 29

U.S.C. § 402(k). The statute even contemplates that other methods of voting might be

used, since it refers to votes cast "by ballot, voting machine, *or otherwise.*" *Id.* (emphasis

added). Voting by non-paper-ballot methods such as by machine or "otherwise"

implicates many of the same issues the APFA claims render the LMRDA inapplicable to

its electronic voting system. Human beings cannot physically be placed inside the

internal mechanisms of machines where votes are recorded and tallied, for example.

Nonetheless, Congress did not exempt votes cast by "voting machine, or otherwise,"

from the observation requirement. This requirement instead applies to all union

elections, no matter the specific method of voting used.

In this regard it can also be seen that the APFA conceives of the observation

requirement in unduly narrow terms, as if it is "impossible" to provide for effective

observation rights in any context other than that of human beings counting paper ballots

at an in-person election. The APFA is incorrect. For example, although the APFA

suggests that there is no way to allow observers "at the polls" in any election that is not

conducted by in-person voting, the history of the LMRDA as applied to mail-ballot

elections shows otherwise. To protect the same interests that are safeguarded by having

observers at the physical "polls" in an in-person election (e.g., to ensure that only eligible

voters are voting), the observer requirement operates in a mail-ballot election by allowing

observers to be present at specific stages of the election process, such as the preparation

and mailing of the ballots, their receipt by the counting agency, and the opening and

counting of the ballots.  29 C.F.R. § 452.107(c).  Through these procedures, observers are able to ensure that the election is fair and that the ballots are not tampered with.

Similar solutions tailored to fit different voting methods have also routinely been instituted in political elections (which were Congress' model for union elections in the LMRDA) to vindicate the same goals behind the LMRDA's observer requirement.  For example, in Texas, testing boards consisting of representatives from each political party are allowed to conduct logic and accuracy tests on voting machines, in a process that is also open to the press and the public.  *See* Tex. Election Code § 129.023.  The testing board can also vote "test ballots" and verify that the results announced by the system match the predetermined results of the test ballots.  *Id.* § 129.023(c).  Finally, the software used in the election is copied and kept in a secure location outside the administrator's control.  *Id.* § 129.023(f)(2).

In the APFA's election, no similar procedures were in place to ensure that the candidates' observers could verify that the result announced by the APFA's contractor actually represented an accurate tally of the votes cast.  Instead, as stated in the Secretary's complaint, observers were limited to simply viewing a copy of the tally produced by the contractor.  (Doc. 1, ¶ 24.)  Because that amounts to a violation of the LMRDA's observer requirement, the Secretary has stated a cause of action.

## IV.     Conclusion

For these reasons, the Secretary requests that the APFA's motion to dismiss be denied.  The Secretary further requests general relief.

Respectfully submitted,

JOHN R. PARKER
United States Attorney

_Brian W. Stoltz_

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff,
the Secretary of Labor

## Certificate of Service

On February 21, 2017, I served the foregoing document, and its accompanying

proposed order, on defendant, the Association of Professional Flight Attendants, by

mailing it by prepaid first-class mail to defendant's counsel of record, addressed as

follows:

Sanford R. Denison
Baab & Denison, LLP
6301 Gaston Avenue, Suite 550
Dallas, TX 75214

_Brian W. Stoltz_

Brian W. Stoltz
Assistant United States Attorney