



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 5 2017

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

THOMAS E. PEREZ [now R. ALEXANDER
ACOSTA], Secretary of Labor,

     Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

     Defendant.

Civil Action No. 4:16-cv-1057-A

## APPENDIX OF EVIDENTIARY MATERIALS IN SUPPORT OF APFA'S MOTION FOR SUMMARY JUDGMENT

ANDREW D. ROTH
D.C. Bar No. 414038
ADAM BELLOTTI
D.C. Bar No. 1020169
ROBERT ALEXANDER
D.C. Bar No. 465673
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St. N.W., Tenth Floor
Washington, D.C.  20005
Tel:  (202) 842-2600
Fax: (202) 842-1888
Email: aroth@bredhoff.com
Email: abellotti@bredhoff.com
Email: ralexander@bredhoff.com

SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Avenue, Suite 550
Dallas, TX 75214
Tel: (214) 637-0750
Fax: (214) 637-0730
Email: denison@baabdenison.com

Attorneys for Defendant Association
of Professional Flight Attendants

# TABLE OF CONTENTS

| Document | Tab | Pg. |
|---|---|---|
| Deposition of Stephen J. Willertz (Excerpts) | A | 1 |
| Deposition of Stephen J. Willertz, Exhibit 13 | A | 67 |
| Secretary of Labor Stipulation Regarding the Deposition of Stephen J. Willertz | B | 72 |
| Plaintiff's Responses to Defendant's First Set of Interrogatories | C | 74 |
| Defendant APFA's Answers to Plaintiff DOL's First Set of Interrogatories | D | 87 |
| Deposition of Gerry Feldkamp (Excerpts) | E | 96 |
| Deposition of Gerry Feldkamp, Exhibit 1 | E | 106 |
| Deposition of Gerry Feldkamp, Exhibit 3 | E | 116 |
| Deposition of Gerry Feldkamp, Exhibit 9 | E | 124 |
| Stapleton Declaration in Support of APFA's Motion for Summary Judgment | F | 127 |
| Stapleton Declaration, Exhibit A: Stapleton Expert Report | F | 129 |
| Declaration of Cindy Horan in Support of APFA's Motion for Summary Judgment | G | 161 |
| Deposition of Cindy Horan (Excerpts) | H | 165 |

Respectfully submitted,


ANDREW D. ROTH*
D.C. Bar No. 414038
ROBERT ALEXANDER*
D.C. BAR No. 465673
ADAM BELLOTTI*
D.C. Bar No. 1020169
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St. N.W., Tenth Floor
Washington, D.C.  20005
Tel:  (202) 842-2600
Fax: (202) 842-1888
Email: aroth@bredhoff.com
Email: ralexander@bredhoff.com
Email: abellotti@bredhoff.com


SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Avenue, Suite 550
Dallas, TX 75214
Tel: (214) 637-0750
Fax: (214) 637-0730
Email: denison@baabdenison.com

Attorneys for Defendant Association
of Professional Flight Attendants

* Admitted Pro Hac Vice

Dated: August 25, 2017

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 25th day of August, 2017, the above and

foregoing Appendix of Evidentiary Materials in Support of Motion for Summary Judgment was

served on the following Plaintiff's counsel of record electronically by email transmission and by

overnight mail, as authorized by Federal Rule of Civil Procedure 5(b):

Brian W. Stoltz
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8626
Facsimile: 214-659-8807
brian.stoltz@usdoj.gov

SANFORD R. DENISON

Deposition of Stephen J. Willertz (Excerpts)          Tab A; Page 1

# Alderson®

## COURT REPORTING

Transcript of **Stephen J. Willertz**

June 13, 2017

*Perez v. Association of Professional Flight Attendants*

Alderson Reporting
1-800-367-3376
info@aldersonreporting.com
http://www.aldersonreporting.com

Alderson Reference Number: 70651

Stephen J. Willertz                                              June 13, 2017
Washington, D.C.

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF TEXAS

3                   FORTH WORTH DIVISION

4    - - - - - - - - - - - - - - - X

5    THOMAS E. PEREZ, Secretary of   :

6    Labor, [now EDWARD HUGLER,      :

7    Acting Secretary of Labor],     :   Civil Action No.

8        Plaintiff,                  :   4:16-cv-1057-A

9            v.                      :

10   ASSOCIATION OF PROFESSIONAL     :

11   FLIGHT ATTENDANTS,              :

12       Defendant.                  :

13   - - - - - - - - - - - - - - - X

14                   Washington, D.C.

15                   Tuesday, June 13, 2017

16           Deposition of STEPHEN J. WILLERTZ, a

17   witness herein, called for examination by counsel for

18   Defendant in the above-entitled matter, pursuant to

19   notice, the witness being duly sworn by MARY GRACE

20   CASTLEBERRY, a Notary Public in and for the District

21   of Columbia, taken at the offices of Bredhoff &

22   Kaiser, 805 15th Street, N.W., Washington, D.C., at

Stephen J. Willertz                                                    June 13, 2017

Washington, D.C.

Page 2

1    9:53 a.m., Tuesday, June 13, 2017, and the

2    proceedings being taken down by Stenotype by MARY

3    GRACE CASTLEBERRY, RPR, and transcribed under her

4    direction.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Stephen J. Willertz                                                June 13, 2017
Washington, D.C.

Page 3

```
 1    APPEARANCES:

 2

 3        On behalf of the Plaintiff:

 4            BRIAN W. STOLTZ, ESQ.

 5            Assistant United States Attorney

 6            1100 Commerce Street, Third Floor

 7            Dallas, Texas  75242-1699

 8            (214) 659-8626

 9                and

10            TAMBRA LEONARD, ESQ.

11            JENNIFER FREY, ESQ.

12            CLINTON WOLCOTT, ESQ.

13            U.S. Department of Labor

14            200 Constitution Avenue, N.W.

15            Room N-2474

16            Washington, D.C.  20210

17            (202) 693-5744

18

19

20

21

22
```

Stephen J. Willertz                                                    June 13, 2017

Washington, D.C.

Page 4

```
 1       On behalf of Defendant:

 2            ANDREW D. ROTH, ESQ.

 3            ADAM M. BELLOTTI, ESQ.

 4            Bredhoff & Kaiser

 5            805 15th Street, N.W.

 6            Washington, D.C.  20005

 7            (202) 842-2600

 8

 9    ALSO PRESENT:

10            KATHERINE ANDREWS, Summer Associate

11

12

13

14

15

16

17

18

19

20

21

22
```

Stephen J. Willertz                                                June 13, 2017
Washington, D.C.

Page 13

```
 1      A.    I apologize, but I don't specifically

 2   recall.  I believe that I have, but I can't recall

 3   specific cases.  What stands out in my mind more are

 4   the cases that I testified in the grand jury and in

 5   criminal trials.

 6      Q.    Were those election cases?

 7      A.    Those were criminal cases.

 8      Q.    Criminal cases.  So there were no criminal

 9   penalties for election violations?

10      A.    That's right.  Those were all criminal

11   cases.

12      Q.    Any civil depositions or case testimony

13   you can recall under Title IV of the LMDR?

14      A.    I believe that I have been deposed in

15   election cases, but I can't recall a specific one.

16      Q.    Any cases involving electronic balloting?

17      A.    No.

18      Q.    How about mail balloting?

19      A.    Not that I recall.

20      Q.    So in 2012, I think, you've testified you

21   became the head of the office, you came to

22   headquarters in your office of field -- director of
```

Stephen J. Willertz                                                    June 13, 2017

Washington, D.C.

Page 14

1    the office of field operations.

2            What are your primary responsibilities in

3    that position?

4        A.    Yes.   I oversee and direct OLMS

5    enforcement programs throughout our field offices

6    around the country.

7        Q.    So that would include a number of

8    different programs, including the enforcement of

9    Title IV regarding union elections?

10       A.    Yes.

11       Q.    And you have a staff at headquarters that

12   works under you?

13       A.    Yes.   I don't have any direct reports at

14   headquarters.   The four regional directors that are

15   located around the country report to me, the computer

16   cadre enforcement coordinator, Bill Mitchell, reports

17   to me, and I have a special assistant that reports to

18   me.

19       Q.    Who is that?

20       A.    Her name is Antoinette Dempsey.   She's

21   located in Atlanta.

22       Q.    So you have regional directors underneath

Stephen J. Willertz                                                      June 13, 2017
Washington, D.C.

Page 15

1   you.  You also have district directors of the various

2   field offices around the country; is that correct?

3       A.    Yes.  The district directors report to the

4   regional directors.

5       Q.    They report to the regional directors?

6       A.    Yes.

7       Q.    When a complaint is filed by a union

8   member concerning alleged problems or irregularities

9   with an election, those are typically -- or they're

10  required to be filed with the district director or

11  the district office where the union election took

12  place or is headquartered or how does that work?

13      A.    They can be -- election complaints can be

14  filed with any representative or employee of the

15  Department of Labor.

16      Q.    I see.

17      A.    They could be filed with somebody from

18  OSHA or MSHA.  And we hope, in those instances, they

19  make their way to OLMS fairly quickly.

20      Q.    Right.

21      A.    So they don't necessarily have to be filed

22  with a district director.  They could be filed with

Stephen J. Willertz                                                  June 13, 2017
Washington, D.C.

Page 16

1    any of us.

2         Q.    But, typically, they are filed with

3    district directors?

4         A.    Often they are.

5         Q.    Sometimes they're filed with the national

6    office directly?

7         A.    Yes, sometimes they are filed with us in

8    the national office.

9         Q.    When they're filed somewhere else, are

10   they always referred to the district?

11        A.    Yes.  The district office where the labor

12   organization is physically located has jurisdiction

13   to investigate that election complaint.  So we would

14   get that complaint to the district director in the

15   particular field office as quickly as we could, so

16   that the district director can open a case, assign

17   it, and start investigating.

18        Q.    Now, are there some cases, election

19   challenges to union elections that are handled

20   exclusively at the local level, at the district

21   level, or do you get involved in every single

22   election complaint?

Washington, D.C.

Page 17

1      A.    I don't necessarily get involved in every

2  election complaint.  The majority of election

3  investigative work is done in the field.  I may be

4  contacted if there is a question or a problem or a

5  scope issue or a jurisdictional issue or some novel

6  question that needs to be answered.

7      Q.    So in routine cases, are district

8  directors at liberty to dispose of the complaint on

9  their own, or do they need sign-off from headquarters

10  in every case?

11      A.    Let me explain how this works.

12      Q.    Please.

13      A.    So the field office opens an

14  investigation.  They conduct the investigation and

15  write a report of investigation that is sent to the

16  division of enforcement in OLMS headquarters.  Sharon

17  Hanley, the chief of the division of enforcement,

18  she's in the office right next door to me.  Then the

19  case is assigned to one of the investigators in the

20  division of enforcement, and that division of

21  enforcement investigator reviews the report of

22  investigation.

Stephen J. Willertz                                                           June 13, 2017
Washington, D.C.

Page 18

1          The case is also assigned to an attorney

2     in our solicitor's office who reviews the report of

3     investigation, and then a case meeting is scheduled.

4     And I attend those case meetings, as well as Sharon

5     Hanley and whoever the DOE -- that's the Division of

6     Enforcement -- investigator is and the attorneys from

7     SOL.  And we discuss the case and make a case

8     determination.

9          Q.    Now, was this case handled differently in

10    that you sort of took more of a -- I mean, you were

11    ultimately in charge of the investigation of this

12    case; is that fair to say?

13         A.    I wouldn't say I was in charge.  I think,

14    technically, the district director was still in

15    charge of the investigation.  But, yes, I took more

16    of a hands-on approach to this investigation.

17         Q.    And why was that?

18         A.    Because it was an Internet voting system

19    election case, and we were working on guidelines at

20    the national office for electronic voting systems.

21    And I decided to get involved and sort of monitor the

22    results of the investigation as they came in.

Stephen J. Willertz                                                      June 13, 2017
                              Washington, D.C.

Page 40

1      A.     -- do we need to investigate this or not?

2   I would say yes.

3      Q.     If he's raised it, it's fairly encompassed

4   within the scope of the investigation?

5      A.     Yes.

6      Q.     Let me go back to -- I know you said you

7   didn't read it, but I still have one question about

8   Exhibit 4.

9             On page 5 of the questionnaire, Bates

10  stamp number 143 --

11     A.     Yes.

12     Q.     -- if you go down to the second to last

13  paragraph of this questionnaire, it says at this

14  page, "Morales stated that he couldn't single out any

15  particular evidence to support his statement that he

16  felt that APFA violated" -- and then skip

17  integrity -- "the ballot secrecy of section 401(e)."

18            Does that surprise you?

19     A.     The sentence goes on to say, I should say,

20  "Other than his visibility to observe the ballot

21  process."

22     Q.     Right.  Is there something about observing

Stephen J. Willertz                                          June 13, 2017
                        Washington, D.C.

                                                    Page 41

1    the ballot process that would lead a member to think

2    there is a secrecy issue?

3        A.    I don't know, and I can't speculate what's

4    going on in his mind.

5        Q.    I don't want you to speculate.

6        A.    But, again, from an investigative policy

7    standpoint, if a member raises an issue, maybe the

8    member can't see any particular evidence.  And the

9    fact that the member can't see it causes them to

10   suspect that it's not secret, that wouldn't be

11   unusual.

12       Q.    My question really is not so much of, you

13   know, whether sort of it's a fair game for

14   investigation at that juncture.  My question is

15   really different, is does it surprise you that this

16   complainant couldn't provide any basis or evidence

17   for his concern that ballot secrecy had been

18   violated?  Does that surprise you?

19       A.    No.

20       Q.    Why does it not surprise you?

21       A.    Because the investigation noted that there

22   was no tangible record or way for any candidates in

Stephen J. Willertz                                                       June 13, 2017
                          Washington, D.C.

                                                              Page 42

1    this particular election, to observe the votes as

2    they were recorded by the electronic system, or the

3    way that they were tallied, and verify the accuracy

4    or look inside the system in any way, shape, or form

5    to make any sort of assessment as to whether or not

6    votes and voters could be connected.  There is just

7    no way.  So it wouldn't surprise me that a member

8    might allege or suspect that this system wasn't

9    specific in filing in a complaint.

10        Q.    Okay.  Before I leave the subject of the

11   interview with Morales, do you know whether any other

12   rank and file union member was interviewed in

13   connection with your investigation of this complaint?

14   I say "rank and file" because I know you interviewed

15   union officials --

16        A.    Yes.

17        Q.    -- who were involved in the election.  But

18   any members who weren't part of the election, you

19   know, part of the administration of the election.

20   Did you interview anybody similarly situated to

21   Morales regarding their concerns about observability

22   or secret ballot violations?

Page 45

1    allegations.  Read that.  I'm going to have a series

2    of questions --

3         A.    Yes.

4         Q.    -- about how you got to this result later

5    on in the deposition.  But for right now, my question

6    to you is, are you aware of the complainant in this

7    case, Mr. Morales, or any other rank and file union

8    member ever expressing a concern or a believe that,

9    to quote paragraph 21, that "The system stores and

10   maintains member-identifying information and voting

11   records on two servers in a way that could allow

12   individuals with access to both of the servers to

13   identify how a member voted"?

14        A.    I didn't understand the question.  Did --

15        Q.    Did Mr. Morales, or any other rank and

16   file union member ever express that concern to you,

17   to your knowledge?  To you or to a member of your

18   investigatory team in this case?  Did Mr. Morales

19   ever say, Here's why I feel that ballot secrecy is a

20   problem, because I have a sense that the system

21   stores member information in a way that could allow

22   individuals with access to both of the servers to

Stephen J. Willertz
June 13, 2017
Washington, D.C.

Page 46

1    identify how a member voted?

2        A.    Okay.  I'm not aware that Mr. Morales

3    would ever have said that.  I do know that he alleged

4    a lack of voter secrecy.

5        Q.    Correct.  But he never raised this

6    particular concern as the basis for why he was

7    concerned about ballot secrecy?

8        A.    I don't believe that he ever articulated

9    anything about two servers.

10       Q.    And correct me if I'm wrong, but, I think,

11   you said you would find it highly unlikely that he

12   would have enough knowledge about how the system

13   worked that he would form such a belief?

14       A.    Yeah, I don't know.  I don't know to what

15   degree he may have read up on BallotPoint's system.

16   I do know that they have a website and there are some

17   description of their system, but I don't know that.

18       Q.    But you have no information to support --

19       A.    No.

20       Q.    And certainly those -- to your knowledge,

21   that concern was ever expressed by him or any other

22   rank and file member to you or any of your

Stephen J. Willertz                                              June 13, 2017
Washington, D.C.

Page 47

1    investigators?

2        A.    I don't have any information on that, no.

3        Q.    All right.  As I think we have just

4    reviewed, there was what, I think, it's fair to

5    characterize as a fairly conclusory allegation in the

6    complaints here, that ballot secrecy was a problem.

7              So were you -- at what junction did you

8    get involved in investigating that and other

9    allegations of the complaint?

10             MR. STOLTZ:  Object to the extent that

11   that characterization may be argument.

12             But go ahead.

13             THE WITNESS:  Yes, I reviewed the

14   documents that BallotPoint and APFA initially

15   provided.

16   BY MR. ROTH:

17       Q.    You're getting ahead of me.  So let me do

18   it this way, actually.  And that was a very inartful

19   way for me, but your answer to my inartful question

20   has led me to ask you to mark this as Exhibit 6 --

21             (Willertz Exhibit No. 6 as

22             marked for identification.)

Stephen J. Willertz                                                     June 13, 2017

Washington, D.C.

Page 70

1    obtain the data in the voter database.

2          Q.    You mean the member database?

3          A.    The member database.  I sometimes refer to

4    it as voter database because it's --

5          Q.    Oh, voter rather than the vote.

6          A.    Yes.

7          Q.    I got it.  What BallotPoint calls the

8    MRNS?

9          A.    Yes.

10         Q.    All right.  And what exactly transpired at

11   the demonstration that heightened your interest in

12   obtaining that?

13         A.    It was clear that information, you know,

14   was passed from one server to the other, and then to

15   the member and to the election administrator, Cindy

16   Horan, that appeared to us -- or at least made us

17   suspect even more that there was a link between the

18   voter and the vote contained in the data that was in

19   this database.

20         Q.    You mean there was data that if -- in the

21   two servers --

22         A.    Exactly.

Stephen J. Willertz                                    June 13, 2017

Washington, D.C.

Page 71

```
 1        Q.     -- that could be combined?

 2        A.     Exactly.  That if we -- if BallotPoint

 3   provided the member table or the voter table, that

 4   there was going to be information in there that would

 5   allow us to link the voter and the vote by comparing

 6   it against the vote table.

 7        Q.     When you say "provide the table," in other

 8   words --

 9        A.     The data in the table.

10        Q.     -- create a table that would show the data

11   that was in the member database?

12        A.     I --

13        Q.     I mean, I think you agreed before, and let

14   me just clarify for the record, you're not

15   maintaining that BallotPoint had already generated

16   and had in their warehouse somewhere a table that had

17   all that data in it.  You were looking for them to

18   generate that table?

19        A.     Again, I don't know.  And I'm not a

20   technical expert, so I don't know whether it needed

21   to be generated.  What I suspected was the data was

22   there.  In what format it existed and whether it
```

Stephen J. Willertz

Washington, D.C.

1    needed to be reformatted or a new database needed to

2    be created to release it, again, that's over my head

3    in terms of technical expertise.  But it appeared

4    that the database contained IP addresses from which

5    the members voted, and it appeared to contain at

6    least an eight-hour window on a particular date as to

7    when the member voted.

8           At that point, we didn't know for sure

9    whether or not there might even be a more detailed

10   time/date stamp in the database, but we knew, based

11   on the demonstration, there was at least an

12   eight-hour date/time stamp window.

13       Q.    So you wanted to see that data because --

14       A.    We wanted to see that data.

15       Q.    If that data were provided to you through

16   software changes, or whatever had to be done, then

17   you didn't particularly care.  You just wanted the

18   data?

19       A.    Exactly.

20       Q.    You didn't focus on what needed to be

21   done?

22       A.    Yes.

Page 73

1      Q.    You didn't question or not question their

2    claims of what was involved.  You just wanted the

3    data?

4      A.    Yes.

5      Q.    And you were hell bent on getting that

6    data?

7      A.    Yes.  We served the subpoena and --

8      Q.    Right.

9      A.    After that.

10     Q.    Before we get to the subpoena, let me mark

11   9.

12               (Willertz Exhibit No. 9 was

13               marked for identification.)

14   BY MR. ROTH:

15     Q.    Can you identify this document?

16     A.    Yes.  This is written follow-up request

17   that was made after the demonstration.  And, as is

18   indicated in the first sentence, I made the request

19   verbally during the meeting that was the

20   demonstration.

21     Q.    And the request being, "I want the table

22   entitled 'officer election members' and all data it

Stephen J. Willertz                                                    June 13, 2017
Washington, D.C.

Page 74

1    contains (regardless of election) during the

2    balloting period."

3              Okay.  And correct me if I'm wrong, but

4    ultimately, BallotPoint howled and you backed off the

5    request for all elections.  You just wanted the data

6    for that particular election?

7         A.    Yes.  And if it helps to explain --

8         Q.    Please.

9         A.    The reason we asked regardless of the

10   election, we had, in the previous year, conducted

11   another election investigation involving an

12   electronic voting system that didn't involve this

13   union, and it didn't involve BallotPoint, but the

14   investigation disclosed that the data was sequenced

15   chronologically in order of receipt of votes across

16   all the elections that the company was administering

17   or conducting at the same time.

18        Q.    Okay.

19        A.    And we didn't know if that, perhaps, was

20   similar in any way to BallotPoint.  But just to

21   preserve the possibility that there may be some

22   chronological sequencing of rows of data, that's why

Page 75

1    we initially requested it that way.

2        Q.    Now, this, like all these correspondence

3    back and forth, are coming from or to Michelle

4    Hussar.  But you were involved in the framing of this

5    request, correct?

6        A.    Yes.

7        Q.    And it says you want the information,

8    "even if an override of the system is necessary."

9              Were those your words?

10       A.    I don't know who drafted those words.  It

11   might have been.  Again, I apologize for any

12   technical shortcomings.  I don't know necessarily

13   what an override of this system is.

14       Q.    You can't testify in terms of what your

15   thinking was in saying that?

16       A.    No.  In re-reviewing this letter now, I

17   think it was a poor choice of a word in the request,

18   "override of the system."  I don't even know what

19   that would mean.

20       Q.    Well, I think you testified previously

21   that the source code that -- software source code

22   that's used in an election is part of the system,

Stephen J. Willertz                                                    June 13, 2017
Washington, D.C.

Page 76

1    right?  I mean, the system doesn't stand apart from

2    the application software code that's -- I mean, is

3    your technical understanding at least that great,

4    that you would know that's part of the system?

5         A.    I think what I understand is that there is

6    a whole lot of detailed software code that tells the

7    system what to do.

8         Q.    Right.  When you say, "tells the system

9    what to do," I mean, it is part of the system, right?

10        A.    It runs the system.

11        Q.    It runs the system?

12        A.    Yes.

13        Q.    Okay.

14        A.    And, again, my not technical knowledge is

15   that the software code can be changed.  You could

16   change a line of code that would alter the way a

17   system runs.  There may be a line of software code

18   that says when a voter pushes number 1, record a vote

19   for the candidate identified as the number 1

20   candidate, for example.  And there would be a way to

21   change that line of software code to make it number

22   2, and so that would alter the way the system runs.

Washington, D.C.

Page 77

1      Q.    So would it be fair to say, then, if you

2  change the code, you're changing the system?

3      A.    It's possible, yes.

4      Q.    I mean, the system, presumably, is written

5  in a way -- the code is written in a way that if

6  somebody votes, presumably, for candidate 1, that's

7  how it's recorded?

8      A.    Yes.

9      Q.    But you're saying it's your understanding

10  that, you know -- you don't know exactly from a

11  technical standpoint how, but it's your understanding

12  that somebody could rewrite that code --

13      A.    Yes, I understand.

14      Q.    -- to say, all right, every time somebody

15  votes for one, count it as two?

16      A.    Yes.

17      Q.    And that would be a change to the system?

18      A.    Yes.

19      Q.    And so is it possible that when you said

20  "override of the system," you meant, I don't care if

21  you need to change the software code that was run,

22  that was in place at the time, I don't care.  I just

Stephen J. Willertz                                          June 13, 2017
                      Washington, D.C.

                                                    Page 78

1    want the data?

2         A.    That was our understanding.

3         Q.    Because I know you can do that.

4         A.    If you have to write a new line of code

5    to --

6         Q.    So be it?

7         A.    -- provide the table, do so.  Yes.

8         Q.    But you didn't have an understanding, one

9    way or the other, whether that was, in fact,

10   required?

11        A.    Yes, I didn't.

12        Q.    So, again, I want to be sure the record is

13   clear.  Let me go back just to summarize.

14              So you didn't investigate, and you don't

15   know, one way or the other, whether an override of

16   the system was, in fact, required to generate that

17   data?

18        A.    I believe that Gerry Feldkamp said in the

19   BallotPoint demonstration, that they would have to

20   make some modification of the software.

21        Q.    And you accepted that?

22        A.    Yes.

Stephen J. Willertz                                                          June 13, 2017
Washington, D.C.

Page 79

```
 1        Q.    You didn't look behind that?

 2        A.    I didn't question that.

 3        Q.    And you have no evidence to question

 4   that --

 5        A.    No.

 6        Q.    -- that you accumulated in the course of

 7   your investigation?

 8        A.    That's right.

 9        Q.    So I think you may have said this already,

10   but just to confirm, BallotPoint resisted providing

11   that data, and you ended up having to subpoena them

12   for it, correct?

13        A.    Yes, that's correct.

14        Q.    And whose decision was it to issue the

15   subpoena?  Was that a product of your group

16   deliberations?

17        A.    Yes.  I know I probably made the ultimate

18   call to say, Let's subpoena those records.

19        Q.    Okay.  Do you recall when exactly that

20   subpoena issued?  I think it was early August or late

21   July.

22              Does that sound right to you?
```

Stephen J. Willertz                               June 13, 2017
Washington, D.C.

Page 86

1    get -- I'm not going to stop and talk about that now.

2           But, ultimately, you concluded, based on

3    the work that the three of you did, and as described

4    in the interrogatories, that your suspicion here,

5    your tentative conclusion that the system appears to

6    have allowed for was, in fact, the case?

7    A.    Yes.

8    Q.    Can you give him back D-5, which is the

9    complaint?

10          I asked you some questions about this

11    before, but let me turn to Factual Allegation No. 21.

12    A.    Yes.

13    Q.    And that's sort of another way of framing

14    that point that was in one of the investigatory

15    findings, correct, that the system --

16    A.    Yes.

17    Q.    There is data in it that can be matched

18    up, if you have access to both of the servers?

19    A.    Yes.

20    Q.    That could be done?

21    A.    Yes.

22    Q.    In the course of your investigation, by

Page 87

1    the way, did you uncover any evidence that

2    BallotPoint had, in fact, matched up that data -- had

3    pulled and matched up that data?

4         A.    No.

5         Q.    Let me just sort of -- I want to parse

6    this factual allegation with you a little bit.  It

7    says, the first sentence, "This Internet-based

8    electronic voting system permitted the names of

9    voters to be linked with their voting choices."

10        A.    Yes.

11        Q.    Now, you previously testified -- and

12   correct me if I'm wrong, if I'm mischaracterizing --

13   that part of the system is the software code

14   applications.  So you have no evidence, as you've

15   testified, that the system, including the source code

16   that was in place at the time of the election,

17   permitted the names of voters to be linked with their

18   voting choices, correct?

19        A.    I don't know what that characterization

20   means.

21        Q.    What do you --

22        A.    I --

Page 117

1    logical matter, it seems logical to me, but you would

2    conclude that if it cost them $1 million, it would be

3    pretty unlikely that they would invest that kind of

4    money or 100 hours, invest that kind of time in doing

5    that.  Is that fair?

6          A.    I don't know about -- perhaps.  I don't

7    know how many hours.

8          Q.    It would have been --

9          A.    I don't remember how many hours.  100

10   hours.  I don't know.

11         Q.    That was one of the reasons you were

12   asking for this information?

13         A.    Yes.

14         Q.    So, generically, then, things like cost of

15   doing something to connect the voter with the vote

16   and time, those are all relevant considerations in

17   assessing whether there has been a ballot secrecy --

18   there's a ballot secrecy issue, in your mind?

19               MR. STOLTZ:  Objection, calls for a legal

20   conclusion.

21               THE WITNESS:  I think -- we know there is

22   a ballot secrecy issue because we connected the voter

Stephen J. Willertz                                                    June 13, 2017
Washington, D.C.

Page 118

1    and the vote.  So we know the law was violated.

2    Again, the LMRDA has a strict secrecy requirement.

3    We connected the voter and the vote.  So that's a

4    violation.

5              As far as I'm concerned, you know,

6    regardless of how long it would have taken

7    BallotPoint to reconfigure or make changes to the

8    system to access the data, if they, indeed, even -- I

9    should add, if they, indeed, needed to make a

10   software code change to view the data.  I don't know

11   that.

12             Again, I would defer to technical experts.

13   BY MR. ROTH:

14        Q.    Okay.  I mean, obviously, you need -- as

15   an investigator, you need to understand Department

16   policy in order to know what to investigate, what

17   questions to ask and stuff like that.  So, I think, I

18   sort of heard two conflicting -- on the one hand, you

19   said that kind of information is relevant to your --

20   under DOL policy, in terms of what might be a

21   violation.

22             And, on the other hand, I heard you say it

Page 119

1    wouldn't have mattered, even if you found out it cost

2    them 10 million -- it would be cost prohibitive and

3    time prohibitive, so it wouldn't -- you could almost

4    rule out the prospect that they did it, that wouldn't

5    matter?

6         A.    Yes.  The fact that we were able to

7    connect the voter and the vote and to say positively,

8    affirmatively, over 4,000 members, this is how they

9    voted in this election, is a violation.

10        Q.    No matter how remote the prospect that

11   they would, in fact -- that BallotPoint, in fact,

12   would have done something like this?

13        A.    Right.

14        Q.    In the absence of a complaint and

15   investigation?  That's totally irrelevant, in your

16   view?

17        A.    I'm not saying it's irrelevant.  I'm

18   saying it's a violation.

19        Q.    It's a violation that --

20        A.    The fact that we could connect the voter

21   and the vote is a violation.

22        Q.    So it's possible?

Stephen J. Willertz                                                        June 13, 2017
Washington, D.C.

Page 120

1       A.      No, the fact that we did.

2       Q.      The fact that it can be done, it's

3   possible.  You did it?

4       A.      We did it, exactly.

5       Q.      Which is proof that it's possible?

6       A.      Exactly.

7       Q.      So as long as you prove that it's

8   possible, under your understanding of the policy

9   that -- you're investigating under a policy, correct?

10  These questions really didn't -- weren't ultimately

11  relevant to your determination that there was a

12  violation, whatever the answer was -- to this would

13  be?

14      A.      It was already a violation, yes.

15      Q.      Was already a violation, in your view?

16      A.      Yes.

17      Q.      I take it that your answer would be the

18  same with respect to any assessment of BallotPoint's

19  sort of bona fides, in terms of whether they were

20  known to be a reputable organization or known to be

21  unscrupulous in some way, that would be irrelevant to

22  you.  Because you're not in the business of assessing

Page 143

1    prompted their development of one-vote, no void, what

2    you would say is, That's all well and good, but it

3    didn't go far enough, basically?

4        A.    That's exactly what I would say.  I think

5    they picked up on some of the principles that we

6    discussed in the stipulated settlement, and they

7    employed parts of that, but I don't believe they went

8    far enough.

9        Q.    In your view, did it represent an

10   improvement over the prior system?

11       A.    I don't know that it did.  I mean, the

12   fact that we were able to connect the voter and the

13   vote, I mean, it's still a fatal flaw.  If they would

14   have gone the whole way so that no member voter

15   information ever enters the system, then the secrecy

16   problem is cured.

17       Q.    Are you aware that they've made further

18   refinements to their system so that they no longer --

19   that the software no longer collects IP address

20   information and time stamp information?  Are you

21   aware of that?

22            MR. STOLTZ:  Objection, ambiguous.

Stephen J. Willertz                                                    June 13, 2017

Washington, D.C.

Page 160

1    know?

2         A.    As far as I know, no.

3         Q.    Just one final question on this.

4              I know you said there was some member

5    communication about confirmation numbers, but are you

6    aware of any communication with a rank and file

7    member, either with personal or with one of your

8    investigators, where they expressed concern that the

9    fact that they got a confirmation e-mail was

10   suggestive of a secret ballot problem?

11        A.    No, I don't have any information in

12   regards to that.

13        Q.    All right.  I'm sure this will be a relief

14   to you, but I'm going to switch gears now to observer

15   issues, reserving the right to come back with a

16   question or two that crosses the divide.

17              Just as sort of a generic question about

18   observers, my understanding of the function of an

19   observer -- and I want to get, sort of, your

20   understanding of the function of observer and see if

21   it jives with mine.

22              My understanding is that's a human being

Stephen J. Willertz                                                    June 13, 2017
Washington, D.C.

Page 161

1    with eyes.  And the statute says you have to have one

2    at the polls and at the counting of the ballots.  And

3    so you have -- the point of that is that you have

4    somebody who can see if there is either some

5    hanky-panky or fraud or tampering or something

6    illicit, they can see with their own eyes that that's

7    happening.

8            Or something sort of illicit, you know.

9    Just mistakes, ballots are being miscounted, you

10   know, innocently.  There's some -- anything, whether

11   it's illicit or nonillicit, that would affect the

12   accuracy of the tally.  They can -- an observer is

13   there and functions as somebody who can tell and then

14   spill the beans on something like that.

15           Is that fair?

16       A.    Yes, I think that's fair.  That's what the

17   statute says at the polls and at the counting of the

18   ballot.

19       Q.    And the statute says that.

20           And that's sort of your understanding of

21   the point behind having an observer, right?

22       A.    Yes.

Washington, D.C.

Page 166

1    have -- we just talked about what an observer is.  An

2    observer is somebody who visualizes.

3         A.    Exactly.

4         Q.    Is it possible to have an observer at the

5    polls in a remote electronic voting system election?

6    An election held by remote electronic voting of a

7    client at ballot, is it possible to have an observer

8    at the polls?  There are no polls, correct?

9         A.    Correct.

10        Q.    I mean, people vote.  That's what an

11   electronic vote is.  People vote, either from their

12   personal computers or from their phones.

13        A.    Exactly.

14        Q.    There is no polling place.  Similar to a

15   mail ballot election, correct?

16        A.    Similar.  And that's why we've -- the

17   department in OLMS has put out guidelines and

18   guidance for observer rights in the context of a mail

19   ballot election, realizing that there aren't actual

20   polls.

21        Q.    Right.  You can't --

22        A.    There's other observer rights that -- you

Page 167

1    know, that are built in, like the mailing of the

2    ballots to the members.

3         Q.    Right.  But the statute requirement of

4    having an observer at the polls is impossible in both

5    the mail ballot and the electronic ballot context,

6    correct?

7              MR. STOLTZ:  Objection, calls for a legal

8    conclusion.

9    BY MR. ROTH:

10        Q.    I'm not asking for your legal conclusion.

11   I'm asking for a physical possibility.

12             Is it physically possible to have a human

13   observer visualizing the balloting at the polls in an

14   election that doesn't have polls?

15             MR. STOLTZ:  Same objection.

16             THE WITNESS:  Yeah.  There's --

17   BY MR. ROTH:

18        Q.    You can answer.

19        A.    There is no way that an observer could

20   observe somebody filling out their ballot in their

21   living room in a mail ballot election.  And there is

22   no way that an observer can observe -- you can set up

Stephen J. Willertz                                                          June 13, 2017
Washington, D.C.

Page 168

1    a system where an observer can observe somebody

2    voting from their personal computer in their living

3    room.

4         Q.      Or their telephone when they're running

5    through an airport --

6         A.      Yes.

7         Q.      -- to get on a plane?

8         A.      Which makes it incumbent upon a system to

9    provide --

10        Q.      Alternatives?

11        A.      -- some alternative mechanisms for

12   candidates to have observer rights so that observers

13   can see some sort of -- visualize and see some sort

14   of tangible record that could help them verify that

15   the system is accurately recording votes, and that

16   the system is accurately tallying the votes.

17        Q.      But the alternatives don't necessarily

18   have to be observers.  They could be other

19   technological safeguards, correct?  Like client-side

20   encryption is not an observer, right?

21        A.      I don't think the client-side encryption

22   is an observer right.  I think your analogy is

```
                                                        Page 171

 1     are counted?

 2           A.    Yes.

 3           Q.    Aren't the votes counted through a

 4     software application that is a counting -- is like a

 5     computer?  Doesn't the counting take place inside the

 6     gears of a computer?

 7           A.    That's right.  So there is no way --

 8           Q.    That is right.

 9           A.    That's right.  I don't believe that there

10     is a way for an observer to observe the counting of

11     the ballots electronically.

12           Q.    Right.

13           A.    But I do believe that it's possible to

14     build in a paper backup that will allow an observer

15     to observe the tallying of the ballots.

16           Q.    That wasn't my -- I understand that, and

17     I'll come back to that.  The more you want to say

18     about that, I'm more than happy to let you say.

19                 But just for the present time, you would

20     acknowledge, at least, that -- forget checking the

21     count, but the actual count itself that's performed

22     inside the gears of a computer, the observer, Morales
```

Stephen J. Willertz                                          June 13, 2017
                            Washington, D.C.

Page 172

1    was not able to see that?

2        A.    No.

3        Q.    And it was not possible for him to see

4    that?

5        A.    That's right.  I agree.

6               (Willertz Exhibit No. 13 was

7               marked for identification.)

8    BY MR. ROTH:

9        Q.    Can you identify this document?

10       A.    Yes.  This is the OLMS compliance tip for

11   electing union officers using remote electronic

12   voting systems.  We published this on our website.  I

13   think it was in October 2016.

14       Q.    Is it still up on the website?

15       A.    It is still up on the website, yes.

16       Q.    And this is a true and accurate copy, as

17   far as you can tell?

18       A.    Yes, as far as I can tell.

19       Q.    Copy of what's been taken off the website?

20       A.    Uh-huh.

21       Q.    Just -- if you turn to page -- it's not

22   paginated, but one, two -- nor is it Bates stamped.

Stephen J. Willertz                                                        June 13, 2017
                              Washington, D.C.

                                                                      Page 173

 1              The third page, the first carryover

 2    paragraph, last sentence, where it says, "In the

 3    context of electronic voting systems" -- and here

 4    you're talking about Mode electronic voting

 5    systems -- "in which the polls and tally are not

 6    visible, assuring the integrity of such systems

 7    presents."

 8              And that's what we were just talking

 9    about.  You can't have an observer visualizing those

10    things, so you've got to come up with some other

11    mechanism.

12              Then you start talking about mail ballot.

13    So let me ask you about mail ballot.  And you've

14    already acknowledged that there were no polls in the

15    mail ballot.  So you can't have an observer at the

16    polls, so you come up with a substitute set of

17    safeguards.

18              I take it -- and these are embodied in the

19    regulations cited, correct?

20         A.   Yes.

21         Q.   And, I take it, that these safeguards

22    are -- I mean, every case may vary and they may not

Stephen J. Willertz                                              June 13, 2017
Washington, D.C.

Page 174

1   be followed accurately, but if these safeguards are

2   followed, you believe that that -- OLMS believes that

3   those serve as adequate safeguards in the mail ballot

4   election context?

5       A.    Yes.

6       Q.    Adequate safeguard for what?  To prevent

7   against what?  For what -- on what are they

8   safeguards against, these alternatives?

9       A.    Adequate safeguards for the handling of

10  the ballots.  I mean, it gives candidates the right

11  to have an observer observe the process and

12  understand the process and have some sort of

13  independent verification that the ballots were mailed

14  to all members.  That members had an opportunity to

15  vote.  That there was a mechanism for receipt of

16  these ballots.

17            That they can observe the pickup of the

18  ballots at the appointed time and see the return

19  ballots and inspect them and to see they are brought

20  back to a tallying site and observe the separation of

21  the inner secret ballot envelope from the outer

22  envelope with identifying information.  And then

Stephen J. Willertz

Washington, D.C.

June 13, 2017

Page 175

```
 1    observe the separation of those two different types
 2    of envelopes.  And then observe, at that point, the
 3    opening of the secret ballot envelope, the removal of
 4    the actual ballots.
 5                 And then the counting of the ballots so
 6    that they can see, with their own eyes, that the
 7    ballots are being counted correctly, according to the
 8    voter's intent.  They can see markings, a checkmark
 9    for Candidate A, and they can see that the counters
10    are accurately counting those votes and registering
11    the votes for their proper candidate.
12         Q.    Okay.
13         A.    Yeah.
14         Q.    Those are the sort of substitutes for the
15    inability to have all of the observer requirements
16    that the statute provides for?
17         A.    Well, it's just basically the first,
18    because the tallying of the ballots is --
19         Q.    The counting.
20         A.    The counting of the ballots is
21         Q.    That's incorporated?
22         A.    -- is incorporated here.
```

Stephen J. Willertz                                                        June 13, 2017
                              Washington, D.C.

Page 176

1       Q.      That is not an alternative.

2       A.      Yes.

3       Q.      That's incorporated within the

4    regulations?

5       A.      Yes.

6       Q.      Okay.  I got that.  I want to take each

7    one of those, sort of, three things individually and

8    ask you about them.

9              The right to have an observer at the

10   preparation and mailing of the ballots.  Now, I'm

11   just trying to sort of get a sense of the

12   practicality of that.  Let's take a union like APFA.

13   They've got 20,000 members or so.  They're spread out

14   all across the country.  Just like in the electronic

15   ballot here, where you had a third party in Michigan

16   prepare the ballots, you're going to have to pick

17   somewhere.

18             I think APFA has traditionally picked

19   their home area of Dallas/Fort Worth to have -- hire

20   a company to do the preparation of the ballots, but

21   it's not going to -- correct me if I'm wrong, but in

22   practical terms, it's not really going to be feasible