Stephen J. Willertz                                                          June 13, 2017

Washington, D.C.

Page 192

1    adequate safeguards in a mail ballot election?

2         A.    Yes.

3         Q.    On the regulations.

4    ~~Switching gears now to remote electronic~~

5    ~~correct me if I'm wrong, but I read this question as~~

6    ~~saying that notwithstanding the fact that the polls~~

7    ~~and the tally are not visible, so the traditional~~

8    ~~observer rights don't apply, by at least in theory~~

9    ~~as possible to handle electronic balloting in the~~

10   ~~same way as mail balloting.  In other words, we will~~

11   ~~come up with a novel alternative --~~

12   ~~A.    Yes.~~

13   ~~Q.    -- that we regard as adequate, okay?~~

14   ~~A.    (Witness nodding.)~~

15        Q.    And there are some here that you say are

16   just absolutely required as alternatives, and others

17   you say you give a range of things that might be

18   acceptable and things like that.  But at bottom --

19   and I don't want to get into the detail of all of

20   these, because these weren't even in place at the

21   time of the BallotPoint election that were at issue,

22   correct?

Alderson Court Reporting

Stephen J. Willertz                                                   June 13, 2017

Washington, D.C.

Page 193

1        A.      Correct.

2        Q.      That this reflects a view of CMS that it

3    is, at least theoretically, possible that you could

4    come up with a set of subtleties for the traditional

5    observer rights, such as this technology, paper,

6    paper balloting, client-side encryption, auditing,

7    various auditing rights are noted.  You could come up

8    with a series of safeguards that would serve the same

9    function in a remote electronic balloting context as

10   those alternate safeguards in the traditional

11   context.

12               That would serve the need at least

13   theoretically possible that you would satisfy an

14   electronic election conducted with these group of

15   safeguards as meeting the general mandate in the

16   statute that the adequate safeguards are in place.

17               Is that fair?

18       A.      Yes.  Yes.  Although, I don't know that I

19   would put client-side encryption in that category.

20       Q.      Yeah.  So I'm looking at D here.  It says,

21   "The use" -- this is under "must include."

22       A.      Okay, this is must include.

Stephen J. Willertz                                                          June 13, 2017

Washington, D.C.

Page 195

1    did, I apologize.  And, I guess, the record will

2    reflect it.  But I don't think I asked you to what

3    extent you participated in this, in the drafting of

4    these guidelines.

5         A.    I worked on this quite a bit, yes.

6         Q.    Quite a bit.  Based on the experience you

7    have with these systems from your various

8    investigations?

9         A.    Yes.

10        Q.    So at least you're familiar --

11        A.    Yes.

12        Q.    You're intimately familiar with these

13   various concepts, at least?

14        A.    Yes.

15        Q.    Whether you necessarily agree with each

16   and every one of them is neither here nor there.

17              But you're familiar with them?

18        A.    Yes.

19        Q.    So let me ask you this:  In your

20   investigation of the BallotPoint election, the

21   national office areas election in January 2016, did

22   you specifically investigate the issue of whether

Stephen J. Willertz                                          June 13, 2017
                        Washington, D.C.

Page 196

1    these kind of other types of safeguards were put in

2    place or are contained with the BallotPoint system?

3    Was that sort of an investigatory topic of yours?

4            Does that question make sense?

5       A.   Yes.

6       Q.   Was that an area of inquiry in your

7    investigation?

8       A.   Yes.  I think we definitely gathered as

9    much information as possible to determine what could

10   be observed, in terms of by a candidate observer in

11   the observer process, yes.

12      Q.   No.  But I thought you've already said

13   that it was -- I want to be clear, because it's not

14   just semantics.  You can't -- I thought you've

15   already testified it's impossible to observe the

16   polling place because there is no polling place.

17      A.   Right.

18      Q.   And it's impossible to observe the actual

19   count.  So, I guess, what you're saying is you looked

20   at whether there were other technologies -- whether

21   there were or were not other technologies, such as

22   paper ballot records.

Stephen J. Willertz                                                  June 13, 2017
Washington, D.C.

Page 199

1        Q.      I understand.

2        A.      As you've said earlier.

3        Q.      But it's not an observer right, is it?

4        A.      It is an observer right to observe the

5    tallying of the ballots.  That's what the statute

6    calls for.

7        Q.      I don't want to be argumentative.

8        A.      Okay.

9        Q.      So you did look -- you did consider these

10   issues?

11       A.      Yes.

12       Q.      What other safeguards were in place at

13   BallotPoint?  Did you reach a conclusion in your

14   investigation as to -- well, let me back up a second.

15              Are you aware that the statute -- not the

16   statute -- the Department of Labor regulations state

17   that the statute has a separate requirement from

18   observer rights, and the requirement is a general

19   mandate that adequate safeguards be provided in an

20   election?  Are you aware of that?

21       A.      Yes.

22       Q.      Did you make a finding, in the course of

Stephen J. Willertz                                                      June 13, 2017
Washington, D.C.

Page 200

1    your investigation, as to whether the union, through

2    the hiring of BallotPoint, provided adequate

3    safeguards to ensure a fair election, and, therefore,

4    satisfied that general mandate?   Did you make an

5    investigatory finding on that point?

6         A.    Yeah.   We didn't find that there was a

7    violation of general fairness adequate safeguards.

8    The finding was that there was not observer rights.

9         Q.    Observer rights, okay.

10        A.    Yes.

11        Q.    And in the same vein -- do you have the

12   complaint in front of you still?

13        A.    Yes.

14        Q.    Is there any factual allegation in this

15   case that BallotPoint -- that the union did not

16   comply with the general mandate in the statute to

17   provide adequate safeguards to ensure a fair

18   election?

19        A.    No, I don't see that here.

20              Did I miss it?

21        Q.    All right.   Where are we here?

22              MR. ROTH:   Can we just take a short break?

Washington, D.C.

Page 217

1    one theory.

2         A.    Yes.

3         Q.    All right.  Let me go back to the

4    interrogatories.

5              Do you still have those in front of you?

6         A.    Yes.

7         Q.    So you do but I don't.  Let's see.  All

8    right.  Moving on to -- we're still at page 8.  A

9    little further down the paragraph -- the two

10   paragraphs starting "moreover" on page 8.

11        A.    Yes.

12        Q.    I have a few questions.  If you want to

13   take a second to read those two paragraphs, the

14   "moreover" and the "further."

15             Just let me know when you've had a chance

16   to review that.

17        A.    Yes, I've read that paragraph.

18        Q.    Can you read both of them, the "moreover"

19   and the "further"?

20        A.    Okay, further.  Okay.

21        Q.    Now, what I read you to be saying in the

22   "moreover" paragraph is, that you were able to link a

Washington, D.C.

Page 218

1    voter with a vote in 4,081 cases, through the

2    methodology that you've described here in the

3    interrogatories?

4         A.    Yes.

5         Q.    And that if you assume that all or a

6    substantial part of those 4,000, by virtue of the

7    secret ballot violation, because you call them

8    affected voters, the ones who were affected by the

9    secret ballot violation, if they had changed their

10   votes, or if they had cast their votes for the losing

11   candidate, that could have affected the outcome of

12   the election.

13          Now, my question to you is, doesn't that

14   presuppose that these 4,081 people knew about the

15   secret ballot violation, and, therefore, changed

16   their votes out of some type of fear that, you know,

17   if they voted for one candidate as opposed to

18   another, i.e., the favorite candidate, that their

19   vote could be revealed, and, therefore, they could be

20   retaliated against?

21          So, to prevent that, they would vote for

22   somebody else?  Doesn't that presuppose some type of

Stephen J. Willertz                                                      June 13, 2017

Washington, D.C.

Page 219

1    knowledge on the part --

2          A.    No.

3          Q.    Does not?

4          A.    No.  We don't look at it that way.  When

5    we look at a fact with respect to nonsecret votes, we

6    would count up the number of nonsecret votes and

7    compare them to the margins.  And if the number of

8    nonsecret votes exceeds the margins, we may -- it may

9    have affected, because it mathematically may have

10   affected.

11         Q.    Well, it can only mathematically have

12   affected the outcome if it changed people's votes,

13   right?  And it wouldn't change people's votes unless

14   they had some knowledge of the violation, correct?

15         A.    Well, when we look at secrecy violations,

16   we don't know what's going on in the voter's head.

17   We don't know what they know or what they don't know

18   or whether there is subtle coercion or how the

19   violation may have affected.  So we look at the

20   maximum number, the number of nonsecret votes

21   compared against the margins, and then we say, It may

22   have affected.

Stephen J. Willertz                                                June 13, 2017

Washington, D.C.

Page 220

1       Q.      Okay.   When you say "we," is that sort

2    of --

3       A.      Department of Labor, OLMS.

4       Q.      Is that --

5       A.      That's our policy.

6       Q.      That's your policy?

7       A.      The way we look at secrecy violations,

8    yes.

9       Q.      So, in your view -- under that policy, in

10   your view, it's totally irrelevant whether the member

11   would have known about the secret ballot violation or

12   not?

13      A.      Well, we don't -- no, it's not irrelevant.

14   But we don't know.   And we don't know -- we can't get

15   inside of the heads of the voters at the time that

16   they were voting.   We don't know.   And so we presume

17   effect, and we count up the nonsecret votes.

18              As an example, in a manual election, if

19   voters are marking their ballots in an open cafeteria

20   and members are milling around and there is no

21   partitions and other members could look over the

22   person's shoulder to see how they're voting, we would

Stephen J. Willertz                                                                                          June 13, 2017
Washington, D.C.

Page 221

1    determine how many people -- how many voters voted in

2    that manner.

3              We would see those are nonsecret votes and

4    we would compare that number against the margins and

5    we would say that any of those races that had margins

6    less than the number of nonsecret votes, may have

7    affected the outcome, even though we may not know how

8    that affected how those voters marked their ballots.

9         Q.    In the manual vote example, though,

10   correct me if I'm wrong, but if people are looking

11   over people's shoulders and stuff, that could give

12   rise to a legitimate fear on the part of the member,

13   because he sees people looking over his shoulder,

14   that people actually can see how they voted.  And the

15   union hasn't taken adequate steps with partitions or

16   whatever to prevent that.

17             So that strikes me as a situation where

18   the presumption that it did affect their vote has

19   some validity to it.

20             You testified earlier -- and I'm going to

21   get to another one of your interrogatory responses --

22   that there is no way a member would know that the

Washington, D.C.

Page 222

1    system stores information in a way that somebody who

2    had access to two servers could connect -- I mean,

3    they don't have -- you testified earlier they don't

4    have access to the BallotPoint system.  And, I think,

5    your exact words were, "and they don't have the

6    technological know how."

7              There is no way you said that they would

8    know and, therefore, be put into a reasonable fear

9    that their vote was being surveyed or monitored or

10   was not totally secret?

11             MR. STOLTZ:  Objection, misstates the

12   prior testimony.

13   BY MR. ROTH:

14        Q.   Okay.  You can answer my question.

15             So my question to you is, in that far

16   different context, wouldn't you agree that it's

17   totally counterintuitive, at best, to presume that a

18   voter would know about the secret ballot violation?

19        A.   I don't know that it would be

20   counterintuitive.  I don't know that they would know.

21   What we say is that the system has to be secret, and

22   if it's not secret, we don't know how that may affect

Washington, D.C.

Page 223

1    how people vote.  I point to the example of the

2    member -- the voter who asked that question to Cindy

3    Horan --

4          Q.     Right.

5          A.     -- Hey, I wrote down my confirmation

6    number --

7          Q.     Right.

8          A.     -- is there any way that anybody can use

9    that confirmation number to determine how I voted, as

10   an example of a member or voter wondering, you know,

11   is it secret?  Can someone tell how I voted?  They

12   just sent me an e-mail.  They sent me a confirmation

13   number.  Is there a link?

14               We don't know what may be going through

15   these members' heads when they're voting, whether

16   they suspect that there is a secrecy problem or not.

17         Q.     I understand that.  I understand that.

18   But you're not saying that the use of confirmation

19   numbers was a violation of the statute, are you?

20         A.     No.  The ability for us to link the voter

21   and the vote was this secrecy violation.

22         Q.     Through this methodology?

Stephen J. Willertz                                                    June 13, 2017

Washington, D.C.

Page 224

1     A.    We weren't able to do it with the

2  confirmation numbers because they didn't keep the

3  confirmation numbers.  They overrode the confirmation

4  numbers.

5     Q.    You were able to do it, as you set forth

6  in the interrogatories, because there was this data

7  on the two servers that, when you connected it up

8  through this very painstaking process that you

9  described, you were able to link them up, and that

10  you say shows that there was a secret ballot

11  violation.

12            And my question to you is, if no member

13  would have been aware of that capability of the

14  system to be linked up, how would that influence

15  their vote?  They didn't even know about it.

16     A.    I don't know.

17     Q.    Can you explain?

18            You say you don't know.  Can you explain

19  to me how -- through what mechanism a person's vote

20  would be affected if they had no knowledge of that

21  capability of the system?  How would that affect

22  their vote if they didn't know about it?

Alderson Court Reporting

Washington, D.C.

Page 225

1      A.      There is no way for them to know exactly

2  what was behind the scenes or in the black box.   But

3  either the fact that it was not secret and that there

4  could be questions, concerns, suspicions on

5  the part of the members, means it may have affected

6  the outcome.

7      Q.      But other than that one inquiry about

8  confirmation numbers, you're not aware -- I think you

9  testified earlier -- of any inquiry or stated concern

10 from a member about this capability of matching up

11 the data to learn people's identity in terms of how

12 they voted?

13     A.      No.  Other than the complaint itself.

14 But --

15     Q.      The complaint?

16     A.      The complaint by Mr. Morales.

17     Q.      But Mr. Morales didn't --

18     A.      He didn't discuss--

19     Q.      He just said, There is a secret ballot

20 violation, correct?  He didn't specify?

21     A.      He wasn't as specific as the other member

22 who questioned the confirmation number.

Stephen J. Willertz                                                                    June 13, 2017
                              Washington, D.C.

                                                                          Page 226

1        Q.    He wasn't specific at all, was he?  He

2   just said, I fear -- or I believe there has been a

3   secret ballot violation?

4        A.    Yeah, he raised the issue.

5        Q.    In the same vein, let me turn to page 9,

6   No. 3, 6.  So paragraph 3, subparagraph 6, where you

7   say, "BallotPoint's election system is not accessible

8   for inspection by members or their agents; moreover,

9   it's complicated, highly-technical design makes it

10  highly unlikely that a union member could discern

11  whether it was functioning to only count votes from

12  eligible voters, and to accurately count those

13  votes."

14              Isn't it also true that given that

15  BallotPoint's election system is not accessible for

16  inspection by members or their agents, and is

17  moreover a complicated, highly-technical design,

18  doesn't that make it highly unlikely, if not

19  impossible, that a member could discern that there is

20  data in the two servers that could be connected up to

21  link a voter with the vote?

22       A.    Right.

Page 227

1          Q.      Correct?

2          A.      That's correct.    I think the fact that

3    there is a secrecy violation, and that the voter and

4    the vote can be connected for over 4,000 voters,

5    means that there is a secrecy violation.    How it

6    affected how they voted, we don't know.    But we know

7    that --

8          Q.      But you're still saying it may have

9    affected the outcome of the election?

10         A.      Yes.

11         Q.      Because you just say so?

12         A.      And I've seen --

13         Q.      That's your policy?

14                 MR. STOLTZ:    Objection, argument.

15                 Go ahead.

16                 THE WITNESS:    Yes.    In a nonsecret

17   election, if the election is nonsecret, the number of

18   nonsecret votes determines the effect on outcome.

19   BY MR. ROTH:

20         Q.      And that's the OLMS view of the statute?

21         A.      Uh-huh.

22         Q.      And, I guess, your answer would then be

Stephen J. Willertz                                                     June 13, 2017
Washington, D.C.

Page 228

1    the same on the "further" paragraph, where it says --

2    or maybe not.  You tell me.  It says, "9,355 members

3    voted.  Over 11,000 members did not vote.  If the

4    election had been conducted with a secret ballot, it

5    is possible that these 11,000 nonvoting members would

6    have voted, and that the votes would have changed the

7    election outcome."

8            Now, my question to you, again, is, it's

9    only possible, correct, for the 11,000 members not to

10   vote out of fear of a secret ballot that their ballot

11   could be revealed, if they have some inkling that

12   their ballot might be revealed, correct?

13       A.   That's right.

14       Q.   And the violation here is that it could be

15   revealed by matching up data with data from the two

16   servers.

17       A.   That's right.

18       Q.   But you have no evidence that any member

19   knew that was possible?

20       A.   That's right.

21       Q.   Okay.  Let's turn to page 9.  "The

22   following facts" -- I'm going to read this sentence

Stephen J. Willertz                                             June 13, 2017
                        Washington, D.C.

```
                                                          Page 268
   1    Notice Date: 06/23/2017

   2    Deposition Date: 06/13/2017

   3    Deponent: Stephen J. Willertz

   4    Case Name: Perez v. Association of Professional

   5    Flight Attendants
        Page: Line          Now Reads              Should Read
   6    _____          _____          _____

   7    Page 42, line 9, "specific" should read "secret"    _____

   8    Page 111, line 19, "district" should be "strict"    _____

   9    Page 191, line 1, "avoided" should be "voided"    _____

  10    Page 212, line 21, "a fact" should be "affect"    _____

  11    Page 247, line 11, "contacted" should be "contracted"

        Page 254, line 11, "a fact" should be "affect"    _____
  12    _____  _____          _____

  13    _____  _____          _____

  14    _____  _____          _____

  15    _____  _____          _____

  16    _____  _____          _____

  17    _____  _____          _____

  18    _____  _____          _____

  19    _____  _____          _____

  20    _____  _____          _____

  21    _____  _____          _____

  22    _____  _____          _____
```

Alderson Court Reporting

Stephen J. Willertz                                                    June 13, 2017
                              Washington, D.C.

Page 269

1                    CERTIFICATE OF DEPONENT

2

3      I hereby certify that I have read and examined the

4      foregoing transcript, and the same is a true and

5      accurate record of the testimony given by me.

6      Any additions or corrections that I feel are

7      necessary, I will attach on a separate sheet of

8      paper to the original transcript.

9      I swear under penalty of perjury that the foregoing is true and correct.

10                        _Stephen J. Willertz_

11                        Signature of Deponent

12                        Dated: _

13     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Stephen J. Willertz                                                      June 13, 2017
Washington, D.C.

Page 270

```
 1                   CERTIFICATE OF REPORTER

 2   UNITED STATES OF AMERICA   ) ss:

 3   DISTRICT OF COLUMBIA       )

 4       I, MARY GRACE CASTLEBERRY, RPR, the officer

 5   before whom the foregoing proceedings were taken, do

 6   hereby certify that the foregoing transcript is a

 7   true and correct record of the proceedings; that said

 8   proceedings were taken by me stenographically to the

 9   best of my ability and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed by any

12   parties to this case and have no interest, financial

13   or otherwise, in its outcome.

14

15

16

17                          Notary Public in and for

18                          The District of Columbia

19

20

21   My commission expires:   7/14/2021

22
```

# Willertz Deposition
# Exhibit 13

# Electing Union Officers Using Remote Electronic Voting Systems



OLMS COMPLIANCE TIP

**The Labor-Management Reporting and Disclosure Act (LMRDA) establishes democratic standards for conducting regular elections of union officers and elections of delegates who elect officers. The Office of Labor-Management Standards (OLMS), an agency within the Department of Labor, is responsible for enforcing the LMRDA. The LMRDA requires every local labor organization to elect its officers by secret ballot, and every national, international and intermediate labor organization to elect officers by secret ballot among the members in good standing or by representatives chosen by secret ballot. *See* 29 U.S.C. 481(a), (b), (d). The LMRDA further requires that adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots, 29 U.S.C. 481(c), and that the ballots and all other records pertaining to the election shall be preserved for one year following the election, 29 U.S.C. 481(e). The LMRDA also gives union members who believe that a violation of the election provisions of the LMRDA has occurred the right to file a complaint with the Secretary of Labor.**

### Purpose of this compliance tip:

This guidance has been developed by OLMS to explain how the LMRDA's requirements apply when implementing remote electronic voting systems in union officer elections. The challenges presented in assuring the secrecy and security of remote electronic voting systems have been well-documented in the context of public elections, which Congress used as the model for union elections under the LMRDA.[i] While remote electronic voting has not been widely adopted for public elections, technology to address these challenges has been a matter of extensive study and discussion. Two significant challenges are the tension between maintaining the secrecy of the ballot while ensuring that each eligible member's vote is accurately cast, and ensuring observability for a voting technology that does not necessarily generate "ballots" that can be observed at the "polls" and at their "counting," as the LMRDA provides. Because the technology in this field is evolving, it is difficult to identify definitive solutions that are most likely to permit voting that is in conformance with the LMRDA. Further, new technology is likely to provide additional methods of conducting remote electronic voting consistent with the LMRDA.[ii]

The specific guidance presented here is based on current technology and the characteristics and design elements of remote electronic voting systems that OLMS has reviewed to date. While all remote electronic voting systems must comply with the LMRDA's requirements, it is possible that solutions other than those identified here would also satisfy these requirements. Thus, OLMS will evaluate each electronic voting system that is the subject of a complaint under title IV of the LMRDA on a case-by-case basis to determine whether it meets the requirements of the statute. If you have questions about remote electronic voting systems, OLMS welcomes you to contact us at olms-public@dol.gov. Moreover, OLMS recognizes that innovative voting technology may be developed that enhances compliance with the requirements of the LMRDA, and OLMS invites such innovative developments to be shared with us, also at olms-public@dol.gov

### Remote electronic voting systems:

The LMRDA does not require a particular method or system of voting. Labor organizations may establish their own methods or systems of voting for officer elections as long as they are consistent with the LMRDA. Some labor organizations, in recent years, have chosen to conduct

EXHIBIT
WILBER 13

67

officer elections using remote electronic voting systems or have expressed interest in using a remote electronic voting system to elect their officers. The term "remote electronic voting systems" is meant to include: (1) electronic voting from remote site personal computers via the Internet; and (2) electronic voting from remote site telephones. It is not meant to include electronic voting machines used for casting votes at polling sites or electronic tabulation systems where votes are cast non-electronically but counted electronically (such as punch card voting or optical scanning systems). As with other voting procedures, remote electronic voting systems may be permissible under the statute so long as they satisfy the LMRDA's standards.

### 1.  *Guidance for preserving ballot secrecy*:

LMRDA Section 3(k) defines a secret ballot as: "the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed." 29 U.S.C. 402(k). Several court cases make it clear that the requirement of a secret ballot in union officer elections is to be interpreted strictly. Ballot secrecy requires that no person, including an independent third party, have access to information allowing such person to learn how a particular member cast his or her vote at any time. Moreover, a member's vote must remain secret after the ballot is cast.

One way to help to insure that ballot secrecy is maintained in an electronic voting system is to avoid creating a connection between a voter's identity and the vote cast, *i.e.*, voters' names would never be entered into the system as part of the voting credentials (the term "credentials" in this guidance includes the multiple codes used for various purposes in electronic voting systems, including access codes, log-in codes, confirmation codes, etc.). In this way a voter's identity could never be linked to his or her vote using information in the system. This can be accomplished by determining voter eligibility prior to mailing the voting credentials and by randomly assigning the credentials to each eligible voter. Once this initial eligibility determination is made and the credentials mailed, there can be no mechanism to void or prevent the casting of ballots by any members who were determined to be eligible. Such a system, however, can present logistical challenges. For example, a union may need to provide replacement credentials to members who have not received or have lost their voting credentials or issue such credentials to newly eligible members. If duplicate credentials or other processes are used to resolve these logistical challenges, all material must be secured when not in use and observers must be given the opportunity to observe the processes employed when using the materials.

Systems should employ proper safeguards to prevent a voter from being able to provide visual proof of the content of his/her vote in order to prevent secrecy violations in the form of coercion or vote buying/selling. For example, the system must not display the voter credential and the content of the vote in such a way that it permits the voter to capture and share the image, nor should lists matching voter credentials and the content of the vote be publicly available.

To the extent that technology is developed for public elections that allows for the inclusion of voter-identifying information in a manner that protects vote secrecy, that technology may also be appropriate for use in union elections.

### 2.  *Guidance for preserving observer rights*:

Section 401(c) of the LMRDA requires that "adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting

of the ballots." 29 U.S.C. 481(c). This requirement provides for the essential monitoring that votes were cast by eligible union members and that those votes were accurately tallied. In the context of electronic voting systems, in which the "polls" and "tally" are not visible, assuring the integrity of such systems presents challenges.

The Department's regulations have permitted the conduct of election by mail ballot, as long as safeguards are followed to protect secrecy and to allow observation of specific stages of the election process, namely, the preparation and mailing of the ballots, their receipt by the counting agency, and the opening and counting of the ballots. 29 CFR 452.97, 107(c). Similar procedures in the context of electronic voting, which permit observation and protect the security of the vote from its casting to its counting, must include:

a) The opportunity to view the list of members and make eligibility challenges prior to the distribution of voter credentials.

b) The opportunity to observe the preparation and distribution of voting credentials to be used by members. Observers must be allowed to view the process, but must not be allowed to see the specific voting credentials that are sent to individual members, which must be kept secret.

c) The opportunity to observe any later distribution of credentials to members who did not receive or who lost credentials. Again, observers must be allowed to view the process, but must not be allowed to see what specific voting credentials are sent to individual members, which must be kept secret.

d) The use of technology that protects the integrity of the vote from the point when it is cast by the voter through the voting process, such as client-side encryption technology, that runs on the voter's computer or in conjunction with any computer-telephone integration, rather than on the election server.

e) The opportunity to observe any steps necessary for the counting of the votes, and any other steps necessary to audit that process.

f) The use of technology that provides a secure method of independent vote verification that allows the voter or an observer to confirm that the vote was recorded and counted accurately. Safeguards should be employed, however, to prevent such features from presenting secrecy lapses and opportunities for voter coercion. Safeguards that could preserve this aspect of observability without compromising vote secrecy may include:

    i. Allowing each member to view a printed ballot version of his or her electronic vote, which contains a credential known only to the voter and which is stored in a supervised, secure, observable location. These printed ballots could also be tallied in a supervised, secure, observable location to verify the accuracy of the electronic vote count.

    ii. Allowing each member to confirm the accuracy or integrity of his or her vote by inspecting a non-public list of the electronic votes alongside the credential known only to the voter, stored in a supervised, secure, observable location.

    iii. Allowing each member to confirm the accuracy or integrity of his or her vote by inspecting a posted list that pairs representations of votes (e.g., as hashes or codes that would allow a voter to know that the vote has not been changed but would not reveal the vote choice itself) alongside voter credentials, or representations of voter credentials.

The electronic voting system should contain mechanisms by which observers can verify, prior to an election, that the system is working properly.

The electronic voting system should include hash chains on the activity logs and the ballot box.

The electronic voting system should be audited by an authorized independent party periodically.

For any electronic voting system, there should be a document or documents that specify the security policy for all systems that will come into contact with the voter or vote information. Further, every role and its corresponding access should be clearly specified, using mathematical descriptions where applicable. The security policy should also include a risk assessment, threat analysis, and modifications made to mitigate such risks/threats.

### 3. *Guidance for preserving records*:

The electronic votes and any paper versions of the electronic votes, and all other paper and electronic records pertaining to the election, including eligibility lists, the voting credentials, the log files, the time stamped software code used to run the electronic voting system, and the ballot tally results, must be preserved for one year.

### 4. *Guidance for preserving right to vote*:

An alternative voting method must be provided, upon request, to any member who does not have access to the electronic voting system.

Remote voting must be implemented in a manner that does not create barriers for individuals with accessibility needs.

## Office of Labor-Management Standards Field Offices

| | | | | |
|---|---|---|---|---|
| Atlanta, GA | Cleveland, OH | Kansas City, MO | New York, NY | Seattle, WA |
| Birmingham, AL | Dallas, TX | Los Angeles, CA | Philadelphia, PA | Tampa, FL |
| Boston, MA | Denver, CO | Milwaukee, WI | Phoenix, AZ | Washington, DC |
| Buffalo, NY | Detroit, MI | Minneapolis, MN | Pittsburgh, PA | |
| Chicago, IL | Ft. Lauderdale, FL | Nashville, TN | St. Louis, MO | |
| Cincinnati, OH | Honolulu, HI | New Orleans, LA | San Francisco, CA | |

For the address and telephone number of our field offices, please call 1-866-4-USA-DOL (1-866-487-2365) , or view our online organizational listing at **http://www.dol.gov/olms/contacts/lmskeyp.htm**.

# OLMS

Office of Labor-Management Standards

U.S. Department of Labor

October 2016

Visit us at **www.olms.dol.gov**

E-mail us at **olms-public@dol.gov**

Call the DOL National Call Center at **1.866.487.2365**

70

## REFERENCES

[i] Nelson Hastings, et al.: Security Considerations for Remote Electronic UOCAVA Voting. National Institute of Standards and Technology, NISTIR 7770 (February 2011). *Available at*: http://www.nist.gov/itl/vote/upload/NISTIR-7770-feb2011-2.pdf.

[ii] U.S. Vote Foundation: The Future of Voting: End-to-End Verifiable Internet Voting Specification and Feasibility Assessment Study (July 2015). *Available at:* https://www.usvotefoundation.org/E2E-VIV.

## ADDITIONAL RESOURCES

iVote Advisory Committee Final Report, Aug. 21, 2015, Utah Lt. Governor Spencer J. Cox

Peter Haynes, "Online voting, rewards and risks," Atlantic Council, (2014). *Available* at: http://www.atlanticcouncil.org/publications/reports/online-voting-rewards-and-risks

Barbara Simons and Douglas W. Jones, "Internet Voting in the U.S." (2012), 55 *Communications of the ACM* 68, http://cacm.acm.org/magazines/2012/10/155536-internet-voting-in-the-us/fulltext.

U.S. Election Assistance Commission (EAC), "A Survey of Internet Voting" (September 2011), http://www.eac.gov/assets/1/Documents/SIV-FINAL.pdf.

David Jefferson, "If I Can Shop and Bank Online, Why Can't I Vote Online?" https://www.verifiedvoting.org/resources/internet-voting/vote-online/

Association for Computing Machinery (ACM) U.S. Public Policy Council, "Issue Brief: Internet Voting and Uniformed and Overseas Citizens absentee Voters," http://usacm.acm.org/images/documents/IB_Internet_Voting_UOCAVA.pdf.

Drew Springal, Travis Finkenauer, Zakir Durumeric, Jason Kitcat, Harri Hursti, Maggie MacAlpine, J. Alex Haldermann, "Security Analysis of the Estonian Internet Voting System," *Proceedings of the 21st ACM Conference on Computer and Communications Security* (CCS '14) (November 2014), https://estoniaevoting.org/findings/paper/.

Secretary of Labor Stipulation Regarding
the Deposition of Stephen J. Willertz

Tab B; Page 72

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THOMAS E. PEREZ [now
R. ALEXANDER ACOSTA],
Secretary of Labor,

      Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

      Defendant.

Civil Action No. 4:16-CV-1057-A

## **STIPULATION**

Plaintiff, the Secretary of Labor, stipulates as follows for all purposes in this action:

In giving deposition testimony in this case on June 13, 2017 with respect to various Department of Labor ("DOL") policies and practices deemed relevant by Defendant, Stephen J. Willertz was authorized to testify and did testify on the DOL's behalf within the meaning of Fed. R. Civ. P. 30(b)(6).

Respectfully submitted,

JOHN R. PARKER
UNITED STATES ATTORNEY


Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff

Dated:  June 3 0, 2017

Plaintiff's Responses to Defendant's First Set
of Interrogatories

Tab C; Page 74

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THOMAS E. PEREZ [now
R. ALEXANDER ACOSTA],
Secretary of Labor,

        Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

        Defendant.

Civil Action No. 4:16-CV-1057-A

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

Plaintiff, the Secretary of Labor, provides the following responses to the first set

of interrogatories served by defendant, the Association of Professional Flight Attendants:

    1.     Describe in detail the method used or steps taken to "match the names of

4,082 voters out of 9,355 votes cast to their choice of candidates," as alleged in Paragraph

23 of the Complaint.

Response:

    1.     During its investigation, the Department of Labor Office of Labor-
        Management Standards (OLMS) received data contained in the EID15-
        VotesTable (Votes Table), which was maintained on the Election Server.
        This Votes Table data was received in the form of an Excel spreadsheet.
        OLMS also received data from the EID15-OEM-data-20160909-104048
        table ("OfficersElectionMembers" table), which was maintained on the



Member Registration and Notification Server (MRNS), and which was provided by BallotPoint on September 12, 2016. This MRNS data was received in the form of a text file, which was converted to an Excel spreadsheet for readability. Each set of data contained information regarding votes cast over the Internet and by telephone.

2. The Votes Table consisted of a line of data for each vote cast. Each row contained a number of fields showing attributes of the voter, including the IP address or area code from which the vote was cast, the exact time the vote was cast, the "vote string" showing the voting choices, and the voter's domicile.

3. The MRNS data consisted of a line of data for each member who logged in to vote. Each row contained a number of fields showing attributes of the member, including the IP address from which the member voted, the date and eight-hour window during which the member voted, the member's name, and the member's domicile.

4. OLMS was able to match the names of voters to the particular vote that they cast by comparing the data from the Votes Table to the MRNS data.

5. OLMS used a different method to match the APFA member to his or her vote depending on if the vote was cast by Internet (including web-browsing capability of cell phones) or by telephone (call-in). In analyzing votes cast by Internet and telephone (call-in), OLMS began by reviewing the data line-by-line and cross-referencing individual lines of the MRNS data with those from the Votes Table. OLMS initially connected voters to votes via this "line-by-line data analysis method." Given the large amount of data, OLMS subsequently used automated processes in Excel and Access to more quickly make voter-to-vote connections, a process referred to as the "automated data analysis method."

<u>Voter-to-Vote Matches Made for Votes Cast by Internet</u>

*Line-by-line data analysis method: Votes cast by Internet*
6. Stephen Willertz and Tracy Shanker began by cross-referencing individual lines of the MRNS data with individual lines of data from the Votes Table, analyzing three fields across both the MRNS data and the Votes Table: (1) IP address; (2) date/time information; and (3) voter's domicile, following the steps below.

7. They identified a unique IP address in the MRNS data.

8. They searched for that same unique IP address in the Votes Table.



9.   When the search revealed only one result, they determined that they had likely matched voter with vote. To ensure that they had established a match, they verified that two additional fields (*i.e.*, domicile and date/time information) also matched.

10.   Once the unique IP address, domicile, and date/time information were matched, then the voter's name from the MRNS data could be linked to the voter's vote string, establishing that the voter's choices for each race could be linked.

11.   When IP addresses from the MRNS table search revealed more than one matching IP address in the Votes Table, they analyzed the date/time ("oem_access_when") field.

12.   The "oem_access_when" field in the MRNS table contains the voting date and the time of voting, recorded in eight-hour windows.  Specifically, when the time of voting was between 12:00 a.m. midnight and 7:59 a.m., the time was listed as "0000."  When the time of voting was between 8:00 a.m. and 3:59 p.m., the time was listed as "0800."  When the time of voting was between 4:00 p.m. and 11:59 p.m., the time was listed as "1600."  As an example, if a member voted on January 6, 2016, at 9:34 p.m., the "oem_access_when" field in the MRNS table would read "20160106-1600."

13.   As stated above, the Votes Table lists the exact time of voting in the "timestamp" field; time is listed in military time format (hour/minutes/second).  Utilizing the example above, if a member voted on January 6, 2016, at 9:34 p.m., the "timestamp" field would read "2016-01-06 21:34:22.000."

14.   When Willertz and Shanker compared the date/time information in the MRNS table and Votes Table, and obtained more than one unique IP address to establish the match, then they analyzed the domicile ("oem_attr1") field to eliminate non-matches.  To illustrate, the Votes Table sometimes contained more than one row with a date/time [hour/minute/second] that fell within the MRNS table's "date and eight-hour window" field associated with the IP address in question.  In these cases, analyzing the domicile field usually enabled Willertz and Shanker to eliminate non-matches to find the one matching set of data.

15.   In some instances, the data analysis steps outlined above did not reveal a one-to-one match because two different members voted from the same IP address, during the same eight-hour window, and were based in the same

domicile. (For example, this appeared to occur when two flight attendants resided at the same physical address.) Willertz and Shanker were still able to connect voter with vote in this situation when the two voters' respective vote strings were identical.

*Automated data analysis method: Votes cast by Internet*

16.    William Mitchell used Excel and Access to analyze the MRNS data and data from the Votes Table. This method included the following steps.

17.    He used Excel to sort the Votes Table data and the MRNS data to identify all votes cast via Internet.

18.    Utilizing one working spreadsheet, he copied data for all Internet voters into separate worksheets, and then sorted/filtered the data to isolate unique IP addresses.

19.    Using Excel's conditional formatting function, he identified and highlighted all of the duplicate IP addresses. He filtered the data to select all highlighted cells (*i.e.*, cells indicating duplicate IP addresses), and then applied a filter to select all of the *non*-highlighted cells (*i.e.*, cells indicating *unique* IP addresses). He then copied the unique IP addresses from the Votes Table and the MRNS data into separate worksheets within the same working spreadsheet, and did the same with the duplicate IP addresses.

20.    He imported the unique IP addresses data (from the Votes Table and MRNS data) into Access, and created an Access query that matched all of the unique IP addresses from the Votes Table with those from the MRNS data. This query established a connection between voter and vote for approximately 3,421 members.

21.    The 3,421 figure includes ten votes for which the IP addresses from the Votes Table data and MRNS data did not completely match for unknown reasons. However, because both the domiciles and the timestamps/eight-hour voting windows match up in each instance, OLMS determined that these ten rows of data were highly likely to reflect voter-to-vote connections.

22.    To establish a connection between voter and vote for the duplicate IP addresses, he copied and pasted the duplicate IP addresses from Votes Table and MRNS data side-by-side in a separate worksheet within his working spreadsheet. He needed to revert to the line-by-line data analysis method to attempt to make voter-to-vote matches for duplicate IP addresses. These data fit into these four general categories:

      a.     Votes from duplicate IP addresses where the votes were cast in different eight-hour windows (*match between voter and vote could be made when the votes were cast during different eight-hour windows*).

      b.     Votes from duplicate IP addresses where votes were cast in the same eight-hour time window, but the domiciles were different (*match between voter and vote could be made when the domiciles were different*).

      c.     Votes from duplicate IP addresses where the votes were cast in the same eight-hour window, and the domiciles were the same, but the vote string was identical (*indicating that a match between voter and vote was made*).

      d.     Votes from duplicate IP addresses where the votes were cast in the same eight-hour time window, and where the domiciles were the same, but the vote strings were different (*no match between voter and vote could be made*).

A total of 433 voter-to-vote matches were made by using this "line-by-line" method to analyze duplicate IP addresses.

23.     The "automated" and "line-by-line" data analysis methods resulted in approximately 3,854 matches of voter and vote. These 3,854 matches comprise 41.2% of the total number of ballots cast (9,355) in APFA's January 9, 2016 election.

Voter-to-Vote Matches Made for Votes Cast by Telephone

24.     With respect to the votes cast by telephone (call-in), OLMS was again able to match the names of voters to their vote using two methods; first, by reviewing the data line-by-line and cross-referencing the MRNS data and the Votes Table data; and second, by using automated processes in Excel and Access to analyze the large volume of data more quickly.

*Line-by-line data analysis method: Votes cast by telephone*

25.     Willertz initially compared the MRNS data showing members who had voted by telephone to the Votes Table data showing the votes of the members who had voted by telephone.

26.     He examined the MRNS data for all telephone voters within a particular eight-hour voting window.

27.     Within one particular eight-hour voting window, he identified rows of data in which there was only one *voter* from one particular domicile who voted within that eight-hour period.

28.    He searched the Votes Table for all telephone votes within that same eight-hour window, and identified any rows of data in which only *one* telephone vote was received from a voter in the domicile that was just identified in the MRNS table.  When he identified only one telephone voter from a particular domicile (in one eight-hour window) and only one vote string from a telephone voter from that same domicile (in the same eight-hour window), he was able to successfully connect the voter with voter with his or her vote.

*Automated data analysis method: Votes cast by telephone*

29.    Mitchell filtered the Votes Table and the MRNS data table to identify only the votes cast by telephone.  He copied and pasted this data (side-by-side) on a separate worksheet within his working spreadsheet.

30.    He sorted the data from the Votes Table by "timestamp" (*i.e.*, time of voting, down to the second) and then by "attr1" (*i.e.*, domicile).

31.    He sorted the MRNS data by "oem_access_when" (*i.e.*, time of voting, in eight-hour window format), and then by "oem_attr1" (*i.e.*, domicile).

32.    Using Excel's subtotal command, he identified how many telephone votes were cast on each date and during each eight-hour window.

33.    He then used Excel's conditional formatting feature to highlight all the *duplicate values* based on "attr1" (*i.e.*, domicile) in each subtotal grouping – for both the Votes Table data and for the MRNS data.  The unique "attr1" (*i.e.*, domicile) rows in the Votes Table and the MRNS data were now easily identified – since they were all the rows that were *not* highlighted.

34.    He used Excel to filter the *non*-highlighted "attr1" (*i.e.*, domicile) rows, and subsequently copied and pasted that data from the Votes Table and the MRNS data side-by-side in a separate worksheet within his working spreadsheet.

35.    The result of Mitchell's analysis is an additional 227 voter-to-vote matches.

To conclude, the data analysis of the votes cast by Internet (including the web-browsing capability of cell phones) undertaken by Willertz, Mitchell, and Shanker resulted in 3,854 matches of voter and vote.  Adding these 227 voter-to-vote matches for votes cast by telephone (call-in) resulted in matching a total of 4,081 voters to the voters' choice of candidates.  These 4,081 matches comprise 43.6% of the total number of ballots

cast (9,355) in APFA's January 9, 2016 election. Note that this figure is one match fewer than the 4,082 reported in the complaint. That figure included an extra header row in Excel which did not actually include a matched vote and should have been disregarded. Thus the total number of matched votes was actually 4,081 rather than 4,082.

\* \* \* \* \* \* \*

2.    Describe in detail the complete factual basis for your contention in Paragraph 27 of the Complaint that the violation of 29 U.S.C. § 481(a) alleged by You in the Complaint may have affected the outcome of the APFA's election for the offices of National President, National Vice President, National Secretary, and National Treasurer.

Response:

The ES records indicate that 9,355 of 20,656 eligible APFA members voted in at least one of the four national officer races during the January 9, 2016 national officer election using BallotPoint's electronic voting system, specifically its "One-Vote-No-Void" or "OVNV" method.

This voting system stored and maintained member-identifying information and voting records on two servers in a way that could allow individuals with access to both servers to identify how a member voted. Member records, including voter email addresses are stored on the MRNS while members' votes are stored on the ES. A link between these two servers, and thus between the voters and their votes, is evident because the system is capable of sending a confirmation email message to the voter after the voter has voted successfully or after a voter has voted, but the system has malfunctioned, so that the voter is notified that he or she must vote again. In addition, when election

administrators submitted support requests, the information generated by the system viewable to BallotPoint Engineers could be combined with member information known by the election administrators to link the particular member who requested support to his or her vote. Accordingly, the fact that the voters voted using a balloting method that permitted their identities to be identified with their choices tainted all votes cast and the integrity of the election, and the national officers who were subsequently installed in their posts after the election also were not elected by "secret ballot" as required by 29 U.S.C. § 481.

Moreover, when OLMS analyzed the data maintained in the system, as described in the response above, it was able to match over 40% of the individual members to their voting choices. Even assuming that the only effect on the election is the percentage of votes for which OLMS could make a connection, these 4,081 votes far exceeded every margin in the national officer election. In addition, the "winning" vote margins of the candidates who advanced to a run-off and/or won their races were such that if it is assumed that all of the affected voters had cast their votes for the losing candidates, different outcomes would have occurred.

Further, while 9,355 members voted in at least one of the national officer races, over 11,000 members did not vote in any race, and if the election had been conducted with a secret ballot it is possible that these non-voting members would have voted and that their votes would have changed the election outcome.

Finally, under LMRDA case law, proof that a ballot-secrecy violation occurred creates a presumption that the outcome of the election may have been affected, and the

APFA bears the burden of providing genuine, tangible, and probative evidence that there was no effect on the outcome of the election.

*******

3.    Describe in detail the complete factual basis for your contention in Paragraph 27 of the Complaint that the violation of 29 U.S.C. § 481(c) alleged by You in the Complaint may have affected the outcome of the APFA's election for the offices of National President, National Vice President, National Secretary, and National Treasurer.

Response:

The following facts highlight the defects of the electronic voting system which do not permit a candidate's observer to verify that a vote was recorded and tallied accurately:

1.    No tangible permanent record of the votes cast, paper or otherwise, independent of the computer system was maintained which would have allowed a manual recount to verify the electronic count.

2.    No tangible permanent record, paper or otherwise, independent of the computer system was maintained which would have demonstrated that votes were received from each voter.

3.    The APFA Board of Directors voted against providing observers with observer access to the BallotPoint system, which would have allowed candidates or their observers to log onto the BallotPoint website to access the Vote Digests.

4.    Two BallotPoint system generated reports, the "Who Voted" and the "Who Did Not Vote" reports, were not made available to observers.

5.    Candidates and their observers were only permitted to see the results of the election on a screen at the APFA headquarters; they could not observe the ballot-tallying process nor could they confirm that the tally presented was the authenticate tally sent from BallotPoint .

6.    BallotPoint's election system is not accessible for inspection by members or their agents; moreover, its complicated highly-technical design makes it

highly unlikely that a union member could discern whether it was functioning to only count votes from eligible voters and to accurately count those votes.

7.  The lack of tangible records or any method of inspecting the accuracy of the system in assigning and counting votes makes effective auditing of the system impossible.

8.  BallotPoint did not maintain its system at the time of the election so that election records could be accessed by observers; in fact, by design, its system did not retain a record of the confirmation emails sent to members and its system automatically deleted support request records after sixty days.

9.  BallotPoint/CCComplete is located in Portland, Oregon, while the APFA headquarters is located in Euless, Texas.

10.  The two servers and the logs showing software modifications for the BallotPoint election system are located in a separate facility, LightPoint, in Portland, Oregon, to which APFA members do not have access.

11.  The election vendor, Allied Media, located in Fenton, Michigan, used a program to erase its records so that they could not be used to check which members received ballots and their access codes.

12.  There were irregularities; 19 extra votes were present on the MRNS. OLMS has not yet been able to confirm the reason for this irregularity or if related irregularities exist, and this information was not presented to voters and/or observers.

13.  Ten voters who were on the Who voted list were also on the Ineligible voter list. OLMS has not yet been able to confirm the reason for this irregularity or if related irregularities exist, and this information was not presented to voters and/or observers.

14.  In analyzing the data maintained by the MRNS and the ES servers, it appears that the system may have improperly recorded some votes as having come from multiple IP addresses. OLMS has not yet been able to confirm the reason for this irregularity or if related irregularities exist.

15.  The BallotPoint electronic voting system did not utilize client-side encryption, necessary to protect the security of the votes cast by members' computers or telephones.

Once it is established that a candidate was denied the opportunity to have an observer at the polls and the counting of the ballots, there is a presumption that the

violation "may have affected the outcome of the election."  Defendant bears the burden

of providing genuine, tangible, and probative evidence that the failure to provide

candidate's the right to have an observer at the polls did not affect the outcome of the

election.  Because the system provides no method of proving that the votes were properly

transmitted from the voters or counted as cast, it is not possible to provide such proof.

Respectfully submitted,

JOHN R. PARKER
UNITED STATES ATTORNEY

*Brian W. Stoltz*

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff

## Certificate of Service

On May $\underline{25}$, 2017, I served the foregoing document on defendant, the

Association of Professional Flight Attendants, by mailing it by prepaid first-class mail

(CMRRR 7016 2070 0001 0698 1138) to defendant's counsel of record, addressed as

follows:

>   Andrew D. Roth
>   Bredhoff & Kaiser, P.L.L.C.
>   805 Fifteenth St., N.W., Tenth Floor
>   Washington, D.C. 20005

                                    Brian W. Stoltz
                                    Brian W. Stoltz
                                    Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THOMAS E. PEREZ [now
R. ALEXANDER ACOSTA],
Secretary of Labor,

      Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

      Defendant.

Civil Action No. 4:16-CV-1057-A

## DECLARATION OF STEPHEN J. WILLERTZ

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States that the responses to the interrogatories contained in Plaintiff's

Responses to Defendant's First Set of Interrogatories in this action are true and correct to

the best of my knowledge.

    Executed on this __25th__ day of May, 2017, at Washington, D.C.

                                     _Stephen J. Willertz_

                                     Stephen J. Willertz
                                     Director of the Office of Field Operations
                                     Office of Labor-Managements Standards
                                     U.S. Department of Labor

Defendant APFA's Answers to Plaintiff DOL's
First Set of Interrogatories                    Tab D; Page 87

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

R. ALEXANDER ACOSTA, Secretary of
Labor,

      Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

      Defendant.

Civil Action No. 4:16-cv-1057-A

## DEFENDANT APFA'S ANSWERS TO PLAINTIFF DOL'S FIRST SET OF INTERROGATORIES

Defendant, the Association of Professional Flight Attendants ("APFA"), hereby answers the first set of interrogatories propounded on it by the Plaintiff, R. Alexander Acosta, acting in his official capacity as the Secretary of Labor.

APFA has not completed its investigation of all the facts relating to this litigation. All of the objections and answers contained herein are based only on the information, documents, and sources that are presently available and known to APFA, based on a reasonable and ongoing investigation of available sources. APFA expressly reserves its right to supplement, clarify, revise, or correct any or all of the objections and answers, and to supplement its objections, and answers, as well as its assertions of privileges, as appropriate.

APFA objects generally to Plaintiff's interrogatories to the extent they call for information protected by the attorney-client privilege or the attorney work-product doctrine.

87

Each of Plaintiff's interrogatories is set forth in bold preceding APFA's answer and/or objections to that interrogatory.

**INTERROGATORY NO. 1:  Describe in detail the complete factual basis for the APFA's denial of the contention in paragraph 27 of Plaintiff's original complaint that the violation of 29 U.S.C. § 48l(a) alleged by Plaintiff in the original complaint may have affected the outcome of the APFA's election for the offices of National President, National Vice President, National Secretary, and National Treasurer at issue in this action.**

At this point in time, the facts known to APFA which support this denial are as follows:

1.      In his internal union complaint, *see* DOL 0087, Samuel Morales stated no basis for his "feel[ing]" that APFA violated the ballot secrecy provision of the LMRDA.  Nor did he assert (much less point to any evidence) that the secrecy of any union member's vote had actually been compromised, or that any member had claimed that a concern about ballot secrecy impacted how, or if, that member voted.

2.      In his subsequent complaint to the DOL, *see* DOL 0001, Mr. Morales likewise stated no basis for his "belie[f]" that APFA violated the ballot secrecy provision of the LMRDA. Nor did he assert (much less point to any evidence) that the secrecy of any union member's vote had actually been compromised, or that any member had claimed that a concern about ballot secrecy impacted how, or if, that member voted.

3.      The Complaint Interview Questionnaire prepared by DOL investigator Keith King, *see* DOL 0139, states that Mr. Morales was interviewed by the DOL on March 8 and 17, 2016, and that in his interview Mr. Morales stated "that he couldn't single out any particular evidence to support his statement that he felt that APFA violated . . . the ballot secrecy provision of [the LMRDA]."

4.      In his deposition, Stephen J. Willertz testified that, to his knowledge, during the course of the DOL's investigation, neither Mr. Morales nor any other union member expressed a

concern that—to quote paragraph 21 of the DOL's Complaint in this matter—"[t]he [BallotPoint] system stores and maintains member identifying information and voting records on two servers in a way that could allow individuals with access to both of the servers to identify how a member voted." *See* Willertz Dep. at 45-47.

5.      In his deposition, Mr. Willertz further testified that based on the evidence "noted" in the DOL's investigation, "[t]here is just no way" that voters in the challenged APFA election could have made "any sort of assessment as to whether or not votes and voters could be connected." *See* Willertz Dep. at 41-42.

6.      Along the same lines, an Interrogatory Response signed by Mr. Willertz states that "BallotPoint's election system is not accessible for inspection by members or their agents; moreover, its complicated highly-technical design makes it highly unlikely that a union member could discern whether it was functioning to only count votes from eligible voters and to accurately count those votes," *see* Responses at pp. 9-10, and Mr. Willertz admitted in his deposition testimony that the same considerations make it "highly unlikely, if not impossible, that a member could discern that there is data on the two servers that could be connected up to link a voter with the vote," *see* Willertz Dep. at 226-27.

7.      A Statement of Reasons disposing of a prior election challenge brought by Mr. Morales, *see* Willertz Dep., Exh. 18, coupled with the two election complaints filed by Mr. Morales in this matter, *see* subparagraphs 1-2 above, show that Mr. Morales challenged the national officers' election at issue here on secret ballot grounds because the DOL had planted a seed in Mr. Morales' head that the BallotPoint system did not adequately ensure ballot secrecy, and not because Mr. Morales had an independent feeling or belief that such was the case.

3

Discovery in this action is ongoing, and APFA anticipates that it will be able to develop additional facts in support of its denial in the course of that discovery.

**INTERROGATORY NO. 2: Describe in detail the complete factual basis for the APFA's denial of the contention in paragraph 27 of Plaintiff s original complaint that the violation of 29 U.S.C. § 481(c) alleged by Plaintiff in the original complaint may have affected the outcome of the APFA's election for the offices of National President, National Vice President, National Secretary, and National Treasurer at issue in this action.**

At this point in time, the facts known to APFA which support this denial are as follows:

1.     The facts and opinions set out in Part III.B of Curt Stapleton's expert report, which APFA provided to the Secretary on June 30, 2017, and which Mr. Stapleton likely will be called upon to elaborate on in his forthcoming deposition.

2.     The facts and opinions summarized in Part (ii)(6) of the Rule 26(a)(2)(C) Disclosure pertaining to Gerry Feldkamp's anticipated expert testimony, which APFA provided to the Secretary on June 30, 2017, and which Mr. Feldkamp likely will be called upon to elaborate on in his forthcoming deposition.

3.     Mr. Feldkamp, Mike Baum, and Bob Thompson, the three BallotPoint engineers with privileged access to the BallotPoint system, are anticipated to confirm that they did not engage in any form of misconduct or tampering with the software application related to the recordation and counting of votes in the challenged APFA election. And BallotPoint's business reputation and track record, among other factors, stand as independent confirmation of this fact.

4.     In his deposition, Mr. Willertz testified that "I don't have any evidence that the results [of the election] are inaccurate or wrong." *See* Willertz Dep. at 249.

5.     In his deposition, Mr. Willertz further testified that a "spot check" of the underlying vote data in the election disclosed nothing irregular. *See* Willertz Dep. at 265-66.