**D.    Documents and Other Materials Considered.**

- Complaint
- Materials reviewed in conjunction with site visit to BallotPoint
  - Application code modules containing references to "oem_access_" and "ipaddr" in use during the 2016 APFA NO election
  - MRNS baseline code (that is, MRNS application code at beginning of the 2016 APFA National Officer Election)
  - MRNS application code change logs for January 2016 and February 2016
  - Two application code changes made to MRNS application code during the course of the 2016 National Officer Election
  - MRNS application code currently used by BallotPoint in LMRDA-compliant elections
  - ES application code that performs the counting of the ballots
  - ES application code that generates a web page to display the results
  - ES application code that generates the CSV file containing the results
  - Text files of MRNS and ES application code change logs
  - Voter Participation Report from the 2016 APFA National Officer Election
  - Downloaded Vote Digests from the 2016 APFA National Officer Election
  - "TallyRecords-to-Consultants-TabDelimited.txt" - a spreadsheet containing DEV, downloaded vote digests, vote key, SEV, vote salt, and ballot selections for the January 2016 APFA NO election
  - "check-tally-records-eid15.cfm" code module (containing election key)
  - Printed copy of Post-Election Vote Digest
  - Printed copy of "ESTSAPFAEID15OEMRetrieval.cfm" code module (containing modification made in response to DOL subpoena)
- Interviews of the following BallotPoint personnel were conducted during the site visit:
  - Gerry Feldkamp
- I received additional oral information from the following BallotPoint personnel
  - Dan Hilderbrand
  - Mike Baum
  - Bob Thompson
- Election Official Interview Questionnaire of Cindy Horan, Chair of the APFA National Ballot Committee
- Plaintiff's Answers to Defendant's First Set of Interrogatories
- Defendant APFA's Rule 26(a)(2)(C) Disclosure of Gerry Feldkamp
- Authoritative Literature (a complete list of the authoritative literature consulted in the drafting of this report is attached to the report as Exhibit C)

## II.    BACKGROUND

### A.    Security Assessments of Information Technology Systems

A security assessment of an information technology system is conducted to determine the risk of harm that may be done to owners and users of a system by threats to the system.  For information-technology systems, common harms include: exposure of sensitive information to unauthorized parties, manipulation or degradation of information stored on the system, and unavailability to authorized parties of information stored on the system.  The risk to the system, in turn, is a function of the degree and likelihood of harm—the greater the likelihood that a harm will occur, and the more severe the harm that will result if the threat is realized, the greater the risk to owners and users of the system.[2]  Security assessors analyze the steps an organization has taken to identify threats, identify vulnerabilities, identify the adverse impact and likelihood of a vulnerability being exploited, and the steps taken to mitigate those threats and vulnerabilities. Based on this information, a security assessor ultimately makes a risk determination for the system.[3]

Threats to a system come in a variety of forms.  Threat sources include natural disasters, technical failures, unintentional human errors, or intentional attacks by hostile actors.[4]  Every system has a unique threat profile that is developed based on the purpose, architecture, and exposure (sometimes referred to as the attack surface) of the system.  Understanding the credible

---

[2] U.S. Dep't of Commerce, National Institute of Standards and Technology ("NIST"), Special Publication 800-30, *Guide for Conducting Risk Assessments* (September 2012), at 12.

[3] *See* U.S. Dep't of Commerce, National Institute of Standards and Technology, Special Publication 800-30, *Guide for Conducting Risk Assessments* (September 2012), at Appendix I (template risk determinations).

[4] NIST's *Security Considerations for Remote Electronic UOCAVA Voting* explains that remote electronic voting systems face threats from internal sources including voters, election officials, and system administrators and external sources including hostile individuals or organizations not necessary to the election itself.  U.S. Dep't of Commerce, National Institute of Standards and Technology Interagency Report 7770, *Security Considerations for Remote Electronic UOCAVA Voting* (Feb. 2011) (hereafter, "NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*"), at 8-11.

threats and the sources behind those threats guides the security assessment of a system because the threats inform which system components, data, or processes may be vulnerable to attackers or susceptible to interference from unintentional human error.

For an information system to function optimally, its designers will consider and implement safeguards from threats that could affect the way in which the system is intended to operate, and threats to the information that is collected, processed, and stored by the system. Security assessors review threats to three core concepts of information protection: confidentiality, integrity, and availability.[5] In the information security industry, these concepts are understood as follows:

- Confidentiality refers to the possibility that information contained within the system will be disclosed to unauthorized persons or entities. In secret-ballot elections conducted via an electronic voting system, the core confidentiality concerns are (i) avoiding disclosure of confidential, personal voter information to unauthorized persons, and (ii) ensuring that the content of an individual voter's vote cannot be matched with the identity of the voter, that is "ballot secrecy."[6]

- Integrity refers to the maintenance by the system of complete and accurate information over its lifetime. In an electronic voting system, the core integrity concerns are ensuring that a vote was cast-as-intended, and ensuring that it was counted-as-cast.[7]

- Availability refers to the system's ability to collect and produce the information when it is needed and for as long as it is needed. In an electronic voting system, the core availability concerns include reducing the difficulty of casting a ballot in the first place—including the accessibility of the system to voters—and ensuring that the cast-ballot information is available to be counted at the moment of the tally.[8]

The degree to which each of these concepts is important varies based on the purpose of the system and the types of information processed. An information security assessment utilizes threat information, an understanding of the system, and its data protection requirements to

---

[5] U.S. Dep't of Commerce, National Institute of Standards and Technology, Special Publication 800-30, *Guide for Conducting Risk Assessments* (September 2012), at 6.

[6] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, at 14.

[7] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, at 23-24.

[8] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, at 38-40.

determine if there are sufficient controls in place to protect the system and its users from harm. Depending on the purpose of the system, its exposure to threats, and the harm that will occur if one of the three core information protection concepts is compromised, a greater or lesser degree of control over the system's information might be appropriate.[9] Because each additional control implemented entails a cost (in terms of the cost in dollars, the complexity entailed in designing and maintaining the system, and in potentially reducing the system's functionality or robustness), the appropriate level of control is oftentimes not the *most* controlled system, but one maintaining reasonable controls given the purpose of the system and its individual risk profile.

In particular, introducing additional controls to protect one aspect of information security might increase the risk that another aspect of information security will be compromised. For example, in electronic voting systems, additional integrity controls (such as providing voters with additional confirmation numbers throughout the voting process) to ensure ballots are cast-as-intended and counted-as-cast can oftentimes increase the opportunity for breaches of ballot secrecy, and could compromise the confidentiality of voters' choices. It is part of my role as a security assessor to understand and consider such trade-offs made by systems architects to achieve an appropriate level of security for their information technology systems.

**B.      The BallotPoint-Administered 2016 APFA National Officer Election**

My understanding of the following background facts is derived from my review of the Complaint and other documents provided to me by Bredhoff & Kaiser, including the expert disclosure of Gerry Feldkamp, and from information discovered during a site visit to the BallotPoint facilities conducted from May 15, through May 19, 2017.

---

[9] NIST's *Security Considerations for Remote Electronic UOCAVA Voting* recognizes that the extent a security property can be met must be measured against "the cost and usability of implementing that property." NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, at 13.

134

The Association of Professional Flight Attendants ("APFA") conducted an election of officers ending January 9, 2016, for the positions of National President, National Vice President, National Treasurer, and National Secretary ("the January 2016 National Officer Election"). APFA's election was conducted over a thirty-day period beginning on December 10, 2015. There were over twenty thousand eligible voters. APFA members are geographically dispersed across the United States, and they are absent from their homes (and, sometimes, the United States) for periods throughout the 30-day election period depending on their flying schedules.

The APFA engaged the services of a contractor, BallotPoint Election Services, owned by CCComplete, to administer the January 2016 National Officer Election using an Internet-based and phone-based remote electronic voting system. Pursuant to its contract with APFA, BallotPoint administered the election from December 10, 2015 through January 9, 2016. At the beginning of the election, Allied Media, another third-party contractor of APFA, mailed eligible APFA members a voting credential consisting of a unique access code each voter could use to access the voting system. With that individualized credential, each voter could access a ballot on BallotPoint's website via a computer or smart-phone web browser, or could access a ballot over the phone by dialing a toll-free number. Once voters successfully voted, BallotPoint maintained their votes on one computer server, the Election Server ("ES"), and maintained member identifying information on another server, the Member Registration and Notification Server ("MRNS"). Both servers were owned by BallotPoint but physically located in a secure co-location facility in Portland, Oregon operated by Lightpoint, an independent company. Once a voter successfully cast a ballot, the BallotPoint system presented the voter with a confirmation code and emailed the voter a message informing the voter that his or her vote had been cast successfully, or, alternatively, read out a confirmation code over the phone if the voter had cast

135

his or her ballot via phone. A chart summarizing the interactions between voters and the BallotPoint voting system is attached to this report as Exhibit A.

On January 9, 2016, at the end of the election, the BallotPoint system electronically tallied the cast ballots and transmitted the results to the APFA Union Hall.

### C. My Security Assessment of the BallotPoint System

I performed a qualitative security assessment of the BallotPoint election system based on a predefined scope and over the period of two (2) weeks. In particular, I assessed the confidentiality and integrity of voter selections made using the electronic voting system; the development, operations, and maintenance of the voting system; and the integrity of the application and its source code. I conducted my assessment against the background of the assessment methods published by the National Institute of Standards and Technology ("NIST"), in NIST Special Publication ("SP") 800-30, *Guide for Conducting Risk Assessments*, and NIST SP 800-53A, *Assessing Security and Privacy Controls in Federal Information Systems and Organizations*. These standards are used by the federal government to secure information systems and they provide detailed guidance for systems and data of all risk levels. In addition to this general NIST guidance on risk assessments, my assessment of the BallotPoint electronic voting system was conducted against the background of NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*.

My specific assessment approach was tailored based on previously reported system security concerns, professional experience as an auditor of government and non-government computing systems, and professional experience conducting numerous penetration tests of government and non-government systems.

136

Following federal information system assessment methods, and drawing on professional experience, I gathered information and performed analysis of various aspects of the system to answer the following questions:

1. Do I understand what the system is supposed to do, how it is put together, how it is maintained, and how it works?

2. Do I understand the technical details surrounding the voter confidentiality issue raised following the January 2016 APFA election?

3. Do I understand the changes that have been made because of the issue raised following the January 2016 APFA election?

4. Do I understand the protections built into the system to protect the integrity of voters' choices of candidates?

I analyzed each step of the electronic voting process, and where there were conditions that warranted security controls to protect the confidentiality and integrity of election information, I analyzed the types of protections in place, and how closely those controls adhered to accepted guidelines. The scope of my analysis did not include investigation of the system's controls related to availability of the information because I understood that neither party in the litigation had raised concerns about the availability of vote information.[10]

## III.   PRINCIPAL OPINIONS

Based on the work that I have performed, my site visit to BallotPoint, my review of portions of the BallotPoint source code, and my review of the documents provided to me by Bredhoff & Kaiser, along with my professional skill, experience, and training, I have concluded that, given its individual risk profile, the BallotPoint remote electronic voting system, as it

---

[10] Although I did not extensively assess availability concerns raised by the 2016 APFA National Officer Election, I note that remote electronic voting offers significant accessibility benefits to a highly mobile population like the flight attendants represented by APFA. In its review of security considerations related to UOCAVA voting, NIST specifically noted the availability benefits remote electronic voting offered to another highly mobile population, overseas military voters. NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, at 38-40.

137

existed at the time of the 2016 APFA National Officer Election, provided an appropriate level of control over the information stored on the system.  In particular, as explained in more detail below, I have concluded that (A) the system appropriately protected confidentiality because the system, as designed, did not allow the identities of voters to be matched to the content of their votes by matching IP addresses associated with votes to IP addresses associated with member identifying information, or through the transmission of confirmation emails.  In addition, I have determined that (B) the system appropriately protected the integrity of voting information because the system had controls in place at each step of the voting process to ensure that votes were cast-as-intended and counted-as-cast.

### A.    The BallotPoint Electronic Voting System did not permit voters' identities to be linked with their votes.

As it existed at the time of the 2016 APFA National Officer Election, the BallotPoint remote electronic voting system did not permit voters' identities to be linked to the content of their votes.  Based on the documents I reviewed in preparation for rendering this opinion, I understand that the Department of Labor ("DOL") was ultimately able to match voters' identities with approximately 4,082 cast ballots (out of a total of 9,355 first-round ballots) by using IP address and timestamp information stored on BallotPoint's servers.  Specifically, after the BallotPoint system was altered in response to a DOL subpoena, DOL was able to match certain IP address data stored on the ES and associated with individual votes to IP address data stored on the MRNS and associated with voter identities.  Below, I explain why the system as it existed during the 2016 APFA National Officer Election did not permit the matching of votes with voters in this manner and maintained controls to protect against unauthorized alterations such as those eventually performed at DOL's demand.

138

The hardware setup of the BallotPoint system consists of two servers:  the MRNS stores member identifying information (but does not store voters' votes), and the ES stores cast ballots (but does not store individual identifying information).  BallotPoint does not have unfettered physical access to these servers; they are hosted by a third-party co-location facility, Lightpoint, which maintains its own security protocols over physical access to BallotPoint's servers.  Communication between the two servers is conducted only via the internet, and there is no direct communication link between the two servers.  In addition to this hardware architecture, the BallotPoint system consists of the software applications for both servers.  The software portion of the system is an integral part of the overall system because the software dictates what information each server collects and stores, what the server can do with that information, and what access users of the system (to include BallotPoint administrators, APFA election officials, and voters) have to information stored on the servers.

In order to determine what information was stored by the two servers, and what information was accessible to users of the BallotPoint system as of the 2016 APFA National Officer Election, I reviewed the application code running on both servers.  I conducted this review by searching the application code for "oem_access_" to catch all references to either "oem_access_from" or "oem_access_when," and searched for "addr," to catch all references to "ipaddr."  These were the BallotPoint data fields that were used to store IP address and timestamp information.  Based on this review, I was able to determine that both servers stored IP address information throughout the 2016 APFA National Officer elections; the ES associated stored IP addresses with cast ballots, while the MRNS stored IP addresses with member information, including member names.  In addition, both servers stored timestamp information;

139

the MRNS timestamped users' votes in 8-hour windows, while the ES provided timestamps of cast ballots to the second.

My review of the application source code also determined that the system did not provide a mechanism by which users (including BallotPoint administrators, APFA election officials, and voters) could access the IP address information stored on the MRNS. By way of explanation, an information system can collect and store data, but, without a software mechanism for accessing that data, or physical access to the server combined with a software tool to compile the data stored on that server, the data will remain internal to the system, and users will not be able to access that information. There are ways in which stored data can be made accessible to a user of the system without physical access to the server, including display via a web page or inclusion of that data in a report that the software is designed to generate. By searching for references to the "oem_access_from" and "oem_access_when" data fields and the "addr" variable in the MRNS application source code, I was able to determine that the software, as it existed at the time of the 2016 APFA National Officer Election, did not include such a mechanism. Therefore, although this data was being collected by the system, it would not have been accessible to BallotPoint engineers or to any other authorized users of the system.

Of course, software can be changed. Given that this information existed on the system, it was possible for BallotPoint engineers to change the software to make this data accessible to one or more categories of users. For example, BallotPoint could write software to generate a report that would list the IP address information stored in the "oem_access_from" field next to the other voter identifying information stored on the MRNS, including voter name. Because of this possibility that a BallotPoint engineer could change the software to make this data accessible, my

140

assessment is that the system's greatest vulnerability to the "confidentiality" information-protection concept was the internal threat posed by BallotPoint systems administrators.[11]

It is my opinion, however, that voter confidentiality was adequately protected during the 2016 APFA National Officer Election because of a series of controls and limits included on the system to limit BallotPoint's own ability to alter the application software. Specifically, BallotPoint has designed the MRNS so that BallotPoint itself cannot make changes to the application software running on the MRNS; rather, all changes to the application software can only be made by the third-party server host, Lightpoint. In order to effect a software change on the MRNS, BallotPoint sends an encrypted CD to Lightpoint, which then installs the software update via its terminal without physically accessing the BallotPoint server. Lightpoint maintains a log of all such changes, and BallotPoint maintains an identical log at its offices.[12]

As part of my site visit, I reviewed the BallotPoint logs of changes made to the MRNS application software during the 2016 APFA National Officer Election, as well as the application code of each change. There were two such changes made during the election. Based on that review, I was able to determine that neither software update made any reference to the data stored in the "oem_access_from" or "oem_access_when" fields, *i.e.*, the IP address and timestamp data that was ultimately used by the DOL to match voter identifying information with cast ballots. Therefore, I conclude that the information stored in these fields was not available to

---

[11] NIST's *Security Considerations for Remote Electronic UOCAVA Voting*, describes generally the threats posed by systems administrators in all remote electronic voting systems. NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 2.3.1, at 10-11. In the BallotPoint system, there is very low risk that other authorized users (voters and election officials) could make the requisite software change because those users do not have the necessary level of system access to make a change to the application software.

[12] This separation of duties ensures that two independent contractors must collude in order to make undetected changes to the MRNS application code, and is a recommended control for ensuring ballot secrecy. NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 4.4.4, at 21.

BallotPoint system administrators (or other system users) through the end of the 2016 APFA National Officer Election.

Based on my experience conducting risk assessments for information systems, I consider the controls BallotPoint has put in place to protect against an unauthorized software change by a system administrator adequate to protect against the threat to voter confidentiality posed by such a change. Although BallotPoint has the ability to make software changes that would cause the system to collect identifying information or to make that data accessible to system administrators or other users, the making of such changes would ultimately leave a forensic trail (at least on the Lightpoint versions of the change logs), which would disclose in a subsequent investigation (be it by DOL or a user organization) that such identifying information had been collected/made accessible.[13] Moreover, because of the existence of this trail, I am able to state confidently that no software changes were made to the MRNS that would have made this data accessible during the election.

Therefore, it is my opinion that, in connection with the 2016 APFA National Officer Election, the BallotPoint electronic voting system included reasonable controls of the kind that would be expected to protect ballot secrecy in a remote-electronic voting system from the possibility that votes could be linked to voters via IP address information associated with both the content of votes and voter identifying information.

*          *          *

---

[13] Such logging of software changes provides an effective means to deter and detect attacks on an information-technology system. U.S. Dep't of Commerce, National Institute of Standards and Technology, Special Publication 800-123, *Guide to General Server Security,* (July 2008), at 6-1 ("Logging is a cornerstone of a sound security posture. . . . [L]og files are often the only record of suspicious behavior. Enabling the mechanisms to log information allows the logs to be used to detect failed and successful intrusion attempts and to initiate alert mechanisms when further investigation is needed.")

I note separately that the ability of the BallotPoint system to send voters confirmation emails or to provide them with confirmation that their votes have been successfully cast in no way demonstrates that the system as designed enabled voters' identities to be associated with the content of their votes. The system provides voter confirmations as follows.

Once a voter checks into the voting system (via the MRNS) with his or her unique voting credential, the MRNS indicates to the ES the voter profile of the voter who just checked in (ensuring that the voter is presented with the appropriate ballot; in the 2016 APFA National Officer Election, voter profiles corresponded to each member's domicile).  But although the voter profile is communicated to the ES, by design, no individual voter identifying information is shared other than a randomly generated one-time password that is identified with that voting session.  After the voter successfully casts a vote and it is recorded to the ES, the ES informs the MRNS that the voting session associated with that one-time password has been successfully completed, but it does not send the content of the vote to the MRNS.  In the member table, the MRNS marks the member identity associated with that one-time password as having voted, and then permanently deletes the one-time password.  The MRNS then informs the voter that he or she has voted successfully, a function it can perform without ever possessing the information necessary to associate the content of a vote with that voter's identity.

Thus, the MRNS sends confirmation emails based only on the *fact* that a vote was successfully cast, and completely independent of the *content* of that vote.  The ability of the system to send confirmation emails is not evidence that the system was designed to enable voters' identities to be matched with the content of their votes.

143

**B.    There is no reasonable possibility that the tally of ballots communicated by BallotPoint to APFA at the end of the election incorrectly reflected the winners of the election selected by the voters.**

Based on my review of the overall system architecture, and the controls BallotPoint instituted at each step of the voting and tallying process, in connection with the 2016 APFA National Officer Election, it is my opinion that there is no reasonable possibility that the BallotPoint system failed to perform as intended to ensure that voters' votes were cast-as-intended and counted-as-cast.  In particular, controls at each step of the process exist to ensure that vote integrity is maintained when the voter's vote is (1) cast and transmitted from the user's machine to BallotPoint; (2) recorded on the ES; (3) maintained on the ES during the remainder of the election period; and (4) correctly tallied at the end of the election.  Although no information system can be considered 100% secure, the protections in place in the BallotPoint system used in the 2016 APFA National Officer Election include many controls recommended by NIST for systems of this type and purpose, and together ensure that there is no reasonable possibility that the reported results of the election failed to reflect voters' intentions.

I have included a flowchart, attached as Exhibit A to this report, that illustrates the voter-system interactions in the BallotPoint voting process.  I have also included a flowchart, attached as Exhibit B to this report, that illustrates the server-to-server interactions, including the encryption and hashing of data performed by each server.  What follows is a review of the adequacy of the controls BallotPoint introduced at each step of the voting process to ensure vote integrity.

**1.    Casting of votes.**

In the first step of the voting process, a voter casts his or her ballot using a web application (on a computer or smartphone) or over the telephone.  For computer-based votes, the primary threat at this stage is the risk that malicious software on client systems could interfere

144

with the casting of a vote, preventing the vote from being cast-as-intended.  The threat of malicious software on a user's machine (as opposed to the servers maintained by the election systems administrator) is often referred to as a client-side threat.[14]  A personal computer or smartphone infected with malicious software targeting the election could potentially steal the victim's authentication credentials or could, in theory, change a user's vote without the victim noticing.[15]

Ensuring the security of personally owned computers is one of the most difficult aspects of securing any information system in which users are permitted to access the system from their personal machines.[16]  To mitigate this threat, BallotPoint has implemented a recommended control, the use of a secondary communication channel.[17]  Specifically, in BallotPoint-administered elections, voter credentials are distributed through the postal mail, instead of through an electronic communication channel.  Use of the postal mail ensures that an infected computer cannot intercept the voting credential and use it to cast a ballot without the voter ever becoming aware that he or she had been sent a credential.  However, the voter must still enter his or her credential before casting a ballot, introducing the credential to the potentially infected system and the possibility of manipulation by malicious software.

However, despite the conceptual vulnerability represented by client-side infection of the user's machine, in my opinion, the risk that such infection could have affected the outcome of the 2016 APFA National Officer Election is very low.  Each successful attack on a voter's computer can impact only one or an extremely small number of voters.[18]  Moreover, a piece of

---

[14] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.3.4, at 29.

[15] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.3.4, at 29.

[16] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.5, at 37.

[17] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.4.9, at 35.

[18] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.3 at 30.

malicious software capable of manipulating the BallotPoint voting process would need to be sophisticated and would require in-depth knowledge of BallotPoint's processes.  Security assessors consider the notoriety of the purpose to which a system is being put when assessing the risk presented by a particular vulnerability, including client-side vulnerabilities; in general, the more well-known the purpose to which an information technology system is put, the greater the likelihood (and therefore the risk) that an attacker will invest the time and resources required to affect a sufficient number of client-side systems.[19]  Given the relatively low notoriety of the APFA 2016 National Officer Election (as compared to say, a national or statewide political election),[20] and in the absence of any evidence (in the form of suspicious voting patterns or irregular voter activity) of client-side malicious interference with votes, in my opinion, there is not a significant possibility that a sufficient number of voters' machines could have been infected with malicious software capable of altering the content of a vote (such that the vote was not cast-as-intended) to have affected the outcome of the National President general election, the election with the smallest margin of victory (582 votes).[21]

### 2. Transmission and recording of a vote on the BallotPoint server.

Once a voter selects his or her voting choice, BallotPoint has instituted strong controls to ensure, with a high degree of likelihood, that the vote will be successfully transmitted to BallotPoint without interception or manipulation.  The primary control BallotPoint uses to ensure

---

[19] For example, in Ben Adida et. al, *Electing a University President using Open-Audit Voting: Analysis of real world use of Helios*, June 25, 2009, at 2, because of client-side risks, the authors declined to endorse the use of a remote-electronic voting system in "large, high-stakes, governmental elections where the threat of a targeted virus would be far more realistic."

[20] For comparison's sake, NIST's assessment of the use of remote electronic voting systems for overseas military voters suggested that it would be difficult for attackers to "successfully target the relatively small percentage of individuals in the world that are eligible to vote as overseas or military voters."  NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.5, at 37.  The individuals voting in the 2016 APFA National Officer Election are likewise a relatively small percentage of the computer-using public.

[21] The 582-vote margin of victory describes the margin between the second- and third-place finishers, because, in this first-round election, the top two finishers advanced to the final round of voting.

146

successful transmission is encryption via secure-socket-layer (SSL) protocol, a commonly used form of cryptographic protection for both data integrity and confidentiality.[22]  In a transaction conducted according to the SSL protocol, the server hosting the web application (here, BallotPoint's server) and the user's web browser must agree on an encryption algorithm and an encryption key before any information is sent from the user's machine to the web server.  Once that agreement is reached, the information is encrypted and can only be decrypted by a party possessing both the algorithm and the key.  Thus, even if someone successfully intercepted transmission of the data, he or she would not be able to manipulate it (or even view it) unless he or she possessed both the algorithm and key.[23]  SSL encryption, which is widely used for a variety of everyday commercial and financial transactions, is very effective at protecting data in transit.[24]  Accordingly, once a voter successfully selects candidates and authorizes the system to submit his or her ballot (that is, once he or she casts his or her ballot), there is a very high likelihood that it will arrive at BallotPoint's servers without interference, effectively ensuring that the vote will be transmitted-as-cast.

Once it arrives at the BallotPoint servers, the vote must be recorded.  At this stage, the most significant threat is an insider attack by a BallotPoint system administrator, potentially taking the form of intentional installation of malicious code that can change election data.[25]  Despite the possibility that a BallotPoint system engineer could, theoretically, alter the application code to manipulate the content of a vote at the moment it arrives at the BallotPoint server, before the vote is encrypted or hashed (see Section III.B.3, below), there is no evidence to

---

[22] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 4.4.1, at 19-20.

[23] TechRadar.com, *How SSL and TLS works,* (Jan. 2, 2012), *available at* http://www.techradar.com/news/software/how-ssl-and-tls-works-1047412.

[24] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.4.1, at 31.

[25] Such insider "attacks have the potential to change a large number of votes and can be difficult to detect."  NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.3.2, at 28.

suggest that such intentional manipulation occurred in the 2016 APFA National Officer Election. In conducting risk assessments, it is appropriate to consider both the motivations of users who constitute a threat to one of the information-protection concepts, and the opportunity such a user has to do harm. In the BallotPoint electronic voting system, there is little to no motivation for BallotPoint system administrators to manipulate the outcome of an election in this way. Indeed, because the value of the BallotPoint product is tied almost entirely to its perception as an impartial electoral tool, even an unfounded allegation of such manipulation could undermine BallotPoint's entire business model. Moreover, the opportunity of any BallotPoint system administrator to make such a change without alerting one of the other two system administrators is very limited due to the closed nature of the application and the level of familiarity all three system administrators have with the entire code.

In sum, BallotPoint has put in place controls to ensure the integrity of the vote will be maintained during transmission to its servers, and, based on my experience conducting risk assessments of information systems, I can state with a high degree of confidence that the BallotPoint system is designed to record accurately votes once they arrive at the BallotPoint server.

### 3.     Maintenance of a vote on the BallotPoint server.

Once a vote has been successfully recorded to the ES, additional sophisticated controls exist to ensure that the integrity of that vote is maintained throughout the duration of the election. Like at the transmission phase, the BallotPoint servers store encrypted votes to ensure vote integrity is maintained while the votes are at rest on the server (while also helping to preserve voter confidentiality). The BallotPoint server employs two levels of encryption. First, the ES encrypts a vote using a standard encryption key common to the entire election (the "election

148

key"). The now-encrypted vote (a "singly encrypted vote") is then sent to the MRNS, which encrypts the vote again using an encryption key unique to that vote (creating a "doubly encrypted vote"). This double-encryption process provides additional protection for the integrity of the cast ballot because each level of encryption requires a different key to decrypt the vote, and those keys are stored on different servers, providing a level of separation in the event an attacker obtained access to one of the encryption keys. Exhibit B, the flowchart illustrating server-to-server interactions, summarizes these processes.

After the doubly encrypted vote is created by the MRNS, an algorithm is run on the doubly encrypted vote to create a SHA256 hash value.[26] The doubly encrypted vote is sent to the ES and the SHA256 hash value of the doubly encrypted vote is stored on the MRNS. The hash value factors in both the vote itself and certain ancillary data, so that each hash value is unique to that vote. But, because the hash value generated from the doubly encrypted vote consists of a (seemingly random) string of characters, a person viewing the hash values cannot (during the election or afterwards) determine the content of the underlying vote from the hash value. However, if any changes are made to the underlying vote (or the ancillary data that is factored into the hashing algorithm), a completely new hash value will be created, and the original hash value could not be generated.[27] Therefore, if, at the time of the tally, the hash

---

[26] SHA256 refers to a "Secure Hashing Algorithm" resulting in a 256-bit message digest, a commonly used cryptographic algorithm for which it is "computationally infeasible 1) to find a message that corresponds to a given message digest, or 2) to find two different messages that produce the same message digest." NIST, *Federal Information Processing Standards Publication* 180-4 (March 2012), at iv.

[27] NIST explained this process in connection with the release of an additional SHA standard:

> Hash algorithms are broadly useful in the world of electronic communications. They transform a digital message into a short 'message digest' for use in digital signatures and other applications. Even a small change in the original message creates a change in the digest, making it easier to detect accidental or intentional changes to the original message. Hash functions can be used in a variety of security applications such as message authentication.

149

values generated from a given vote string on the ES do not match those on the MRNS, BallotPoint system administrators would be alerted that the record of the vote stored on one or the other system had been tampered with.

The generation and storage of the doubly encrypted vote and hash value in two different places (one on each server) provides an effective way to ensure that there is no tampering (intentional or otherwise) with the content of the vote between the time the hash value is generated and the time of the vote tally—if a generated hash value for a vote does not match a previously generated hash value, at least one of the vote data files has been tampered with, providing notice that the vote might be inaccurate. In particular, if any of the hash values present on the earlier tables of vote digests are not present on the final, post-tally table, it will alert officials or investigators to potential tampering or other interference with the content of saved votes between the time the table of vote digests was downloaded and the time the ballots were tallied.

As part of my review of the BallotPoint system, I compared a table of vote digest values that had been downloaded by Cindy Horan during the 2016 APFA National Officer Election and a table of vote digests generated after the conclusion of the election. This review disclosed no changes to vote digest values, indicating that no changes were made to recorded vote selections. From this evidence, I can conclude that there was no tampering or other interference with the integrity of votes while they were at rest on the BallotPoint system from the point when the vote digest table was generated. Based on the consistency of the downloaded table of vote digests and my understanding of the hashing process used by BallotPoint, I concluded that there is no reasonable probability that any of the votes were altered between the time they were recorded

Press Release, NIST, NIST Releases SHA-3 Cryptographic Hash Standard (August 5, 2015), *available at* https://www.nist.gov/news-events/news/2015/08/nist-releases-sha-3-cryptographic-hash-standard.

150

and encrypted in the BallotPoint system, and the time at which they were tallied at the end of the election.

### 4.     Counting of the Ballots.

The final step in ensuring that voters' votes are counted-as-cast is the actual tallying of the ballots.  To ensure that the BallotPoint system was accurately tallying the cast ballots, I reviewed the portion of the application code responsible for counting the cast ballots.  This is a very straightforward program, and is functionally similar to tallying programs used in all manner of computer applications.  Based on my experience designing and reviewing similar systems, there is no reasonable possibility that the BallotPoint application would make an error tallying the votes.  Based on this review of the application code, I concluded that the tally of the vote totals sent by BallotPoint to APFA accurately reflected the sum of recorded votes for each candidate at the moment of the tally.

In addition, the BallotPoint application is capable of generating a report (referred to as a "Votes Table") that lists the plain-text vote string of all recorded ballots at the time of the tally.  A person (or someone using a familiar computer program like Microsoft Excel) could count the number of votes cast for each candidate by reviewing these plain-text vote strings in order to verify independently that the BallotPoint-reported vote totals accurately reflected the recorded ballots at the time of the tally.  By using simple Excel commands, I was able to conduct an automated recount of the vote strings stored in the Votes Table, and I independently confirmed that the recorded vote totals for each election choice matched the totals reported by BallotPoint to APFA.

151

## Conclusion as to Principal Opinion B

The security architecture and security controls BallotPoint implemented and maintained during the 2016 APFA National Officer Election protected the integrity of: the authentication credentials sent to voters, ballot selections transmitted from voters to the election system, ballot selections made by voters at rest within the election system, and the tally results generated by the election system. These controls were sufficient to protect from any inadvertent or malicious attempts by credible, motivated attackers to manipulate or alter the results of the APFA election.

Once a voter submitted his or her ballot selections, it is very unlikely that those selections could have been changed after a voter had cast them and before they reached the election system because that communication was sufficiently encrypted by an industry-standard cryptographic protocol.

It is also very unlikely that the BallotPoint system would have captured and recorded voters' ballot selections incorrectly because the application code BallotPoint designed to perform those functions is well organized, mature, and maintained by a very small number of experienced BallotPoint employees.

Once a ballot has been cast and recorded by the BallotPoint system, it is very unlikely that modifications can be made to an existing vote without such a modification being noticed by BallotPoint employees and election officials because BallotPoint has implemented a sophisticated suite of encryption and hashing protocols designed to alert system administrators if such a modification occurs.

Finally, the method used to tally election results guarantees that only votes whose information found in one server (MRNS) matches vote information found in another server (ES) are counted. It is likewise very unlikely that the program would have mis-tallied the recorded

votes because the portion of the code that performs the tallying is, again, well-organized, mature, and maintained by a very small number of experienced BallotPoint employees.

Throughout the voting, recording, and tallying process, there are very few opportunities to mishandle or manipulate votes. There are three (3) BallotPoint employees that have privileged access to the application source code; given this privileged status, these employees would have had the greatest opportunity to attempt to maliciously introduce application source code changes that could have affected the outcome of the election. These three employees represent a distinct threat because of their unique profile: insider, privileged, and skilled. However, it is very unlikely that such a malicious attempt to interfere with the results of the election could occur and go unnoticed, as it would likely require collusion between more than one employee. Moreover, the motivation of each of these employees to interfere with the election in this manner was very low. None of the BallotPoint privileged insiders are members of the APFA, and my assessment is that it is very unlikely that they would have been motivated to risk their livelihood on an attempt to throw the election. My assessment is that it is far more likely that the BallotPoint system administrators are highly motivated to ensure the proper function and unvarnished perception of the election system: accurate election results and user trust are vital to BallotPoint employees' success and future employment. Therefore, I assess the likelihood of intentional manipulation of the source code that is responsible for recording votes to be very low.

In sum, given the assessed security architecture, the threats to vote integrity, and the security controls in place to protect against those threats, the residual risk of manipulation of the election results, or of inadvertent system error that affected the election results, is very low. It is

unreasonable to believe that the result of the election did not reflect the votes cast by the voting users of the system.

_____

Curt Stapleton

DATED: June 30, 2017

EXHIBIT A



156

# EXHIBIT B

# Server-Server Interactions

## h Voting Session
·rmines Voter Type



MRNS sends ballot type to ES

MRNS requests a One-Time-Password

ES Sends One-Time-Password to MRNS



1. ES Generates One-Time-Password
2. ES Presents Ballot to User + One Time Password

The One-Time-Password is a random code that is never stored on disk
It allows the MRNS to associate messages sent with it to a distinct voter

## Vote
ballot

ot Selections
Time-Password



Once the ballot has been submitted, ES knows:
- The ballot selections made by the voter
- The one-time-password associated with this voting session

## Vote
pts and stores ballot

ES generates a new, unique code for vote.
The ballot selections and unique code are combined, and that
combined information is encrypted.
The combined information is encrypted using the ES election
key, and the result is the "Encrypted Vote".



Encrypted vote
One-Time-Password
Doubly Encrypted Vote
One-Time-Password



1. MRNS generates a new key unique to the encrypt
2. MRNS encrypts the Encrypted Vote using the new
   result is a "Doubly Encrypted Vote".
3. MRNS calculates a HASH value of the Doubly Encr
   guaranteed to be unique.
4. MRNS stores the HASH value, and key loca.
5. MRNS sends the Doubly Encrypted Vote to the ES

## ꞁ Vote Record
·irms recording of vote



Doubly Encrypted Vote Received

One-Time-Password

One-Time-Password
Vote confirmed

Vote Confirmation Email

1. Once ES receives "Vote Confirmed" message, the one-time-pas
   is destroyed and the 12 digit PIN cannot be used again to vote.

# EXHIBIT C

Authoritative Literature

U.S. Dep't of Commerce, National Institute of Standards and Technology, Special Publication 800-30, *Guide for Conducting Risk Assessments* (Sept. 2012).

U.S. Dep't of Commerce, National Institute of Standards and Technology, Internal/Interagency Report 7770, *Security Considerations for Remote Electronic UOCAVA Voting* (Feb. 2011).

U.S. Dep't of Commerce, National Institute of Standards and Technology, Special Publication 800-123, *Guide to General Server Security,* (July 2008).

Ben Adida et. al, *Electing a University President using Open-Audit Voting: Analysis of real world use of Helios,* 2009 Electronic Voting Technology Workshop/Workshop on Trustworthy Elections (June 25, 2009).

TechRadar.com, *How SSL and TLS works,* (Jan. 2, 2012), *available at* http://www.techradar.com/news/software/how-ssl-and-tls-works-1047412.

U.S. Dep't of Commerce, National Institute of Standards and Technology, Federal Information Processing Standards Publication 180-4, *Secure Hash Standard (SHS)* (March 2012).

Press Release, National Institute of Standards and Technology, *NIST Releases SHA-3 Cryptographic Hash Standard* (August 5, 2015), *available at* https://www.nist.gov/news-events/news/2015/08/nist-releases-sha-3-cryptographic-hash-standard.

160

Declaration of Cindy Horan in Support of APFA's
Motion for Summary Judgment

Tab G; Page 161

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THOMAS E. PEREZ [now R. ALEXANDER
ACOSTA], Secretary of Labor,

     Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

     Defendant.

Civil Action No. 4:16-cv-1057-A

## DECLARATION OF CINDY HORAN IN SUPPORT OF APFA'S MOTION FOR SUMMARY JUDGMENT

I, Cindy Horan, hereby declare as follows:

1.     I am over the age of eighteen and am competent to testify as to all of the facts contained in this Declaration, of which I have first-hand, personal knowledge, or know from the business records of the Association of Professional Flight Attendants ("APFA").

2.     The APFA is the largest independent flight attendant union in the United States. APFA represents over 26,000 flights attendants employed by American Airlines, and APFA members live in nearly all of the 50 states as well as several foreign countries.

3.     APFA is administratively divided into 14 local units known as bases. The bases correspond generally to airports that serve as American Airlines hubs, although there are two bases at Reagan Washington National Airport (DCA), one representing legacy American Airlines flight attendants and one representing legacy U.S. Airways flight attendants. Each

161

APFA-represented flight attendant is assigned to a base, although many APFA members are "commuters" who do not live in close proximity to their assigned base. APFA also maintains three "satellite" bases (Atlanta (ATL), Minneapolis-St. Paul (MSP), and San Diego (SAN)), near which many flight attendants live and from which they might disembark for flights.

4.      I have been employed by American Airlines as a flight attendant for over 25 years. I have been a member of the APFA for the length of my employment with American Airlines. Although I live in Round Hill, VA, I am currently assigned to the Miami, FL (MIA) base.

5.      I was elected and served as APFA Base Vice Chair for Reagan Washington National Airport – International Flights from 1998 until 2003. I was elected and served as APFA Base Chair for Reagan Washington National Airport – International Flights from 2003 until 2007, and again for a period in 2008.

6.      In 2010, I was appointed by the APFA Board of Directors to serve as a member of the National Ballot Committee ("NBC"). I served as a member of the NBC until August 2011, when I was elected by the other NBC members to serve as Chairperson of the NBC. I was reappointed as a member of the NBC and then re-elected as its Chairperson in 2014, and I served as Chairperson during the 2016 APFA National Officer Election. In 2016, after the conclusion of the National Officer Election, I was again reappointed by the APFA Board of Directors to the NBC and was again re-elected to serve as its Chairperson, and I continue to serve in that capacity today.

7.      The NBC is a five-member committee established by the APFA Constitution that has responsibility for overseeing all facets of APFA elections and referenda. The duties of the NBC include but are not limited to: (1) supervising election and balloting procedures; (2)

162

determining eligibility of nominees; (3) overseeing the preparation of the ballots; (4) determining

ballot validity; and (5) certifying the results of the balloting to the National Secretary or

certifying contract referenda in accordance with the APFA Constitution.

8.    When I first became a member of APFA, APFA conducted its elections via mail

ballot. APFA continued to use mail ballots through about 2009, when APFA began using an

electronic ballot system through which voters could cast their votes over the phone or via the

internet. Sometime before my 2010 appointment to the NBC, APFA engaged BallotPoint

Election Services to serve as APFA's third-party election administrator. Throughout my tenure

on the NBC, APFA has used BallotPoint to administer both its officer elections and its contract

referenda.

9.    Through my service on the NBC, as well as my employment as a flight attendant,

I have become familiar with the manner in which other unions with large, national memberships

conduct their elections. In particular, I am familiar with the manner in which airline pilots and

other flight attendant unions conduct elections. In each such instance of which I am aware, those

unions conduct their elections via electronic ballot or mail ballot anytime the election requires

the union to poll its entire membership (that is, in directly elected national officer elections and

national contract referenda). Before the advent of electronic balloting, each such union of which

I am aware conducted elections requiring a poll of the entire membership via mail ballot.

10.    APFA-represented flight attendants are a highly mobile population. On any given

day, approximately 40% of APFA members are flying on assigned international or domestic

trips. Depending on these flight attendants' schedules, it can be difficult or impossible for flight

attendants on trips to appear in-person at a voting booth to cast a ballot, even if APFA

maintained and staffed voting booths at each of its 13 separate bases and 3 satellite bases.

163

11.    Therefore, the practical effect of APFA conducting in-person balloting would be that, on any given day, a substantial percentage of APFA's membership would be unable to cast a vote and would be effectively disenfranchised.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed in Round Hill, VA, this 18 day of August, 2017.

Cindy Horan

4

164

Deposition of Cindy Horan (Excerpts)

Tab H; Page 165

# Alderson®

## COURT REPORTING

Transcript of **Cindy Horan**

July 27, 2017

*Perez v. Association of Professional Flight Attendants*

Alderson Reporting
1-800-367-3376
info@aldersonreporting.com
http://www.aldersonreporting.com

Alderson Reference Number: 71545

Cindy Horan                                                       July 27, 2017

Washington, D.C.

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                     FORT WORTH DIVISION

 4     - - - - - - - - - - - - - - - X

 5     R. ALEXANDER ACOSTA,              :

 6     Secretary of Labor                :

 7          Plaintiff,                   :   Civil Action No.

 8              v.                       :   4:16-cv-1057-A

 9     ASSOCIATION OF PROFESSIONAL       :

10     FLIGHT ATTENDANTS,                :

11          Defendant.                   :

12     - - - - - - - - - - - - - - - X

13                          Washington, D.C.

14                          Thursday, July 27, 2017

15          Deposition of CINDY HORAN, a witness

16     herein, called for examination by counsel for

17     Plaintiff in the above-entitled matter, pursuant to

18     notice, the witness being duly sworn by ANGELA K.

19     MCCULLOUGH, RPR, a Notary Public in and for the

20     District of Columbia, taken at the offices of

21     Bredhoff & Kaiser PLLC, 805 15th Street, Northwest,

22     Suite 1000, Washington, DC, at 9:52 a.m., Thursday,
```

Cindy Horan                                                        July 27, 2017
                           Washington, D.C.

Page 2

1    July 27, 2017, and the proceedings being taken down

2    by Stenotype by ANGELA K. MCCULLOUGH, RPR, and

3    transcribed under her direction.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Cindy Horan                                                    July 27, 2017
                        Washington, D.C.

```
                                                        Page 3

1    APPEARANCES:

2

3         On behalf of the Plaintiff:

4              BRIAN W. STOLTZ, ESQ.

5              JENNIFER FREY, ESQ.

6              U.S. Department of Justice

7              United States Attorney's Office

8              Northern District of Texas

9              1100 Commerce Street, Suite 300

10             Dallas, Texas   75242

11             (214) 659-8626

12             brian.stoltz@usdoj.gov

13              and

14             TAMBRA LEONARD, ESQ.

15             U.S. Department of Labor

16             Office of the Solicitor

17             200 Constitution Avenue, Northwest

18             Washington, DC   20210

19             (202) 693-5744

20             Leonard.tambra@dol.gov

21

22
```

Cindy Horan                                                      July 27, 2017
                        Washington, D.C.

```
                                                         Page 4

 1    APPEARANCES (Continued):

 2

 3        On behalf of the Defendant:

 4              ANDREW D. ROTH, ESQ.

 5              ANDREW MILLER, ESQ.

 6              Bredhoff & Kaiser, PLLC

 7              805 15th Street, Northwest, 10th Floor

 8              Washington, DC  20005

 9              (202) 842-2600

10              aroth@bredhoff.com

11

12    ALSO PRESENT:

13              Ellen Kresha, DOJ Intern

14

15

16

17

18

19

20

21

22
```

Page 29

1  work, we have an employee number.

2       Q.    You also mentioned a ballot as being

3  uploaded to the BallotPoint website.  And I take it

4  the ballot -- let's say, for example, for the

5  presidential race, the ballot would say who the

6  candidates are; is that right?

7       A.    That correct.

8       Q.    And then is each -- I think I've seen one

9  of these notices.  But my understanding is that each

10  candidate is assigned a number; is that right?

11      A.    That's correct.

12      Q.    So if a -- is the procedure that if a --

13  essentially the union members are instructed that in

14  the presidential race, if you want to vote for

15  candidate Joe Smith press or select 1; is that how it

16  works?

17      A.    That's correct.

18      Q.    And, likewise, if you want to vote for

19  candidate William Smith he would be candidate 2; is

20  that right?

21      A.    That's correct.

22      Q.    Okay.  So you had -- you mentioned that

Cindy Horan                                                                July 27, 2017
Washington, D.C.

Page 104

1   Notice Date: August 8, 2017

2   Deposition Date: July 27, 2017

3   Deponent: Cindy Horan

4   Case Name: Perez v. Association of Professional

5   Flight Attendants

6   Page:Line          Now Reads            Should Read

7   _____  _____  _____

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

Alderson Court Reporting

Cindy Horan                                                              July 27, 2017
Washington, D.C.

Page 105

```
 1              CERTIFICATE OF DEPONENT

 2    I hereby certify that I have read and examined the

 3    foregoing transcript, and the same is a true and

 4    accurate record of the testimony given by me.

 5    Any additions or corrections that I feel are

 6    necessary, I will attach on a separate sheet of

 7    paper to the original transcript.

 8                       _____

 9                       Signature of Deponent

10    I hereby certify that the individual representing

11    himself/herself to be the above-named individual,

12    appeared before me this _____ day of _____,

13    2017, and executed the above certificate in my

14    presence.

15

16                       _____

17                       NOTARY PUBLIC IN AND FOR

18

19                       _____

20                       County Name

21

22    MY COMMISSION EXPIRES:
```

```
 1              CERTIFICATE OF REPORTER
 2   UNITED STATES OF AMERICA ) ss.:
 3   DISTRICT OF COLUMBIA     )
 4       I, ANGELA MCCULLLOUGH, the officer before whom
 5   the foregoing proceedings were taken, do hereby
 6   certify that the foregoing transcript is a true and
 7   correct record of the proceedings; that said
 8   proceedings were taken by me stenographically to the
 9   best of my ability and thereafter reduced to
10   typewriting under my supervision; and that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to this case and have no interest,
13   financial or otherwise, in its outcome.
14
15
16                    Angela K. McCullough
17                    Notary Public in and for
18                    The District of Columbia
19
20   My commission expires: 1/31/2020
21
22
```

173