

# ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

2017 AUG 25  PM 1: 57

CLERK OF COURT

NC

|  |  |
|---|---|
| THOMAS E. PEREZ [now R. ALEXANDER ACOSTA], Secretary of Labor, | |
| Plaintiff, | Civil Action No. 4:16-CV-1057-A |
| v. | |
| ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, | |
| Defendant. | |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

JOHN R. PARKER
United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff,
the Secretary of Labor

# Table of Contents

I.   Introduction ................................................................................. 1

II.  Background ................................................................................. 1

   A.  The LMRDA's ballot-secrecy and observer requirements. .......................... 2

   B.  The APFA's January 2016 election of national officers................................ 5

   C.  The BallotPoint remote electronic voting system. ..................................... 7

   D.  A losing candidate contests the election and files a complaint with
       the Secretary under the LMRDA. ........................................................ 10

   E.  The Secretary investigates and, finding probable cause to believe
       that the LMRDA's ballot-secrecy and observer requirements were
       violated in the APFA's election, files this suit. ...................................... 12

III. Summary-Judgment Standard ...................................................... 16

IV.  Argument and Authorities............................................................. 17

   A.  The voting system used in the APFA's election made it possible to
       link voters to their votes, in violation of the LMRDA's secrecy
       requirement. ................................................................................. 18

       1.  Ballot secrecy was violated in two different ways:  by the use
           of one-time passwords that linked voters to votes, and also by
           the use of IP addresses and other data that linked voters to
           votes. ........................................................................... 18

       2.  The APFA's anticipated arguments against the existence of
           ballot-secrecy violations are unavailing. ............................... 23

       3.  Summary. ...................................................................... 28

   B.  The voting system used in the APFA's election did not permit
       candidates to have an observer at the polls and at the counting of the
       ballots, in violation of the LMRDA's observer requirement...................... 28

   C.  Because the ballot-secrecy and observer violations in the APFA's
       election may have affected the outcome of the election, the LMRDA
       requires that the election be voided and that a new election be
       conducted under the Secretary's supervision............................................ 34

V.   Conclusion................................................................................... 46

# Table of Authorities

## Cases

*Am. Fed'n of Musicians v. Wittstein*,
    379 U.S. 171 (1964) ............................................................................... 3

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................. 16

*Bachowski v. Brennan*,
    413 F. Supp. 147 (W.D. Pa. 1976) .................................................. 4, 36

*Brennan v. Local Union 300*,
    No. 72-3042-LTL, 1974 WL 1068 (C.D. Cal. Feb. 21, 1974) ............... 31

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ......................................................................... 16, 17

*Chao v. Local 54*,
    166 F. Supp. 2d 109 (D.N.J. 2001) ............................................ 17, 18, 35

*Dole v. Graphic Commc's Int'l Union*,
    722 F. Supp. 782 (D.D.C. Sept. 22, 1989) ......................................... 35

*Dole v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers*,
    No. 89-241, 1990 WL 251022 (D. Haw. May 2, 1990) ..................... 35, 41

*Donovan v. CSEA Local Union 1000*,
    594 F. Supp. 188 (N.D.N.Y. 1984) ........................... 21, 22, 24, 37

*Donovan v. CSEA Local Union 1000*,
    761 F.2d 870 (2d Cir. 1985) ............................................................. 21

*Donovan v. Local 719*,
    561 F. Supp. 54 (N.D. Ill. 1982) ...................................................... 35

*Ellis v. Chao*,
    155 F. App'x 18 (2d Cir. 2005) .................................................. 4–5, 29

*Garcia v. United States*,
    No. 4:16-CV-963-A, 2017 WL 2537280 (N.D. Tex. June 9, 2017) ...... 16

*Hodgson v. Local 6799*,
    403 U.S. 333 (1971) ......................................................................... 12

*Hugler v. Local 689,*
 No. GJH-16-2052, 2017 WL 3085321 (D. Md. July 18, 2017)........... 35, 37–38, 38

*Kelly v. Local No. B-183,*
 566 F. Supp. 1199 (S.D.N.Y. 1983).................................................................. 20, 21

*Marshall v. Am. Postal Workers Union,*
 486 F. Supp. 79 (D.D.C. 1980) ........................................................................ 35, 38

*Marshall v. Local 135,*
 No. 78-4280, 1980 WL 18743 (E.D. Pa. Sept. 16, 1980) ...................... 5, 29, 31, 44

*Marshall v. Local Union 12447,*
 591 F.2d 199 (3d Cir. 1978)................................................................. 3, 18, 24, 44

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
 475 U.S. 574 (1986) ................................................................................................ 17

*Miss. Prot. & Advocacy Sys. v. Cotten,*
 929 F.2d 1054 (5th Cir. 1991) ............................................................................... 17

*Mitchell v. Mitchell Truck Line, Inc.,*
 286 F.2d 721 (5th Cir. 1961).................................................................................. 42

*Reich v. District Lodge 720,*
 11 F.3d 1496 (9th Cir. 1993)............................................................................. 4, 42

*Reich v. United Mine Workers,*
 No. 94-1691, 1995 WL 791950 (D.D.C. Oct. 24, 1995) ....................................... 21

*Shultz v. Indep. Employees Union,*
 No. 68-C-169, 1970 WL 5444 (W.D. Wis. Apr. 10, 1970) .................................... 43

*Solis v. Local 9477,*
 798 F. Supp. 2d 701 (D. Md. 2011) ...................................................................... 18

*United States v. Wells,*
 No. 07-448, 2008 WL 4483735 (D. Minn. Sept. 30, 2008)..................................... 8

*Usery v. District 22,*
 543 F.2d 744 (10th Cir. 1976)......................................................................... 12, 46

*Usery v. Int'l Org. of Masters, Mates & Pilots,*
 422 F. Supp. 1221 (S.D.N.Y. 1976)...................................................................... 37

*Wirtz v. Am. Guild of Variety Artists*,
    267 F. Supp. 527 (S.D.N.Y. 1967) ................................................................ 3

*Wirtz v. Hotel, Motel & Club Employees Union, Local 6*,
    391 U.S. 492 (1968) ............................................................ 2, 3, 18, 35, 44

*Wirtz v. Local 125*,
    389 U.S. 477 (1986) ............................................................................... 12

*Wirtz v. Local 153*,
    389 U.S. 463 (1968) ............................................................................. 2, 3

*Wirtz v. Local Union No. 125*,
    270 F. Supp. 12 (N.D. Ohio 1966) ................................................. 36, 38, 42

*Wirtz v. Local Union No. 169*,
    246 F. Supp. 741 (D. Nev. 1965) ............................................................. 42

Statutes, Regluations, and Rules

29 C.F.R. § 452.97 ..................................................................................... 23

29 C.F.R. § 452.107(a) ............................................................................... 28

29 C.F.R. § 452.107(c) ........................................................................... 28, 33

29 U.S.C. §§ 401 *et seq.* .............................................................................. 2

29 U.S.C. § 402(k) .......................................................................... 4, 18, 32

29 U.S.C. § 481 ......................................................................................... 34

29 U.S.C. § 481(a) ............................................................................ 3, 16, 18

29 U.S.C. § 481(c) ............................................................................ 4, 16, 29

29 U.S.C. § 482(a) .............................................................................. 10, 12

29 U.S.C. § 482(b) ..................................................................................... 12

29 U.S.C. § 482(c) ............................................................................... 34, 46

29 U.S.C. § 482(c)(2) ................................................................................. 17

Fed. R. Civ. P. 12(b)(6) .................................................................. 16, 32, 33

Fed. R. Civ. P. 56(a) ................................................................................. 16

Fed. R. Civ. P. 56(c) ................................................................................. 17

Tex. Election Code § 129.023 .................................................................. 33

Tex. Election Code § 129.023(c) .............................................................. 33

Tex. Election Code § 129.023(f)(2) .......................................................... 34

## I.     Introduction

This case arises out of an election of union officers conducted by the defendant, the Association of Professional Flight Attendants (APFA).  The plaintiff, the Secretary of Labor, received a complaint that the election was conducted in violation of federal law requiring, among other things, that unions elect their officers by secret ballot and that candidates be permitted to have observers at the polls and at the counting of the ballots. As discussed below, the election in question was conducted by having union members submit their votes over the internet or by phone to a computer system that contained and collected information which made it possible to determine how specific members voted—information such as the members' names, IP addresses, and the content of cast votes.  This violated the statutory ballot-secrecy requirement.  In addition, at the conclusion of the election, the candidates' designated observers were shown only a projected image of a screen purporting to announce the election results, and were provided no meaningful way to observe the counting of the votes to determine if they had been tallied accurately.  This violated the statutory observer requirement.

After conducting an investigation and finding probable cause to believe such violations had occurred, the Secretary filed this suit.  Now, on the basis of the violations detailed in this brief, the Secretary requests that the Court grant summary judgment in his favor and enforce the statutorily-prescribed remedy of voiding the results of the election and ordering that a new election be run under the Secretary's supervision.

## II.     Background

The APFA is the union for flight attendants employed by American Airlines.

(App. 010–11 (Tab D).[1])  As a national labor organization engaged in an industry affecting interstate commerce, the APFA is subject to the requirements of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401 *et seq.*, including the LMRDA's provisions governing the conduct of union officer elections. (Doc. 4, ¶¶ 6–7; Doc. 16, ¶¶ 6–7.[2])  This suit concerns the APFA's January 2016 election of national officers, which was conducted using a remote electronic voting system whereby union members cast their votes over the internet or by phone.  (Doc. 4, ¶¶ 7, 20; Doc. 16, ¶¶ 7, 20.)

## A.    The LMRDA's ballot-secrecy and observer requirements.

The LMRDA was enacted by Congress with the intent of ensuring fair and democratic practices in unions.  In the 1950s, Congress investigated the nation's unions and found corruption in union leadership and disregard for the rights of rank-and-file members. *See Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 497–98 (1968) (*Local 6*); *Wirtz v. Local 153*, 389 U.S. 463, 469–71 (1968).  Through the LMRDA, Congress sought to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government." *Local 6*, 391 U.S. at 497.  Congress equated the interests of union members in democratic

---

[1] "App. __" citations refer by page number to the evidentiary materials found in the consecutively numbered pages of the Appendix to Plaintiff's Motion for Summary Judgment, which is being filed with this brief.  The parties stipulated to the authenticity of the documents that were obtained or produced in connection with this case, (*see* App. 184 (Tab I)), so to the extent documents appear in the appendix that are not accompanied by a declaration or deposition testimony, the authenticity of these documents has nonetheless been established by stipulation.

[2] "Doc. __" citations refer to the filings on the Court's docket in this action, by reference to the numbers assigned to documents on the electronic docket kept by the clerk's office.

union elections with the public interest in general, and sought "to protect the public interest by assuring that union elections would be conducted in accordance with democratic principles." *Id.* at 496.

Recognizing that free and fair elections were essential to union self-government, Congress mandated various election safeguards in the LMRDA. *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 181–82 (1964); *Local 153*, 389 U.S. at 470; *see also Wirtz v. Am. Guild of Variety Artists*, 267 F. Supp. 527, 544 (S.D.N.Y. 1967) (noting that Congress intended that unions conduct democratic and scrupulously fair elections). In doing so, Congress looked to the example of political elections, with the idea that union elections should be subject to the same type of safeguards that are commonly employed in political elections. *See Local 6*, 391 U.S. at 504 (noting that "Congress' model of democratic elections was political elections in this country"); *Marshall v. Local Union 12447*, 591 F.2d 199, 205 (3d Cir. 1978) (explaining that the LMRDA requires unions to "take every reasonable precaution to ensure that the facilities available for balloting are used in a manner similar to their use in political elections in this country").

One of the principal election safeguards crafted by Congress in the LMRDA is the requirement that elections be conducted by secret ballot. Pursuant to 29 U.S.C. § 481(a), a union "shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot." The statute defines "secret ballot" as:

> the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner

that the person expressing such choice cannot be identified
with the choice expressed.

29 U.S.C. § 402(k).  "By imposing the requirement of secrecy Congress meant to

eliminate any form of potential coercion or intimidation which might occur if it could be

learned in any manner how an individual voter had voted." *Bachowski v. Brennan*, 413

F. Supp. 147, 150 (W.D. Pa. 1976).  Accordingly, the secret-ballot provision requires

more than simply ensuring that ballots can be marked in a private setting shielded from

the view of others; it also encompasses secrecy after members cast their ballots, including

during the collection of ballots and the vote-tallying process.  *See Reich v. District Lodge

720*, 11 F.3d 1496, 1500 (9th Cir. 1993) (explaining that "the LMRDA's secrecy mandate

extends not only to the actual casting of ballots but also to any post-voting procedure

designed to determine how individual union members voted or would have voted");

*Bachowski*, 413 F. Supp. at 150 (noting that "[t]he requirement of secrecy would seem to

include not only the right to vote in secret . . . but also the right to secrecy *after the

ballots are cast*," and that "[a]ny post-voting device by which it can be determined how a

particular voter voted would be a violation of secrecy" (emphasis in original)).

A second voting safeguard in the LMRDA is the right for candidates to have

observers of the election process.  Per 29 U.S.C. § 481(c), candidates in union elections

must be permitted to "have an observer at the polls and at the counting of the ballots."

As the Second Circuit has explained, "observer rights . . . are an important procedure that

ensure free and fair union elections, which are themselves critical to protecting and

promoting the interests of represented workers." *Ellis v. Chao*, 155 F. App'x 18, 20 (2d

Cir. 2005). "Without observers, election officials could tamper with ballots in ways unknown to the complaining union members." *Marshall v. Local 135*, No. 78-4280, 1980 WL 18743, at *11 (E.D. Pa. Sept. 16, 1980).

## B.    The APFA's January 2016 election of national officers.

The APFA conducted an election for its national offices of president, vice president, secretary, and treasurer in January 2016.[3] (App. 001 (Tab A); App. 002 (Tab B).) During the election, union members were permitted to vote either by using the internet or by phone. (App. 002 (Tab B).) To collect and count the votes (both internet and phone votes), the APFA used a company known as BallotPoint Election Services. (App. 172 (Tab H).)

Voting through the BallotPoint system was accomplished as follows. In advance of the election, BallotPoint assigned each eligible union member a unique twelve-digit access code. (App. 096, 103 (Tab G); App. 172 (Tab H); *see also* App. 002 (Tab B).) These access codes were distributed to the members in voting notices that were sent through the mail. (App. 096 (Tab G); *see also* App. 002 (Tab B).) The notice explained that the member could use his or her access code to vote, either over the internet or by phone. (App. 002 (Tab B); *see also* App. 172 (Tab H).) If desiring to vote over the internet, the member was instructed to go to a specific page on the BallotPoint web site and to log in using the member's access code. (App. 002 (Tab B).) If desiring to vote by phone, the member was instructed to call a toll-free number and to enter the access code

---

[3] Technically the voting period began on December 10, 2015, and concluded on January 9, 2016. (*See* App. 001 (Tab A); App. 002 (Tab B).)

when prompted.  (App. 002 (Tab B).)  Once logged in using either method, members could follow instructions to select the candidates they wished to vote for, either by marking choices on a web page or by pushing buttons on their phone (e.g., by pressing 1 to vote for the first candidate listed for president, pressing 2 for the second candidate, etc.).  (App. 086–88 (Tab G).)

The voting period ended at 10:00 a.m. (Central time) on January 9, 2016.  (App. 002 (Tab B).)  Candidates and their designated observers were permitted to attend a "ballot count" at the APFA's headquarters in Euless, Texas on the day that voting closed. (App. 017–18, 39–40 (Tab D).)  During this event, candidates, their observers, and any other interested union members were allowed to assemble in the "Unity Pays" room at APFA headquarters.  (App. 018 (Tab D).)  This room is relatively large (fitting four or five large tables with chairs, with additional chairs around the circumference of the room), and between 20 and 30 people were in attendance.  (App. 020–21 (Tab D).)

Union official Cindy Horan, chair of the APFA's election committee, presided at the "ballot count" event.  (App. 012–13, 017–25 (Tab D).)  Horan sat at a table in the front of the room with a laptop computer in front of her.  (App. 021–22 (Tab D).)  The laptop's screen was visible to Horan but not to the assembled candidates and observers. (App. 021–24 (Tab D).)  Horan explained to those present that she was logging in to the BallotPoint website and taking other steps necessary to obtain the election results.  (App. 023–24 (Tab D).)  Next, Horan "shared" her laptop with a large projection screen visible to the assembled candidates and observers by pressing a button.  (App. 021–25 (Tab D).) The candidates and observers were at that point able to see an "official results" page

which listed the candidates for the various positions, with vote and percentage totals shown to the right of their names. (App. 024–25, 044 (Tab D).) Candidates and observers were not able to see any preliminary steps that Horan took prior to the appearance of the "official results" on the projection screen. (App. 021–24 (Tab D).)

The results of the election were that the vice-presidential race was won outright (i.e., with over 50% of the vote and no need for a runoff), by a margin of 2,147 votes. (App. 044 (Tab D); *see also* App. 006 (Tab C).) In the other races, for president, secretary, and treasurer, no candidate received more than 50% of the vote, so a runoff for these positions was required. (App. 044 (Tab D); App. 006 (Tab C).) The margins between the second-place candidates who made the runoff and the next candidates who were eliminated from the runoff were 582 votes, 680 votes, and 1,566 votes, respectively, in the races for president, secretary, and treasurer. (App. 044 (Tab D).) Out of a total of 20,656 eligible voters, 9,355 people cast a ballot, meaning that 11,301 eligible voters did not vote. (App. 044 (Tab D).)

## C.    The BallotPoint remote electronic voting system.

Behind the scenes, BallotPoint used several computers and related interconnected devices to perform the voting process and to record and count votes in the APFA's election. Some of these machines are grouped together into what BallotPoint refers to as the election server, or ES. (App. 071–72 (Tab G).) The other machines are grouped together into what is referred to as the member registration and notification server, or MRNS. (App. 071–72 (Tab G).) The ES and MRNS are housed in a co-location facility

in Portland, Oregon.[4]  (App. 074–75 (Tab G); App. 144–45, 172 (Tab H).)  BallotPoint's

office is also in Portland.  (App. 143–44 (Tab H).)

The ES and MRNS have different functions.  The ES collects and stores the

members' votes in a field called the "vote string."  (App. 081, 086–88, 128 (Tab G).)  It

also stores other information that is associated with each vote string, such as the voter's

base of operation (i.e., the airport where the voter is based as a flight attendant) and a

timestamp for the vote.  (App. 081–85, 088–89, 128 (Tab G).)  A portion of the ES

supports an interface that connects phone voters to the computer system.  (*See* App. 072

(Tab G).)  If the vote is cast over the internet, the ES records the IP address[5] that the vote

was cast from.  (App. 081–82, 128 (Tab G).)  If the vote is cast by phone, the ES records

the area code of the phone number that the vote was cast from.  (App. 090, 128 (Tab G).)

The MRNS holds data about the union members who are eligible to vote,

including such information as their names, addresses, email addresses, and bases of

operation.  (App. 091–97, 129 (Tab G).)  The MRNS also contains the access codes that

the members have been assigned, and it records whether a member has voted.  (App. 096,

099, 129 (Tab G).)  For votes cast over the internet, the MRNS records the IP address that

the voter has logged in from, along with a date and timestamp representing the eight-hour

---

[4] A co-location facility is a space that houses computer equipment potentially belonging to a number of different parties.  (*See* App. 144–45 (Tab H)); *see also* Colocation Centre, Wikipedia, https://en. wikipedia.org/wiki/ Colocation_centre (viewed Aug. 4, 2017) (explaining that "[c]olocation facilities provide space, power, cooling, and physical security for the server, storage, and networking equipment of other firms").

[5] An IP address (or "Internet Protocol" address) is a unique address that is used by certain electronic devices to communicate with each other—"in simpler terms, a computer address."  *See United States v. Wells*, No. 07-448, 2008 WL 4483735, at *2 n.1 (D. Minn. Sept. 30, 2008).

window in which this access occurred.[6] (App. 098, 129 (Tab G); App. 187 (Tab J).) For votes cast over the phone, the MRNS does not record any portion of the phone number, but instead records an IP address associated with the local network on which BallotPoint's equipment resides (since phone voters interface with the system through a piece of computer equipment that is part of the ES),[7] again along with a date and eight-hour timestamp. (App. 097–99, 129 (Tab G); App. 187 (Tab J).)

The ES and MRNS must communicate in order to allow a member to vote and then to record that the member has voted. (*See* App. 099–102 (Tab G); App. 151–52, 176, 181, 183 (Tab H).) A member seeking to vote first arrives at the ES (either directly over the internet or, for phone voters, through the ES's phone interface). (App. 151–52, 181, 183 (Tab H).) A "voting session" is established and a random value referred to as a "one-time password" (which is not the same as the member's access code) is generated internally within the ES for the member. (App. 083–84 (Tab G); App. 151–54, 181, 183 (Tab H).)

The would-be voter is then transferred to the MRNS, along with the one-time password, and instructed to input his or her access code. (App. 084 (Tab G); App. 154, 181, 183 (Tab H).) Upon confirming by way of the access code that the person is an eligible voter, the MRNS returns the voter to the ES in order for he or she to actually vote. (App. 181, 183 (Tab H).) The ES records the specific voting choices—which

---

[6] In contrast, the timestamp recorded on the ES shows the exact hour, minute, and second. (*See* App. 084–85, 128 (Tab G).)

[7] The same generic IP address therefore appears for every phone voter on the MRNS. (App. 098 (Tab G).)

remain linked with the one-time password that was also transmitted to the MRNS—and then generates a page showing a confirmation number (for internet voters) or reads the confirmation number over the phone (for phone voters). (App. 083–85, 128 (Tab G); App. 181 (Tab H)[8].) The ES also sends a message back to the MRNS, again using the one-time password, to inform the MRNS that the vote associated with that one-time password has successfully been cast. (App. 099–102 (Tab G); App. 156 (Tab H).) Because the one-time password is associated in the MRNS with a specific voter, the MRNS is then able to modify its own records to show that the member associated with that one-time password has voted, and also to send a confirmation email to the member, if the MRNS has an email address on file for that particular member. (App. 099–102 (Tab G); App. 156–57, 181, 183 (Tab H).)

**D.    A losing candidate contests the election and files a complaint with the Secretary under the LMRDA.**

The LMRDA allows a union member to file a complaint with the Secretary alleging that an election conducted by his or her union violated the LMRDA, provided that the union member has first exhausted whatever remedies are available within the union. *See* 29 U.S.C. § 482(a). The APFA's constitution provides a two-step internal procedure for a candidate who wishes to contest an election. (App. 006–07 (Tab C).)

---

[8] The APFA's retained expert stated in his deposition that he did not believe the one-time passwords were stored on the ES with the specific votes that the one-time passwords were associated with. (*See* App. 152 (Tab H); *see also* App. 183 (Tab H) (diagram from the expert's report, which asserts that the one-time password is "never stored on disc" and is "destroyed").) However, BallotPoint's software engineer—who actually created the relevant software on the ES—confirmed in his deposition that the one-time passwords were saved on the ES, where they appear in the "votes table" on that server. (App. 080, 084, 101, 128 (Tab G).)

First, the candidate must file a written complaint within 15 days of the canvassing date, which complaint is to be ruled on by the union's election committee[9] no later than 30 days after the canvassing date. (App. 006 (Tab C).) If dissatisfied with the election committee's decision, the candidate can appeal to the union's executive committee no later than 45 days after the canvassing date. (App. 007 (Tab C).) The executive committee is to issue a ruling within 60 days of the canvassing date, at which time the APFA constitution considers the candidate to "have satisfied the internal remedies provision of the LMRDA." (App. 007 (Tab C).)

With respect to the APFA's January 2016 election, one of the losing candidates for vice president, Samuel Morales, filed an election contest with the union on January 22, 2016.[10] (Doc. 4, ¶ 8; Doc. 16, ¶ 8; *see also* App. 028, 046 (Tab D).) Morales stated that he believed that ballot secrecy had been violated during the election, and he also complained that the final tallies for the election were simply displayed on a laptop with no way to verify the results and with no ability for an observer to view the balloting process. (App. 046–48 (Tab D).) The union's election committee issued a decision denying relief to Morales on January 29, 2016. (Doc. 4, ¶ 9; Doc. 16, ¶ 9; App. 029, 049 (Tab D).) Morales then appealed to the union's executive committee, on February 7, 2016. (Doc. 4, ¶ 10; Doc. 16, ¶ 10; App. 062–63 (Tab E).) On February 10, 2016, the executive committee issued a decision denying the appeal. (Doc. 4, ¶ 11; Doc. 16, ¶ 11;

---

[9] This committee is variously referred to as the National Balloting Committee or the National Ballot Committee. (*See* App. 005 (Tab C); App. 012–13 (Tab D).)

[10] The protest is actually dated January 22, <u>2015</u>, but the reference to 2015—rather than 2016—apparently was a typo. (*See* App. 028, 046 (Tab D).)

App. 064 (Tab F).)  Having exhausted his internal union remedies, Morales filed a

complaint with the Secretary that was dated February 28, 2016, and marked "received"

by the Department of Labor's Dallas office on March 7, 2016.  (App. 186, 193 (Tab J).)

Morales's complaint to the Secretary was therefore timely filed "within one calendar

month" of the date on which internal APFA remedies were exhausted, as required by 29

U.S.C. § 482(a).

E.    **The Secretary investigates and, finding probable cause to believe that the
      LMRDA's ballot-secrecy and observer requirements were violated in the
      APFA's election, files this suit.**

Congress has directed that, upon the filing of an LMRDA complaint, "[t]he

Secretary shall investigate such complaint." 29 U.S.C. § 482(b).  The Secretary has

delegated responsibility for investigating LMRDA complaints to the Office of Labor-

Management Standards (OLMS) within the Department of Labor.  (*See* Doc. 19 at 014.)

Because the ballot-secrecy and observer issues raised in Morales's complaint implicated

not just his own race for vice president, but also the races for president, secretary, and

treasurer that were conducted simultaneously using the same voting system, OLMS's

investigation was not limited to the vice-presidential race but rather encompassed all four

races in the election.  *See Usery v. District 22*, 543 F.2d 744, 750 (10th Cir. 1976)

(explaining, where a union member complained about the nominating procedure for the

office he attempted to run for, that the investigation of this complaint properly

encompassed the question of whether the nominating procedure was invalid as to the

other offices that were being elected at the same time) (citing *Hodgson v. Local 6799*,

403 U.S. 333 (1971); *Wirtz v. Local 125*, 389 U.S. 477, 483, 484 (1986))).

In its investigation of Morales's complaint, OLMS obtained information about what observation activities were permitted at the APFA "ballot count" event and also about how the BallotPoint system functioned, including information concerning the functions of the ES and MRNS, the types of data recorded and stored on each, and the system's capability to send emails to members who had voted. (*See* App. 187–88 (Tab J).) As discussed above, this email functionality is enabled by BallotPoint's assignment of a one-time password to each voter during the voting process, which one-time password is associated on the ES with the content of the voter's vote, and on the MRNS with the voter's identity. (*See* pp. 9–10, *supra*.) OLMS obtained records from the ES showing the one-time passwords associated with each vote that was recorded in the election. (App. 187 (Tab J); *see also* App. 082–83, 128 (Tab G).) However, the corresponding one-time passwords that were transmitted to the MRNS were not available from the MRNS because they were not permanently written to disc on the MRNS. (*See* App. 084 (Tab G); App. 158–61 (Tab H); *see also* App. 187 (Tab J).)

OLMS also obtained various other electronic records that were created and maintained on the ES and MRNS during the APFA's election. These included: (1) information from a "votes table" on the ES that contained not only the contents of all the votes in the election but also, for each vote, the IP address from which the vote was cast (if an internet vote), the voter's base of operation (also sometimes referred to as the "domicile"), the timestamp for the vote, and the one-time password; and (2) information from an "officer election member" (OEM) table on the MRNS that contained the members' names, addresses, email addresses, access codes, a timestamp showing the date

and eight-hour window during which the member accessed the voting system, and the IP address from which the member accessed the system (for internet votes).  (App. 187 (Tab J).)

OLMS determined, by cross-referencing the data that was available from the ES votes table and the MRNS OEM table, that even long after the election had concluded, it was possible to link 4,081 voters to their votes, representing approximately 43% of all the votes.  (App. 188 (Tab J).)  Such linkage was predominantly made possible by the presence of IP addresses that were recorded for internet voters on both the ES and the MRNS.  (*See* App. 188–91 (Tab J).)  Where a unique IP address associated with a specific internet vote appears on the ES votes table, it is a simple matter of cross-referencing that unique IP address against the data on the MRNS OEM table:  once the same unique IP address is located on the MRNS OEM table, the voter's identity is revealed.  (App. 188–90 (Tab J).)  OLMS found 3,421 unique IP addresses that, by cross-referencing the ES and MRNS data, could be used to determine how specific voters voted in the election.  (App. 190 (Tab J).)

In addition, even in situations where multiple voters voted from the same IP address (such as when two union members lived in the same household), it is still sometimes possible to link specific voters to their votes by analyzing the additional information provided in other fields in conjunction with the IP addresses, to either rule out or confirm that a specific vote came from a specific voter.  (App. 190–91 (Tab J).)  For example, if two votes from the same IP address were cast during different eight-hour windows, it is possible by using the timestamp information in the ES and MRNS to

establish which particular vote belongs to which voter.[11]  (App. 191 (Tab J).)  Similarly,

if two votes are from the same IP address but show different bases of operation for the

voters, it is possible to determine which voter cast which vote because the base-of-

operation information appears on both the ES and MRNS.[12]  (App. 191 (Tab J).)  This

analysis reveals 433 votes that, although coming from non-unique IP addresses, can be

linked to specific voters through this process of comparing the other fields associated

with the non-unique IP addresses on the ES and MRNS.  (App. 191 (Tab J).)

Certain phone votes can also be linked with specific voters through a similar

process of analyzing the other data captured by the ES and MRNS and using that data to

link specific phone votes to identifiable voters.  (App. 191–92 (Tab J).)  For example, in

situations where the MRNS's timestamp information showed that only one voter from a

particular base of operation had voted by phone during a given eight-hour period, this

information can be cross-referenced against the timestamp and base-of-operation data

from the ES to determine how that particular voter voted.  (App. 191–92 (Tab J).)  This

type of analysis reveals 227 phone votes that can be linked to specific voters.  (App. 192

(Tab J).)

The above analysis shows that the ES and MRNS data provided after the election

---

[11] For example, if union members John Doe and Jane Doe both accessed the system from the same IP address resulting in two votes from the same IP address on the ES, and the MRNS shows that John accessed the system during a particular eight-hour window on one day, and that Jane accessed the system during a different eight-hour window on that day (or on another day entirely), it can be determined which vote on the ES is John's vote and which is Jane's by reviewing the timestamp information.

[12] For example, if union members John and Jane both accessed the system from the same IP address resulting in two votes from the same IP address on the ES, and the MRNS shows that John is from the DFW base and that Jane is from the Miami base, it can be determined that the vote on the ES associated with the DFW base is John's vote, and the vote on the ES associated with the Miami base is Jane's vote.

made it possible to link 4,081 votes to specific voters. Neither BallotPoint's software engineer nor the APFA's retained expert disputes that matching voters to their votes in this manner is possible, given the information that was provided from the ES and MRNS. (*See* App. 112, 114 (Tab G); App. 137–38, 142 (Tab H).)

Based on the facts uncovered in OLMS's investigation, the Secretary filed a two-count complaint against the APFA in this Court alleging that: (1) the APFA violated 29 U.S.C. § 481(a) by using an electronic voting method that permitted voters to be linked to their votes; and (2) the APFA violated 29 U.S.C. § 481(c) because the voting system did not permit observers to verify that votes were recorded and tallied accurately. (Doc. 4, ¶¶ 25, 26.) After the Court denied a Rule 12(b)(6) motion to dismiss filed by the APFA, (Doc. 14), the APFA answered (Doc. 16) and the parties engaged in discovery. The Secretary now moves for summary judgment on both counts of the complaint.

## III.   Summary-Judgment Standard[13]

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Once the movant has carried his burden under Rule 56(a), the nonmoving party must identify evidence in the record that

---

[13] This discussion of the summary-judgment standard is adapted from *Garcia v. United States*, No. 4:16-CV-963-A, 2017 WL 2537280, at *1 (N.D. Tex. June 9, 2017).

creates a genuine dispute as to some element or elements of the case. *See id.* at 324; *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party, there is no genuine dispute for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 597 (1986). As the Fifth Circuit has explained:

> Where the record, including affidavits, interrogatories, admissions, and depositions could not, as a whole, lead a rational trier of fact to find for the nonmoving party, there is no issue for trial.

*Miss. Prot. & Advocacy Sys. v. Cotten*, 929 F.2d 1054, 1058 (5th Cir. 1991). The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## IV.    Argument and Authorities

For the Court to nullify the results of a union election based upon violations of the LMRDA, the Court must find: (1) that a statutory violation occurred during the conduct of the union's election, and (2) that the violation "may have affected the outcome" of the election. 29 U.S.C. § 482(c)(2); *Chao v. Local 54*, 166 F. Supp. 2d 109, 112–13 (D.N.J. 2001). If the Court determines that a violation occurred, "the Secretary enjoys the benefit of a presumption that the outcome of the challenged election may have been affected." *Local 54*, 166 F. Supp. 2d at 113. Thus, "proof of a violation establishes a prima facie case that the outcome of the election may have been affected and shifts the burden to the

defendant to show that the established violation did not affect the election results." *Id.* (citing *Local 6*, 391 U.S. at 506–07); *see also Solis v. Local 9477*, 798 F. Supp. 2d 701, 705 (D. Md. 2011).

## A. The voting system used in the APFA's election made it possible to link voters to their votes, in violation of the LMRDA's secrecy requirement.

The LMRDA requires a "secret ballot." 29 U.S.C. § 481(a). And that operative term is defined as a method of voting in which each vote is "cast in such a manner that the person expressing [the voting] choice *cannot* be identified with the choice expressed." *Id.* § 402(k) (emphasis added). The key inquiry is thus whether, under the voting method implemented by the union, voters "cannot" be linked to their voting choices. Or, put another way, whether it is possible to link voters to their choices. *See Local Union 12447*, 591 F.2d at 203 n.10 (explaining that the LMRDA's ballot-secrecy requirement is violated by a showing that, "because of the way the election was conducted, it was *possible* to observe how some voters had marked their ballots").

### 1. Ballot secrecy was violated in two different ways: by the use of one-time passwords that linked voters to votes, and also by the use of IP addresses and other data that linked voters to votes.

The BallotPoint voting system used in the APFA's election failed to protect voter secrecy, and thus violated the LMRDA, in two principal ways. First, as discussed above, each vote on the ES was associated with a one-time password that was also transmitted to and associated with the voter's identity on the MRNS. (*See* pp. 9–10, *supra*.) The MRNS used each one-time password to mark that the voter had voted, and also to send an email to the voter if the voter had an email address on file. (App. 083–85, 099–102 (Tab

G); App. 183 (Tab H).)  The one-time passwords were deleted from—or more precisely, they were stored in memory but not written to disc on[14]—the MRNS after the voter's vote was recorded on the ES.  (App. 158–62 (Tab H); *see also* App. 100 (Tab G).)  However, a ballot-secrecy violation nonetheless occurred because the one-time password served as a link between every voter identified on the MRNS and his or her specific vote as recorded on the ES.

A comparable violation would occur if, in an election at a traditional polling site using paper ballots, the election administrator recorded a unique identifying number next to each voter's name on the registration roll when the voter first arrived to vote, and then also recorded the same unique identifying number on the voter's ballot.  No one would countenance such a system, even if the election administrator promised that the unique identifying number would later be obliterated from next to the voter's name on the registration roll after the voter's vote was recorded.  Instead, voters would rightly insist that the election administrator refrain from using any such identifying number linking voters to their votes in the first place.  The same is true here.[15]  Therefore, the use of the

---

[14] The APFA's retained expert explained that if information is "written to disc," an affirmative act of deletion is required in order to delete the information, whereas information that is not written to disc and instead merely stored in memory can be overwritten if the computer needs the space for something else. (*See* App. 158–61 (Tab H).)

[15] One way that the secrecy problem arising from the use of the one-time passwords could have been avoided is if the APFA had used a blind distribution system to assign access codes to members, in such a manner that member identifying information such as names and addresses were never recorded in the MRNS.  (For example, this could be accomplished by having the MRNS generate access codes for the total number of members but without assigning the access codes to any specific member, and then printing the access codes in "hidden" form on scratch-off papers for distribution to the members through a random stuffing of the obscured access codes into envelopes labeled with members' addresses.)  In this scenario, because the MRNS would never have in it any member identifying information, when a one-

so-called one-time passwords in the APFA's election was in violation of the LMRDA's ballot-secrecy requirement.

Second, as also discussed above, the ES and MRNS recorded IP addresses and other information about voters and their votes in such a way that even long after the conclusion of the election, this information could be cross-referenced to determine how approximately 43% of the voters voted.  (*See* pp. 13–16, *supra*.)  Again, consider if in an election conducted using paper ballots a unique identifying code was recorded next to 43% of the voters' names on the registration roll while also being recorded on these voters' ballots.  The use of these unique identifying codes would result in a violation of ballot secrecy for that 43% of the voters.  In the APFA's election, the IP addresses and other data recorded for internet and phone voters functioned similarly as unique identifying codes linking approximately 43% of the voters to their votes.  (*See* App. 192 (Tab J).)

With respect to both (a) the use of one-time passwords and (b) the use of IP addresses, timestamps, and other identifying information, the BallotPoint system employed during the APFA's election is analogous to paper voting systems that have been found to violate the LMRDA's ballot-secrecy requirement due to the use of ballots that are numbered or marked in such a way that they can be cross-referenced against a list of voters to determine how specific voters voted.  For example, in *Kelly v. Local No. B-183*, 566 F. Supp. 1199, 1200–01 (S.D.N.Y. 1983), voters signed in on a numbered sheet

---

time password was used to confirm that a vote had been cast, the one-time password would only link the vote to the access code that was used to cast it, and the system would not "know" the identity of the voter.

and then received numbered ballots that were exactly one hundred numbers higher than their sign-in numbers (e.g., voter #5 on the sign-in sheet would have received ballot #105, voter #6 would have received ballot #106, etc.). The court found a ballot-secrecy violation because this system enabled an identification of voters with their votes. *See id.* at 1201. Similarly, in *Reich v. United Mine Workers*, No. 94-1691, 1995 WL 791950, at *1, 6 (D.D.C. Oct. 24, 1995), the ballots were printed with unique sequential numbers and were handed out in order to voters who signed in on a numbered registry. Notwithstanding evidence that election officials had cross-referenced the ballots and the list only with respect to one vote (to invalidate a ballot cast by an ineligible voter), the court found that because of the "ability to identify how members voted," the LMRDA was violated. *Id.* at *6. The system used in the APFA's election created a similar ability to identify how members voted. The one-time passwords, IP addresses, and other information recorded on the BallotPoint servers are functionally the equivalent of the numbered ballots and lists that were held to have compromised ballot secrecy in *Local No. B-183* and *United Mine Workers*.

Also instructive is *Donovan v. CSEA Local Union 1000*, 594 F. Supp. 188 (N.D.N.Y. 1984), *aff'd in part, rev'd in part on other grounds*, 761 F.2d 870 (2d Cir. 1985). In that case, voting occurred by mail using perforated ballot forms that contained the voter's identifying information on the top and his or her voting choices on the bottom. *Id.* at 195. The ballots were returned to a third-party election administrator, the Independent Election Corporation of America (IECA), and the court explained that there was "no dispute that IECA maintained secrecy in its processing of the ballots." *Id.*

Nonetheless, the court found that an LMRDA ballot-secrecy violation had occurred because "voters were capable of being identified with their ballots." *Id.* at 196. The problem in *CSEA* was that at the time the voters' choices were transmitted to the election administrator, they were still associated with the voters' identities. A similar capability of identifying voters with their votes existed in the BallotPoint system during the APFA's election because, like the election administrator in *CSEA*, BallotPoint possessed sufficient information—in the form of the one-time passwords, IP addresses, and other data—to be able to match voters to their votes. (*See* pp. 9–10, 13–16, *supra*.)

In addition, and specifically with respect to the one-time passwords that were associated with member's identities on the MRNS but later deleted (or not permanently written to disc on the MRNS), it is notable that the ballot forms in *CSEA* had perforations such that the voter-identifying information on the top of the ballot form could be separated from the vote information on the bottom after the voter's eligibility was verified. *See CSEA*, 594 F. Supp. at 195–96. This separation of the perforated ballot forms can be likened to the deletion of the one-time passwords on the MRNS, in that both acts severed a connection that existed between voters and their votes.

Nonetheless, in *CSEA* the fact that the ballot forms could be—and in fact were designed to be—torn apart at the perforations in order to sever the link between voters and votes was not enough to avoid a ballot-secrecy violation. The decision in *CSEA* thus makes clear that the LMRDA ballot-secrecy requirement is violated by the existence of even a brief moment in time where the election administrator, by design, has the

capability to both know what the vote is and to be able to connect it to a specific voter.[16]
The one-time passwords used by BallotPoint to associate information on the ES and
MRNS are analogous to the yet-to-be-broken perforations on the ballot forms in *CSEA*.
Although the one-time passwords were eventually deleted from the MRNS (just as the
perforations on the *CSEA* ballot forms were eventually torn), both elements served to link
voters to their votes.

    To recap, two separate LMRDA ballot-secrecy violations occurred in the APFA's
election. The use of one-time passwords constituted a ballot-secrecy violation as to the
entirety of the voting electorate, because one-time passwords were generated and used for
all voters who voted. And a second violation occurred with respect to the approximately
43% of the voters who could be linked to their votes by reason of the IP addresses,
timestamps, and other identifying information recorded and stored on the ES and MRNS.

### 2.    The APFA's anticipated arguments against the existence of ballot-secrecy violations are unavailing.

    Notwithstanding the foregoing, the Secretary anticipates that the APFA may rely
on several different theories that are essentially legal in nature to argue that no LMRDA
ballot-secrecy violations occurred. But as explained herein, none of these arguments is
consistent with the LMRDA, and none should prevent the Court from entering summary

---

[16] In contrast, in a properly run mail-ballot election, there is never any such moment in time because a
double-envelope system is used, such that the voter's vote is contained in an unmarked inner secret-ballot
envelope, and the voter's identifying information (used to confirm eligibility) only appears on the outer
envelope. *See* 29 C.F.R. § 452.97. The inner envelopes and outer envelopes are separated from each
other in the presence of observers before the inner envelopes are ever opened, so there is never a period of
time where the design of the system enables the election administrator to know both the content of a
voting choice and which voter made that choice.

judgment in the Secretary's favor on the ballot-secrecy issue.

First, the APFA may argue that there is no evidence that any APFA official or BallotPoint employee actually used the one-time-password feature or the other data stored on the ES and MRNS to determine how any specific voter voted. The Secretary indeed is not relying on any such fact of direct, privacy-violating malfeasance by a union official or BallotPoint employee in support of his request for summary judgment.[17] But the APFA would nonetheless be wrong to suggest that the absence of this type of evidence means that no ballot-secrecy violation is established. That is because the LMRDA does not require any showing that someone in fact "took advantage" of the ability to link voters to votes by positively informing themselves of how specific members voted. *See Local Union 12447*, 591 F.2d at 203 n.10 (noting that there is no "additional requirement" that it be shown that someone actually "took advantage" of the ability to view voters' ballots). Instead, the fact that the possibility of doing so even exists is what the LMRDA aims to proscribe. *See id.*; *see also CSEA*, 594 F. Supp. at 196 (explaining that ballot secrecy was violated "since voters were capable of being identified with their ballots"). Accordingly, to find a ballot-secrecy violation in this case it is not necessary for the evidence to establish that some APFA official, BallotPoint employee, or other identifiable person actually learned how any voters voted.

Second, the APFA may argue that the fact that the BallotPoint system disperses the various one-time passwords, IP addresses, member names and addresses, timestamps,

---

[17] The Secretary nonetheless does not agree that it is—or even could be—conclusively established that no such privacy-violating activity by a specific official or employee occurred.

vote strings, and other voter-vote linking data between two different electronic locations (the ES and the MRNS) is sufficient to protect ballot secrecy.  But simply storing the information that compromises ballot secrecy in different locations is not a solution.  This would be akin to allowing an election administrator in a paper-ballot election to compile a voter list with unique identifying numbers that cross-reference to numbered ballots, as long as the administrator promised to keep the list in a filing cabinet somewhere away from the ballots.  Regardless of where the voter-vote linking information is stored, its existence makes it possible to link voters to their votes.  The solution, again, is that the election administrator should never create or record any voter-vote linking information in the first place.

Third, and relatedly, the APFA may argue that the BallotPoint system did not allow any system users (such as system administrators, union officials, or voters) to directly obtain all of the data from BallotPoint's two servers that, together, can be used to link voters to their votes.  Specifically, the APFA may argue that the IP addresses and other information associated with voters' identities on the MRNS OEM table—which can be cross-referenced with the ES votes table to link voters to their votes—were not accessible to any MRNS user at the time the election occurred.[18]  BallotPoint actually made this claim during OLMS's investigation, by asserting that it did not have "direct access" to the MRNS OEM table, and that to access this table, BallotPoint would be required to make a software change to the MRNS application software.  (App. 104–06,

---

[18] In contrast, BallotPoint never made any claim that the ES votes table was not accessible over the internet to at least some system users, and instead BallotPoint produced that table to OLMS during the investigation with no similar objection.  (*See* App. 082 (Tab G); App. 187 (Tab J).)

130 (Tab G).)  The APFA's retained expert has made a similar claim in this litigation. (App. 149–50, 174 (Tab H).)

However, both BallotPoint's software engineer and the APFA's retained expert have confirmed that this "no direct access" claim concerns only the limited issue of whether it was possible to extract the IP addresses and other information from the MRNS OEM table in bulk *over the internet*.  (App. 105–06 (Tab G); App. 149–50 (Tab H); *see also* App. 174 (Tab H) (report of BallotPoint's retained expert, explaining that he searched BallotPoint's MRNS software code for evidence of any mechanism whereby IP address data could be accessed by a system user "*without physical access*" (emphasis added)).)  In other words, when BallotPoint told OLMS that it did not have direct access to the MRNS OEM table and that a software change would be required to retrieve it, BallotPoint meant only that the software currently in place for the MRNS did not contain any functionality that would let an *internet user* log in to the MRNS remotely over the internet and generate or download a report containing the contents of the entire OEM table.  (*See* App. 104–06 (Tab G).)

Notwithstanding the absence of any such internet functionality, BallotPoint *always* retained the ability to access the data on the MRNS through physical access (as opposed to internet access), by simply going to the relevant MRNS computer, at which point the contents of the MRNS could be downloaded on to a thumb drive or otherwise extracted

directly from the computer.[19] (App. 106–08 (Tab G).) Accordingly, there is no merit to any argument that the IP addresses and other data on the MRNS were not accessible except through a change to BallotPoint's software, and such an argument cannot serve to excuse the ballot-secrecy violation created by the presence of IP addresses and other data on the MRNS that can be cross-referenced against ES data to show how specific voters voted.[20]

In any event, discovery in this litigation has revealed that any claim that the IP addresses in the MRNS OEM table were not accessible in any form over the internet absent some change to BallotPoint's software would not quite be true. BallotPoint apparently did not have any functionality enabled in its software at the time of the election that would have permitted a mass downloading, in a single transaction, of all of the IP addresses from the MRNS OEM table over the internet. Yet there was still a way to extract these IP addresses from the MRNS over the internet on a one-by-one basis. Specifically, the MRNS software as it existed at the time of the election contained a "support request" feature that allowed a union election administrator to enter a voter's union member ID number into a field on the BallotPoint website, along with a message (for example, if the voter encountered some problem while voting, that could be

---

[19] BallotPoint software engineer Gerry Feldkamp explained during his deposition that of the five people on staff at BallotPoint, Jeff Bachofner is the person at BallotPoint who has the password to log on to the relevant MRNS computer. (*See* App. 068–70, 106–08 (Tab G).)

[20] During OLMS's investigation, BallotPoint ultimately chose to produce the contents of the MRNS OEM table to OLMS by modifying the software on the MRNS to allow the OEM table to be downloaded by OLMS over the internet. (App. 109–11 (Tab G).) However, this was BallotPoint's choice and a software change to allow over-the-internet-access was not the only way the OEM table could have been provided to OLMS. (*See* App. 106–08 (Tab G).)

described).  (App. 115–18 (Tab G).)  The making of a support request in this manner

caused the BallotPoint system to pull certain information from the OEM table about that

particular member, including the IP address and eight-hour timestamp of when the

member accessed the system, which information was then placed in an email that was

automatically sent to several BallotPoint employees.  (App. 115–18 (Tab G).)  Thus,

there was always a capability to pull IP addresses for internet voters from the MRNS on a

one-by-one basis, through the use of the support-request feature.  (App. 115–18 (Tab G).)

Those IP addresses could then be cross-referenced against information from the ES votes

table to determine how members voted.

### 3.    Summary.

The undisputed facts establish that the electronic voting system used in the

APFA's election failed to preserve ballot secrecy, and that the APFA's likely arguments

against finding an LMRDA violation in the face of these undisputed facts are unavailing.

The Court should therefore grant summary judgment in the Secretary's favor on the issue

of whether the LMRDA's ballot-secrecy provision was violated.

**B.    The voting system used in the APFA's election did not permit candidates to have an observer at the polls and at the counting of the ballots, in violation of the LMRDA's observer requirement.**

The LMRDA requires that union elections must provide candidates the right to

"have an observer at the polls and at the counting of the ballots."  29 U.S.C. § 481(c).

This right is interpreted practically and "encompasses every phase and level of the

counting and tallying process."  29 C.F.R. § 452.107(a); *see also id.* § 452.107(c)

(applying the observer requirement to mail-ballot elections).  The intent of requiring

unions to provide for observer rights is to ensure that union elections are fair and that the ballots and results cannot be tampered with in unknown ways. *See Ellis*, 155 F. App'x at 20; *see also Local 135*, 1980 WL 18743, at *12 (explaining that the observer requirement is designed to prevent ballot manipulation).

Here, contrary to the LMRDA, critical aspects of the election process were conducted outside of the view of the candidates and their observers. First, with respect to the counting of the ballots, the only opportunity provided to observers was that the APFA allowed observers to attend a "ballot count" event at APFA headquarters in Euless, Texas on the day the voting closed. (App. 016, 039–40 (Tab D).) However, no "counting of the ballots" actually occurred at that location. (App. 031 (Tab D).) Instead, any counting occurred within BallotPoint's computers in Portland, Oregon. (App. 031 (Tab D).) The only activity that occurred at APFA headquarters, from the point of view of the observers, was that the union's election committee chair, Cindy Horan, projected an image onto a screen which purported to show the results of the election. (App. 017–25, 044 (Tab D).)

Second, even to the extent the event at APFA headquarters could be considered as the location of the ballot count, observers were not provided any meaningful opportunity to observe the counting in a way that would enable them to obtain an assurance that the ballots were counted correctly. Again, all that observers saw was an image projected onto a screen which purported to be the election results. (App. 021–25, 044 (Tab D).) Horan admitted that this left no way for the observers to know if the results even came from BallotPoint, much less that they were correct. (App. 032–33 (Tab D).) Likewise,

BallotPoint's software engineer agreed that there was no way for an observer to verify that the votes recorded on the BallotPoint system in the election were the votes that voters intended to be cast. (App. 123–24 (Tab G).)

Third, the other "observation" opportunities that the APFA allowed similarly failed to provide any real assurance to observers that votes came from eligible voters and that no eligible voters were denied having their votes cast (which are the types of interests protected by the LMRDA's requirement that an observer be allowed "at the polls"). After the tally, the BallotPoint system provided a "who voted" list, which purported to list the names of all the persons who had voted in the election. (App. 124–25 (Tab G).) However, BallotPoint's software engineer agreed in his deposition testimony that there was no way for an observer to verify that the people on this electronically generated list actually were the voters.[21] (App. 124–26 (Tab G).) Nor was any other opportunity provided for observers to receive assurance that the votes reported at the "ballot count" event at APFA headquarters accurately reflected the choices of eligible voters, or that all eligible voters had their votes counted. (*See* App. 032–33, 039–40 (Tab D).)

What occurred in the APFA's election is analogous to the fact patterns of in-person elections in which LMRDA violations were found due to failures to provide

---

[21] In contrast, in an election conducted at a physical polling site, observers can watch the union members who are signing in to vote and in that way receive an assurance that only eligible members are voting. Similarly, in a mail-ballot election the outer envelopes submitted by voters must have some kind of identifying information, and often, have a signature, that can be used to verify that the (at the time unknown) vote that is concurrently located in the inner secret-ballot envelope is coming from an eligible voter.

meaningful observation opportunities. *See Local 135*, 1980 WL 18743, at *5–6 (union officials permitted an observer inside the polling area, but denied him the opportunity to view the mechanics of the election and also completely excluded other observers from the polls and the ballot count); *Brennan v. Local Union 300*, No. 72-3042-LTL, 1974 WL 1068, at *2 (C.D. Cal. Feb. 21, 1974) (observers were confined to a stage area in the auditorium where the election was taking place, from which they could not see all the functions of the election process).  As in these elections, the system used in the APFA's election by design did not afford observers any way of verifying that the announced election results were accurate.  Observers in the APFA's election had no way to know that the results projected onto the screen at APFA headquarters in Euless represented the actual content of the voted ballots, nor were observers provided any opportunity to receive assurance that the votes came from eligible voters, that all votes from eligible voters were counted, and that no ineligible voters were allowed to vote.  The LMRDA does not allow union officials to adopt this kind of "just trust us" approach to the voting process and the counting of the votes.

The Secretary anticipates that the APFA may argue in response, mirroring an argument the APFA made in its Rule 12(b)(6) motion, that the LMRDA's observer requirement simply should not apply to an election conducted remotely using internet and phone voting. (*See* Doc. 8 at 14–18.)  But for several reasons, this argument is flawed and does not excuse the violation of the LMRDA's observer requirement that occurred in the APFA's election.  First, even assuming that the APFA were correct that there is no possible way to allow observers to verify the counting of votes in the specific electronic

voting system the APFA has opted to use, it would not follow that the LMRDA's observer requirement is thereby simply rendered inapplicable to the APFA's election. Instead, since the LMRDA expressly requires that observers be permitted at the "counting of the ballots," the logical consequence of the APFA's argument would be that the APFA has failed to conduct an LMRDA-compliant election, and should be required to conduct a new election in which effective observation can occur.

Moreover, it would be erroneous to assume that Congress, in enacting the LMRDA's observer requirement, simply could not have anticipated any scenario except elections conducted using paper ballots counted manually by human vote counters, such that the observer requirement should not apply in any other contexts. Even at the time the LMRDA was written in 1959, Congress was aware that unions might use voting machines to conduct elections, because such machines are specifically referenced in the statutory definition of "secret ballot." *See* 29 U.S.C. § 402(k). The statute even contemplates that other methods of voting might be used, since it refers to votes cast "by ballot, voting machine, *or otherwise*." *Id.* (emphasis added). Voting by non-paper-ballot methods such as by machine or "otherwise" implicates many of the same issues that the APFA has claimed should render the LMRDA inapplicable to its electronic voting system. Human beings cannot physically be placed inside the internal mechanisms of machines where votes are recorded and tallied, for example. Nonetheless, Congress did not exempt votes cast by "voting machine, or otherwise," from the LMRDA's observer requirement. This requirement instead applies to all union elections, no matter the specific method of voting used.

The Secretary also does not agree with the notion, implicit if not explicit in the APFA's Rule 12(b)(6) arguments, that it is categorically "impossible" to provide for effective LMRDA observation rights in any context other than that of human beings counting paper ballots at an in-person election. For example, although the APFA suggested in its Rule 12(b)(6) motion that there is no way to allow observers "at the polls" in any election that is not conducted by in-person voting, the history of the LMRDA as applied to mail-ballot elections shows otherwise. To protect the same interests that are safeguarded by having observers at the physical "polls" in an in-person election (e.g., to ensure that only eligible voters are voting), the observer requirement operates in a mail-ballot election by allowing observers to be present at specific stages of the election process, such as the preparation and mailing of the ballots, their receipt by the counting agency, and the opening and counting of the ballots. *See* 29 C.F.R. § 452.107(c). Through these procedures, observers are able to ensure that the election is fair and that the ballots indeed come from eligible voters and are not tampered with.

Similar solutions tailored to fit different voting methods have also routinely been instituted in political elections (which were Congress' model for union elections in the LMRDA) to vindicate the same goals behind the LMRDA's observer requirement. For example, in Texas, testing boards consisting of representatives from each political party are allowed to conduct logic and accuracy tests on voting machines, in a process that is also open to the press and the public. *See* Tex. Election Code § 129.023. The testing board can also vote "test ballots" and verify that the results announced by the system match the predetermined results of the test ballots. *Id.* § 129.023(c). Finally, the

software used in the election is copied and kept in a secure location outside the administrator's control.  *Id.* § 129.023(f)(2).

In the APFA's election, no similar procedures were in place to ensure that the candidates' observers could verify that the results announced at the APFA's "ballot count" event in Euless, Texas actually represented an accurate tally of the votes that were cast and counted via a computer system located and operated in Portland, Oregon.  (*See* App. 039–40 (Tab D) (interrogatory response from the APFA listing all observation opportunities that were offered during the election).)  Instead, as discussed above, observers were limited to simply viewing an image projected on a screen and had no way to verify that the announced results reflected the aggregate actual voting choices that voters made.  Because these facts establish a violation of the LMRDA's observer requirement, the Court should grant summary judgment in the Secretary's favor on the observer issue.

**C.    Because the ballot-secrecy and observer violations in the APFA's election may have affected the outcome of the election, the LMRDA requires that the election be voided and that a new election be conducted under the Secretary's supervision.**

The LMRDA states that "[i]f, upon a preponderance of the evidence after a trial upon the merits, the court finds . . . that the violation of [29 U.S.C. § 481] may have affected the outcome of an election, the court shall declare the election . . . to be void and direct the conduct of a new election under supervision of the Secretary . . . ."  29 U.S.C. § 482(c).  Notwithstanding the statute's reference to a "trial upon the merits," the issue of whether a violation may have affected the outcome of the election can, like the threshold

issue of whether a violation occurred at all, be decided on summary judgment. *See, e.g.,*
*Hugler v. Local 689*, No. GJH-16-2052, 2017 WL 3085321, at *6 (D. Md. July 18, 2017)
(granting summary judgment in favor of the Secretary in an LMRDA election case and
ordering that a new election be conducted).

Once it is established that an LMRDA violation occurred, that violation is prima
facie evidence that the outcome of the union election may have been affected and the
burden shits to the union to prove otherwise. *Id.* at *5 (citing *Local 6*, 391 U.S. at 506–
07; *Local 54*, 166 F. Supp. 2d at 113).  This is a liberal standard in favor of requiring that
a new election be held, and has been described as calling for only a consideration of
whether under the "maximum theoretical possibility" it is possible that the violation may
have affected the outcome of the election. *See Marshall v. Am. Postal Workers Union*,
486 F. Supp. 79, 82 (D.D.C. 1980); *Dole v. Graphic Commc's Int'l Union*, 722 F. Supp.
782, 786 (D.D.C. Sept. 22, 1989); *Dole v. Int'l Brotherhood of Teamsters, Chauffeurs,*
*Warehousemen & Helpers*, No. 89-241, 1990 WL 251022, at *9 (D. Haw. May 2, 1990);
*Local 689*, 2017 WL 3085321, at *5.  Under this standard, the union has "the burden of
demonstrating that the violation *could not have affected* (as opposed to the easier burden
of proving that the violation *did not affect*) the outcome of the election." *Int'l*
*Brotherhood*, 1990 WL 251022, at *9 (citing *Donovan v. Local 719*, 561 F. Supp. 54
(N.D. Ill. 1982)).

Here, for a number of reasons there is no way that the APFA can rebut the
presumption that the LMRDA violations in its election may have affected the election's
outcome.  First, with respect to the ballot-secrecy violations, the undisputed facts show

that the use of one-time passwords affected and rendered non-secret 100% of the 9,355 votes that were cast; that of these votes approximately 43% of them (4,081 votes) can also be considered non-secret by reason of the IP addresses and other information on the MRNS and ES that allowed votes to be linked to voters; and that 11,301 eligible members out of 20,656 did not vote at all. (App. 044 (Tab D); App. 192 (Tab J); *see also* pp. 13–16, *supra*.)  When LMRDA violations have tainted some portion of the votes or potential votes in a union election, the caselaw discussed below shows that the proper analysis under the liberal "may have affected the outcome" standard is to assume that all the potentially affected votes would have been cast against the winning candidate.  Then, if the margin of victory is less than the number of these affected votes, it is "conclusively established" that the LMRDA violation may have affected the outcome of the election. *Wirtz v. Local Union No. 125*, 270 F. Supp. 12, 20 (N.D. Ohio 1966).

For example, in *Bachowski*, ballot-secrecy and other violations had occurred during the voting at certain union locals during an election, and the question before the court was how to determine whether the outcome of the election may have been affected. *Bachowski*, 413 F. Supp. at 148–49.  The Secretary had adopted an analysis that simply eliminated the winning candidate's margin in the locals where the violations had occurred, and based on this rationale, the Secretary had not found any possible effect on the outcome and had declined to file suit. *See id.*  The court, however, determined that the Secretary's methodology of eliminating only the winning candidate's margin was improper because it did not go far enough.  Instead, the Secretary was directed to credit the losing candidate with all the votes in the affected locals. *See id.* at 151 (explaining

that the proper analysis was to "us[e] the same standard" as was used for a second category of violations that occurred when certain locals had no voting or results reported at all, which was a method of "total rejection instead of margin," i.e., crediting all potentially affected votes to the loser).

Similarly, in *CSEA*, where the use of perforated ballot forms violated ballot secrecy, the facts were that a total of 197,000 ballots had been mailed out, that 51,000 were returned, and that of these 5,600 were not counted because these voters had failed to sign their ballots. *CSEA*, 594 F. Supp. at 195. Notwithstanding that one of the three races had been won by a margin of over 14,000 votes, and the others by lesser margins, the court found that a new election was required "since it remains to be seen whether secret ballots would have encouraged [not only] the 5600 non-signing voters to cast meaningful ballots, but the nonvoting members as well." *Id.* at 197. In explaining that it was necessary to take into account not just the votes that were cast but also the number of eligible members who did not vote at all, the court explained that "[t]here is no conceivable way in which defendant can confront and overcome the imponderables inherent in analyzing the decisions made by each elector . . . in choosing to vote or not to vote and in selecting the particular candidate for whom to vote . . . ." *Id.* (quoting *Usery v. Int'l Org. of Masters, Mates & Pilots*, 422 F. Supp. 1221, 1226–27 (S.D.N.Y. 1976)).

The *Local 689* case, decided just this summer, provides another example of the expansive nature of the presumption that a violation "may have affected" an election's outcome when considering the impact of the votes potentially affected by the violation as compared to the winning margins in the election. *See Local 689*, 2017 WL 3085321, at

*5–6. In *Local 689*, the violation was that the union mailed notice of the election to its members on the fourteenth day before the election. *Id.* at *1. This was one day short of meeting the LMRDA's requirement that notice be mailed not less than fifteen days before the election. *Id.* After noting that this violation established a presumption that the outcome of the election may have been affected, the court explained that it need not find that the violation actually affected the outcome, but rather that it need only consider the "maximum theoretical possibility" of an effect on the outcome. *Id.* at *5 (quoting *Am. Postal Workers Union*, 486 F. Supp. at 82). Applying this standard, the court reasoned that the notice violation "could have affected *every* eligible union member that did not vote," which was 8,067 members out of 13,535, and which represented a block of votes greater than the winning margins in all races. *Id.* (emphasis added). Again, the violation was merely that the union mailed out notice of the election a single day later than required by statute, and yet under the "maximum theoretical possibility" rationale the court determined—on summary judgment—that essentially every possible uncast vote could have been affected, and ordered that a new election be held. *Id.* at *5–6.

Yet another example is the *Local Union No. 125* case, in which it was determined that the union had allowed a number of ineligible members to vote, in violation of the LMRDA. *See Local Union No. 125*, 270 F. Supp. at 20. The union argued against finding that this violation may have affected the outcome of the election because, according to the union, it was "not clear which candidate [the ineligible voters] voted for." *Id.* But the court rejected the union's suggestion that such an inquiry into the minds of voters was the proper analysis. *See id.* Instead, the court explained that "if the number

of ineligible votes cast is sufficient to make it mathematically possible that the outcome of the election was affected . . . this fact alone conclusively establishes the [LMRDA's] requirement that the conduct complained of may have affected the outcome of the election." *Id.* Finding that the number of votes in question exceeded the winning margin, the court granted summary judgment in favor of the Secretary and ordered that a new election be held. *Id.*

In the case of the APFA's election, it is likewise conclusively established, by comparison of the winning margins in each of the four races to the number of votes and potential votes that could have been affected by the LMRDA violations, that the ballot-secrecy violations may have affected the outcome of the election. First, the APFA cannot negate the possibility that the 11,301 eligible members who did not vote in the election at all would have voted, and would have voted in such a manner as to alter the results of each race, if an LMRDA-compliant method of voting had been used.

Moreover, even if the potential class of affected votes is limited to only the 9,355 votes that were cast, 100% of these votes were non-secret by reason of the BallotPoint system's use of one-time passwords, and approximately 43% of the votes were also non-secret by reason of the IP addresses and other voter-vote linking information on the ES and MRNS.

As the table below demonstrates,[22] under any of these possible scenarios the

---

[22] In the table, "winning margin" refers to the margin between the winner and runner-up in the vice-presidential race, and, in each of the other races in which a runoff was required, the margin between the second-place candidate who made the runoff and the next candidate who was eliminated from the runoff. The Secretary also notes here that, because voters had the option of not selecting any candidate in a race, there were slightly fewer than 9,355 votes in each of the four races. Instead, 9,355 represents the number

number of potentially affected votes was well in excess of the winning margins of victory

in the four races in the APFA's election. Assuming that each of these votes or potential

votes had been cast against the winning candidates (or the candidates who made the run-

off, where no candidate won outright), it is conclusively established that the outcome of

the election may have been affected by the ballot-secrecy violations.

| Race | Winning Margin | Eligible Members Who Did Not Vote in the Election at All | Non-Secret Votes (Due to One-Time Passwords) | Non-Secret Votes (Due to IP Addresses, etc.) |
|---|---|---|---|---|
| President | 582 | 11,301 | 9,355 | 4,081 |
| Vice President | 2,147 | 11,301 | 9,355 | 4,081 |
| Secretary | 680 | 11,301 | 9,355 | 4,081 |
| Treasurer | 1,566 | 11,301 | 9,355 | 4,081 |

(*See* App. 044 (Tab D) (election results document listing the number of voters, non-

voters, and results in each race); App. 188–92 (Tab J) (explanation of how OLMS

determined that 4,081 votes could be linked to voters through analysis of IP addresses

and other data).)

The APFA may argue that nobody knows whether specific union members were

aware of the ballot-secrecy problems presented by the BallotPoint system, and therefore

that it is impossible to prove that the ballot-secrecy issue affected members' choices—

either the choice to vote or not vote, or the choice of whom to vote for if the member did

vote—in a manner that would have affected the outcome of the election. But for several

---

of voters who voted in at least one race. Nonetheless, the full figure of 9,355 is included in the table for
each race because of the possibility that members who voted in the election, but not in a particular race,
might have done so if the election had been conducted using a different voting system.

reasons, these kind of arguments are unavailing. First, the nature of the presumption created by the existence of an LMRDA violation is that the union must come forward with evidence to rebut the presumption that the outcome of the election may have been affected. *See Int'l Brotherhood*, 1990 WL 251022, at *9. An argument from the APFA that "there is no evidence that union members knew their votes were non-secret" or that "there is no evidence that union members claimed that concerns about ballot secrecy influenced how or if they voted," on the other hand, is just that—an argument, not evidence. In other words, the APFA cannot meet its burden by merely claiming that there is no evidence that union members' voting decisions were influenced by the non-secret nature of the election system.

Instead, the APFA would need to come forward with its own affirmative evidence proving that the violations could not have affected the outcome. But the APFA has already confirmed that it has no such evidence. Specifically, in response to an interrogatory that asked for the factual basis for the APFA's denial that the outcome of the election may have been affected by the ballot-secrecy violations, the APFA pointed to no affirmative evidence tending to negate any possible effect on the election. (App. 036– 37 (Tab D).) The APFA instead relied entirely on testimony or statements from OLMS personnel (or the union member who filed the underlying complaint with OLMS), which statements the APFA argues show that the Secretary does not have any evidence that APFA members knew of, or were concerned about, the ballot-secrecy issues in the

election.[23]  (App. 036–37 (Tab D).)  That kind of "no evidence" argument does not

suffice, though, given that the APFA bears the evidentiary burden.

Indeed, given the nature of the ballot-secrecy violations at issue in this case there

is effectively no evidence that the APFA could ever present—short of evidence that the

number of affected votes or potential votes was smaller than the winning margins, which

is not the case here—to negate the possibility that the outcome of the election may have

been affected.  The APFA has not attempted to gather evidence from all the eligible

union members to discover whether these members' decisions about whether and how to

vote were affected in any way by the fact that voting was conducted over the internet and

by phone.  But even if the APFA had done so, the caselaw establishes that such an

inquiry would be improper and that such evidence cannot be used to defeat the

presumption that the outcome of the election may have been affected.  *See District Lodge

720*, 11 F.3d at 1504 (in an LMRDA case where there was an issue about whether the

number of affected voters who did not vote was less than the winning margin, explaining

that "union members who were eligible to vote but did not do so may not be asked

whether or how they would have voted"); *Local Union No. 125*, 270 F. Supp. at 20

(rejecting a union's argument that it would be necessary to determine "the manner in

---

[23] The APFA also suggested in the seventh numbered paragraph of this interrogatory response that the Secretary may have "planted a seed in [the union member complainant's] head that the BallotPoint system did not adequately ensure ballot secrecy."  (App. 037 (Tab D).)  However, this is immaterial. Even if the Secretary had "planted a seed" in this manner, that would have no legal impact on the case, as the Secretary would have been within his rights to do so.  *See Wirtz v. Local Union No. 169*, 246 F. Supp. 741, 754 (D. Nev. 1965) ("Defendants also contend that the Secretary of Labor solicited the filing of the complaint by the member, thus exceeding his investigatory authority under [the LMRDA].  We see no merit to this defense.  'Congress in its wisdom has concluded as it has in other areas, that to effectuate the policy of the law, the Government may become an active protagonist for private interests and thereby vindicate public rights.'" (quoting *Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721 (5th Cir. 1961))).

which [] ineligible voters voted" to assess whether the outcome of the election may have been affected by an LMRDA violation, and explaining that "[t]o require or allow inquiry into the manner in which certain persons would have voted would be entirely inconsistent with the [LMRDA's] requirement that the ballot be secret").

The APFA also cannot rebut the presumption that the violation of the LMRDA's observer requirement may have affected the outcome of the election. Here the lack of any tangible paper record of the votes makes it impossible for the APFA to meet its burden. *See Shultz v. Indep. Employees Union*, No. 68-C-169, 1970 WL 5444, at *4 (W.D. Wis. Apr. 10, 1970) (concluding that the union's destruction of election records removed the tangible evidence that would have served to establish whether there had been a fair election). In an election conducted with paper ballots, observers who are deprived of the opportunity to witness the counting of the ballots can at least attempt to get access to those ballots later—or, if a complaint is filed, OLMS can use its investigative authority to require the union to turn over these records. At that time, the ballots and other records can be inspected to (a) verify that the votes marked on the ballots conformed to the tally results announced by election officials, and (b) assuming that the votes as recorded on the ballots and the announced tally match, check to see if the ballots show any signs of tampering such as smudges, erasures, white-out marks, or similar physical evidence which might suggest that votes had been altered.

In this case, no similar after-the-fact opportunity to investigate and obtain some assurance about the accuracy of the announced election results exists in the context of a BallotPoint-style election conducted remotely over the internet and phone. Most notably,

because the BallotPoint system does not employ any "client side" protection against malicious software on the voter's own device when a vote is being cast, there is no guarantee that a malicious actor could not corrupt the voter's vote while it is in the process of being transmitted from the voter's device. (App. 161–67, 177–78 (Tab H).) In this situation the voter might think that he or she was voting for candidate A, but the vote could without notice to the voter be flipped such that when it reaches the BallotPoint system it is recorded as a vote for candidate B. The APFA's retained expert recognized this vulnerability in the BallotPoint system, but essentially dismissed it by reasoning that a union election is of such "low notoriety"—essentially meaning of such low stakes—that no malicious actor would bother to attempt to corrupt it. (App. 178 (Tab H); *see also* App. 163–67 (Tab H).) However, the APFA cannot conclusively negate the possibility that such an attack could have occurred. *See Local 135*, 1980 WL 18743, at *8–9, 11 (noting that the burden is not on a protesting candidate to prove how ballot tampering occurred in the absence of observers in order to establish a possible effect on the election, because ballot tampering could occur in ways unknown to complaining union members). Moreover, the dismissive approach of the APFA's retained expert is at odds with the intent of Congress in enacting the LMRDA that union elections be conducted under the same types of safeguards and protections used in political elections. *See Local 6*, 391 U.S. at 504; *Local Union 12447*, 591 F.2d at 205.

The APFA may also argue that there is no evidence that votes were incorrectly reported or tampered with once they were recorded in the BallotPoint system, but again due to the lack of any tangible paper record there is no way that the APFA can

definitively prove that tampering, or even mistakes in computing, could not have occurred.  The APFA's retained expert reviewed the counting and reporting-of-results components of BallotPoint's software for the ES, and has opined that this software correctly counts the votes and reports them over the internet.  (App. 139–41 (Tab H).) However, the expert admitted that he simply took BallotPoint's word that the code he was provided to review was the code that was in place at the relevant time of the election (which was roughly a year and a half earlier), and that he did not review any logs or other system records to verify that the ES software he was provided was in fact the software in place during the election.  (App. 148, 168–69 (Tab H).)  Practically speaking, there is no way to obtain this kind of assurance about the software that BallotPoint uses to record and count votes on the ES, and therefore any conclusions about whether the software reviewed by the APFA's expert correctly counts or reports results cannot discharge the APFA's burden to show that the outcome of the election could not have been affected by the observer violation.

To summarize, each of the three separate LMRDA violations discussed in this brief—the ballot-secrecy violation arising from the use of one-time passwords, the ballot-secrecy violation arising from the use of IP addresses and other data, and the observer violation—is independently sufficient to establish that the outcome of the election may have been affected by the violation, and the APFA cannot show otherwise.  The Court should therefore grant summary judgment in the Secretary's favor on the issue of whether the outcome of the election may have been affected, and declare the results of the election

void[24] and order that a new election be conducted under the Secretary's supervision. *See* 29 U.S.C. § 482(c).

## V.      Conclusion

For these reasons, the Secretary requests that the Court grant his motion for summary judgment and enter a judgment (a) voiding the results of the APFA's January 2016 election for the positions of national president, national vice president, national secretary, and national treasurer, and (b) directing that a new election for these positions be conducted under the Secretary's supervision.  The Secretary further requests that he recover his allowable court costs, and further requests general relief.  A proposed order and judgment are being submitted.

---

[24] Notwithstanding that the union member who complained to the Secretary about the APFA's election was a candidate in only one of the races (the vice-presidential race), the proper remedy is to void the results of all races in the election, since the races were conducted in the same manner using the same voting method and with the same observation opportunities provided. *See District 22*, 543 F.2d at 750 (holding that a district court erred by not voiding the results of two other races that occurred at the same time as the race that a union member had complained about, when the same LMRDA violation was present with respect to the other races).

Respectfully submitted,

JOHN R. PARKER
United States Attorney


*Brian W. Stoltz*
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff,
the Secretary of Labor

## Certificate of Service

On August 25, 2017, I served the foregoing document on defendant, the

Association of Professional Flight Attendants, by mailing it by prepaid first-class mail to

defendant's counsel of record, addressed as follows:

Andrew D. Roth
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St., N.W., Tenth Floor
Washington, D.C. 20005


*Brian W. Stoltz*
Brian W. Stoltz
Assistant United States Attorney