Please note with regard to this protest, I **feel APFA violated the integrity and ballot secrecy provision of section 401(e) of the LMDRA**, 29. C.F.R subsection 452.97 and I incorporate the LMDRA act into this said election complaint.

Respectfully Submitted,

____________________________________,

Samuel Morales -DFW- 80485
5600 Shady Hill Lane
Arlington, TX 76016
817-683-5988



APFA
Association of Professional
Flight Attendants
Representing the Flight Attendants of AmericanAirlines

**Certified Return Receipt #70033110000333300061**

**January 29, 2016**

Samuel Morales
5600 Shady Hill Lane
Arlington, TX 76016

Dear Sam:

The National Ballot Committee (NBC) has completed its investigation of your National Vice President election complaint that was received by the APFA National Secretary on January 22, 2016. You contend that the election violated the Labor-Management Reporting and Disclosure Act (LMRDA). **For the reasons we now describe, the NBC finds no basis for setting aside the election.** The paragraph numbers below refer to the paragraphs in your complaint, and the claims you make are in italics.

1. Electronic Balloting

*In paragraph 2, you state that, "each member is required to enter an employee identification number (VIN) and a (PIN) number, which could be monitored by certain employees of the third-party Company [BallotPoint], which is cast by telephone and whereas votes during this election process can no longer be changed as in previous elections. APFA arbitrarily made changes to electronic voting without providing an explanation as to why changes were made."*

Members were not given a VIN and a PIN.

APFA did make changes in the electronic (internet and telephone) voting system, but those changes were not arbitrary. Instead, they were made in direct response to concerns raised by the U.S. Department of Labor during its investigation and litigation of a complaint that was filed by a member of the Allied Pilots Association alleging that electronic balloting – with the use of BallotPoint and the same procedures APFA used in past elections – did not satisfy the requirements of the LMRDA.

Under the revised system, only eligible candidates were permitted to log in and access a ballot. Once the member logged in, the connection between the voter and the ballot was severed. This meant that a voter could not change his or her vote after it was cast. In addition, the LMRDA does not require that a voter be allowed to change his or her vote.

EXHIBIT
Horan 6
7/27/17

Contrary to your assertion, APFA explained to the membership the reasons for the changes in a December 1, 2015 hotline and reiterated in a December 8, 2015 hotline. Copies of those hotlines are Attachment 1 to this letter. Moreover, these hotlines remained posted on the APFA website, www.apfa.org, throughout the balloting period, as did the resolution passed by the Board of Directors adopting the changes and explaining why they were being made.

2. Undelivered/returned ballot packets

*In paragraph 3, you claim that "no record of undelivered/returned ballot envelopes was published or provided for any of the observers who observed at APFA Headquarters. Where did the returned ballots go and who receives them when they're returned undelivered?"*

APFA does keep records of undelivered/returned ballot packets. You never made any request to review those records or for an explanation of the process for handling undelivered/returned ballot packets.

3. Observer Rights – Vote Tallies

a. *In paragraph 3, you state, "What safeguards and/or protections members we have [sic] if the so-called "Official Tallies" arrive in one room at APFA (a room off limits to ballot count observers) and are forwarded to the main Unity Pays room where the observers are and the tally is counted. This procedure is both unsterile and unsecure."*

The tallies "arrived" only on a computer in the Unity Pays room, where the observers were; they did not arrive in, nor were they forwarded from, any other room at APFA.

b. *In paragraph 7, you assert: "During this National election, the final tallies came to a laptop in the Unity Pays room and not a fax machine. There is no way to verify if the results came directly from Ballotpoint, which is in another state, or if the Tallies came from a different room within APFA."*

There is no requirement that final tallies come in by fax machine. The tally results did come from BallotPoint, not from a different room in APFA. You did not request verification of that fact.

c. *You also state in paragraph 7 that "Ballotpoint has stated that it does not certify our elections, only APFA does, which means there's absolutely no way to verify any of the results because it's all done in secret. Unlike previous paper ballots that were certified by an outside accounting firm, electronic ballots are certified by the APFA alone with no second verification as to the authenticity." In paragraph 10, you state, "I was handed a piece of paper(s) with regard to my election, which only stated the*

*names of the candidates (3) and the final numbers, with absolutely no certification whatsoever from Ballotpoint."*

We do not understand what you mean by a "verification as to the authenticity" of the results. In any event, you did not make a request for any such verification, much less for a second verification. Furthermore, there is no requirement of a "second verification." Nor is there any requirement that BallotPoint certify the "final numbers."

4. Other Observer Rights

a. *In paragraph 4, you state that: "Since APFA is in one state and Ballot Point is in another, its is [sic] practically impossible for me (or any observer) to view the balloting process, which I believe violates LMDRA 29 U.S.C. 481(c)."*

The fact that APFA and BallotPoint are in different states did not prevent you from observing all stages of the balloting process. You did not ask to have an observer present at the preparation of the ballot, the preparation of the ballot packets or the mailing of the ballot packets. You did observe the ballot count.

b. *In paragraph 6, you complain that on the day of the ballot count, "there was nothing to view or challenge. No eligible membership voters list was provided, however APFA provided the names of those who became dues current within the required statutory voting deadline, a new change never provided before and was sent via email, but not the entire eligible list."*

During the balloting period, you emailed the NBC and asked to be provided with "the entire list of eligible voters prior to election day." (Attachment 2.) The NBC sent an email in response, informing you that:

> APFA doesn't provide any candidate or other observer with a list of eligible voters during the balloting period. We have been sending you (and other observers who have asked) daily emails with a list of newly-eligible voters and giving observers an opportunity to challenge the voters' new eligibility before those voters can cast a ballot.

The NBC went on to advise you:

> You do have the right at the ballot count to review the list of eligible voters, as well as a list of ineligible members and a list of those who voted.

However, at the ballot count you did not ask to see any of those lists.

In light of these facts, there was no LMRDA violation, much less one that may have affected the outcome of the National Vice President election. **Therefore, the NBC will not set aside the election results.**

Per Article VI, Section 6.D. of the APFA Constitution, you may appeal this decision to the APFA Executive Committee no later than forty-five (45) days following the canvassing date (date the ballots were counted) which was January 9, 2016, that is no later than February 8, 2016. If you have any questions, please feel free to contact us at ballot@apfa.org or (817) 540-0108 extension 8311.

Sincerely,

Cindy Horan
NBC Chairperson

Attachments

ATTACHMENT 1



Email not displaying correctly? View it in your browser.

**Tuesday, December 1, 2015**

Like Tweet

**Important Changes to APFA Election Balloting - LAA/LUS**

Due to a potentially landmark settlement between the Allied Pilots Association (APA) and the US Department of Labor (DOL), on November 30, 2015, the APFA Board of Directors made two important changes to APFA's internet and telephone (electronic) balloting process for ALL upcoming elections:

1. **Members will no longer be able to change votes.** In all upcoming elections, members will only have one opportunity to vote and that ballot cannot be changed later.
2. **Only members in good standing will be allowed to cast a ballot.** Members in bad standing must become dues-eligible no later than the fifth day before the close of the balloting period in order to vote in that election.

To read the Board of Directors resolution, **click here**.

Why is APFA Making This Change Now?

Last year, the DOL brought a lawsuit against the APA challenging the electronic balloting system the Union used for Officer elections. Negotiations between APA and DOL stretched for nearly a year. Today, it is clear that the DOL believes that an electronic balloting system will violate the Labor Management Reporting and Disclosure Act (LMRDA) – which governs all Union Officer elections – if it allows voters to change their votes or if it allows ineligible voters to cast a ballot. Here's why.

All electronic balloting must satisfy the LMRDA's requirement of secrecy, that is, the vote cannot be connected to the voter. The DOL believes that in order for a voter to change his or her vote, an electronic balloting system must maintain a connection between the voter and the ballot cast. Similarly, in order for an electronic balloting system to void the ballot of a voter who is determined to be ineligible, a connection between voter and vote would need to be maintained. Therefore, according to the DOL, an electronic balloting system that includes those features violates the LMRDA's secrecy requirement.

Can APFA Continue Balloting the Way We Always Have?

No. BallotPoint, APFA's longtime electronic balloting vendor, is the same vendor APA used in the elections challenged in the lawsuit. To address the DOL's concerns, BallotPoint already has changed its process for all electronic balloting to a new system called "One Vote, No Void." APFA was unable to find an electronic balloting vendor that conducts elections at a major carrier and uses the same system APFA used. But even if there were a vendor that would be willing to redesign its system to match APFA's former one, that could not be accomplished before the ballots go out on December 10. More important, it is clear that the DOL would find that ANY electronic balloting system that allows votes to be changed or voided violates the LMRDA. Therefore, unless APFA eliminates members' ability to change their vote or to cast a ballot until they are in good standing, the DOL would likely uphold a challenge to the process and seek to overturn the election results.

Is There a Reason This Change Is Being Made Now, So Close to the Mailing of the Ballots?

Yes. It was not until the DOL/APA settlement that the need for the change became clear.

Does This Change Comply with the APFA Constitution?

Yes. The APFA Board of Directors has made the necessary changes to the APFA Policy Manual in compliance with the APFA Constitution. To see those Policy Manual changes, **click here**.

Can Previous APFA Elections be Challenged Due to this Change?

No. This change and the DOL's interpretation of the LMRDA will apply only to the current and future elections. They do not affect previous elections. It is too late to challenge those elections.

**Cindy Horan**
**APFA National Ballot Committee Chair**
**ballot@apfa.org**

You received this e-mail as an APFA Member. If you no longer wish to receive this Weekly Hotline Update via e-mail, unsubscribe information is available below.

Unsubscribe mailson@bredhoff.com from this list | Forward to a friend | Update your profile
**Our mailing address is:**
APFA
1004 W. Euless Blvd.
Euless, TX 76040

Add us to your address book

*Copyright (C) 2015 APFA All rights reserved.*



Email not displaying correctly? View it in your browser.

**Tuesday, December 8, 2015**

Like Tweet

**APFA National Elections Balloting - LAA/LUS**

**Recently, the Department of Labor (DOL) and the Allied Pilots Association (APA) reached a potentially landmark settlement which has led APFA to modify its balloting procedures. For more information on the changes, click here. Below is a helpful guide for members ahead of the coming National Officer election:**

New Access Code

Each APFA member will be mailed a new "access code." The activation code and PIN you may have received in a past election no longer are valid. A new access code will be issued every time there is an election.

No Changing of Votes

Make sure you have all of the information you need before you vote. Double-check the names of the candidates you have chosen to ensure no mistakes are made on your ballot. **ONCE YOU CAST YOUR BALLOT, YOU WILL NOT BE ABLE TO CHANGE YOUR VOTE.**

Duplicate Ballots

If you do not receive the ballot packet that APFA mailed to you, or if you received the packet but have misplaced your access code, please contact the National Ballot Committee (NBC) at **ballot@apfa.org** or (817) 540-0108 ext. 8311. Please be aware that if the

electronic balloting system shows that your access code was already used to cast a vote, no duplicate will be issued.

Eligibility to Vote

In order to be eligible to vote, you must be a member in good standing. If you are not yet an APFA member and would like to vote in the National Officer elections, you must join **BY THIS THURSDAY, December 10, 2015**, the day the ballots are mailed. To join APFA, **click here**.

In order to be eligible to vote, you must be in good standing – not more than sixty (60) days in dues arrears. You must be in good standing no later than the fifth (5th) day before the close of the balloting period: **BY January 4,** 2016.

As in the past, the NBC will mail ballot packets, now including access codes, to all APFA members. **The balloting system will not allow members in bad standing to log in.** Instead, a message will appear (or in a recording if you are voting by telephone) instructing you to contact the Election Administrator/NBC. You can reach the NBC at **ballot@apfa.org** or (817) 540-0108 ext. 8311.

If you are ineligible because you are in dues arrears, you can become a member in good standing by contacting the APFA Dues Department at **dues1@apfa.org** or (817) 540-0108 ext. 8151. You can pay over the telephone by credit card, send in a check or pay in person at APFA Headquarters. A check must be **received by APFA no later than January 4, 2016**, the fifth (5th) day before the close of the balloting period. **If you are unsure of your dues status, contact the Dues Department as soon as possible in order to become voting-eligible before the deadline!**

Challenges to Eligibility

The Labor-Management Reporting and Disclosure Act (LRMDA) – the federal law that governs Union Officer elections – requires Unions to give candidates or their designated observers an opportunity to challenge a member's eligibility to vote. This will apply when the NBC changes your membership status from bad standing to good standing. Therefore, members who catch up on their dues may not be able to cast a ballot immediately.

Upon request, the NBC will notify a slate of candidates, and a candidate who is not running

on a slate, that you are now eligible to vote. The candidate or observer will have 48 hours to challenge your eligibility. If no challenge is brought forward, the NBC will upload an updated eligibility list to the electronic balloting system and you will be able to access the system and cast a ballot.

If a candidate or observer notifies the NBC by email that he or she is challenging your new eligibility, the NBC will notify you and then promptly review the matter. If it sustains the challenge, the NBC will notify you that you still are ineligible to vote and will give you the reason. If the NBC confirms your eligibility, you will be added to the eligibility list and the NBC will notify you that you can now cast your ballot.

**Cindy Horan**
**APFA National Ballot Committee Chair**
ballot@apfa.org



ATTACHMENT 2

From: Cindy Horan
Sent: Thursday, December 24, 2015 7:32 AM
To: SAMUEL MORALES
Subject: RE: ineligible to eligible

Sam,

All candidates had the right to view the membership list once within the 45 days before the ballots were mailed.

APFA doesn't provide any candidate or other observer with a list of eligible voters during the balloting period. We have been sending you (and other observers who have asked) daily emails with a list of newly-eligible voters and giving observers an opportunity to challenge the voters' new eligibility before those voters can cast a ballot.

You do have the right at the ballot count to review the list of eligible voters, as well as a list of ineligible members and a list of those who voted.

Thank you,

Cindy Horan
APFA National Ballot Committee

---

From: SAMUEL MORALES [miadolphins@sbcglobal.net]
Sent: Tuesday, December 22, 2015 1:38 PM
To: Cindy Horan
Subject: Re: ineligible to eligible

Hi Cindy,

Can you provide me the entire list of eligible voters prior to election day?

Thanks,Sam....

**Liz Marko**

**From:** Jeff Pharr
**Sent:** Monday, February 8, 2016 9:17 PM
**To:** Samuel Morales; Liz Marko
**Subject:** RE: Typo on appeal letter

Sam - there is nothing attached to the email. Will you send an updated letter?

Thanks,
Jeff

Jeff Pharr
APFA National Secretary
817.540.0108 ext 8221
Association of Professional Flight Attendants (APFA) Proudly Representing the Flight Attendants of American Airlines
Twitter: @apfaunity | www.APFA.org | Facebook: /apfaunity This e-mail, including attachments, is intended for the exclusive use of the addressee. If you are not the intended recipient, any dissemination, use, distribution or copying is prohibited.

-----Original Message-----
From: Samuel Morales [mailto:miadolphins@sbcglobal.net]
Sent: Monday, February 8, 2016 8:56 PM
To: Liz Marko
Cc: Jeff Pharr
Subject: Typo on appeal letter

Dear Liz and Jeff,

My VP appeal letter to EC was inadvertently dated January 7, 2016, when it should have been dated February 7th , 2016. Please attach this email to amend said date.

Thanks,

Samuel Morales

January 7, 2016

Dear Mr Jeff Pharr,

I am in receipt of the NBC's 4 page answer to my complaint and I deny all of the NBC's assertions and interpretation of their findings. I am sure you have a record of Cindy Horan's interpretation, asserations and allegations dated on January 29,2016.

Please forward this letter and my appeal and reincorporate my original complaint to the Executive Committee for further consideration, which you have on file.

Respectfully Submitted,

Samuel Morales
5600 Shady Hill Lane
Arlington, TX 76016
817-683-5988



*Association of Professional Flight Attendants*
*Representing the Flight Attendants of AmericanAirlines*

**Certified Return Receipt #70151730000184850455**

February 10, 2016

Samuel Morales
5600 Shady Hill Lane
Arlington, TX 76016

Dear Sam:

Per Article VI, Section 6.E. of the APFA Constitution, the Executive Committee, at its February 9, 2016 meeting, considered your appeal of the National Ballot Committee's findings regarding your National Vice President election complaint.

After careful consideration, the Executive Committee denied your appeal.

Sincerely,

Jeff Pharr
APFA National Secretary

cc: Executive Committee
Board of Directors

*1004 West Euless Blvd • Euless, Texas 76040*
*Tel: (817) 540-0108 • Fax: (817) 540-2077 • www.apfa.org*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

THOMAS E. PEREZ, [now R. ALEXANDER ACOSTA], Secretary of Labor, Plaintiff,

VS. )NO. 4:16-CV-1057-A

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, Defendant.

DEPOSITION OF GERRY FELDKAMP

TAKEN ON BEHALF OF PLAINTIFF

* * *

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the deposition of GERRY FELDKAMP was taken before Paula D. Tieger, a Registered Professional Reporter and Notary Public for the State of Oregon, on July 14, 2017, commencing at the hour of 9:29 a.m., in the office of McKanna, Bishop, Joffe, 1635 NW Johnson Street, Portland, Oregon.

* * *

people can look at the back of the book and find out where that content occurred.

Q What came next after -- when you were working on your own doing the text processing work?

09:37:31 A It wasn't an after. In 1994, we started that, and that product lasted for about 14 years, 14, 15 years. And during that time, we had very little need to go back and fix it up. We did a great job to start with. We ended up with 2,000 companies using our software. And

09:37:59 so, I just let the royalties come in from that. And at the same time -- or around that same time, 1995-1996, I and a few others formed what we called at the time Black Rose, Limited, which became Telserve, which became CCComplete over time, name changes.

09:38:25 And so, starting in 1996 is when it incorporated in the state of Oregon. There were, I think, seven of us at the time, something like that. And that's where we are today.

Q What business was the entity that's now known as

09:38:43 CCComplete -- was it all in -- or describe what kind of business it was in starting then.

A We started by putting together custom applications for what's called IVR, or interactive voice response, telephone systems so that companies, for instance, that

09:39:03 were doing automated telephone calling or receiving

09:39:21
09:39:46

automated -- or people calling in to leave their names, addresses and that sort of thing, that it could be done on an automated basis. And so, there were a number of companies -- for instance, Bear Creek down in Medford -- that needed an automated system to reduce the costs associated with somebody calling in to a human, because you got to pay the human all the time; you don't have to pay the computer all the time. So, the idea was to provide custom applications. And we did that 1996-ish to 2001.

We now have -- a reasonable portion of the CCComplete business still uses or is really still oriented toward non-balloting customers. So...

09:40:10
09:40:29

Q What was your title or position at this entity beginning in 1996?

A We don't really have titles, but I've been the software architect for certainly all of the balloting operations. Prior to that, I was just really the software development engineer, because IVR processing wasn't my favorite thing to do.

09:40:43

Q Now, you mentioned getting into the balloting work. Tell me about that.

First of all, is BallotPoint Election Services -- I've seen that name. Is that a separate entity, or is that just sort of a trade name that CCComplete uses for

its balloting business?

A It's a doing business as type name.

Q So, here, if we refer to BallotPoint, we can -- do y'all refer to it like that?

09:40:54 A We often, with clients, balloting clients, refer to ourselves as BallotPoint. They understand that.

Q Okay.

A Others still call us CCComplete. And we're good at listening to either.

09:41:08 Q Okay. So, BallotPoint or CCComplete, as it exists today, can you just tell me how many people work there?

A We have five people on the staff.

Q And who are those people?

A Dan Hilderbrand is COO/president; myself, Robert

09:41:33 Thompson, software engineer; Michael Baum, B-A-U-M, software engineer; and Jeffrey Bachofner, or Jeff Bachofner, B-A-C-H-O-F-N-E-R, and he is our hardware/infrastructure person. We also have a part-time person on staff, and that would be James Devine,

09:42:08 D-E-V-I-N-E, and he lives in Phoenix.

Q Could you please, real briefly, give me just a very short explanation of what these people do? You've already described yourself. Dan Hilderbrand, who is here, he is, I think you said, the COO or the CEO or the

09:42:29 president?

09:42:36
09:42:45
09:43:06
09:43:32
09:43:54

A I repeat it again, titles.
Q Is it fair to say that Mr. Hilderbrand is not a technical guy?
A That's very fair to say.
Q Okay. So, he handles the business side of things more?
A That is correct.
Q Okay. You've talked about yourself.
How about Robert Thompson? What is his job duties, or what does he do?
A He's a software engineer. And I can be fairly broad about this, that all of -- myself, Mike, and Bob deal directly with clients, new clients, existing clients, and we develop software for the BallotPoint system, all three of us, and we -- well, Bob is the primary one who deals with new clients, and on a sort of client service basis, he deals with them more often than Mike or I do.
Q And you also mentioned Jeff Bachofner?
A Bachofner.
Q And what is his role?
A He keeps all of our equipment -- he's put together all of our equipment through purchases and configuration. He maintains that equipment. And so, if there are any questions about the physical equipment or our services through LightPoint or services through RackSpace, Jeff is

the person who is responsible for looking into and handling those things.

Q And what does James Devine do in Phoenix?

A He is formerly Department of Labor. And I don't remember the year that we hired him, but we talked with him about various kinds of election systems, and he has a background in -- on the financial side, but we appreciate his judgment on how the Department of Labor thinks about things. It's helpful to us.

09:44:13

09:44:42

Q Is Mr. Devine a full-time employee?

A No, not a full-time employee.

Q Would you estimate, does he do work for BallotPoint every month or more of an on-needed basis?

A More of an on-needed basis.

09:44:56

Q You mentioned the Department of Labor.

And I take it -- and you tell me -- are you familiar with the Labor Management Reporting and Disclosure Act?

A I am familiar with it, yes.

09:45:08

Q And can we refer to that as the LMRDA here?

A Please do.

Q Okay. Can you tell us, just very basically, what is your understanding of what the LMRDA is or does as relevant to the BallotPoint business?

09:45:29

MR. ALEXANDER: Object to the form of the

09:51:27
09:51:53
09:52:08
09:52:25
09:52:43

explanations here is your explanation?
A Yes.
Q So, you adopt this document, essentially, as if it were your own testimony?
A Correct.
Q Can you provide a brief -- and we will get back to that document later.
Can you provide us a brief overview of how the BallotPoint system works for the type of election that is at issue here -- well, specifically -- let me start over.
When we're talking about the BallotPoint system here, can we agree that we're talking about the BallotPoint system as it existed and was used at the time of the APFA national officer elections?
A Yes. Let's do.
Q Can you give us a brief overview in broad terms, how did that system function?
A Are you looking for an explanation beginning to end of an election, or...
Q Well, how about this. Physically, what is the system comprised of? Is it a single computer? Is it multiple computers? That sort of thing.
A Okay. We'll start there. The hardware consists of two -- and we'll call them virtual entities here. One's called the MRNS for member registration and notification

09:53:12 09:53:43 09:54:07 09:54:25 09:54:48

server, and the other major entity is the election server. And the MRNS itself consists of two computers with fire wall in front of them. There is a Web server and a database server; physically different machines.

The election server comprises a Web server, which is where administrators and voters go, log in to that. There are subsidiary processors or -- not really servers but extra computers there which support things like connecting to the telephone, the public telephone system, database server, and support servers which activate background jobs. All of that -- all of those entities make up the election server.

The election server is not an individual computer; it's a number of machines working together.

Q When you say a computer here -- for example, you said the MRNS consists of two computers. For those computers, can you describe in layman's terms for somebody like me, are we talking the same thing as a desktop computer, similar to a desktop computer that I might have in my house?

What is it exactly?

A The Web server is a stand-alone computer running the Windows server operating system. The database server is another stand-alone Windows-based machine which provides the SQL server services necessary to maintain databases

within the MRNS.

Q So, each of those two stand-alone computers that comprise the MRNS physically -- and I understand they may have different programs on them or be configured differently.

But physically, are those any different than the type of computer that somebody may have at their office or their house?

A They're very different in the sense of, the kinds of applications that run on them are extremely limited to what a desktop computer may have on it. Desktop computers have email on them and games and whatever else, and these servers don't have that breadth of capability, intentionally so.

They have a certain job to do.

Q But are they -- does it consist of a hard drive?

A Standard hard drives, memory, connections to an internal network, connections to a fire wall and, thereby, to the Internet.

Q Do these computers have -- tell me about them physically. I mean, is it a -- is there a disk drive associated with them? Is there a -- are there ports where you can plug in thumb drives? Are there cables like I would see on my computer at home?

Tell me about that.

09:56:45

A They have internal disk drives. There are USB ports on them, and the -- again, the database server and the -- what we call the MRNS, but the Web server and the database server are connected on a local area network. And then two of them can -- or they -- the Web server can see the outside world through a fire wall.

Q And these two machines, do they have a screen connected to them? Do they have a keyboard? Do they have a mouse?

09:57:03

A They have those. At the time when someone needs to -- or when Jeff Bachofner needs to access them, he wheels a keyboard and a mouse and a screen over to them.

Q So, we've been talking about the two machines that make up the MRNS.

09:57:22

Is the same basic description true of the machines that make up the ES?

A There are more of them, but yes.

Q Okay.

A Yeah.

09:57:33

Q And tell me where -- you mentioned LightPoint earlier.

Can you tell us, who is LightPoint?

A LightPoint Communications is a company here in Portland, offices on 6th Avenue, and they run a

09:57:48

co-location facility. Our machines, our servers are

stored at that co-location facility, are resident there. Inside that co-location facility, there are also computers supporting government operations, financial institutions, and so on.

09:58:07 So, it's a -- you know, it's a large business, a Portland-based business, co-location facility.

Q So, just so we have a picture in our mind, if you were to go to LightPoint, they have a room somewhere.

And is it fair to say they have a cage or some

09:58:25 kind of chain link type fence, and behind that are a bunch of computers set up; is that accurate?

A It's a large room with, actually, multiple cages, one cage of which we're in, along with computers from we don't know who else.

09:58:42 There is a lot of other computers in that same cage area.

Q So, if you want to physically go access the ES, I understand that it's in the LightPoint building.

Tell me how you go and actually get to that

09:58:54 machine.

A To get to the ES requires us to -- someone from BallotPoint or CCComplete to use cards, palm prints, to get into that facility. There is a key to the cage. There is a key to our rack.

09:59:18 And so, there is, you know, physical access

required there that runs through LightPoint.

Q If I can back up, I take it you have some sort of contractual arrangement with LightPoint where you pay them to house these servers; is that correct?

09:59:36 A That's correct.

Q Okay. And LightPoint, then, do they, essentially, ask you, who do you want to have access to these? And for each person you do, they get their palm scanned, and they get a key?

09:59:49 Is that how it works?

A We all have a palm card, yeah, a palm key.

Q So, if you or somebody else who is on the approved list at BallotPoint wanted to go to the ES, you would get in with your palm card.

10:00:02 And then you physically have the key that you can unlock the rack; is that correct?

A I don't physically have the key. There is only one such key. Jeff Bachofner maintains those.

But they would be accessible to us.

10:00:12 Q Okay. So, Jeff Bachofner, or somebody at BallotPoint, can, essentially, take the key that BallotPoint has and then go unlock the cages and physically access the ES; is that accurate?

A That's correct.

10:00:23 Q Okay. Now, tell me how it works for the MRNS. I

understand it's slightly different.

A It is different. There are -- entry by palm print is still necessary, but in addition, the rack that holds the MRNS has two keys, one of which we maintain and one of which is maintained by LightPoint. So, we can't get into that particular cage without our key and LightPoint producing their key and unlocking their half of the card cage or the rack in which the MRNS is stored.

Q And is this two key system for the MRNS, is that because you wanted to do it that way? In other words, did you tell LightPoint, we want it in a two key cage?

A That's correct.

Q So, it was your decision to house the MRNS in this manner; correct?

A We did that in 2007, yes.

Q And here's a -- just to back up, this whole idea of storing the servers at LightPoint, that is BallotPoint's decision that y'all made; correct?

A Entirely proactive on our part, following no guidelines from the Department, correct.

Q So, if BallotPoint wanted to, they could go retrieve the servers from LightPoint and, instead, house them in your own office if you wanted to; correct?

A Correct.

Q And I understand for business reasons, you --

whatever reasons, you've chosen not to do that; correct?

A Correct.

Q All right. Now, in terms of accessing the MRNS physically, I think you told me that, once you get into the facility through your palm reader or card, BallotPoint has one key that needs to be turned, but then LightPoint has a second key that needs to be turned; correct?

A That is correct.

10:02:15 Q Okay. And what's the procedure for getting LightPoint to go retrieve their key and turn it?

How do you do that?

A That's been done exclusively by Jeff Bachofner. None of the rest of us have ever gone through that process. But he will go into the LightPoint business office area and say, I need to get in; and, assuming that one of their people is around to get the key and unlock it, then that's the process. They walk with him. They use their key. Jeff uses his key. He's into the physical MRNS.

Q And is that -- I take it that LightPoint wouldn't do that for just somebody who walked in off the street.

But do they know Jeff?

A They know Jeff, yes.

Q And is he on some sort of approved list of people who can access the MRNS?

A I believe he is. I can't say for sure.

Q Does LightPoint have the ability to tell Jeff, or anybody else at BallotPoint, no, I'm not going to let you in the MRNS? And I understand there might be a staffing issue if the person might not be around.

10:03:26

But do they exercise any sort of independent judgment in terms of whether or not they're going to let somebody into the MRNS, or do they simply do what they're asked to do by the appropriate person at BallotPoint?

10:03:39

A I can't speak for them.

Q Who would be the right person to speak for them?

A The main contact is a fellow named Alden, A-L-D-E-N, and I don't know his last name.

Q And this is Alden at LightPoint?

10:03:55

A Yeah.

Q Do you know, has LightPoint ever told BallotPoint, or Jeff, or anybody at BallotPoint, that you cannot get into the MRNS?

A No, not to my knowledge.

10:04:10

Q And if, for some reason, LightPoint took the position that BallotPoint could no longer get to the MRNS, what would BallotPoint do?

MR. ALEXANDER: Calls for speculation.

THE WITNESS: Try to figure out what's the issue.

10:04:24

MR. STOLTZ: All right.

Q BY MR. STOLTZ: And, obviously, at any time, you could, essentially, terminate your contractual arrangement with LightPoint; correct, and, as you said earlier, move the servers back to your own office; right?

10:04:34

A Yeah. Easier -- the answer is yes, but far easier said than done.

Q Now, I understand that each of these servers has some kind of programs on it that run whatever operations that the software -- or whatever operations the server is tasked to do.

10:04:56

Is that fair to say?

A Yes.

Q Okay. So, let's talk about the ES.

10:05:03

**Who is the one who developed or wrote or created whatever programs exist on the ES to enable it to do what it needs to do?**

**A Myself, Mike Baum, and Bob Thompson.**

Q And what, in very broad terms, is the task or the -- what is the task that ES is supposed to do?

10:05:28

A To provide members with ballots -- the appropriate ballot to their voting attributes, and to record their ballots. That's the primary task. It's also used by administrators to upload the definition of a ballot; meaning, what questions, what answers are available on

10:05:50

vote, can you explain to me what sort of information is captured on the ES with or in connection with the voting?

MR. ALEXANDER: Object to the form of the question, vague as to the term captured.

10:07:44 THE WITNESS: Please restate the question so I can give you an answer.

Q BY MR. STOLTZ: I'm just looking to find out, what kind of information does the ES collect whenever a member comes in to vote? Obviously, it collects what their

10:07:57 actual vote is.

But is there other information that it stores and collects?

A With respect to the election in question?

Q Yes.

10:08:06 A There are -- there was information about where they -- where they came from in terms of IP address, if they were voting by Web. Telephone, we didn't include that -- didn't have that kind of information because it's not an Internet-based process. We collected time stamps

10:08:32 about when a vote was cast. We collected the actual vote string as submitted by the browser. And then we also, in that election, went through a process of taking the unencrypted vote string and going through an encryption process that left, effectively, a validated or second

10:09:04 copy, but now encrypted, of the vote within the system.

Q Now, this information, is it -- is the database or the table where it's stored, is that something that's referred to as the votes table?
A It would have been stored there, yes.
10:09:23 Q And this votes table, is it fair to say that every time a new voter arrives, does that, essentially, create a new line on the votes table where it then logs where -- if there is an IP address, what IP address, what the vote string is, and these other...
10:09:42 A That's correct.
(Exhibit No. 2 was marked)
Q BY MR. STOLTZ: Now, for the election in question here, BallotPoint provided the Department of Labor with a copy of the votes table for that election; correct?
10:10:15 A Correct.
Q And that would have been an Excel file; is that right?
A I believe it was.
Q Now, I'll represent to you that I did not print the
10:10:29 entire Excel file because it is --
A Lengthy.
Q Yes, sir, very lengthy. It would be hundreds of pages. What I've done here, and what I would like to ask you to confirm, is, I've printed off, essentially, the
10:10:41 first page of that votes table, and it has the votes

arranged in chronological order from the earliest vote received. So, it's about the first 25 or 30 votes.

Do you see that?

A I do.

10:10:52 Q Okay. And does this appear to you to be the -- a paper representation of the information that's from the votes table for this election?

A For that election, yes.

Q And I'm referring again to Exhibit 2.

10:11:10 On Exhibit 2, there is a number of columns. And can we go through and just explain what each column means? The first one is EID.

What is EID?

A Election ID.

10:11:22 Q Okay.

A Election ID 15 was this particular election.

Q So, that's an internal BallotPoint thing to distinguish this election from some other election you may be running for a different union?

10:11:31 A Or for the same union but a different election at the same time.

Q Okay. The second column on Exhibit 2 is a unique ID column.

What is that?

10:11:39 A Those were just randomly generated numbers. We need,

10:12:05
10:12:21
10:12:44
10:13:01
10:13:16

in that column, a unique ID so that -- well, because that's the way that things were done. A unique ID so that every one of the things, all 9,300 or whatever votes, ended up with a unique ID in that column.

Q So, is this unique ID generated at the time the vote is made or recorded?

A It was generated at the time that the member was transferred from the MRNS during the login process to the election server.

Q And is this unique ID used anywhere else in the system, outside of the election server?

A It's created by the election server. It's a thing that we call the one-time password, and it's created by the election server during the login process, and it's retained here. It's not retained -- it's known to the MRNS during the time that the person is voting and does not -- it's not retained beyond that time.

Q Okay. So, for a brief period of time, this unique ID is transferred to the MRNS.

But is it fair to say that, once the voting is completed, the MRNS deletes or no longer holds that information?

A That is absolutely correct, yes.

Q Okay. Time stamp is the next column on Exhibit 2.

Is it fair to say that the time stamp shows the

date and time that the vote is recorded?

A Either recorded or when the person came in to the system, and I don't know which of the two.

They won't be very different.

10:13:31 Q And it appears to be -- for example, the first one is 2015-12-12.

That would refer to December 12th, 2015; is that correct?

A Correct. Right.

10:13:41 Q And then, after that, it says 21:34:17.

I guess, in military time, that would be 11 -- no, 9:34 p.m., roughly; is that right?

A Yes. Pacific time, yes.

Q Okay. The next column is CONFNUM.

10:14:07 Can you explain what that is on Exhibit 2?

A When a vote is cast, we produce a unique ID to present to the user. If voting by Web, the confirmation number is shown on the screen. If voting by phone, it's spoken to the voter. And that confirmation number can be

10:14:29 carried through so that, when the election is completed, if I've got -- for instance, in row 1, there is the confirmation number 152317194. If this table were made available to me, I could look and see that my vote string corresponds to what it is I actually -- how I actually

10:14:51 voted.

10:15:07
10:15:23
10:15:57
10:16:13
10:16:31

So, the intent of the confirmation number is to provide a mechanism where the voter can confirm that that's really the vote that they cast.

Q And the next column on Exhibit 2 says Medium.

And can you explain what that is?

A IVR means that was a vote cast by phone. Web means it's a vote cast over the Internet.

Q The next column on Exhibit 2 is Vote String.

Can you please tell me what that is?

A It's an encoded version of responses to that voter's questions. So, for instance, in the first one, the 1~8 says that choice 8 was made on question 1. And then the -- to separate the responses to different questions, we use a colon and then an up arrow or hat, circumflex.

And so, after the first one there, it says 2~2, meaning selection 2 on question 2, and so on.

Q So, is it fair to say that, on this Exhibit 2, vote string represents the actual content of the person's vote; is that accurate?

A That is correct.

Q And taking the first row that has information in it on Exhibit 2, where it says 1~8, we can derive from that that, in the first question that was presented to the voter, the voter chose the 8th option or the 8th choice; is that what you said?

A That is correct.

Q So, for example, is it your understanding in this election that the first question was who to vote for for national officer president?

Would that have been accurate?

A I don't have a copy of the election in front of me.

I would assume so.

Q And assuming that's the case, since this person voted for choice number 8, it would stand to reason that there were at least 8 different candidates for that?

A Yes.

Q And we can go down, and the next person appears to have voted for the 7th candidate; correct?

A Correct.

Q And the third row, the person voted for the fourth candidate; is that right?

A Correct.

Q Okay. And if we had a copy of the notice that was mailed to the union members for voting where he has instructions to vote, and it says, For national officer election, press 1 to vote for candidate Joe; press 2 to vote for candidate Bob, et cetera, et cetera, do those 1s and 2s correspond here to the number that's chosen to show the vote?

Is that your understanding?

A Correct.

Q And it's the same if the vote comes in by Internet?

In other words, if somebody votes by Internet and they select choice 8, is that the same candidate as if you selected choice 8 on the phone?

A Correct.

Q Okay. Now, in this particular election -- and I understand it may have changed going forward.

But in this particular election, the vote string, i.e., the content of the vote, was stored in plain text on the election server; is that correct?

A Correct.

Q In other words, it was not encrypted?

A That is not correct.

Q It may have been encrypted elsewhere, but there was an encrypted version of it stored; correct?

A There were both versions of it during this election, correct.

Q The next column on Exhibit 8 says ATTR1, which I think means Attribute 1; is that right?

A That is correct.

Q And what does this refer to?

A Attributes 1 through 4 are provided to us by the union, and they identify -- for this particular election, Attribute 1 identifies the so-called base of operation

10:19:03
10:19:18
10:19:27
10:19:45
10:20:08

for a particular voter. ORD, meaning O'Hare, I guess. I think that's right.

Q So, these are airports?

A They use airport designations. And FA was used as Attribute 2 in all cases to mean flight attendant, because there was no use for a secondary attribute in this election.

Q So, we're talking about the column that's labeled Attribute, or ATTR2?

A Correct.

Q Every voter in this election was a flight attendant; correct?

A That's correct, yes.

Q And that's why they all say FA?

A Correct.

Q Okay. The next column that's filled in says TRKID.

Can you explain what that is?

A Tracking ID is what that stands for. TRKID, tracking ID. And this is an identifier generated by the telephone system. So, you will see there are tracking IDs for any vote which is listed as Medium equals IVR.

So, if you went back to the Medium column, you would see IVR, and then over on the right-hand side is a tracking ID. That corresponds to a particular telephone log record that was created for this particular vote.

10:20:27
10:20:43
10:20:59
10:21:21
10:21:34

Q And where -- so, there is a copy of the tracking ID on the ES in the votes table, and then there is a separate log where the tracking ID also is?

A A textural log was maintained by the phone system where the tracking ID would have appeared.

Q And where is this log located? Also on the ES?

A It's located on the ES, correct.

Q Okay. Does the tracking ID number appear anywhere outside of the ES?

A No.

Q Is the tracking ID number used at any point during this process of transferring somebody from the ES to the MRNS and then back to the --

A No. No.

Q The next column on Exhibit 2 is the From column. And can you explain what that is, please?

A The From column for telephone votes indicates the area code that the call came in from.

Q So, for example, for the first row where it says 708 then it has some asterisks after that, that means this was a telephone vote that was received from area code 708; is that right?

A That is correct.

Q Okay. And why are there asterisks after the 708?

A We don't retain any data beyond the area code.

10:33:52
10:34:15
10:34:35
10:34:58
10:35:17

And I went through a rather lengthy explanation of that. The Department actually has that email in their hands at this moment. But the term certify is one of those legal terms. I'm not sure what he meant by it. I'm not sure the right way to interpret it. But, essentially, he wanted to know, I believe, do we stand by the results of the election. The answer is yes.

There were no such emails or contact from Mr. Morales for the election of interest.

MR. STOLTZ: Okay. Thank you. We had talked about the ES. Let's shift to the MRNS. And I understand that, like the ES, there is some kind of software and programs that run the operations that the MRNS performs or is tasked with performing.

Q BY MR. STOLTZ: Can you tell us who developed those?

A I did.

Q Okay. And just briefly, what is the purpose of the MRNS as far as the software that's on it?

What is the MRNS designed to do in the context of an election?

A What it's designed to do is to sequester member information into a sequestered server so that member information is retained on that to permit us things like uploaded -- we have administrators upload rosters which necessarily have personal information in them; and to

allow members to log in to get to vote.

So, the MRNS is used from an administrative point of view and from a voting point of view as well.

Q Can you describe the process that BallotPoint uses if it wants to modify or change or update or revise the software on the MRNS?

A When I see that there is something that needs newly creating or a modification of an existing module, I work in a test environment to develop or make that module to make the changes to it. And so, we have a parallel MRNS not used for officer elections where I develop that code, test that code.

When the code is tested, I produce an encrypted disk, CD, which contains the modules that I need to have uploaded to the MRNS. I don't physically access -- I don't access the MRNS in any way for voting software. Instead, that encrypted disk is carried over to LightPoint, handed to Alden, whatever his last name is, and Alden has a login to the MRNS specific to him that allows him to take that encrypted disk and get the software that resides on that installed into the system.

Q And the disk is encrypted.

So, I take it that Alden, or whoever it is at LightPoint, they don't actually read what's on the disk; is that correct?

retain physical copies of all the software that's ever been installed.

So, long story, but that's how it came about that LightPoint was involved in the software installation.

10:42:47 Q So, is using LightPoint to do the software installation, is that something that, if you or BallotPoint had a change of heart or a new idea, you could stop doing that if you wanted to; is that right?

A That's correct.

10:43:04 Q And as far as software installation, if you wanted to, could BallotPoint just get LightPoint to open up the cage to the MRNS and then do a software update directly?

And I understand that's not your practice. But if you wanted to change your practice, is that a way you

10:43:20 could do it?

A Not with those disks, no. Not using present structure.

Q Okay. So, instead of using a disk that's encrypted, you would have to tell me what you would have to do.

10:43:37 A That's -- as an engineer, there were a lot of different things that you could do. But certainly, one of them would be to put software on a thumb drive, stick in your interchange, plug it in, copy it into the code base area, and be done with it.

10:44:00 Q Let's talk about the information that is recorded on

the MRNS. And I understand there is something on the MRNS that is called the OEM table, standing for the officer election member table; is that right?

A That's correct.

10:44:21 Q And you can -- can you tell us -- the OEM table, is it fair to say it stores member identifying information for the voters; is that right?

A That's correct.

Q Now, BallotPoint --

10:44:34 (Exhibit No. 4 was marked)

Q BY MR. STOLTZ: Now, when the Department of Labor was investigating this case, at one point, BallotPoint provided a picture file, I think, showing the structure of the OEM table; is that correct?

10:45:08 A Yes.

Q Okay. And the Exhibit 4, which you've just received, is this the picture of the structure of the OEM table that BallotPoint provided?

A I believe it is. Without comparing it to the actual 10:45:24 original they sent, I can't say for sure.

But it looks like -- very much like the right one.

Q There is a -- on Exhibit 4, there is a folder that say Columns, and then under that column, there is a series of little boxes that say -- the first one says 10:45:40

oem_cl_id. The second one says oem_eid.

A Uh-huh.

Q Is it fair to say that each one of these blue boxes represents a column in this table?

10:45:56 A That is correct.

Q All right. And can we go through -- and they all begin with oem_. So, for our purposes, is it okay if we just say -- sort of skip that, but the first one on Exhibit 4 says cl_id.

10:46:14 What does that refer to?

A That's the client ID. cl_id is the client ID. So, every client that we have -- every distinct client that we have, when added to the MRNS, is assigned a random number which happens to be the client ID.

10:46:31 Q And next on the Exhibit 4, there is oem_eid.

And is that the election number that's also on the votes table?

A Correct. Right. So, for the contested election, it's 15.

10:46:41 Q And the next item on Exhibit 4 is oem_mid.

What is that?

A M-I-D stands for member ID. And the member ID is a unique identifier provided by the union in a roster to identify an individual member.

10:47:00 So, it's their internal or external ID, if you

will.

Q And the next item on Exhibit 4 says oem_mtype.

What is that?

A Mtype stands for member type, and these have one of really four values. One would be a P, means -- if this member is listed in the roster with mtype set to P, it means that's an eligible participant who, when the election opens, is free to vote. It might be set to an I to indicate ineligible to vote. So, if that person tried to log in, the login would be rejected for ineligibility. There are also two other administrative values called A and C; A meaning election server administrator, and C meaning election server chair.

Q Okay. The next item on Exhibit 4 is oem_access_code.

What is that?

A Access code is the -- is a 12-digit unique ID randomly generated by the MRNS and provided to a member through the U.S. mail in the documents that get mailed to each member in each election.

And that access code is used to log in to vote.

Q Following that on Exhibit 4, there is a number of attributes starting at oem first name going all the way down through attributes, address, city, state, country, ZIP.

Is it fair to say that these columns collectively

give each of the members' name, address, whether they're a flight attendant, what base they're at, the city, state, and ZIP code; is that fair?

A Correct. The mailing information would be the name data, the address data, city, state, country, ZIP. And the attributes would be the attributes that we saw on a previous exhibit.

Q On the votes table?

A On the votes table.

10:49:09 Q Okay. Those attributes being what base or airport the particular flight attendant is located at, and also the fact that they are a flight attendant, or an FA?

A For this election, correct.

Q Okay. Moving down on Exhibit 4, there is oem_eaddr. Is that an email address?

A That is an email address, correct.

Q Okay. So, if the member has an email address that's listed, it would be here. Next on Exhibit 4 is oem_accessed.

10:49:38 And what does that refer to?

A Accessed is a flag -- a logical flag within the member record here. It's either a 0 or it's a 1. If it's a 0, it means this member has not yet accessed the system for this election, as indicated by the eid. If it's set to 1, it means the member has accessed the