Charles Stapleton                                                                July 28, 2017

Washington, D.C.

Page 88

1       Q.      LightPoint does that?

2       A.      Oh, no, no.  Sorry.  No.  BallotPoint

3   implements changes to the ES code.

4       Q.      Is there any similar log on the --

5   available through the ES that shows when the ES code

6   was changed?

7       A.      No.

8       Q.      And obviously, if LightPoint is not

9   involved with ES code changes, LightPoint would have

10  no log of those, correct?

11      A.      I don't think they would.

12      Q.      On page 8 of Exhibit 2, there's a

13  paragraph at the bottom that said, "My specific

14  assessment approach was tailored based on previously

15  reported system security concerns."  And then it goes

16  on to list other items.  Do you see that?

17      A.      Yes.

18      Q.      What is the previously reported system

19  security concerns that you're referring to here?

20      A.      When I -- before I conducted my

21  assessment, I was aware that an election had been

22  contested.  And I was aware that votes had been

Charles Stapleton                                    July 28, 2017
Washington, D.C.

Page 97

1      Q.    What -- what did you consider about the

2   issue of a person who has physical access to the

3   BallotPoint servers?

4      A.    Primarily whether or not they could do

5   it -- whether there would be a trail of them doing

6   it.

7      Q.    So did your review -- are you giving any

8   opinions in this case about whether somebody who has

9   physical access to the ES and physical access to the

10  MRNS can extract data physically from those servers?

11  Are you giving any opinion about that?

12     A.    I don't believe so.  I'd have to read

13  through entirely to remember completely.  But I don't

14  believe I am.

15     Q.    Turning to page 12, first paragraph where

16  it says, "My review of the application source code

17  also determined that the system did not provide a

18  mechanism by which users (including BallotPoint

19  administrators, APFA election officials, and voters)

20  could access the IP address information stored on the

21  MRNS," do you see that sentence?

22     A.    Yes.

App. 149

Charles Stapleton                                    July 28, 2017
Washington, D.C.

Page 98

1        Q.      My question about that sentence, again, is
2   users here is referring to people who are accessing
3   the server over the internet, correct?
4        A.      Yes.
5        Q.      So you're not making any claim here that
6   people who have direct physical access to the MRNS
7   cannot access IP address information, are you?
8        A.      I'm not claiming that.
9        Q.      And just to confirm, I believe you said
10  earlier -- or you agreed earlier that a person --
11  certain administrators on the ES are privileged to
12  extract IP address, and timestamp, and vote data from
13  the ES over the internet, correct?
14       A.      Yeah.  With regard to whether it's on the
15  ES or MRNS, I mean, logging in -- overall, in the
16  system, the information that's on the ES is
17  accessible -- that information can be looked at.
18       Q.      And are you making any claim about whether
19  the IP addresses, and the votes, and the timestamps
20  on the ES can be pulled by someone who just has
21  direct physical access to the ES?
22       A.      Am I making -- I'm sorry.

Charles Stapleton                                      July 28, 2017
Washington, D.C.

Page 104

1        Q.    And based on your review of that trail,

2    you can conclude that there was no changes at the

3    time that would've made the IP addresses and voter

4    names accessible over the internet, right?

5        A.    Yes.

6        Q.    Now, did you conduct any similar review of

7    the -- whatever forensic trail might exist for

8    somebody who wanted to make a change to the MRNS by

9    physical access?

10        A.    No.

11        Q.    And, likewise, did you conduct any review

12    of whatever forensic trail might exist for somebody

13    who wanted to not make a change to the MRNS software

14    but simply plug into the MRNS and extract data from

15    it?

16        A.    No.

17        Q.    There's a discussion in your report of

18    communications between the MRNS and the ES using a

19    so-called one-time password.  And without getting

20    specifically into the report -- but what's your

21    understanding of how this one-time password feature

22    works?

Charles Stapleton                                    July 28, 2017
Washington, D.C.

Page 105

1        A.    The one-time password is used to allow the

2    MRNS and the ES to understand that they're

3    communicating about a particular vote.

4        Q.    So is it fair to say -- well, first of

5    all, do you know who -- who generates this one-time

6    password?

7        A.    Yes.

8        Q.    Okay.  And who's that?

9        A.    It's in the diagram.  I believe it's the

10   ES.

11       Q.    So the one-time password is associated --

12   it's -- excuse me.  Assuming that it's generated by

13   ES, the one-time password is linked to a vote on the

14   ES; is that right?

15       A.    It's linked to a voter session, basically.

16       Q.    Well, do you know -- for example, if I

17   were to look at the votes table that comes from the

18   ES, would the one-time password appear on that table

19   next to the -- the specific vote, the time it

20   occurred, and all that?  Do you know?

21       A.    I don't believe it would.

22       Q.    Okay.  Do you know -- is the one-time

Charles Stapleton                                          July 28, 2017
Washington, D.C.

Page 106

1    password saved in any way, -- in other words, such

2    that it continues to exist even after the election --

3    on any of the reports that are generated by the ES?

4    Do you know?

5         A.    I don't believe it is, no.

6         Q.    Are you aware -- is the one-time password

7    saved anywhere on the ES during and after the

8    election?

9         A.    I believe during a voting session it is on

10   the ES.   Yeah.

11        Q.    And a voting session refers to what

12   exactly?

13        A.    The interaction between the voter and the

14   voting system from the time they log in to the time

15   they cast their -- to the time the vote is recorded.

16        Q.    So the voting session is the few minutes

17   or however long it takes for the voter to actually

18   work through the system, input their credentials,

19   select who they're going to vote for for each race,

20   and then finish, more or less?

21        A.    Yes.

22        Q.    So the voting session just refers to that

Alderson Court Reporting

App. 153

Charles Stapleton                                                July 28, 2017
                        Washington, D.C.

```
                                                        Page 107

 1    period of time essentially that --

 2         A.    Yes.

 3         Q.    So it's your understanding then that the

 4    ES is generated on the -- I'm sorry.  The one-time

 5    password is generated on the ES.  It exists at least

 6    for some period of time in connection with a voting

 7    session.  But is the one-time password also sent to

 8    the MRNS at some point?

 9         A.    Yeah, I believe the MRNS actually requests

10    that one be created by the ES and then receives one

11    from the ES.

12         Q.    And is the purpose of the -- well, does

13    the MRNS associate the one-time password with a

14    specific voter?

15         A.    It takes the one-time password, and it

16    associates a voter type, I suppose, with the one-time

17    password.

18         Q.    And what does that mean, "voter type"?

19         A.    During an election, there could be voters

20    that may have access to ten different ballot

21    selections or maybe three as an example.

22         Q.    So, in this election specifically, my
```

Page 108

1    understanding is that every voter was voting for the

2    same four races and had the same four decisions to

3    make or choices.  So how does -- how does that

4    function in this race?

5        A.    Because the ES has to have some way to

6    determine what type of ballot to provide the voter.

7        Q.    Okay.  So I think I understand.  So the --

8    the MRNS says request a one-time password for this

9    voting session, and it's going to be a voter who will

10   vote in all four races, let's say?

11       A.    Yeah.

12       Q.    Okay.  And then the ES creates a --

13   essentially records a vote during that session.  And

14   you think the one-time password is not actually

15   correlated in any way with the vote, though?  Is that

16   what you think?

17       A.    With the vote selections, right.

18       Q.    Okay.  It's not correlated with the vote

19   selection?

20       A.    Correct.

21       Q.    So another way to ask that is -- say I

22   know one of the one-time passwords.  Can I go on the

App. 155

Charles Stapleton                                               July 28, 2017
                        Washington, D.C.

Page 109

1    ES and look up what votes -- what specific votes are

2    associated with this one-time password?

3           A.    No, I don't believe so.

4           Q.    Now, at some point, the -- the MRNS has to

5    be informed that a known, identifiable voter has now

6    successfully cast a vote, correct?

7           A.    Has to know that a vote has been

8    completed.  Yeah.

9           Q.    And, at that point, the MRNS then makes

10   some change in its table to show that voter John Doe

11   has now voted and can't vote again, right?

12          A.    Right.  Whether he can vote again or not,

13   I think, is, like, an option that can be set.  But

14   whether the voter has voted, yes.

15          Q.    So is it your understanding that the ES

16   transmits the one-time password to the MRNS so that

17   the MRNS can mark somebody as having voted?  Is that

18   how it works?

19          A.    Yes.

20          Q.    Okay.

21          A.    Well -- yeah, I believe so.  I'd have to

22   consult the diagram again.  But I believe that's one

Charles Stapleton                                      July 28, 2017

Washington, D.C.

Page 110

```
 1    of the main reasons why it exists.

 2          Q.    So the MRNS then by necessity --

 3                MR. ALEXANDER:  You want to let him review

 4    his --

 5                THE WITNESS:  Yeah.  Can I take a look

 6    real quick?

 7    BY MR. STOLTZ:

 8          Q.    Sure.  Go ahead.

 9          A.    (Witness complies.)

10                Yeah.  It's to let the voter know that --

11    it's to let the system know that a voter has

12    completed a vote.

13          Q.    So the MRNS logically -- would you agree

14    that the MRNS has to know an association between a

15    one-time password and a specific voter?  Correct?

16          A.    Yes.

17          Q.    And that's because the MRNS has to be able

18    to go down the list of voters, and find John Doe, and

19    mark that he's now voted, right?

20          A.    Yes.

21          Q.    So in your report on page 15 -- well,

22    first of all, just conceptually, let's assume that
```

Charles Stapleton                                                July 28, 2017
                            Washington, D.C.

                                                              Page 139

     1        A.      There are probably a variety of different

     2    ways to do it.

     3        Q.      Do you know the names of any such

     4    companies that do that?

     5        A.      I mean, as an example, Gmail would almost

     6    be like that.  The most -- most mail services are

     7    going to be like that.  Microsoft.

     8        Q.      So do you know if this third-party mail

     9    server company -- do they keep copies of all the

    10    e-mails they send?

    11        A.      I don't know.

    12        Q.      If we wanted to find that out, I guess

    13    we'd have to ask the -- the third-party mail server.

    14        A.      Yeah.

    15        Q.      I'm looking at Exhibit B of Exhibit 2 if

    16    you wouldn't mind taking a look.

    17        A.      Sure.

    18        Q.      Is this, Exhibit B, an explanation of the

    19    communications between the MRNS and the ES roughly?

    20        A.      Yes.

    21        Q.      Under -- or next to the first -- there's a

    22    1 in a circle, and then there's some diagrams.  And

Charles Stapleton                                                July 28, 2017

Washington, D.C.

Page 140

1    there's some language that says, "The

2    One-Time-Password is a random code that is never

3    stored on disk."

4         A.    Right.

5         Q.    And then it says, "It allows the MRNS to

6    associate messages sent with it to a distinct voter."

7               Do you see that?

8         A.    Yeah.

9         Q.    So the first sentence there that says the

10   one-time password is never stored on disk, what does

11   that refer to?

12        A.    Yeah.  I believe it's never stored on disk

13   on the MRNS.  But I think the ES does retain it for

14   some amount of time.

15              So, anyway, it's not 100 percent clear the

16   way it's written right there.

17        Q.    And when you say it's never stored on disk

18   on the MRNS, storing it on disk would be -- is that

19   the hard drive?

20        A.    Yeah.

21        Q.    And I think you mentioned earlier that if

22   something is not stored on the hard drive but it is

Charles Stapleton                                                      July 28, 2017
Washington, D.C.

Page 141

1    received or possessed for some period of time, it

2    might be just in, quote, "memory." Is that what you

3    call it?

4        A.    It could be.

5        Q.    And what are the sort of alternative

6    places you can store something other than disk and

7    memory?

8        A.    Those are the two primary -- those are the

9    two places I can think of where it would be stored,

10   you know, on an external storage device or in memory.

11       Q.    And if something is stored on disk, is the

12   significance of that that, in order to remove it from

13   the disk, you have to take some affirmative action

14   such as clicking on it and choosing delete or

15   something like that?

16       A.    Yeah.  I guess the difference is, you

17   know, everything that gets written to any disk is

18   first in memory.  Okay.  And you don't have to write

19   everything in memory to a disk.  And so that's what

20   this is intended to convey.

21       Q.    And memory, is that the portion where, if

22   somebody is in memory but not on a disk, it can be

Charles  Stapleton                                                    July 28, 2017
Washington, D.C.

Page 142

1    overwritten whenever the computer needs to use that

2    memory, things like that?

3        A.    Yes.

4        Q.    The -- let's look at page 16 of Exhibit 2

5    if you don't mind.  Now, this, under heading B, is

6    your opinion that there's no reasonable possibility

7    that the tally of ballots communicated by BallotPoint

8    to APFA at the end of the election incorrectly

9    reflected the winners of the election selected by the

10   voters.

11           Do you see that?

12       A.    Yes.

13       Q.    Now, first, you discuss the process of

14   casting votes.  And is it fair to say that the

15   BallotPoint system does not use or require that the

16   voter's device use client-side encryption?  Is that

17   true?

18       A.    I suppose it means -- on what specifically

19   you mean by client-side encryption because the vote,

20   as it is sent to the server from the web browser, is

21   encrypted.

22       Q.    So what does "client-side" mean to you?

Charles Stapleton                                                    July 28, 2017
Washington, D.C.

Page 143

```
 1        A.      It means it's done on the -- on the side
 2   of the web browser.
 3        Q.      So on page 17 of Exhibit 2, you say -- you
 4   refer to a conceptual vulnerability represented by
 5   client-side infection of the user's machine.
 6        A.      Yes.
 7        Q.      And explain that.  What is that conceptual
 8   vulnerability?
 9        A.      If a client's web browser or computer is
10   compromised and someone were to install, you know,
11   malware on it.
12        Q.      And so is the point of that that the --
13   the voter's own computer could change or alter the
14   vote without the voter's knowledge before the vote
15   ever is sent into the sort of encrypted channel to
16   get to BallotPoint?  Is that the issue there?
17        A.      Yeah.  That would be the -- the --
18   exactly.
19        Q.      Because I think you also say that when the
20   vote is being transmitted to BallotPoint, BallotPoint
21   uses an SSL protocol to protect the vote while it's
22   in transmission; is that right?
```

Charles Stapleton                                    July 28, 2017
Washington, D.C.

Page 144

1      A.    Yes.

2      Q.    So the distinction there is if there's

3   something on the voter's own computer that can alter

4   the vote before it gets into that secure

5   transmission, that's the, quote, unquote,

6   "client-side" issue?

7      A.    Yeah.  A client-side typically means

8   something that happens on the client's computer.

9      Q.    Now, you say that although this is a risk,

10  you think, in this specific election situation, the

11  risk is pretty low; is that fair?

12     A.    Yes.

13     Q.    And what's -- what's the basis for that

14  assessment?

15     A.    Well, a couple of things.  One is if an

16  attacker were to try to compromise enough work

17  stations of people that were going to vote, they

18  would have to know who all those people were.  All

19  their computers might have to be similar.  They would

20  have to attack them all at a particular time maybe.

21  They would have to create some kind of malware or

22  some kind of thing that -- that knew how the system

Charles Stapleton                                              July 28, 2017
                        Washington, D.C.

                                                        Page 145

1    worked, and what kind of information to send to the

2    system, and at what point during the voting process

3    to do that.  You know, I think it would require

4    several steps.

5        Q.    And so is it your -- your opinion is based

6    on the steps that would be required, that essentially

7    nobody would realistically bother doing that for this

8    type of election; is that fair?

9        A.    Yeah.  I think the -- the threats -- the

10   likely threats that would want to do that are

11   relatively small compared to many systems that use

12   the internet.  So that's one factor.

13           The -- to do it effectively and easily,

14   someone would have to be very familiar with the

15   system.  And I don't think many people are very

16   familiar with the system.

17           And identifying the voters, targeting

18   them, and then assuming that they're going to vote

19   would also be part of it.  So I think it would be

20   unlikely.

21       Q.    And when you talk about the likely threat,

22   is that based on any -- did you do any kind of

                    Alderson Court Reporting
1-800-FOR-DEPO                           www.aldersonreporting.com

**App. 164**

Charles Stapleton                                                          July 28, 2017

Washington, D.C.

Page 146

1    research specific to labor union elections or

2    anything like that?

3         A.    Nothing specific to labor union elections.

4         Q.    Is it just your sort of sense thinking

5    about it of -- of the likelihood, or is there some

6    other source that I'm missing?

7         A.    What sources do you have?

8         Q.    Well, I gather that part of this is just

9    in your own mind sort of just evaluating it

10   critically and thinking how likely would it be that

11   there would be a threat here.

12        A.    Yeah.  For example, a hostile nation-state

13   is probably not going to devote a lot of their

14   resources to creating malware to figure out who's

15   going to vote on a particular election, and then try

16   to infect each machine, and then assume they're going

17   to vote.  I mean, I just -- that seems unlikely to

18   me.

19        Q.    Right.  And I guess that's what I'm

20   asking.  This is just sort of reasoning that you've

21   conducted based on your sort of general knowledge of

22   the world, right?  There's not some specific source

Charles Stapleton                                           July 28, 2017
Washington, D.C.

Page 147

1    that you looked at for this issue, is there?

2         A.    I mean, it's -- it's pretty

3    well-established threat modeling kind of activity.

4         Q.    Right.  And I'm not saying that there is a

5    source that exists.  I'm just wanting to make sure

6    there's not something that you were consulting about

7    this because maybe it doesn't exist.  That's all I'm

8    saying.  So there -- to be clear, there was no

9    specific source that you consulted about this; it's

10   just your own sort of threat analysis based on the

11   world as we know it?

12        A.    Yes.  And based on my experience doing

13   similar type assessments and tests.

14        Q.    And in this -- in this regard, do you draw

15   a distinction between a union officer election and

16   a -- a political election such as an election for

17   Congress or for a state office?

18        A.    I didn't make any comparisons to any other

19   types of elections or anything.  I based it on this

20   particular election in January.

21        Q.    So on page 18 of Exhibit 2 of your report,

22   it says, "Given the relatively low notoriety of the

Alderson Court Reporting

App. 166

Charles Stapleton                                                July 28, 2017
Washington, D.C.

Page 148

1    APFA 2016 national officer election (as compared to,

2    say, a national or statewide political election)" --

3    and then you go on to give your opinion.

4              What is the significance of this

5    comparison that you've drawn between the -- the union

6    election and a national or statewide political

7    election?

8         A.    Primarily, the number of voters and the

9    motivation of different threat sources.

10        Q.    So does this reflect a -- and I think

11   you've kind of alluded to it earlier -- a thought on

12   your part whereas a hostile government -- foreign

13   government or some other power may be motivated to

14   attempt to tamper with a national or statewide

15   political election, the likelihood of a similar

16   motivation for a union election is -- is much less

17   likely?  Is that your belief?

18        A.    Yes.

19        Q.    And, again, you've, I guess, stated that

20   you were analyzing this particular union election.

21   You were not analyzing a national or statewide

22   political election, correct?

Charles Stapleton                                                July 28, 2017
                              Washington, D.C.

Page 155

1        A.    Yes.

2        Q.    You go on to conclude, though, that

3   there's no evidence to suggest that such manipulation

4   occurred in this election.

5              So my question is what evidence -- or what

6   sources did you check to see if there was any

7   evidence of those?

8        A.    There -- there's no source of evidence

9   that shows that it did not -- wait -- that it

10  occurred.  And, based on what I was able to ask and

11  see, I didn't believe that there was a question as to

12  whether or not that did occur.

13       Q.    Well, let me ask it this way:  If I was

14  going to go about checking into that, what are some

15  of the things I would want to look at?  Would I want

16  to look at the logs for changes to the election

17  server?

18       A.    If you were trying to do what?

19       Q.    Well, if I wanted to find out if -- if the

20  election server manipulated the content of the vote

21  at the moment it arrived, I guess I would want to see

22  the code that the election server was running,

Alderson Court Reporting
1-800-FOR-DEPO                                    www.aldersonreporting.com

App. 168

Charles Stapleton                                                July 28, 2017
                        Washington, D.C.

Page 156

1    correct?

2        A.      Correct.

3        Q.      And, I suppose, I'd also want to see some

4    sort of verification that the code that's been

5    presented to me was, in fact, the code at the time,

6    correct?

7        A.      Correct.

8        Q.      And, in this case, is it fair to say you

9    essentially relied on the representation of

10   BallotPoint that this was the code that they were

11   using at the time?

12       A.      Correct.

13       Q.      And you also discuss that, in your view,

14   there's little or no motivation for BallotPoint

15   personnel to manipulate an election in this way; is

16   that correct?

17       A.      Correct.

18       Q.      You said earlier that BallotPoint's

19   servers are running -- or at least the application

20   code that they use runs on a combination of Cold

21   Fusion and Perl; is that right?

22       A.      Yes.

1                    CERTIFICATE OF REPORTER

2    UNITED STATES OF AMERICA ) ss.:

3    DISTRICT OF COLUMBIA      )

4         I, ANGELA MCCULLLOUGH, the officer before whom

5    the foregoing proceedings were taken, do hereby

6    certify that the foregoing transcript is a true and

7    correct record of the proceedings; that said

8    proceedings were taken by me stenographically to the

9    best of my ability and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14

15

16                 _Angela K. McCullough_

17                 Notary Public in and for

18                 The District of Columbia

19

20   My commission expires: 1/31/2020

21

22

App. 170

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

R. ALEXANDER ACOSTA, Secretary of
Labor,

       Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

       Defendant.

Civil Action No. 4:16-cv-1057-A

## EXPERT REPORT OF CURT STAPLETON, CEO
## ADEPT SECURITY CONSULTING

### I.    INTRODUCTION

**A.    Retention and Scope.**

I have been retained by Bredhoff & Kaiser, P.L.L.C. to serve as an expert witness in the

above-captioned case.  My findings and opinions are set forth in this "Report."

**B.    Qualifications.**

I am the founder and CEO of Adept Security Consulting, LLC ("AdeptSec"), a

consultancy I founded in 2015 to provide network application penetration testing, systems

security training, and security consulting.

Before founding AdeptSec, I served approximately eight years as a technical director for

Aerstone, a cybersecurity consultancy providing security assessment and systems enhancement

and sustainment.  At Aerstone, I served as the service-area lead for penetration testing and



EXHIBIT ak'm
Stapleton 2
7/28/17

App. 171

The Association of Professional Flight Attendants ("APFA") conducted an election of officers ending January 9, 2016, for the positions of National President, National Vice President, National Treasurer, and National Secretary ("the January 2016 National Officer Election"). APFA's election was conducted over a thirty-day period beginning on December 10, 2015. There were over twenty thousand eligible voters. APFA members are geographically dispersed across the United States, and they are absent from their homes (and, sometimes, the United States) for periods throughout the 30-day election period depending on their flying schedules.

The APFA engaged the services of a contractor, BallotPoint Election Services, owned by CCComplete, to administer the January 2016 National Officer Election using an Internet-based and phone-based remote electronic voting system. Pursuant to its contract with APFA, BallotPoint administered the election from December 10, 2015 through January 9, 2016. At the beginning of the election, Allied Media, another third-party contractor of APFA, mailed eligible APFA members a voting credential consisting of a unique access code each voter could use to access the voting system. With that individualized credential, each voter could access a ballot on BallotPoint's website via a computer or smart-phone web browser, or could access a ballot over the phone by dialing a toll-free number. Once voters successfully voted, BallotPoint maintained their votes on one computer server, the Election Server ("ES"), and maintained member identifying information on another server, the Member Registration and Notification Server ("MRNS"). Both servers were owned by BallotPoint but physically located in a secure co-location facility in Portland, Oregon operated by Lightpoint, an independent company. Once a voter successfully cast a ballot, the BallotPoint system presented the voter with a confirmation code and emailed the voter a message informing the voter that his or her vote had been cast successfully, or, alternatively, read out a confirmation code over the phone if the voter had cast

7

**App. 172**

his or her ballot via phone. A chart summarizing the interactions between voters and the BallotPoint voting system is attached to this report as Exhibit A.

On January 9, 2016, at the end of the election, the BallotPoint system electronically tallied the cast ballots and transmitted the results to the APFA Union Hall.

### C.    My Security Assessment of the BallotPoint System

I performed a qualitative security assessment of the BallotPoint election system based on a predefined scope and over the period of two (2) weeks. In particular, I assessed the confidentiality and integrity of voter selections made using the electronic voting system; the development, operations, and maintenance of the voting system; and the integrity of the application and its source code. I conducted my assessment against the background of the assessment methods published by the National Institute of Standards and Technology ("NIST"), in NIST Special Publication ("SP") 800-30, *Guide for Conducting Risk Assessments*, and NIST SP 800-53A, *Assessing Security and Privacy Controls in Federal Information Systems and Organizations*. These standards are used by the federal government to secure information systems and they provide detailed guidance for systems and data of all risk levels. In addition to this general NIST guidance on risk assessments, my assessment of the BallotPoint electronic voting system was conducted against the background of NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*.

My specific assessment approach was tailored based on previously reported system security concerns, professional experience as an auditor of government and non-government computing systems, and professional experience conducting numerous penetration tests of government and non-government systems.

8

the MRNS timestamped users' votes in 8-hour windows, while the ES provided timestamps of cast ballots to the second.

My review of the application source code also determined that the system did not provide a mechanism by which users (including BallotPoint administrators, APFA election officials, and voters) could access the IP address information stored on the MRNS.  By way of explanation, an information system can collect and store data, but, without a software mechanism for accessing that data, or physical access to the server combined with a software tool to compile the data stored on that server, the data will remain internal to the system, and users will not be able to access that information.  There are ways in which stored data can be made accessible to a user of the system without physical access to the server, including display via a web page or inclusion of that data in a report that the software is designed to generate.  By searching for references to the "oem_access_from" and "oem_access_when" data fields and the "addr" variable in the MRNS application source code, I was able to determine that the software, as it existed at the time of the 2016 APFA National Officer Election, did not include such a mechanism.  Therefore, although this data was being collected by the system, it would not have been accessible to BallotPoint engineers or to any other authorized users of the system.

Of course, software can be changed.  Given that this information existed on the system, it was possible for BallotPoint engineers to change the software to make this data accessible to one or more categories of users.  For example, BallotPoint could write software to generate a report that would list the IP address information stored in the "oem_access_from" field next to the other voter identifying information stored on the MRNS, including voter name.  Because of this possibility that a BallotPoint engineer could change the software to make this data accessible, my

12

**App. 174**

I note separately that the ability of the BallotPoint system to send voters confirmation emails or to provide them with confirmation that their votes have been successfully cast in no way demonstrates that the system as designed enabled voters' identities to be associated with the content of their votes.  The system provides voter confirmations as follows.

Once a voter checks into the voting system (via the MRNS) with his or her unique voting credential, the MRNS indicates to the ES the voter profile of the voter who just checked in (ensuring that the voter is presented with the appropriate ballot; in the 2016 APFA National Officer Election, voter profiles corresponded to each member's domicile).  But although the voter profile is communicated to the ES, by design, no individual voter identifying information is shared other than a randomly generated one-time password that is identified with that voting session.  After the voter successfully casts a vote and it is recorded to the ES, the ES informs the MRNS that the voting session associated with that one-time password has been successfully completed, but it does not send the content of the vote to the MRNS.  In the member table, the MRNS marks the member identity associated with that one-time password as having voted, and then permanently deletes the one-time password.  The MRNS then informs the voter that he or she has voted successfully, a function it can perform without ever possessing the information necessary to associate the content of a vote with that voter's identity.

Thus, the MRNS sends confirmation emails based only on the *fact* that a vote was successfully cast, and completely independent of the *content* of that vote.  The ability of the system to send confirmation emails is not evidence that the system was designed to enable voters' identities to be matched with the content of their votes.

15

**App. 175**

**B.**     **There is no reasonable possibility that the tally of ballots communicated by BallotPoint to APFA at the end of the election incorrectly reflected the winners of the election selected by the voters.**

Based on my review of the overall system architecture, and the controls BallotPoint instituted at each step of the voting and tallying process, in connection with the 2016 APFA National Officer Election, it is my opinion that there is no reasonable possibility that the BallotPoint system failed to perform as intended to ensure that voters' votes were cast-as-intended and counted-as-cast.  In particular, controls at each step of the process exist to ensure that vote integrity is maintained when the voter's vote is (1) cast and transmitted from the user's machine to BallotPoint; (2) recorded on the ES; (3) maintained on the ES during the remainder of the election period; and (4) correctly tallied at the end of the election.  Although no information system can be considered 100% secure, the protections in place in the BallotPoint system used in the 2016 APFA National Officer Election include many controls recommended by NIST for systems of this type and purpose, and together ensure that there is no reasonable possibility that the reported results of the election failed to reflect voters' intentions.

I have included a flowchart, attached as Exhibit A to this report, that illustrates the voter-system interactions in the BallotPoint voting process.  I have also included a flowchart, attached as Exhibit B to this report, that illustrates the server-to-server interactions, including the encryption and hashing of data performed by each server.  What follows is a review of the adequacy of the controls BallotPoint introduced at each step of the voting process to ensure vote integrity.

**1.**     **Casting of votes.**

In the first step of the voting process, a voter casts his or her ballot using a web application (on a computer or smartphone) or over the telephone.  For computer-based votes, the primary threat at this stage is the risk that malicious software on client systems could interfere

16

with the casting of a vote, preventing the vote from being cast-as-intended. The threat of malicious software on a user's machine (as opposed to the servers maintained by the election systems administrator) is often referred to as a client-side threat.[14]  A personal computer or smartphone infected with malicious software targeting the election could potentially steal the victim's authentication credentials or could, in theory, change a user's vote without the victim noticing.[15]

Ensuring the security of personally owned computers is one of the most difficult aspects of securing any information system in which users are permitted to access the system from their personal machines.[16]  To mitigate this threat, BallotPoint has implemented a recommended control, the use of a secondary communication channel.[17]  Specifically, in BallotPoint-administered elections, voter credentials are distributed through the postal mail, instead of through an electronic communication channel.  Use of the postal mail ensures that an infected computer cannot intercept the voting credential and use it to cast a ballot without the voter ever becoming aware that he or she had been sent a credential.  However, the voter must still enter his or her credential before casting a ballot, introducing the credential to the potentially infected system and the possibility of manipulation by malicious software.

However, despite the conceptual vulnerability represented by client-side infection of the user's machine, in my opinion, the risk that such infection could have affected the outcome of the 2016 APFA National Officer Election is very low.  Each successful attack on a voter's computer can impact only one or an extremely small number of voters.[18]  Moreover, a piece of

---

[14] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.3.4, at 29.

[15] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.3.4, at 29.

[16] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.5, at 37.

[17] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.4.9, at 35.

[18] NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.3 at 30.

App. 177

malicious software capable of manipulating the BallotPoint voting process would need to be sophisticated and would require in-depth knowledge of BallotPoint's processes. Security assessors consider the notoriety of the purpose to which a system is being put when assessing the risk presented by a particular vulnerability, including client-side vulnerabilities; in general, the more well-known the purpose to which an information technology system is put, the greater the likelihood (and therefore the risk) that an attacker will invest the time and resources required to affect a sufficient number of client-side systems.[19] Given the relatively low notoriety of the APFA 2016 National Officer Election (as compared to say, a national or statewide political election),[20] and in the absence of any evidence (in the form of suspicious voting patterns or irregular voter activity) of client-side malicious interference with votes, in my opinion, there is not a significant possibility that a sufficient number of voters' machines could have been infected with malicious software capable of altering the content of a vote (such that the vote was not cast-as-intended) to have affected the outcome of the National President general election, the election with the smallest margin of victory (582 votes).[21]

2.    **Transmission and recording of a vote on the BallotPoint server.**

Once a voter selects his or her voting choice, BallotPoint has instituted strong controls to ensure, with a high degree of likelihood, that the vote will be successfully transmitted to BallotPoint without interception or manipulation. The primary control BallotPoint uses to ensure

---

[19] For example, in Ben Adida et. al, *Electing a University President using Open-Audit Voting: Analysis of real world use of Helios*, June 25, 2009, at 2, because of client-side risks, the authors declined to endorse the use of a remote-electronic voting system in "large, high-stakes, governmental elections where the threat of a targeted virus would be far more realistic."

[20] For comparison's sake, NIST's assessment of the use of remote electronic voting systems for overseas military voters suggested that it would be difficult for attackers to "successfully target the relatively small percentage of individuals in the world that are eligible to vote as overseas or military voters." NIST IR 7770, *Security Considerations for Remote Electronic UOCAVA Voting*, § 5.5, at 37. The individuals voting in the 2016 APFA National Officer Election are likewise a relatively small percentage of the computer-using public.

[21] The 582-vote margin of victory describes the margin between the second- and third-place finishers, because, in this first-round election, the top two finishers advanced to the final round of voting.

unreasonable to believe that the result of the election did not reflect the votes cast by the voting users of the system.

_____

Curt Stapleton

DATED: June 30, 2017

26

EXHIBIT A

# Voter-Server Interactions



App. 181

# EXHIBIT B

App. 183

## Server-Server Interactions

### Establish Voting Session
**System Determines Voter Type**

 

MRNS sends ballot type to ES →

MRNS requests a One-Time-Password →

← ES Sends One-Time-Password to MRNS



1. ES Generates One-Time-Password
2. ES Presents Ballot to User + One Time Password

The One-Time-Password is a random code that is never stored on disk
It allows the MRNS to associate messages sent with it to a distinct voter

### Submit Vote
**Voter submits ballot**



Ballot Selections →
One-Time-Password

Once the ballot has been submitted, ES knows:
- The ballot selections made by the voter
- The one-time-password associated with this voting session

### Record Vote
**System encrypts and stores ballot**



1. ES generates a new, unique code for vote.
2. The ballot selections and unique code are combined, and that combined information is encrypted.
3. The combined information is encrypted using the ES election key, and the result is the "Encrypted Vote".



Encrypted vote
One-Time-Password
Doubly Encrypted Vote
One-Time-Password



1. MRNS generates a new key unique to the encrypted vote.
2. MRNS encrypts the Encrypted Vote using the new unique key, and the result is a "Doubly Encrypted Vote".
3. MRNS calculates a HASH value of the Doubly Encrypted Vote which is guaranteed to be unique.
4. MRNS stores the HASH value, and key locally.
5. MRNS sends the Doubly Encrypted Vote to the ES.

### Confirm Vote Record
**System confirms recording of vote**

 

Doubly Encrypted Vote Received →
One-Time-Password

 

One-Time-Password
Vote confirmed

Vote Confirmation Email →

1. Once ES receives "Vote Confirmed" message, the one-time-password is destroyed and the 12 digit PIN cannot be used again to vote.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| R. ALEXANDER ACOSTA, Secretary of Labor, | |
| Plaintiff, | |
| v. | Civil Action No. 4:16-cv-1057-A |
| ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, | |
| Defendant. | |

## STIPULATION REGARDING AUTHENTICITY OF DOCUMENTS

Plaintiff, the Secretary of Labor, and Defendant, the Association of Professional Flight Attendants, hereby stipulate as follows:

Documents produced to a party to this action by another party or a third party in response to compulsory process (e.g., subpoena, Civil Investigative Demand), or as part of a party's Fed. R. Civ. P. 26(a)(1) disclosures or in response to a document request served upon a party pursuant to Fed. R. Civ. P. 34, or in response to a request made by the Department of Labor in its investigation of the underlying complaint filed by Samuel Morales (agency case number 420-6007132(03)), shall be deemed authentic for the purposes of this lawsuit only, absent good cause. Good cause would include issues relating to the completeness of the document (e.g., missing or incomplete pages) or any conditions in the actual document or the manner in which it was produced that brings into question whether the document was actually generated by the relevant party or third-party or is what it purports to be.

**Stipulation Regarding Authenticity of Documents – Page 1**

App. 184

SO STIPULATED.

JOHN R. PARKER
United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:     214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff,
the Secretary of Labor

Dated:  August  2  , 2017

ANDREW D. ROTH*
D.C. Bar No. 414038
ROBERT ALEXANDER*
D.C. BAR No. 465673
ADAM BELLOTTI*
D.C. Bar No. 1020169
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St. N.W., Tenth Floor
Washington, D.C.  20005
Tel:  (202) 842-2600
Fax: (202) 842-1888
Email: aroth@bredhoff.com
Email: ralexander@bredhoff.com
Email: abellotti@bredhoff.com

SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Avenue, Suite 550
Dallas, TX 75214
Tel: (214) 637-0750
Fax: (214) 637-0730
Email: denison@baabdenison.com

Attorneys for Defendant Association
of Professional Flight Attendants

Dated:  August  2 , 2017

* Admitted Pro Hac Vice

**Stipulation Regarding Authenticity of Documents – Page 2**

App. 185

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THOMAS E. PEREZ [now
R. ALEXANDER ACOSTA],
Secretary of Labor,

       Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

       Defendant.

Civil Action No. 4:16-CV-1057-A

## DECLARATION OF STEPHEN J. WILLERTZ

    1.    My name is Stephen J. Willertz. I am over the age of 18 and am otherwise competent to give this declaration.

    2.    I am the Director of the Office of Field Operations of the Office of Labor-Management Standards (OLMS) within the U.S. Department of Labor. OLMS administers and enforces various provisions of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), including the LMRDA provisions relating to union officer elections. As Director of the OLMS Office of Field Operations, I oversee and direct these matters, and I have personal knowledge of the information set out in this declaration.

    3.    On March 7, 2016, OLMS's Dallas office received a written complaint from Samuel Morales in which he claimed that the election of union officers conducted by the Association of Professional Flight Attendants (APFA) on or about January 9, 2016 did not comply with the LMRDA. A true and correct copy of this complaint is attached to this declaration as Exhibit 1.

Declaration of Stephen J. Willertz – Page 1

4.      OLMS opened an investigation of the complaint and determined that voting in the APFA's election had occurred over the internet or by phone, and that the APFA had used a company known as BallotPoint Election Services to collect and count the votes.

5.      As part of the investigation, OLMS requested and received various information and records of the election from BallotPoint. OLMS obtained information about what observation activities were permitted in connection with the election and also about how the BallotPoint system functioned, including information concerning the functions of the computer machines that make up the system, the types of data recorded and stored on each, and the system's capability to send emails to members who had voted. Some of the specific records that OLMS obtained from BallotPoint were: (1) information from a "votes table" on BallotPoint's "election server" (ES), which contained, inter alia, a record of all of the votes cast in the election and also, for each vote, the IP address from which the vote was cast (if an internet vote), the voter's domicile (also sometimes referred to as the "base of operations," i.e., the airport where the flight attendant is based), a date and timestamp for the vote, and a unique ID number that I understand BallotPoint also calls the "one time password"; and (2) information from an "officer election member" (OEM) table on BallotPoint's "member registration and notification server" (MRNS) which contained, inter alia, the union members' names, addresses, email addresses, access codes, domicile, a timestamp showing the date and eight-hour window during which the member accessed the voting system, and the IP address from which the member accessed the voting system.[1]  BallotPoint provided OLMS with the information from the ES votes table in April 2016 and the information from the MRNS OEM table in September 2016.

---

[1] BallotPoint initially told OLMS that it did not have "direct access" to the OEM table, but later produced the table after OLMS issued a subpoena. BallotPoint did not make any similar claim about the ES votes table.

Declaration of Stephen J. Willertz – Page 2

App. 187

6.     The existence of a functionality with the BallotPoint system which allowed an email to be sent to a union member after the member had voted, either reporting that the vote had been successfully cast or had not been successfully cast, caused OLMS to believe that the BallotPoint system contained some kind of internal mechanism which was capable of linking all voters to their votes. In addition, OLMS determined, by cross-referencing the data that was provided to OLMS after the election had concluded by BallotPoint from the ES votes table and the MRNS OEM table, that it was possible to link 4,081 voters to their votes through analysis of this data. Set forth below is a step-by-step explanation of how OLMS found it possible that voters could be linked to their votes by cross-referencing the ES and MRNS data (an explanation of this analysis was also previously provided to the APFA in this litigation in response to one of the APFA's interrogatories, and the following is adapted from that interrogatory response):

1.1     During its investigation, OLMS received data contained in the EID15-VotesTable (Votes Table), which was maintained on the Election Server. This Votes Table data was received in the form of an Excel spreadsheet. OLMS also received data from the EID15-OEM-data-20160909-104048 table ("Officer Election Member" table), which was maintained on the Member Registration and Notification Server (MRNS), and which was provided by BallotPoint on September 12, 2016. This MRNS data was received in the form of a text file, which was converted to an Excel spreadsheet for readability. Each set of data contained information regarding votes cast over the Internet and by telephone.

1.2     The Votes Table consisted of a line of data for each vote cast. Each row contained a number of fields showing attributes of the voter, including the IP address or area code from which the vote was cast, the exact time the vote was cast, the "vote string" showing the voting choices, and the voter's domicile.

1.3     The MRNS data consisted of a line of data for each member who logged in to vote. Each row contained a number of fields showing attributes of the member, including the IP address from which the member voted, the date and eight-hour window during which the member voted, the member's name, and the member's domicile.

1.4     OLMS was able to match the names of voters to the particular vote that they cast by comparing the data from the Votes Table to the MRNS data.

1.5    OLMS used a different method to match the APFA member to his or her vote
       depending on if the vote was cast by Internet (including web-browsing capability
       of cell phones) or by telephone (call-in). In analyzing votes cast by Internet and
       telephone (call-in), OLMS began by reviewing the data line-by-line and cross-
       referencing individual lines of the MRNS data with those from the Votes Table.
       OLMS initially connected voters to votes via this "line-by-line data analysis
       method." Given the large amount of data, OLMS subsequently used automated
       processes in Excel and Access to more quickly make voter-to-vote connections, a
       process referred to as the "automated data analysis method."

**Voter-to-Vote Matches Made for Votes Cast by Internet**

*Line-by-line data analysis method: Votes cast by Internet*

1.6    Stephen Willertz and Tracy Shanker began by cross-referencing individual lines
       of the MRNS data with individual lines of data from the Votes Table, analyzing
       three fields across both the MRNS data and the Votes Table: (1) IP address; (2)
       date/time information; and (3) voter's domicile, following the steps below.

1.7    They identified a unique IP address in the MRNS data.

1.8    They searched for that same unique IP address in the Votes Table.

1.9    When the search revealed only one result, they determined that they had likely
       matched voter with vote. To ensure that they had established a match, they
       verified that two additional fields (*i.e.*, domicile and date/time information) also
       matched.

1.10   Once the unique IP address, domicile, and date/time information were matched,
       then the voter's name from the MRNS data could be linked to the voter's vote
       string, establishing that the voter's choices for each race could be linked.

1.11   When IP addresses from the MRNS table search revealed more than one matching
       IP address in the Votes Table, they analyzed the date/time ("oem_access_when")
       field.

1.12   The "oem_access_when" field in the MRNS table contains the voting date and the
       time of voting, recorded in eight-hour windows. Specifically, when the time of
       voting was between 12:00 a.m. midnight and 7:59 a.m., the time was listed as
       "0000." When the time of voting was between 8:00 a.m. and 3:59 p.m., the time
       was listed as "0800." When the time of voting was between 4:00 p.m. and 11:59
       p.m., the time was listed as "1600." As an example, if a member voted on
       January 6, 2016, at 9:34 p.m., the "oem_access_when" field in the MRNS table
       would read "20160106-1600."

1.13   As stated above, the Votes Table lists the exact time of voting in the "timestamp"
       field; time is listed in military time format (hour/minutes/second). Utilizing the
       example above, if a member voted on January 6, 2016, at 9:34 p.m., the
       "timestamp" field would read "2016-01-06 21:34:22.000."

Declaration of Stephen J. Willertz – Page 4

1.14     When Willertz and Shanker compared the date/time information in the MRNS table and Votes Table, and obtained more than one unique IP address to establish the match, then they analyzed the domicile ("oem_attr1") field to eliminate non-matches. To illustrate, the Votes Table sometimes contained more than one row with a date/time [hour/minute/second] that fell within the MRNS table's "date and eight-hour window" field associated with the IP address in question. In these cases, analyzing the domicile field usually enabled Willertz and Shanker to eliminate non-matches to find the one matching set of data.

1.15     In some instances, the data analysis steps outlined above did not reveal a one-to-one match because two different members voted from the same IP address, during the same eight-hour window, and were based in the same domicile. (For example, this appeared to occur when two flight attendants resided at the same physical address.) Willertz and Shanker were still able to connect voter with vote in this situation when the two voters' respective vote strings were identical.

*Automated data analysis method: Votes cast by Internet*

1.16     William Mitchell used Excel and Access to analyze the MRNS data and data from the Votes Table. This method included the following steps.

1.17     He used Excel to sort the Votes Table data and the MRNS data to identify all votes cast via Internet.

1.18     Utilizing one working spreadsheet, he copied data for all Internet voters into separate worksheets, and then sorted/filtered the data to isolate unique IP addresses.

1.19     Using Excel's conditional formatting function, he identified and highlighted all of the duplicate IP addresses. He filtered the data to select all highlighted cells (*i.e.*, cells indicating duplicate IP addresses), and then applied a filter to select all of the *non-*highlighted cells (*i.e.*, cells indicating *unique* IP addresses). He then copied the unique IP addresses from the Votes Table and the MRNS data into separate worksheets within the same working spreadsheet, and did the same with the duplicate IP addresses.

1.20     He imported the unique IP addresses data (from the Votes Table and MRNS data) into Access, and created an Access query that matched all of the unique IP addresses from the Votes Table with those from the MRNS data. This query established a connection between voter and vote for approximately 3,421 members.

1.21     The 3,421 figure includes ten votes for which the IP addresses from the Votes Table data and MRNS data did not completely match for unknown reasons. However, because both the domiciles and the timestamps/eight-hour voting windows match up in each instance, OLMS determined that these ten rows of data were highly likely to reflect voter-to-vote connections.

1.22     To establish a connection between voter and vote for the duplicate IP addresses, he copied and pasted the duplicate IP addresses from Votes Table and MRNS data

side-by-side in a separate worksheet within his working spreadsheet. He needed to revert to the line-by-line data analysis method to attempt to make voter-to-vote matches for duplicate IP addresses. These data fit into these four general categories:

    a.    Votes from duplicate IP addresses where the votes were cast in different eight-hour windows (*match between voter and vote could be made when the votes were cast during different eight-hour windows*).

    b.    Votes from duplicate IP addresses where votes were cast in the same eight-hour time window, but the domiciles were different (*match between voter and vote could be made when the domiciles were different*).

    c.    Votes from duplicate IP addresses where the votes were cast in the same eight-hour window, and the domiciles were the same, but the vote string was identical (*indicating that a match between voter and vote was made*).

    d.    Votes from duplicate IP addresses where the votes were cast in the same eight-hour time window, and where the domiciles were the same, but the vote strings were different (*no match between voter and vote could be made*).

A total of 433 voter-to-vote matches were made by using this "line-by-line" method to analyze duplicate IP addresses.

1.23    The "automated" and "line-by-line" data analysis methods resulted in approximately 3,854 matches of voter and vote. These 3,854 matches comprise 41.2% of the total number of ballots cast (9,355) in APFA's January 9, 2016 election.

### Voter-to-Vote Matches Made for Votes Cast by Telephone

1.24    With respect to the votes cast by telephone (call-in), OLMS was again able to match the names of voters to their vote using two methods; first, by reviewing the data line-by-line and cross-referencing the MRNS data and the Votes Table data; and second, by using automated processes in Excel and Access to analyze the large volume of data more quickly.

*Line-by-line data analysis method: Votes cast by telephone*

1.25    Willertz initially compared the MRNS data showing members who had voted by telephone to the Votes Table data showing the votes of the members who had voted by telephone.

1.26    He examined the MRNS data for all telephone voters within a particular eight-hour voting window.

1.27    Within one particular eight-hour voting window, he identified rows of data in which there was only one *voter* from one particular domicile who voted within that eight-hour period.

1.28    He searched the Votes Table for all telephone votes within that same eight-hour window, and identified any rows of data in which only *one* telephone vote was

received from a voter in the domicile that was just identified in the MRNS table. When he identified only one telephone voter from a particular domicile (in one eight-hour window) and only one vote string from a telephone voter from that same domicile (in the same eight-hour window), he was able to successfully connect the voter with voter with his or her vote.

*Automated data analysis method: Votes cast by telephone*

1.29 Mitchell filtered the Votes Table and the MRNS data table to identify only the votes cast by telephone. He copied and pasted this data (side-by-side) on a separate worksheet within his working spreadsheet.

1.30 He sorted the data from the Votes Table by "timestamp" (*i.e.*, time of voting, down to the second) and then by "attr1" (*i.e.*, domicile).

1.31 He sorted the MRNS data by "oem_access_when" (*i.e.*, time of voting, in eight-hour window format), and then by "oem_attr1" (*i.e.*, domicile).

1.32 Using Excel's subtotal command, he identified how many telephone votes were cast on each date and during each eight-hour window.

1.33 He then used Excel's conditional formatting feature to highlight all the significant values based on "attr1" (*i.e.*, domicile) in each subtotal grouping -- for both the Votes Table data and for the MRNS data. The unique "attr1" (*i.e.*, domicile) rows in the Votes Table and the MRNS data were now easily identified -- since they were all the rows that were *not* highlighted.

1.34 He used Excel to filter the *non*-highlighted "attr1" (*i.e.*, domicile) rows, and subsequently copied and pasted that data from the Votes Table and the MRNS data side-by-side in a separate worksheet within his working spreadsheet.

1.35 The result of Mitchell's analysis is an additional 227 voter-to-vote matches.

1.36 To summarize, the data analysis of the votes cast by internet (including the web-browsing capability of cell phones) undertaken by OLMS resulted in 3,854 matches of voter and vote. Adding these 227 voter-to-vote matches for votes cast by telephone (call-in) resulted in matching a total of 4,081 voters to the voters' choice of candidates. These 4,081 matches comprise 43.6% of the total number of ballots cast (9,355) in APFA's January 9, 2016 election.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of August, 2017, at Washington, D.C.

*Stephen J. Willertz*

Stephen J. Willertz
Director, Office of Field Operations
Office of Labor-Management Standards
U.S. Department of Labor

**Declaration of Stephen J. Willertz – Page 7**



February 28, 2016

Ms. Michelle Hussar
District Director
OLMS -Department of Labor Office
A. Maceo Smith Federal Building
525 Griffin Street
Suite/Room 300
Dallas, TX 75202

Dear Ms. Michele Hussar,

I am filing an election complaint and contest with your office regarding a union Officers election I ran in Dallas, Texas on or about January 9, 2016, which was conducted by the Association of Professional Flight Attendants (APFA) and BallotPoint, Inc. I ran for the office of National Vice President.

This recent election on January 09, 2016 at APFA Unity Headquarters, and I call for a new election to be run under the observation and direction of the Department of Labor (DOL), and in accordance with provisions outlined in section 401(e) of the LMDRA, See 29 C.F.R. Subsection 452.97.

My election complaint centers around the ability for anyone candidate to truly verify the ballots and that the only party that can verify and certify said election is APFA and not a 3rd party accounting firm. Reason being, there is nothing physical to see.

My complaint which I have filed with your office for years centers around the same problematic issues APA and the DOL are dealing with in a lawsuit.

I believe APFA has the ability to stuff the ballots in favor of the institutional candidates by using phantom members or using the returned ballots that can go unchecked with redelivered/undelivered mail.

APFA won't even publish or make available of the eligible voters nor will they offer a voters list of voters or participated in this current election.

Since BallotPoint won't certify the election and they are a party involved in the tabulation of the said votes, it is in my opinion APFA NBC Officers are in no position to certify said election because they must be a neutral party and they voteed in said election and some have served in previous officers positions.

On the tabulation of my election it was done very quickly and it was not done base-by-base and it was done using a laptop over a TV monitor. It was done by position, i.e. , President, Vice President, Secretary and Treasurer.

In other words, there is nothing to see or touch or feel and for all we know, the tallies could be easily compromised or intercepted from another room and the tallies could be

Exhibit 1 (Willertz Decl.)

changed. The fact that the tallies are conducted in a different state and arriver over the internet, another safeguard is compromised and broken.

The DOL's regulations at 29 CFR 452.107(c) states that in any secret ballot election which is conducted by mail, regardless of whether the ballots are returned by members to the labor organization office, to a mail box, or to an independent agency such as a firm of certified public accountants, candidates must be permitted to have an observer present at the preparation and mailing of the ballots, their receipt by the counting agency and at the opening and counting of the ballots.

Moreover, the DOL's regulations at 29 CFR 452.110(a) states, in part, that the Act contains a general mandate in Section 401(c), that adequately safeguards to insure a fair election be provided. A labor organization's wide range of discretion regarding the conduct of elections is thus circumscribed by a general rule of fairness.

Also with regard to Preservation of Records Section 401(e) of the LMRDA which provides that "[t]he election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election." 29 U.S.C. 481(e). When I asked for verification of the ballots, I was told there is nothing to be seen, and was handed a piece of paper with regard to my election, which only stated the names of the candidates (3) and the final numbers, with absolutely no certification whatsoever.

I personally called BallotPoint after the said election and tried to get them to verbally certify my election and they directed me right back to the APFA. In other words, BallotPoint gives their tallies to the NBC Balloting Chairperson and the NBC Chairperson decides how to interpret the tallies. There's no way to cross-reference the results or verify them outside of the NBC's own assertions. Neither APFA nor BallotPoint would discuss how the balloting process actually worked or whether the results were accurate. The ballot count was conducted in another state with no union supervision, and no candidates or witnesses were allowed to view the ballot count. BallotPoint could deliver any result they wanted and APFA could amend those results locally without providing candidates and means of verify their own election.

While I can't prove it, I do believe that the ballot box can easily be stuffed with phantom voters. I say this because several members on Facebook said they went to vote and it said they had already voted, even in a most recent election Travis Phaler, was sent a ballot by BallotPoint and allowed to cast a ratification vote in 2012 even though he had been terminated by the company one year prior and was in dues arrears at the time of his termination. I have this on video.

Because of the above, I believe APFA is violating the LMRDA and more specifically the ballot secrecy provision of section 401(e) of the LMRDA. See 29 C.F.R. Subsection 452.97 .

In closing I am asking that the DOL to overturn my National Vice President election rerun my election and all elections from the same January 9th, 2016 canvassing date because of the voting problems associated with BallotPoint and the electronic voting system.

Respectfully Submitted,

Samuel Morales
5600 Shady Hill Lane
Arlington, TX 76016
817-683-5988