ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 15 2017

CLERK, U.S. DISTRICT COURT
By_____
           Deputy

THOMAS E. PEREZ [now
R. ALEXANDER ACOSTA],
Secretary of Labor,

      Plaintiff,

v.

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

      Defendant.

Civil Action No. 4:16-CV-1057-A

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JOHN R. PARKER
United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff,
the Secretary of Labor

# Table of Contents

I.      Introduction ........................................................................................ 1

II.     Background ........................................................................................ 2

        A.      The LMRDA's ballot-secrecy and observer requirements. .......................... 2

        B.      The APFA's January 2016 election of national officers .............................. 5

        C.      The BallotPoint remote electronic voting system. ........................................ 7

        D.      A losing candidate contests the election and files a complaint
                with the Secretary under the LMRDA. ...................................................... 10

        E.      The Secretary investigates and, finding probable cause to believe
                that the LMRDA's ballot-secrecy and observer requirements
                were violated in the APFA's election, files this suit. ............................... 11

III.    Summary-Judgment Standard ................................................................ 14

IV.     Argument and Authorities ...................................................................... 15

        A.      The APFA is not entitled to summary judgment against the
                Secretary's claim that the voting system used in the APFA's
                election violated the LMRDA's ballot-secrecy requirement. ..................... 16

        B.      The APFA is not entitled to summary judgment against the
                Secretary's claim that the voting system used in the APFA's
                election violated the LMRDA's observer requirement. ............................. 31

V.      Conclusion ......................................................................................... 45

# Table of Authorities

## Cases

*Am. Fed'n of Musicians v. Wittstein,*
    379 U.S. 171 (1964) ............................................................................................. 3

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................................... 14

*Bachowski v. Brennan,*
    413 F. Supp. 147 (W.D. Pa. 1976) ............................................................. 4, 20, 21

*Brennan v. Local Union 300,*
    No. 72-3042-LTL, 1974 WL 1068 (C.D. Cal. Feb. 21, 1974) .............................. 33

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..................................................................................... 14, 15

*Chao v. Local 54,*
    166 F. Supp. 2d 109 (D.N.J. 2001) ...................................................................... 15

*Dole v. Graphic Commc's Int'l Union,*
    722 F. Supp. 782 (D.D.C. Sept. 22, 1989) ........................................................... 17

*Dole v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers,*
    No. 89-241, 1990 WL 251022 (D. Haw. May 2, 1990) ............................. 17, 18, 27

*Donovan v. CSEA Local Union 1000,*
    594 F. Supp. 188 (N.D.N.Y. 1984) ................................................................. 21, 22

*Donovan v. CSEA Local Union 1000,*
    761 F.2d 870 (2d Cir. 1985) ................................................................................. 21

*Donovan v. Local 719,*
    561 F. Supp. 54 (N.D. Ill. 1982) .......................................................................... 17

*Dunlop v. Bachowski,*
    421 U.S. 560 (1975) ............................................................................................ 20

*Ellis v. Chao,*
    155 F. App'x 18 (2d Cir. 2005) ........................................................................ 4, 31

*Garcia v. United States,*
    No. 4:16-CV-963-A, 2017 WL 2537280 (N.D. Tex. June 9, 2017) ...................... 14

*Hugler v. Local 689,*
    No. GJH-16-2052, 2017 WL 3085321 (D. Md. July 18, 2017)........... 17, 18, 22, 23

*Marshall v. Am. Postal Workers Union,*
    486 F. Supp. 79 (D.D.C. 1980) ...................................................... 17, 22

*Marshall v. Local 135,*
    No. 78-4280, 1980 WL 18743 (E.D. Pa. Sept. 16, 1980) ............................ 5, 31, 33

*Marshall v. Local Union 12447,*
    591 F.2d 199 (3d Cir. 1978).......................................................... 3, 16, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...................................................................... 14

*Miss. Prot. & Advocacy Sys. v. Cotten,*
    929 F.2d 1054 (5th Cir. 1991)........................................................... 15

*Reich v. District Lodge 720,*
    11 F.3d 1496 (9th Cir. 1993)........................................................... 4, 19

*Solis v. Local 9477,*
    798 F. Supp. 2d 701 (D. Md. 2011) .................................................... 15

*United States v. Wells,*
    No. 07-448, 2008 WL 4483735 (D. Minn. Sept. 30, 2008)..................................... 8

*Usery v. Int'l Org. of Masters, Mates & Pilots,*
    422 F. Supp. 1221 (S.D.N.Y. 1976)...................................................... 22

*Wirtz v. Am. Guild of Variety Artists,*
    267 F. Supp. 527 (S.D.N.Y. 1967)......................................................... 3

*Wirtz v. Hotel, Motel & Club Employees Union, Local 6,*
    391 U.S. 492 (1968) .............................................................. 2, 3, 15

*Wirtz v. Local 153,*
    389 U.S. 463 (1968) ................................................................... 2, 3

*Wirtz v. Local Union No. 125,*
    270 F. Supp. 12 (N.D. Ohio 1966)......................................................... 19, 20, 23

Statutes, Regulations, and Rules

29 C.F.R. § 452.97 ............................................................................ 45

29 C.F.R. § 452.98 .................................................................................... 45

29 C.F.R. § 452.102 .................................................................................. 45

29 C.F.R. § 452.107 ....................................................................... 38, 41, 45

29 C.F.R. § 452.107(a) ......................................................................... 31, 38

29 C.F.R. § 452.107(c) ..................................................................... 31, 38, 41

29 C.F.R. § 452.110 .................................................................................. 40

29 U.S.C. §§ 401 *et seq.* ............................................................................ 2

29 U.S.C. § 402(k) ............................................................................... 4, 16

29 U.S.C. § 481(a) ............................................................................... 3, 13

29 U.S.C. § 481(c) ........................................... 4, 13, 31, 34, 35, 36, 38, 39, 43

29 U.S.C. § 482(a) .................................................................................. 10

29 U.S.C. § 482(b) .................................................................................. 11

29 U.S.C. § 482(c) .................................................................................. 16

29 U.S.C. § 482(c)(2) ............................................................................... 15

Fed. R. Civ. P. 12(b)(6) ........................................................ 13, 40, 42, 43, 44

Fed. R. Civ. P. 30(b)(6) ............................................................................ 17

Fed. R. Civ. P. 56(a) ............................................................................... 14

Fed. R. Civ. P. 56(c) ............................................................................... 14

Tex. Election Code § 129.023 .................................................................... 41

Tex. Election Code § 129.023(c) ................................................................ 41

Tex. Election Code § 129.023(f)(2) ............................................................. 41

# I.    Introduction

This case arises out of an election of union officers conducted by the defendant, the Association of Professional Flight Attendants (APFA).  The plaintiff, the Secretary of Labor, received a complaint that the election was conducted in violation of federal law requiring, among other things, that unions elect their officers by secret ballot and that candidates be permitted to have observers at the polls and at the counting of the ballots.  As discussed below, the election in question was conducted by having union members submit their votes over the internet or by phone to a computer system that contained and collected information which made it possible to determine how specific members voted—information such as the members' names, IP addresses, and the content of cast votes.  This violated the statutory ballot-secrecy requirement.  In addition, at the conclusion of the election, the candidates' designated observers were shown only a projected image of a screen purporting to announce the election results, and were provided no meaningful way to observe the counting of the votes to determine if they had been tallied accurately.  This violated the statutory observer requirement.

After conducting an investigation and finding probable cause to believe such violations had occurred, the Secretary filed this suit and, on August 25, 2017, filed a motion for summary judgment.  In this brief, the Secretary responds to the summary-judgment motion filed by the APFA on that same date.  Because the summary-judgment record establishes that ballot-secrecy and observer violations occurred and may have affected the outcome of the election, and because the APFA's arguments to the contrary are unavailing, the Secretary requests that the APFA's motion be denied.

## II.    Background

The APFA is the union for flight attendants employed by American Airlines.

(App. 010–11 (Tab D).[1])  As a national labor organization engaged in an industry

affecting interstate commerce, the APFA is subject to the requirements of the Labor-

Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401 *et seq.*,

including the LMRDA's provisions governing the conduct of union officer elections.

(Doc. 4, ¶¶ 6–7; Doc. 16, ¶¶ 6–7.)  This suit concerns the APFA's January 2016 election

of national officers, which was conducted using a remote electronic voting system

whereby union members cast their votes over the internet or by phone.  (Doc. 4, ¶¶ 7, 20;

Doc. 16, ¶¶ 7, 20.)

### A.    The LMRDA's ballot-secrecy and observer requirements.

The LMRDA was enacted by Congress with the intent of ensuring fair and

democratic practices in unions.  In the 1950s, Congress investigated the nation's unions

and found corruption in union leadership and disregard for the rights of rank-and-file

members.  *See Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492,

497–98 (1968) (*Local 6*); *Wirtz v. Local 153*, 389 U.S. 463, 469–71 (1968).  Through the

LMRDA, Congress sought to "protect the rights of rank-and-file members to participate

fully in the operation of their union through processes of democratic self-government."

*Local 6*, 391 U.S. at 497.  Congress equated the interests of union members in democratic

---

[1] "App. __" citations refer by page number to the evidentiary materials found in the consecutively numbered pages of the Appendix to Plaintiff's Motion for Summary Judgment, which was filed on August 25, 2017.  (*See* Doc. 33.)  "APFA App. __" citations refer to the Appendix of Evidentiary Materials in Support of APFA's Motion for Summary Judgment, filed by the APFA on August 25, 2017. (*See* Doc. 30.)  "Doc. __" citations refer to the filings on the clerk's electronic docket for this action.

union elections with the public interest in general, and sought "to protect the public interest by assuring that union elections would be conducted in accordance with democratic principles." *Id.* at 496.

Recognizing that free and fair elections were essential to union self-government, Congress mandated various election safeguards in the LMRDA. *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 181–82 (1964); *Local 153*, 389 U.S. at 470; *see also Wirtz v. Am. Guild of Variety Artists*, 267 F. Supp. 527, 544 (S.D.N.Y. 1967) (noting that Congress intended that unions conduct democratic and scrupulously fair elections). In doing so, Congress looked to the example of political elections, with the idea that union elections should be subject to the same type of safeguards that are commonly employed in political elections. *See Local 6*, 391 U.S. at 504 (noting that "Congress' model of democratic elections was political elections in this country"); *Marshall v. Local Union 12447*, 591 F.2d 199, 205 (3d Cir. 1978) (explaining that the LMRDA requires unions to "take every reasonable precaution to ensure that the facilities available for balloting are used in a manner similar to their use in political elections in this country").

One of the principal election safeguards crafted by Congress in the LMRDA is the requirement that elections be conducted by secret ballot. Pursuant to 29 U.S.C. § 481(a), a union "shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot." The statute defines "secret ballot" as:

> the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner

> that the person expressing such choice cannot be identified
> with the choice expressed.

29 U.S.C. § 402(k).  "By imposing the requirement of secrecy Congress meant to

eliminate any form of potential coercion or intimidation which might occur if it could be

learned in any manner how an individual voter had voted." *Bachowski v. Brennan*, 413

F. Supp. 147, 150 (W.D. Pa. 1976).  Accordingly, the secret-ballot provision requires

more than simply ensuring that ballots can be marked in a private setting shielded from

the view of others; it also encompasses secrecy after members cast their ballots, including

during the collection of ballots and the vote-tallying process.  *See Reich v. District Lodge

720*, 11 F.3d 1496, 1500 (9th Cir. 1993) (explaining that "the LMRDA's secrecy mandate

extends not only to the actual casting of ballots but also to any post-voting procedure

designed to determine how individual union members voted or would have voted");

*Bachowski*, 413 F. Supp. at 150 (noting that "[t]he requirement of secrecy would seem to

include not only the right to vote in secret . . . but also the right to secrecy *after the

ballots are cast*," and that "[a]ny post-voting device by which it can be determined how a

particular voter voted would be a violation of secrecy" (emphasis in original)).

A second voting safeguard in the LMRDA is the right for candidates to have

observers of the election process.  Per 29 U.S.C. § 481(c), candidates in union elections

must be permitted to "have an observer at the polls and at the counting of the ballots."

As the Second Circuit has explained, "observer rights . . . are an important procedure that

ensure free and fair union elections, which are themselves critical to protecting and

promoting the interests of represented workers." *Ellis v. Chao*, 155 F. App'x 18, 20 (2d

Cir. 2005). "Without observers, election officials could tamper with ballots in ways unknown to the complaining union members." *Marshall v. Local 135*, No. 78-4280, 1980 WL 18743, at *11 (E.D. Pa. Sept. 16, 1980).

**B.    The APFA's January 2016 election of national officers.**

The APFA conducted an election for its national offices of president, vice president, secretary, and treasurer in January 2016.[2]  (App. 001 (Tab A); App. 002 (Tab B).)  During the election, union members were permitted to vote either by using the internet or by phone.  (App. 002 (Tab B).)  To collect and count the votes (both internet and phone votes), the APFA used a company known as BallotPoint Election Services. (App. 172 (Tab H).)

Voting through the BallotPoint system was accomplished as follows.  In advance of the election, BallotPoint assigned each eligible union member a unique twelve-digit access code.  (App. 096, 103 (Tab G); App. 172 (Tab H); *see also* App. 002 (Tab B).) These access codes were distributed to the members in voting notices that were sent through the mail.  (App. 096 (Tab G); *see also* App. 002 (Tab B).)  The notice explained that the member could use his or her access code to vote, either over the internet or by phone.  (App. 002 (Tab B); *see also* App. 172 (Tab H).)  If desiring to vote over the internet, the member was instructed to go to a specific page on the BallotPoint web site and to log in using the member's access code.  (App. 002 (Tab B).)  If desiring to vote by phone, the member was instructed to call a toll-free number and to enter the access code

---

[2] Technically the voting period began on December 10, 2015, and concluded on January 9, 2016.  (*See* App. 001 (Tab A); App. 002 (Tab B).)

when prompted.  (App. 002 (Tab B).)  Once logged in using either method, members

could follow instructions to select the candidates they wished to vote for, either by

marking choices on a web page or by pushing buttons on their phone (e.g., by pressing 1

to vote for the first candidate listed for president, pressing 2 for the second candidate,

etc.).  (App. 086–88 (Tab G).)

The voting period ended at 10:00 a.m. (Central time) on January 9, 2016.  (App.

002 (Tab B).)  Candidates and their designated observers were permitted to attend a

"ballot count" at the APFA's headquarters in Euless, Texas on the day that voting closed.

(App. 017–18, 39–40 (Tab D).)  During this event, candidates, their observers, and any

other interested union members were allowed to assemble in the "Unity Pays" room at

APFA headquarters.  (App. 018 (Tab D).)  This room is relatively large (fitting four or

five large tables with chairs, with additional chairs around the circumference of the

room), and between 20 and 30 people were in attendance.  (App. 020–21 (Tab D).)

Union official Cindy Horan, chair of the APFA's election committee, presided at

the "ballot count" event.  (App. 012–13, 017–25 (Tab D).)  Horan sat at a table in the

front of the room with a laptop computer in front of her.  (App. 021–22 (Tab D).)  The

laptop's screen was visible to Horan but not to the assembled candidates and observers.

(App. 021–24 (Tab D).)  Horan explained to those present that she was logging in to the

BallotPoint website and taking other steps necessary to obtain the election results.  (App.

023–24 (Tab D).)  Next, Horan "shared" her laptop with a large projection screen visible

to the assembled candidates and observers by pressing a button.  (App. 021–25 (Tab D).)

The candidates and observers were at that point able to see an "official results" page

which listed the candidates for the various positions, with vote and percentage totals

shown to the right of their names. (App. 024–25, 044 (Tab D).) Candidates and

observers were not able to see any preliminary steps that Horan took prior to the

appearance of the "official results" on the projection screen. (App. 021–24 (Tab D).)

The results of the election were that the vice-presidential race was won outright

(i.e., with over 50% of the vote and no need for a runoff), by a margin of 2,147 votes.

(App. 044 (Tab D); *see also* App. 006 (Tab C).) In the other races, for president,

secretary, and treasurer, no candidate received more than 50% of the vote, so a runoff for

these positions was required. (App. 044 (Tab D); App. 006 (Tab C).) The margins

between the second-place candidates who made the runoff and the next candidates who

were eliminated from the runoff were 582 votes, 680 votes, and 1,566 votes, respectively,

in the races for president, secretary, and treasurer. (App. 044 (Tab D).) Out of a total of

20,656 eligible voters, 9,355 people cast a ballot, meaning that 11,301 eligible voters did

not vote. (App. 044 (Tab D).)

## C.     The BallotPoint remote electronic voting system.

Behind the scenes, BallotPoint used several computers and related interconnected

devices to perform the voting process and to record and count votes in the APFA's

election. Some of these machines are grouped together into what BallotPoint refers to as

the election server, or ES. (App. 071–72 (Tab G).) The other machines are grouped

together into what is referred to as the member registration and notification server, or

MRNS. (App. 071–72 (Tab G).) The ES and MRNS are housed in a co-location facility

in Portland, Oregon.[3]  (App. 074–75 (Tab G); App. 144–45, 172 (Tab H).)  BallotPoint's office is also in Portland.  (App. 143–44 (Tab H).)

The ES and MRNS have different functions.  The ES collects and stores the members' votes in a field called the "vote string."  (App. 081, 086–88, 128 (Tab G).)  It also stores other information that is associated with each vote string, such as the voter's base of operation (i.e., the airport where the voter is based as a flight attendant) and a timestamp for the vote.  (App. 081–85, 088–89, 128 (Tab G).)  A portion of the ES supports an interface that connects phone voters to the computer system.  (*See* App. 072 (Tab G).)  If the vote is cast over the internet, the ES records the IP address[4] that the vote was cast from.  (App. 081–82, 128 (Tab G).)  If the vote is cast by phone, the ES records the area code of the phone number that the vote was cast from.  (App. 090, 128 (Tab G).)

The MRNS holds data about the union members who are eligible to vote, including such information as their names, addresses, email addresses, and bases of operation.  (App. 091–97, 129 (Tab G).)  The MRNS also contains the access codes that the members have been assigned, and it records whether a member has voted.  (App. 096, 099, 129 (Tab G).)  For votes cast over the internet, the MRNS records the IP address that the voter has logged in from, along with a date and timestamp representing the eight-hour

---

[3] A co-location facility is a space that houses computer equipment potentially belonging to a number of different parties.  (*See* App. 144–45 (Tab H)); *see also* Colocation Centre, Wikipedia, https://en.wikipedia.org/wiki/ Colocation_centre (viewed Aug. 4, 2017) (explaining that "[c]olocation facilities provide space, power, cooling, and physical security for the server, storage, and networking equipment of other firms").

[4] An IP address (or "Internet Protocol" address) is a unique address that is used by certain electronic devices to communicate with each other—"in simpler terms, a computer address."  *See United States v. Wells*, No. 07-448, 2008 WL 4483735, at *2 n.1 (D. Minn. Sept. 30, 2008).

window in which this access occurred.[5]  (App. 098, 129 (Tab G); App. 187 (Tab J).)  For

votes cast over the phone, the MRNS does not record any portion of the phone number,

but instead records an IP address associated with the local network on which

BallotPoint's equipment resides (since phone voters interface with the system through a

piece of computer equipment that is part of the ES),[6] again along with a date and eight-

hour timestamp.  (App. 097–99, 129 (Tab G); App. 187 (Tab J).)

The ES and MRNS must communicate in order to allow a member to vote and

then to record that the member has voted.  (*See* App. 099–102 (Tab G); App. 151–52,

176, 181, 183 (Tab H).)  A member seeking to vote first arrives at the ES (either directly

over the internet or, for phone voters, through the ES's phone interface).  (App. 151–52,

181, 183 (Tab H).)  A "voting session" is established and a random value referred to as a

"one-time password" (which is not the same as the member's access code) is generated

internally within the ES for the member.  (App. 083–84 (Tab G); App. 151–54, 181, 183

(Tab H).)

The would-be voter is then transferred to the MRNS, along with the one-time

password, and instructed to input his or her access code.  (App. 084 (Tab G); App. 154,

181, 183 (Tab H).)  Upon confirming by way of the access code that the person is an

eligible voter, the MRNS returns the voter to the ES in order for he or she to actually

vote.  (App. 181, 183 (Tab H).)  The ES records the specific voting choices—which

---

[5] In contrast, the timestamp recorded on the ES shows the exact hour, minute, and second.  (*See* App. 084–85, 128 (Tab G).)

[6] The same generic IP address therefore appears for every phone voter on the MRNS.  (App. 098 (Tab G).)

remain linked with the one-time password that was also transmitted to the MRNS—and then generates a page showing a confirmation number (for internet voters) or reads the confirmation number over the phone (for phone voters). (App. 083–85, 128 (Tab G); App. 181 (Tab H)[7].) The ES also sends a message back to the MRNS, again using the one-time password, to inform the MRNS that the vote associated with that one-time password has successfully been cast. (App. 099–102 (Tab G); App. 156 (Tab H).) Because the one-time password is associated in the MRNS with a specific voter, the MRNS is then able to modify its own records to show that the member associated with that one-time password has voted, and also to send a confirmation email to the member, if the MRNS has an email address on file for that particular member. (App. 099–102 (Tab G); App. 156–57, 181, 183 (Tab H).)

**D.    A losing candidate contests the election and files a complaint with the Secretary under the LMRDA.**

The LMRDA allows a union member to file a complaint with the Secretary alleging that an election conducted by his or her union violated the LMRDA, provided that the union member has first exhausted whatever remedies are available within the union. *See* 29 U.S.C. § 482(a). With respect to the APFA's January 2016 election, one of the losing candidates for vice president, Samuel Morales, filed an election contest with

---

[7] The APFA's retained expert stated in his deposition that he did not believe the one-time passwords were stored on the ES with the specific votes that the one-time passwords were associated with. (*See* App. 152 (Tab H); *see also* App. 183 (Tab H) (diagram from the expert's report, which asserts that the one-time password is "never stored on disc" and is "destroyed").) However, BallotPoint's software engineer—who actually created the relevant software on the ES—confirmed in his deposition that the one-time passwords were saved on the ES, where they appear in the "votes table" on that server. (App. 080, 084, 101, 128 (Tab G).)

the union on January 22, 2016.[8]  (Doc. 4, ¶ 8; Doc. 16, ¶ 8; *see also* App. 028, 046 (Tab D).)  Morales stated that he believed that ballot secrecy had been violated during the election, and he also complained that the final tallies for the election were simply displayed on a laptop with no way to verify the results and with no ability for an observer to view the balloting process.  (App. 046–48 (Tab D).)  After exhausting his internal union remedies, (*see* App. 064 (Tab F)), Morales filed a complaint with the Secretary, as authorized by the LMRDA, (*see* App. 186, 193 (Tab J)).

**E.    The Secretary investigates and, finding probable cause to believe that the LMRDA's ballot-secrecy and observer requirements were violated in the APFA's election, files this suit.**

Congress has directed that, upon the filing of an LMRDA complaint, "[t]he Secretary shall investigate such complaint." 29 U.S.C. § 482(b).  The Secretary has delegated responsibility for investigating LMRDA complaints to the Office of Labor-Management Standards (OLMS) within the Department of Labor.  (*See* Doc. 19 at 014.)

In its investigation of Morales's complaint, OLMS obtained information about what observation activities were permitted at the APFA "ballot count" event and also about how the BallotPoint system functioned, including information concerning the functions of the ES and MRNS, the types of data recorded and stored on each, and the system's capability to send emails to members who had voted.  (*See* App. 187–88 (Tab J).)  As discussed above, this email functionality is enabled by BallotPoint's assignment of a one-time password to each voter during the voting process, which one-time password

---

[8] The protest is actually dated January 22, <u>2015</u>, but the reference to 2015—rather than 2016—apparently was a typo.  (*See* App. 028, 046 (Tab D).)

is associated on the ES with the content of the voter's vote, and on the MRNS with the

voter's identity.  (*See* pp. 9–10, *supra*.)

OLMS also obtained various other electronic records that were created and

maintained on the ES and MRNS during the APFA's election.  These included:  (1)

information from a "votes table" on the ES that contained not only the contents of all the

votes in the election but also, for each vote, the IP address from which the vote was cast

(if an internet vote), the voter's base of operation (also sometimes referred to as the

"domicile"), the timestamp for the vote, and the one-time password; and (2) information

from an "officer election member" (OEM) table on the MRNS that contained the

members' names, addresses, email addresses, access codes, a timestamp showing the date

and eight-hour window during which the member accessed the voting system, and the IP

address from which the member accessed the system (for internet votes).  (App. 187 (Tab

J).)

OLMS determined, by cross-referencing the data that was available from the ES

votes table and the MRNS OEM table, that even long after the election had concluded, it

was possible to link 4,081 voters to their votes, representing approximately 43% of all the

votes.  (App. 188 (Tab J).)  Such linkage was predominantly made possible by the

presence of IP addresses that were recorded for internet voters on both the ES and the

MRNS.  (*See* App. 188–91 (Tab J).)  Where a unique IP address associated with a

specific internet vote appears on the ES votes table, it is a simple matter of cross-

referencing that unique IP address against the data on the MRNS OEM table:  once the

same unique IP address is located on the MRNS OEM table, the voter's identity is

revealed. (App. 188–90 (Tab J).) In addition, even in situations where multiple voters voted from the same IP address (such as when two union members lived in the same household), it is still sometimes possible to link specific voters to their votes by analyzing the additional information provided in other fields in conjunction with the IP addresses, to either rule out or confirm that a specific vote came from a specific voter.[9] (App. 190–91 (Tab J).) Likewise, certain phone votes can also be linked with specific voters through a similar process of analyzing the other data captured by the ES and MRNS and using that data to link specific phone votes to identifiable voters. (App. 191–92 (Tab J).) Neither BallotPoint's software engineer nor the APFA's retained expert disputes that matching voters to their votes in this manner is possible, given the information that was provided from the ES and MRNS. (*See* App. 112, 114 (Tab G); App. 137–38, 142 (Tab H).)

Based on the facts uncovered in OLMS's investigation, the Secretary filed a two-count complaint against the APFA in this Court alleging that: (1) the APFA violated 29 U.S.C. § 481(a) by using an electronic voting method that permitted voters to be linked to their votes; and (2) the APFA violated 29 U.S.C. § 481(c) because the voting system did not permit observers to verify that votes were recorded and tallied accurately. (Doc. 4, ¶¶ 25, 26.) After the Court denied a Rule 12(b)(6) motion to dismiss filed by the APFA, (Doc. 14), the APFA answered (Doc. 16) and the parties engaged in discovery.

On August 25, 2017, the Secretary filed a motion for summary judgment on both

---

[9] For example, if two votes from the same IP address were cast during different eight-hour windows, it is possible by using the timestamp information in the ES and MRNS to establish which particular vote belongs to which voter. (App. 191 (Tab J).)

counts of the complaint, and requested that the Court grant judgment in his favor and enforce the statutorily-prescribed remedy of voiding the results of the election and ordering that a new election be run under the Secretary's supervision. (*See* Doc. 31.) The APFA also filed its own motion for summary judgment on that same day, (*see* Doc. 27), to which the Secretary now responds.

### III.    Summary-Judgment Standard[10]

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Once the movant has carried his burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to some element or elements of the case. *See id.* at 324; *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party, there is no genuine dispute for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 597 (1986). As the Fifth Circuit has explained:

---

[10] This discussion of the summary-judgment standard is adapted from *Garcia v. United States*, No. 4:16-CV-963-A, 2017 WL 2537280, at *1 (N.D. Tex. June 9, 2017).

> Where the record, including affidavits, interrogatories,
> admissions, and depositions could not, as a whole, lead a
> rational trier of fact to find for the nonmoving party, there is
> no issue for trial.

*Miss. Prot. & Advocacy Sys. v. Cotten*, 929 F.2d 1054, 1058 (5th Cir. 1991). The

standard for granting a motion for summary judgment is the same as the standard for

rendering judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## IV.    Argument and Authorities

The APFA has moved for summary judgment against the Secretary's claims that

seek to nullify the results of the APFA's election based on violations of the LMRDA's

ballot-secrecy and observer requirements. (*See* Doc. 28 at 4, 10.) For the Secretary to

prevail on his request to nullify the results of a union election based upon either type of

violation, the Court must find: (1) that a statutory violation occurred during the conduct

of the union's election, and (2) that the violation "may have affected the outcome" of the

election. 29 U.S.C. § 482(c)(2); *Chao v. Local 54*, 166 F. Supp. 2d 109, 112–13 (D.N.J.

2001). If the Court determines that a violation occurred, "the Secretary enjoys the benefit

of a presumption that the outcome of the challenged election may have been affected."

*Local 54*, 166 F. Supp. 2d at 113. Thus, "proof of a violation establishes a prima facie

case that the outcome of the election may have been affected and shifts the burden to the

defendant to show that the established violation did not affect the election results." *Id.*

(citing *Local 6*, 391 U.S. at 506–07); *see also Solis v. Local 9477*, 798 F. Supp. 2d 701,

705 (D. Md. 2011).

In its summary-judgment brief, the APFA argues that (a) no rational trier of fact

could find that the ballot-secrecy violation alleged by the Secretary may have affected the outcome of the election, and (b) no rational trier of fact could find that the LMRDA's observer requirement was violated. (*See* Doc. 28 at 3–21.) As explained below, though, neither argument advanced by the APFA is correct, and the APFA's summary-judgment motion should therefore be denied.

**A.  The APFA is not entitled to summary judgment against the Secretary's claim that the voting system used in the APFA's election violated the LMRDA's ballot-secrecy requirement.**

In its summary-judgment brief, the APFA does not specifically contest the Secretary's claim that the electronic voting system used in the APFA's election violated the LMRDA's ballot-secrecy requirement.[11] Rather, the APFA argues that, even assuming the existence of a ballot-secrecy violation, there are no grounds for ordering that a new election be conducted. That is because, in the APFA's view, the Secretary cannot show that any ballot-secrecy violation "may have affected the outcome of [the] election," which under 29 U.S.C. § 482(c) is the standard that must be satisfied in order for the Court to order a new election. (Doc. 28 at 5.)

The "may have affected" standard is a liberal one in favor of requiring that a new election be held, and has been described as calling for only a consideration of whether

---

[11] The Secretary, in contrast, has requested that the Court enter summary judgment in his favor on the ballot-secrecy issue. (*See* Doc. 31.) In the Secretary's view, and as discussed in more detail in the Secretary's summary-judgment brief, ballot secrecy was violated in two different ways during the APFA's election—by the use of one-time passwords that linked voters to votes, and also by the use of IP addresses and other data that linked voters to votes. (*See* Doc. 32 at 18–28.) The LMRDA's ballot-secrecy requirement obligates a union to conduct its election using a method of voting in which each vote is "cast in such a manner that the person expressing [the voting] choice cannot be identified with the choice expressed." 29 U.S.C. § 402(k); *see also Local Union 12447*, 591 F.2d at 203 n.10 (explaining that the LMRDA's ballot-secrecy requirement is violated by a showing that, "because of the way the election was conducted, it was *possible* to observe how some voters had marked their ballots").

under the "maximum theoretical possibility" it is possible that the violation may have affected the outcome of the election. *See Marshall v. Am. Postal Workers Union*, 486 F. Supp. 79, 82 (D.D.C. 1980); *Dole v. Graphic Commc's Int'l Union*, 722 F. Supp. 782, 786 (D.D.C. Sept. 22, 1989); *Dole v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers*, No. 89-241, 1990 WL 251022, at *9 (D. Haw. May 2, 1990); *Hugler v. Local 689*, No. GJH-16-2052, 2017 WL 3085321, at *5 (D. Md. July 18, 2017). Under this standard, the union has "the burden of demonstrating that the violation *could not have affected* (as opposed to the easier burden of proving that the violation *did not affect*) the outcome of the election." *Int'l Brotherhood*, 1990 WL 251022, at *9 (citing *Donovan v. Local 719*, 561 F. Supp. 54 (N.D. Ill. 1982)).

Regarding the "may have affected" standard, the APFA correctly recognizes that the existence of a ballot-secrecy violation gives rise to a presumption that the outcome of the election may have been affected, thus shifting the burden to the APFA to rebut that presumption with "tangible evidence." (Doc. 28 at 6.) What the APFA fails to do, however, is provide any such evidence meeting this burden, and for that reason its motion for summary judgment on the ballot-secrecy issue should be denied.

The APFA relies entirely on testimony given by Stephen J. Willertz, who is the head of the OLMS division that conducted the investigation of the APFA's election.[12] (*See* Doc. 28 at 4, 7–10.) According to the APFA, Willertz's testimony establishes that the Secretary has "no evidence" that any APFA member was aware of the way that the

---

[12] As the APFA notes, the Secretary stipulated that Willertz's testimony could be treated as if it were testimony given by a corporate representative under Rule 30(b)(6) of the Federal Rules of Civil Procedure. (*See* APFA App. 72.)

BallotPoint system stored data on two servers in a manner that allowed voters to be linked to their votes. (Doc. 28 at 7–10.) At the outset, then, a crucial deficiency in the APFA's argument is apparent. Under the presumption created by an LMRDA violation, the union must come forward with evidence to rebut the presumption that the outcome of the election may have been affected. *See Local Union 12447*, 591 F.2d at 206; *Int'l Brotherhood*, 1990 WL 251022, at *9. An argument by the APFA that Willertz's testimony confirms that *the Secretary* has no evidence about what union members knew or believed to be true about the BallotPoint system, on the other hand, is just that—an argument about what evidence the Secretary has, as opposed to independent evidence of the APFA's own. The APFA cannot meet its burden by merely stating that the Secretary has no evidence that union members' voting decisions were influenced by the non-secret nature of the election system. *See Local Union 12447*, 591 F.2d at 206 (explaining that a new election was required to be conducted, where "the union offered no evidence to rebut" the prima facie showing that was created by the LMRDA violation); *Local 689*, 2017 WL 3085321, at *5 ("The Union puts forth nothing to rebut this evidence that the election may have been affected by these violations.").

Moreover, the APFA's focus on whether there is evidence about what union members knew or did not know about the BallotPoint system, or about how that knowledge might have affected the members' decisions about whether and how to vote, is misplaced. The APFA's argument presumes that evidence of specific union members' thoughts about their votes is pertinent to the issue before the Court and that it would be necessary for the Court to make findings about these matters (and therefore that the

Secretary must present evidence on them) in order to determine that there may have been an effect on the outcome of the election. However, LMRDA caselaw makes clear that such evidence about union members' thought processes and voting decisions cannot be used to defeat the presumption that the outcome of the election may have been affected.

For example, in the *District Lodge 720* case, where an LMRDA violation had occurred and there was an issue about whether the number of affected voters who did not vote was less than the winning margin, the court explained that while it was necessary to determine *how many* eligible members did not vote, the "union members who were eligible to vote but did not do so may not be asked whether or how they would have voted." *District Lodge 720*, 11 F.3d at 1504. Similarly, in *Wirtz v. Local Union No. 125*, 270 F. Supp. 12, 20 (N.D. Ohio 1966), the court rejected a union's argument that it would be necessary to determine "the manner in which [] ineligible voters voted" in order to assess whether the outcome of the election may have been affected by an LMRDA violation. The court explained that "[t]o require or allow inquiry into the manner in which certain persons have voted would be entirely inconsistent with the [LMRDA's] requirement that the ballot be secret." *Id.*

The same is true here. It would not be proper to question specific union members about whether and how their voting decisions were affected by the fact that the APFA's voting system required them to vote by internet or phone. Likewise, it would not be proper for either the Secretary or the APFA to serve subpoenas on individual union members to compel them to give testimony in a deposition or at trial about the voting choices they made. Such activities certainly "would be entirely inconsistent with the

[LMRDA's] requirement that the ballot be secret." *Local Union No. 125*, 270 F. Supp. at 20.

More fundamentally, as a legal matter, the evidence that the APFA asserts is lacking—evidence concerning voters' perceptions and beliefs about the electronic voting system, and the like—is simply not the type of evidence that would be determinative of whether the outcome of the election may have been affected. Instead, when LMRDA violations have tainted some portion of the votes or potential votes in a union election, the caselaw discussed below shows that the proper analysis under the "may have affected the outcome" standard is to assume that all the potentially affected votes would have been cast against the winning candidate. Then, if the margin of victory is less than the number of these affected votes, this "conclusively establishes" that the LMRDA violation may have affected the outcome of the election. *Local Union No. 125*, 270 F. Supp. at 20.

For example, in *Bachowski*, ballot-secrecy and other violations had occurred at certain union locals during an election for the director of an intermediate union body, and the question before the court was how to determine whether the outcome of this election may have been affected. *Bachowski*, 413 F. Supp. at 148–49; *see also Dunlop v. Bachowski*, 421 U.S. 560, 562–63 (1975) (discussing the underlying facts of the case). The Secretary when considering this issue had with respect to certain violations (in locals where voting had actually occurred and results were reported) adopted an analysis that simply eliminated the winning candidate's margin of victory over the complainant, and based on this rationale, the Secretary had not found any possible effect on the outcome and had declined to file suit. *See id.* The court, however, determined that the Secretary's

methodology of eliminating only the winning candidate's margins in these locals was improper because it did not go far enough. Instead, the Secretary was directed to credit the losing candidate with all the votes in the affected locals. *See id.* at 151 (explaining that the proper analysis was to "us[e] the same standard" as was used for a second category of violations that occurred when certain locals held no election or results were not reported at all, which was a method of "total rejection instead of margin," i.e., crediting all potentially affected votes to the loser). And this was not contingent on the Secretary's obtaining testimony from individual union members about their choices whether and how to vote. *See id.*

Similarly, in *Donovan v. CSEA Local Union 1000*, 594 F. Supp. 188, 195–96 (N.D.N.Y. 1984), *aff'd in part, rev'd in part on other grounds*, 761 F.2d 870 (2d Cir. 1985), a ballot-secrecy violation had occurred because the union used perforated ballot forms that contained the voter's identifying information on the top and his or her voting choices on the bottom. In determining whether this violation may have affected the outcome of the election, the court reviewed the facts establishing that there were a total of 197,000 ballots that had been mailed out, that 51,000 ballots had been returned, and that of these 5,600 were not counted because these voters had failed to sign their ballots. *Id.* at 195. Notwithstanding that one of the three races had been won by a margin of over 14,000 votes, and the others by lesser margins, the court found that a new election was required "since it remains to be seen whether secret ballots would have encouraged [not only] the 5600 non-signing voters to cast meaningful ballots, but the nonvoting members as well." *Id.* at 197. In explaining that it was necessary to take into account not just the

votes that were cast but also the number of eligible members who did not vote at all, the court explained that "[t]here is no conceivable way in which defendant can confront and overcome the imponderables inherent in analyzing the decisions made by each elector . . . in choosing to vote or not to vote and in selecting the particular candidate for whom to vote . . . ." *Id.* (quoting *Usery v. Int'l Org. of Masters, Mates & Pilots*, 422 F. Supp. 1221, 1226–27 (S.D.N.Y. 1976)). Notably, the court did not require evidence from the Secretary showing the thoughts and beliefs of any specific voters. *See id.* Instead, the court simply reached its decision about whether the outcome of the election may have been affected by considering how may potentially affected votes (or non-votes) existed. *See id.*

The *Local 689* case, decided just this summer, provides another example of the expansive nature of the presumption that a violation "may have affected" an election's outcome when considering the impact of the votes potentially affected by the violation as compared to the winning margins in the election. *See Local 689*, 2017 WL 3085321, at *5–6. In *Local 689*, the violation was that the union mailed notice of the election to its members on the fourteenth day before the election. *Id.* at *1. This was one day short of meeting the LMRDA's requirement that notice be mailed not less than fifteen days before the election. *Id.* After noting that this violation established a presumption that the outcome of the election may have been affected, the court explained that it need not find that the violation actually affected the outcome, but rather that it need only consider the "maximum theoretical possibility" of an effect on the outcome. *Id.* at *5 (quoting *Am. Postal Workers Union*, 486 F. Supp. at 82). Applying this standard, the court reasoned

that the notice violation "could have affected *every* eligible union member that did not

vote," which was 8,067 members out of 13,535, and which represented a block of votes

greater than the winning margins in all races. *Id.* (emphasis added). Again, the violation

was merely that the union mailed out notice of the election a single day later than

required by statute, and yet under the "maximum theoretical possibility" rationale the

court determined—on summary judgment—that essentially every possible uncast vote

could have been affected, and ordered that a new election be held. *Id.* at *5–6. Under the

APFA's theory, it instead would have been necessary in *Local 689* for the Secretary to

adduce evidence showing that specific voters' voting decisions were in fact affected by

the one-day notice failure. But, as the result in *Local 689* makes clear, that is not what

the LMRDA requires.

Yet another example is the *Local Union No. 125* case, in which it was determined

that the union had allowed a number of ineligible members to vote, in violation of the

LMRDA. *See Local Union No. 125,* 270 F. Supp. at 20. The union argued against

finding that this violation may have affected the outcome of the election because,

according to the union, it was "not clear which candidate [the ineligible voters] voted

for." *Id.* But the court rejected the union's suggestion that such an inquiry into the minds

of voters was the proper analysis. *See id.* Instead, the court explained that "if the number

of ineligible votes cast is sufficient to make it mathematically possible that the outcome

of the election was affected . . . this fact alone *conclusively establishes* the [LMRDA's]

requirement that the conduct complained of may have affected the outcome of the

election." *Id.* (emphasis added). Finding that the number of votes in question exceeded

the winning margin, the court granted summary judgment in favor of the Secretary and

ordered that a new election be held. *Id.*

In the case of the APFA's election, it is likewise conclusively established, by

comparison of the winning margins in each of the four races to the number of votes and

potential votes that could have been affected by the LMRDA violations, that the ballot-

secrecy violations may have affected the outcome of the election. The largest margin of

victory in any of the races in the APFA's election was 2,147 votes.[13] (App. 044 (Tab

D).) The APFA cannot negate the possibility that the 11,301 eligible members who did

not vote in the election at all would have voted, and would have voted in such a manner

as to alter the results of each race, if an LMRDA-compliant method of voting had been

used. Moreover, even if the potential class of affected votes is limited to only the 9,355

votes that were cast, 100% of these votes were non-secret by reason of the BallotPoint

system's use of one-time passwords, and approximately 43% of the votes (4,081 votes)

were also non-secret by reason of the IP addresses and other voter-vote linking

information on the ES and MRNS. (*See* pp. 11–13, *supra*.) Under any of these possible

scenarios, the number of potentially affected votes was well in excess of the winning

margins of victory in all four races in the APFA's election. Therefore, the APFA cannot

negate the possibility that the outcome of the election may have been affected, and there

is no requirement that the Secretary provide evidence about how specific union members

---

[13] Here, "margin of victory" refers to either the margin in the one race that was decided outright without a runoff (the vice-presidential race), or, for the other races where a runoff was required, the margin between the second-place candidate who made the runoff and the next candidate who was eliminated from the runoff.

arrived at their decisions concerning whether to vote and, if they did choose to vote, whom to vote for.

Finally, even if an inquiry into the minds of specific union members were appropriate (which it is not), and even if the APFA were entitled to use the absence of evidence in the record about specific voters' beliefs to meet its burden of producing "tangible evidence" to rebut the presumption that the outcome may have been affected (which it is not), the testimony that the APFA cites from Willertz's deposition still would not entitle the APFA to summary judgment in its favor. The APFA first points to an exchange in which Willertz was asked about the allegation in the Secretary's complaint that the BallotPoint system "stores and maintains member-identifying information and voting records on two servers in a way that could allow individuals with access to both of the servers" to identify how a member voted. (Doc. 28 at 8 (citing APFA App. 15–17, 63).) The following colloquy occurred:

> Q. . . . But for right now, my question to you is, are you aware of the complainant in this case, Mr. Morales, or any other rank and file union member ever expressing a concern or a [belief] that, to quote paragraph 21 [of the Secretary's complaint], that "The system stores and maintains member-identifying information and voting records on two servers in a way that could allow individuals with access to both of the servers to identify how a member voted"?
>
> A. I didn't understand the question. Did --
>
> Q. Did Mr. Morales, or any other rank and file union member ever express that concern to you, to your knowledge? To you or to a member of your investigatory team in this case? Did Mr. Morales ever say, Here's why I feel that ballot secrecy is a problem, because I have a sense that the system stores member information in a way that could allow individuals

with access to both of the servers to identify how a member voted?

A. Okay. I'm not aware that Mr. Morales would ever have said that. I do know that he alleged a lack of voter secrecy.

Q. Correct. But he never raised this particular concern as the basis for why he was concerned about ballot secrecy?

A. I don't believe that he ever articulated anything about two servers.

Q. And correct me if I'm wrong, but, I think, you said you would find it highly unlikely that he would have enough knowledge about how the system worked that he would form such a belief?

A. Yeah, I don't know. I don't know to what degree he may have read up on BallotPoint's system. I do know that they have a website and there are some description of their system, but I don't know that.

Q. But you have no information to support --

A. No.

Q. And certainly those -- to your knowledge, that concern was ever expressed by him or any other rank and file member to you or any of your investigators?

A. I don't have any information on that, no.

(APFA App. 15–17 (cited in the APFA's brief, Doc. 28 at 8).)

The APFA also cites a later passage in which Willertz was again asked about the

two-server system employed by BallotPoint, as follows:

Q. And the violation here is that it [specific voters' choices] could be revealed by matching up data with data from the two servers.

A. That's right.

Q.  But you have no evidence that any member knew that was possible?

A.  That's right.

(APFA App. 63 (cited in the APFA's brief, Doc. 28 at 8).)

As the context of these questions makes clear, Willertz was answering questions about whether OLMS had any evidence that union members were aware of the specific details of BallotPoint's internal, two-server system architecture.  (*See, e.g.*, APFA App. 15, 16 (asking "Did Mr. Morales ever say, Here's why I feel that ballot secrecy is a problem, because I have a sense that the system stores member information in a way that could allow individuals with access to both of the servers to identify how a member voted?", and then asking about "this particular concern").)  And in response to these questions, Willertz made clear that he—and OLMS generally—did not know whether any union members had any knowledge about that specific two-server architecture.  (*See* APFA App. 16 (Willertz's answer that "I don't believe [the union member complainant] ever articulated anything about two servers").)

Willertz's testimony in no way proves as a matter of law that there is no possibility that union members could have feared that their votes were non-secret.  *Cf. Int'l Brotherhood*, 1990 WL 251022, at *9 (explaining that the union has the heavy burden to prove that the violation "*could not have affected* (as opposed to the easier burden of proving that the violation *did not affect*) the outcome of the election".  It is not necessary for a voter to have an insider's knowledge of the mechanics of the BallotPoint system in order to fear that a vote transmitted through that system may not be secret.

What the APFA's members were able to see and perceive about the voting system was: (1) that they were required to use access codes supplied by the union and printed on pieces of paper with their names on them—thus suggesting that the union knew which codes were assigned to which voters; and (2) that the access codes had to be entered into the voting system, either over the internet or by phone, in order for members to vote.  It is not outside the realm of possibility that voters could have perceived a secrecy problem under these circumstances.

The APFA also says that Willertz testified that there was "'just no way' that APFA members could have made 'any sort of assessment as to whether or not votes and voters could be connected' using data stored in the BallotPoint system."  (Doc. 28 at 8 (citing APFA App. 12–14).)  Willertz's "just no way" quote is taken from the following colloquy:

> Q.  My question really is not so much of, you know, whether sort of it's a fair game for investigation at that juncture.  My question is really different, is does it surprise you that this complainant couldn't provide any basis or evidence for his concern that ballot secrecy had been violated?  Does that surprise you?
>
> A.  No.
>
> Q.  Why does it not surprise you?
>
> A.  Because the investigation noted that there was no tangible record or way for any candidates in this particular election, to observe the votes as they were recorded by the electronic system, or the way that they were tallied, and verify the accuracy or look inside the system in any way, shape, or form to make any sort of assessment as to whether or not votes and voters could be connected.  There is *just no way*.  So it wouldn't surprise me that a member might allege or suspect

that this system wasn't [secret][14] in filing in a complaint.

(APFA App. 13–14 (emphasis added).)

Again, then, Willertz's testimony does not prove as a matter of law that there is no possibility that union members could have feared that their votes were non-secret. Willertz explained that he believed there was "just no way" to "observe the votes as they were recorded by the electronic system, or the way that they were tallied, and verify the accuracy or look inside the system in any way, shape, or form to make any sort of assessment as to whether or not votes and voters could be connected." (APFA App. 14.) That is true—the system, from the union members' perspectives, was essentially a "black box." Nonetheless, the fact that there was no way to look inside this black box—or, in Willertz's words, the fact that there was "just no way" to "look inside the system in any way, shape, or form to make any sort of assessment as to whether or not votes and voters could be connected"—does not establish that there is no possible way that union members might worry that their votes could be non-secret. Indeed, the one union member whose thoughts on the voting system are known—the complainant, Samuel Morales—evidently did have some fear or worry that the system was not secret, because he filed a complaint saying so. (*See* App. 046–48 (Tab D); App. 193–94 (Tab J).) It was not necessary for Morales to know specifically how BallotPoint used a two-server system in order to have such a fear. And what is true of Morales is true of all the other union

---

[14] The original transcript says "specific" rather than "secret," but that appears to have been a transcription error, and the errata sheet submitted by Willertz when he signed the deposition notes this mistake. (*See* APFA App. 64.)

members who were eligible to vote.[15]

      To summarize, the APFA's summary-judgment arguments on the issue of ballot secrecy rely on the wrong standard and are not consistent with the nature of the presumption that the ballot-secrecy violations "may have affected" the outcome of the election. This issue does not turn on whether the Secretary has gathered evidence showing that specific union members had any particular beliefs or fears about the voting system. Instead, under the "maximum theoretical possibility" standard, the dispositive fact is that the number of potentially affected votes greatly surpassed the margins of victory in each race in the APFA's election. Thus, it is at least possible that a number of union members sufficient to sway the results of the election could have had their voting choices influenced by the fact that the election was conducted using the BallotPoint system, and there is no way for the APFA to conclusively negate this possibility. Accordingly, the Court should deny the APFA's motion for summary judgment on the issue of whether the ballot-secrecy violations may have affected the outcome of the election (and instead, the Secretary's motion for summary judgment on this issue should be granted, for the reasons detailed in the summary-judgment brief previously filed by the Secretary, (*see* Doc. 32)).

---

[15] Indeed, were union members required to demonstrate a specific technical reason for their suspicion of non-secrecy, by detailing the inner workings of an electronic voting system, this would create a situation in which the more complicated and obscure a voting system's technology is, the more insulated it is from a legal challenge. This would be contrary to the intent of the LMRDA to provide rank-and-file union members with greater transparency into union voting processes.

**B.    The APFA is not entitled to summary judgment against the Secretary's claim that the voting system used in the APFA's election violated the LMRDA's observer requirement.**

The LMRDA requires that union elections must provide candidates the right to "have an observer at the polls and at the counting of the ballots." 29 U.S.C. § 481(c). This right is interpreted practically and "encompasses every phase and level of the counting and tallying process." 29 C.F.R. § 452.107(a); *see also id.* § 452.107(c) (applying the observer requirement to mail-ballot elections). The intent of requiring unions to provide for observer rights is to ensure that union elections are fair and that the ballots and results cannot be tampered with in unknown ways. *See Ellis*, 155 F. App'x at 20; *see also Local 135*, 1980 WL 18743, at *12 (explaining that the observer requirement is designed to prevent ballot manipulation).

Here, contrary to the LMRDA, critical aspects of the election process were conducted outside of the view of the candidates and their observers. First, with respect to the counting of the ballots, the only opportunity provided to observers was that the APFA allowed observers to attend a "ballot count" event at APFA headquarters in Euless, Texas on the day the voting closed. (App. 016, 039–40 (Tab D).) However, no "counting of the ballots" actually occurred at that location. (App. 031 (Tab D).) Instead, any counting occurred within BallotPoint's computers in Portland, Oregon. (App. 031 (Tab D).) The only activity that occurred at APFA headquarters, from the point of view of the observers, was that the union's election committee chair, Cindy Horan, projected an image onto a screen which purported to show the results of the election. (App. 017–25, 044 (Tab D).)

Second, even to the extent the event at APFA headquarters could be considered as the location of the ballot count, observers were not provided any meaningful opportunity to observe the counting in a way that would enable them to obtain an assurance that the ballots were counted correctly.  Again, all that observers saw was an image projected onto a screen which purported to be the election results.  (App. 021–25, 044 (Tab D).)  Horan admitted that this left no way for the observers to know if the results even came from BallotPoint, much less that they were correct.  (App. 032–33 (Tab D).)  Likewise, BallotPoint's software engineer agreed that there was no way for an observer to verify that the votes recorded on the BallotPoint system in the election were the votes that voters intended to be cast.  (App. 123–24 (Tab G).)

Third, the other "observation" opportunities that the APFA allowed similarly failed to provide any real assurance to observers that votes came from eligible voters and that no eligible voters were denied having their votes cast (which are the types of interests protected by the LMRDA's requirement that an observer be allowed "at the polls").  After the tally, the BallotPoint system provided a "who voted" list, which purported to list the names of all the persons who had voted in the election.  (App. 124–25 (Tab G).)  However, BallotPoint's software engineer agreed in his deposition testimony that there was no way for an observer to verify that the people on this electronically generated list actually were the voters.[16]  (App. 124–26 (Tab G).)  Nor was

---

[16] In contrast, in an election conducted at a physical polling site, observers can watch the union members who are signing in to vote and in that way receive an assurance that only eligible members are voting.  Similarly, in a mail-ballot election the outer envelopes submitted by voters must have some kind of identifying information, and often, have a signature, that can be used to verify that the (at the time

any other opportunity provided for observers to receive assurance that the votes reported at the "ballot count" event at APFA headquarters accurately reflected the choices of eligible voters, or that all eligible voters had their votes counted.  (*See* App. 032–33, 039–40 (Tab D).)

What occurred in the APFA's election is analogous to the fact patterns of in-person elections in which LMRDA violations were found due to failures to provide meaningful observation opportunities.  *See Local 135*, 1980 WL 18743, at *5–6 (union officials permitted an observer inside the polling area, but denied him the opportunity to view the mechanics of the election and also completely excluded other observers from the polls and the ballot count); *Brennan v. Local Union 300*, No. 72-3042-LTL, 1974 WL 1068, at *2 (C.D. Cal. Feb. 21, 1974) (observers were confined to a stage area in the auditorium where the election was taking place, from which they could not see all the functions of the election process).  As in these elections, the system used in the APFA's election by design did not afford observers any way of verifying that the announced election results were accurate.  Observers in the APFA's election had no way to know that the results projected onto the screen at APFA headquarters in Euless represented the actual content of the voted ballots, nor were observers provided any opportunity to receive assurance that the votes came from eligible voters, that all votes from eligible voters were counted, and that no ineligible voters were allowed to vote.  The LMRDA

_____

unknown) vote that is concurrently located in the inner secret-ballot envelope is coming from an eligible voter.

does not allow union officials to adopt this kind of "just trust us" approach to the voting process and the counting of the votes.

Notwithstanding the essentially undisputed facts about what observers were permitted (and not permitted) to do and see in the APFA's election, the APFA argues in its summary-judgment brief that the Secretary cannot establish any violation of the LMRDA's observer requirement in this case. The APFA's argument is essentially a semantic one that is premised on a mischaracterization of the Secretary's pleadings. The APFA first says that there is no dispute that it is "literally impossible" to have an observer "at the polls and at the counting of the ballots" when an election is conducted with an electronic voting system that uses only internet and phone voting, because votes are counted inside a computer and there is no physical polling place. (Doc. 28 at 11.) Next, the APFA argues that the Secretary's claim of an LMRDA observer-requirement violation in this case is, nonetheless, nothing more than a claim that the APFA "fail[ed] to engage in the impossible task of affording candidates the specific observer right provided for in [29 U.S.C. § 481(c)]—*i.e.*, 'the right . . . to have an observer at the polls and at the counting of the ballots.'" (Doc. 28 at 12.) Having characterized the Secretary's claim in this manner, the APFA distinguishes the claim from what the APFA contends would be a separate claim, that there was a failure to provide "[a]dequate safeguards to insure a fair election." (Doc. 28 at 12.) The APFA then arrives at a conclusion that, because in its view the Secretary has alleged only the former claim (that the APFA failed to perform the "impossible task" of allowing observers to attend at a physical polling place and ballot-counting location), the Secretary has in effect pleaded

himself out of court.[17]

But for several reasons, the APFA is incorrect.  First, the APFA is relying on a mischaracterization of the Secretary's pleadings and the nature of the LMRDA observer-requirement violation that has been alleged.  After explaining the facts of the BallotPoint voting system used in the APFA's election, the Secretary's complaint alleged that "[t]he internet voting system . . . did not permit an observer to effectively observe the election," and that "[o]bservers were limited to viewing a tally sheet projected from a personal computer connected to the voting website and were not able to verify that the votes were recorded and tallied correctly."  (Doc. 4, ¶ 24.)  The complaint went on to allege that "[t]he APFA violated . . . 29 U.S.C. § 481(c), by denying a candidate's right to have an observer in the January 9, 2016 election, because the electronic voting system did not permit an observer to verify that a vote was recorded and tallied accurately."  (Doc. 4, ¶ 26.)

Thus, contrary to the APFA's summary-judgment arguments, the Secretary's claim of an LMRDA observer-requirement violation has never been formulated as a claim that the APFA failed to permit observers to engage in the "literally impossible" task of going inside a computer to observe the receipt and counting of the electronic

---

[17] Although the APFA also argues that it is "undisputed that the union, in conducting this election, implemented alternate safeguards that satisfied [29 U.S.C. § 481(c)'s] general mandate that 'adequate safeguards to insure a fair election' be provided," the APFA makes no attempt to show that it adopted any safeguards that would vindicate the concerns behind the "observer" requirement as referenced in the Secretary's complaint, e.g., by providing some mechanism by which observers could "verify that a vote was recorded and tallied accurately."  (*See* Doc. 4, ¶ 26.)  Instead, the APFA's claim about "adequate safeguards" is merely a restatement of its argument that the Secretary has pled only the violation of an "observer" requirement that, in the APFA's view, does not apply to internet voting.

impulses that represent votes in the BallotPoint system. Instead, the Secretary's complaint made clear that the claim of a violation of the LMRDA's observer requirement was premised on the more general fact that "the electronic voting system did not permit an observer to verify that a vote was recorded and tallied accurately." (Doc. 4, ¶ 26.) Such a claim is in no way limited to the issue of whether the APFA performed the "literally impossible" task of placing human beings inside a BallotPoint computer.

Put another way, the Secretary has never taken the position, in the complaint in this case or anywhere else, that the *only* way the APFA could have satisfied the LMRDA's observer requirement would have been to shrink observers down to a size small enough to fit inside the computers that comprise BallotPoint's two-server system. Yet this is how the APFA attempts to characterize the Secretary's claim, because by doing so the APFA can then argue that the only claim the Secretary has presented in this litigation is a claim that the APFA did not provide such an opportunity that would have been "literally impossible." This is a strawman argument. Again, as noted above, the Secretary's complaint makes the more general allegation that the electronic voting system used in the APFA's election "did not permit an observer to verify that a vote was recorded and tallied accurately," and that this state of affairs violated 29 U.S.C. § 481(c). The Secretary's claim is not the claim portrayed by the APFA.

Also unavailing is the APFA's attempt to create an artificial distinction within 29 U.S.C. § 481(c) between an "observer" claim and a separate "adequate safeguards" claim. The LMRDA states, in the relevant portion of 29 U.S.C. § 481(c), that "[a]dequate safeguards to insure a fair election shall be provided, including the right of any candidate

to have an observer at the polls and at the counting of the ballots." The APFA suggests that this statutory language creates two entirely separate requirements. The first would be an "observer" requirement that, in the APFA's view, is limited to only the narrow issue of whether a human being was literally allowed inside the relevant polling and vote-counting space in the election. The second would be an "adequate safeguards" requirement that, in the APFA's view, covers any other way in which an election procedure might allow observers to obtain some assurance that the votes were accurately tallied and counted. In this manner the APFA attempts to construe the statute (and the Secretary's alleged "out-of-court" position) as essentially offering unions a choice between fulfilling the observer requirement or the adequate safeguards requirement, with the union's choice of one requirement totally excluding the applicability of the other.

In this regard, the APFA claims that the Secretary has taken an "out-of-court" position that, if there is no physical polling place or ballot-counting location, a union cannot ever be said to have violated any "observer" requirement, because this requirement purportedly concerns only the ability of observers to be in physical attendance at the polls and at the ballot-counting location. In the APFA's telling, the Secretary believes that an election of this type could potentially violate a separate "adequate safeguards" requirement, if the union fails to provide some alternate way for observers to obtain assurance that the election results were correct, but never could be said to violate any "observer" requirement (because allegedly no such requirement applies). Then, to tie everything together, the APFA concludes that the Secretary, despite having allegedly adopted this sharp distinction between an "observer" violation and an

"adequate safeguards" violation, nonetheless inexplicably pursued only the (in-the-APFA's-view inapplicable) "observer" claim in this case. (*See* Doc. 28 at 11–12, 21.)

But once again, the APFA is relying on a distorted view of the LMRDA's observer requirement and the Secretary's pleadings. The APFA first does so through a discussion of the treatment of LMRDA compliance in mail-ballot elections as set forth in the regulations promulgated by the Secretary under the LMRDA. (*See* Doc. 28 at 13–15 (discussing mail-ballot procedures and citing the regulation at 29 C.F.R. § 452.107).) Contrary to the APFA's arguments, though, the Secretary has made clear via the regulations that the concept of the "observer" requirement, in the Secretary's view, extends beyond simply allowing observers into whatever physical space (if any) is functioning as the polling place and ballot-counting location. The regulation at 29 C.F.R. § 452.107, entitled "Observers," is instructive. This regulation begins, tracking the language of 29 U.S.C. § 481(c), by noting that "each candidate must be permitted to have an observer (1) at the polls and (2) at the counting of the ballots." 29 C.F.R. § 452.107(a). But the regulation then states, in the next sentence, that "[t]his right encompasses every phase and level of the counting and tallying process." *Id.* And the regulation then goes on to explain that in a mail-ballot election (in which, as the APFA notes, there is no physical polling place, at least in any traditional sense), candidates "must be permitted to have an observer present at the preparation and mailing of the ballots, their receipt by the counting agency and at the opening and counting of the ballots." *Id.* § 452.107(c).

The right detailed in 29 C.F.R. § 452.107(c) to have observers at the preparation

and mailing of the ballots and at their receipt by the counting agency is not, literally, the same as having observers at the polls (or at the counting of the ballots). Nonetheless, the Secretary's regulation treats these matters as part and parcel of the same overall observer requirement that is created by 29 U.S.C. § 481(c)'s dictate that observers must be allowed "at the polls and at the counting of the ballots." The regulation is entitled "Observers" and, notably, the phrase "adequate safeguards" nowhere appears within it. *See* 29 C.F.R. § 452.107.[18] This demonstrates the falsity of the APFA's argument that the Secretary has somehow taken the position that the necessity for observers to be provided a means to verify that ballots come from eligible voters and are not tampered with prior to the tally in mail-ballot elections (and, by analogy, in elections using remote electronic voting) is somehow not part of the "observer" requirement at all, and instead is subject only to a separate "adequate safeguards" requirement.[19]

Also contrary to what the APFA suggests, the Secretary has not divided claims under 28 U.S.C. § 481(c) into two separate categories such that everything that is not

---

[18] The record also does not support the APFA's assertion that Willertz "conced[ed]" with respect to this regulation that the Secretary's "out-of-court position with respect to mail ballot elections" matches the APFA's theory that there is no "observer" requirement but only an "adequate safeguards" requirement. (*See* Doc. 28 at 15 (citing APFA App. 42–45 (Willertz's testimony)).) In the testimony that the APFA cites at pages 42 through 45 of its appendix, Willertz repeatedly discusses the applicability of the LMRDA to mail-ballot elections in terms of what can be *observed* in the election process. (*See* APFA App. 42–44 ("it gives candidates the right to have an *observer observe* the process" . . . "they can *observe* the pickup of the ballots" . . . "[a]nd then *observe* the separation of those two different types of envelopes" . . . "[a]nd then *observe*, at that point, the opening of the secret ballot envelope, the removal of the actual ballots") (emphasis added).)

[19] Put another way, 29 C.F.R. § 452.107(c) shows that if a union fails to allow observers in a mail-ballot election the opportunity to be present at the preparation, mailing, and receipt of the ballots, the Secretary would indeed consider this an "observer" violation—just as the Secretary considers what happened in the APFA's election, where observers were similarly denied any opportunity to verify that ballots were properly received from only eligible voters and without any tampering, to have been an "observer" violation.

literally an instance of a person being present at a physical polling place or counting location must be labeled an "adequate safeguards" claim, as distinguished from an "observer" claim.  If that were the case, the Secretary would not have used the "Observers" regulation at 29 C.F.R. § 452.107 as the place to explain what activities observers must be permitted to observe in a mail-ballot election with respect to the preparation of the ballots and their receipt by the counting agency.  Instead, under the APFA's theory the Secretary would have had to have placed these instructions in a separate "Adequate safeguards" regulation.  Indeed, there *is* a separate "Adequate safeguards" regulation, at 29 C.F.R. § 452.110, which states that "[i]n addition to the election safeguards discussed in [29 C.F.R. Part 452], the [LMRDA] contains a general mandate . . . that adequate safeguards to insure a fair election shall be provided."  But the Secretary did not select that regulation as the vehicle to explain that mail-ballot-election observers must be permitted to observe the preparation of the ballots and their receipt by the counting agency.

The APFA is thus wrong to suggest that these and other kinds of similar observer activities that are not, strictly speaking, an observation of the polls or of the counting of the ballots cannot be classified as part of the "observer" requirement at all, and instead must fall under a separate "adequate safeguards" heading.  The APFA's distinction is an artifice that does not correspond to the LMRDA itself or to the way that the Secretary actually interprets and enforces the LMRDA.  Indeed, in response to the Rule 12(b)(6) motion to dismiss filed by the APFA earlier in this case, the Secretary stated as follows in response to a similar argument from the APFA that it is "impossible" to provide

observation rights in the type of election at issue here:

> The APFA is incorrect. For example, although the APFA suggests that there is no way to allow observers "at the polls" in any election that is not conducted by in-person voting, the history of the LMRDA as applied to mail-ballot elections shows otherwise. To protect the same interests that are safeguarded by having observers at the physical "polls" in an in-person election (e.g., to ensure that only eligible voters are voting), *the observer requirement* operates in a mail-ballot election by allowing observers to be present at specific stages of the election process, such as the preparation and mailing of the ballots, their receipt by the counting agency, and the opening and counting of the ballots. 29 C.F.R. § 452.107(c). Through these procedures, observers are able to ensure that the election is fair and that the ballots are not tampered with.
>
> Similar solutions tailored to fit different voting methods have also routinely been instituted in political elections (which were Congress' model for union elections in the LMRDA) to vindicate the same goals behind the LMRDA's observer requirement. For example, in Texas, testing boards consisting of representatives from each political party are allowed to conduct logic and accuracy tests on voting machines, in a process that is also open to the press and the public. *See* Tex. Election Code § 129.023. The testing board can also vote "test ballots" and verify that the results announced by the system match the predetermined results of the test ballots. *Id.* § 129.023(c). Finally, the software used in the election is copied and kept in a secure location outside the administrator's control. *Id.* § 129.023(f)(2).

(Doc. 13 at 24–25 (emphasis added).) As this discussion makes clear, the Secretary's position has always been that a failure to provide effective observation rights in an election implicates what the Secretary refers to as the LMRDA's "observer requirement," even if the activities at issue did not literally involve standing around at a physical polling place or ballot-counting location.

The APFA also fails to establish any right to summary judgment through its

discussion of a "compliance tip" issued by OLMS on the subject of using remote electronic voting systems in union elections.[20] (*See* Doc. 28 at 15–16 (citing APFA App. 67–70).) The APFA tries to make it seem as though the Secretary has, with the compliance tip, taken an "out-of-court position" that no "observer" requirement applies to elections conducted remotely over the internet or by phone, and that all issues concerning the accuracy and verifiability of the results of such elections instead fall under a separate "adequate safeguards" category. (*See* Doc. 28 at 15–16.) But that is not what the compliance tip says.

The compliance tip is divided into two principal sections—which incidentally conform to the two claims made by the Secretary in this case—concerning ballot secrecy and observer rights.[21] (*See* APFA App. 68–70.) The first section, under the heading "Guidance for preserving ballot secrecy," discusses various ways that ballot secrecy can be preserved in an electronic voting system. (APFA App. 68.) The second section, under the heading "Guidance for preserving *observer rights*," discusses many of the same observer issues that are at issue in this case, including the "opportunity to observe any steps necessary for the counting of the votes, and any other steps necessary to audit that process," the need for a "secure method of independent vote verification that allows the

---

[20] The Secretary noted the following when the compliance tip was mentioned in the Secretary's response to the APFA's Rule 12(b)(6) motion to dismiss: "As the compliance tip post-dates the APFA election at issue in this litigation, it is not relied on here for purposes of establishing the sufficiency of the complaint's allegations that the APFA's election did not comply with the LMRDA, but instead to show the consistency over time in the Secretary's position that the LMRDA generally applies to internet-based electronic voting." (*See* Doc. 13 at 14 n.4.)

[21] There are also two brief sections in the compliance tip about preserving records and preserving the right to vote for union members who cannot access the electronic voting system. (APFA App. 70.)

voter or an observer to confirm that the vote was recorded and counted accurately," and the need for "mechanisms by which observers can verify, prior to an election, that the system is working properly." (APFA App. 69–70 (emphasis added).) Notably, the compliance tip did not create a third category entitled "Guidance for providing adequate safeguards" as the place to discuss these issues. (*See* APFA App. 68–70.) And of course, none of these "observer rights" involve physically placing human beings inside a computer as observers. Accordingly, the APFA is incorrect to argue that the Secretary has through the compliance tip taken a position that there is no "observer" requirement in remote electronic elections, and that only a separate and independent "adequate safeguards" requirement applies.

To recap, the Secretary's complaint alleged that 29 U.S.C. § 481(c) was violated because "[t]he internet voting system [used in the APFA's election] did not permit an observer to effectively observe the election," because "[o]bservers were limited to viewing a tally sheet projected from a personal computer connected to the voting website and were not able to verify that the votes were recorded and tallied correctly," and because "the electronic voting system did not permit an observer to verify that a vote was recorded and tallied accurately." (Doc. 4, ¶¶ 24, 26.) The Court has already denied the APFA's Rule 12(b)(6) motion which asserted that these allegations somehow failed to state a cause of action, (*see* Doc. 14), and the APFA fares no better with its summary-judgment arguments, which are likewise founded on a mischaracterization of how the Secretary is claiming that the APFA violated the LMRDA's observer requirement.

One final issue remains: the APFA's argument (Doc. 28 at 18–21) that the

Secretary is interpreting the LMRDA's observer requirement in such a way that a ruling in the Secretary's favor in this litigation would have the alleged effect of "prohibit[ing] unions from using mail balloting and internet-based voting procedures to conduct their elections," (Doc. 28 at 19). There is no merit to this claim, and to illustrate why, the Secretary will first quote from the response that was filed earlier in the case to the APFA's Rule 12(b)(6) motion to dismiss, where a similar argument appeared:

> [T]he Secretary's considered judgment has long been that the LMRDA fully applies to internet-based electronic voting, and for that reason the Secretary has worked to issue sub-regulatory guidance on this topic, including guidance on preserving ballot secrecy and observer rights when using an electronic voting system. . . .
>
> Thus, to the extent the APFA suggests that the Secretary's position in this suit is that no internet-based electronic voting may ever be used by a union (no matter what features and safeguards the system has), the APFA is mistaken. (*See* Doc. 8 at 2 (asserting that the Secretary has advanced a "totally nonsensical reading" of the LMRDA that would "effectively . . . deny" the right to use an internet-based electronic voting system).) The Secretary's claim is simply that the particular system used by the APFA did not comply with the LMRDA.

(Doc. 13 at 13–14 (footnote and citations omitted and paragraph break added).) These words remain as true today as they did at the time the Court ruled on the APFA's Rule 12(b)(6) motion. Indeed, the very compliance tip that the APFA cites and discusses in its brief makes clear that the Secretary has not purported to take any position that the LMRDA prohibits all forms of remote electronic voting. (*See* APFA App. 67–70.) The compliance tips sets out certain procedures and observer opportunities that the Secretary believes might be helpful in ensuring that an election conducted using a remote electronic

system complies with the LMRDA. (APFA App. 67–70.) It would make no sense to provide this guidance if the Secretary's position is that no remote electronic voting system can ever be used in an election that is subject to the LMRDA. The compliance tip even makes clear that it does not purport to list the exclusive means by which such an election can be conducted, by stating that "it is possible that solutions other than those identified [in the compliance tip] would also satisfy [the LMRDA's] requirements." (APFA App. 67.)

Likewise, on the issue of mail-ballot elections, the Secretary has made clear through longstanding LMRDA regulations and elsewhere that it is possible for unions to conduct mail-ballot elections that are compliant with the LMRDA. *See, e.g.*, 29 C.F.R. §§ 452.97, 452.98, 452.102, 452.107 (various LMRDA regulations that discuss mail-ballot-election procedures and that further illustrate that mail-ballot elections may be conducted in compliance with the LMRDA). A decision by this Court that the specific BallotPoint election system used by the APFA in its January 2016 election failed to provide for effective LMRDA observer rights would do nothing to alter the ability of unions to conduct mail-ballot elections.

## V.    Conclusion

For these reasons, the Secretary requests that the Court deny the APFA's motion for summary judgment. The Secretary further requests general relief. A proposed order is being submitted.

Respectfully submitted,

JOHN R. PARKER
United States Attorney

_Brian W. Stoltz_
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Plaintiff,
the Secretary of Labor

<u>Certificate of Service</u>

On September _15_, 2017, I served the foregoing document on defendant, the

Association of Professional Flight Attendants, by mailing it by prepaid first-class mail to

defendant's counsel of record, addressed as follows:

Andrew D. Roth
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St., N.W., Tenth Floor
Washington, D.C. 20005

_Brian W. Stoltz_
Brian W. Stoltz
Assistant United States Attorney