# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



| | |
|---|---|
| THOMAS E. PEREZ [now R. ALEXANDER ACOSTA], Secretary of Labor, <br><br> Plaintiff, <br><br> v. <br><br> ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, <br><br> Defendant. | Civil Action No. 4:16-CV-1057-A |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Many of the arguments made by the APFA in response to the Secretary's summary-judgment motion mirror arguments in the APFA's own summary-judgment motion, to which the Secretary has now responded.[1] (*See* Doc. 35 (the Secretary's brief in opposition to the APFA's motion).) In this reply, the Secretary will focus on the following additional issues:

1.  The APFA acknowledges the existence of LMRDA caselaw that, for purposes of determining whether an LMRDA violation may have affected the outcome of a union election, compares the winning margin of victory to the number of votes potentially affected by the violation. As discussed in the Secretary's opening brief, if the

---

[1] Capitalized terms in this reply have the same meaning as in the Secretary's opening summary-judgment brief. (*See* Doc. 32.)

Reply in Support of Plaintiff's Motion for Summary Judgment – Page 1

latter exceeds the former, then it is established that the outcome of the election may have been affected and that a new election must be held. (*See* Doc. 32 at 36–40.) The APFA argues, however, that this approach should apply only when it is "patently obvious to all union members" that a non-secret ballot is being used, and that a ballot-secrecy violation was not obvious (or obvious enough) in the AFPA's election. (*See* Doc. 37 at 6 (emphasis removed).) For several reasons, though, the APFA is incorrect. Instead, on the facts of this case the proper analysis for determining if there may have been an effect on the outcome of the election is to compare the number of potentially affected votes to the winning margins of victory.

First, if the rule were as the APFA argues, unions could violate ballot secrecy with impunity so long as they did so in a way that was hidden or undetectable by union members. That is not a sensible result given the underlying purpose of the LMRDA to protect union democracy and, specifically with respect to the secret ballot, its purpose to "eliminate any form of potential coercion or intimidation which might occur if it could be learned in any manner how an individual voter had voted." *Bachowski v. Brennan*, 413 F. Supp. 147, 150 (W.D. Pa. 1976). The potential for post-election coercion or intimidation can exist even if the union member did not realize at the time the vote was cast that the vote would not be secret. *See also Reich v. District Lodge 720*, 11 F.3d 1496, 1500 (9th Cir. 1993) (explaining that "the LMRDA's secrecy mandate extends not only to the actual casting of ballots but also to any post-voting procedure designed to determine how individual union members voted or would have voted").

Second, the *CSEA* case that the APFA relies on, (*see* Doc. 37 at 6 (citing *Donovan*

*v. CSEA Local 1000*, 594 F. Supp. 188 (N.D.N.Y. 1984))), does not purport to establish any rule that a ballot-secrecy violation must be "obvious" in order for there to be a possible effect on the outcome of the election within the meaning of the LMRDA. *See CSEA*, 594 F. Supp. at 197. Instead, when discussing whether a new election was required, the *CSEA* court relied on the presumption that is created by an LMRDA violation, and explained that there was no way for the union to "confront and overcome the imponderables inherent in analyzing the decisions made by each elector . . . in choosing to vote or not to vote and in selecting the particular candidate for whom to vote." *Id.* (internal quotation marks and citation omitted). The fact that the court referred to the issue as involving "imponderables" undermines the APFA's suggestion that there was something "obvious" about the impact of the violation on each voter. Moreover, the court expressly rejected and labeled "irrelevant" the union's argument that only a single member had complained about the voting process. *Id.* Clearly the union's point with this argument was that the secrecy violation was either unnoticed by, or not perceived to be significant by, all of the other voters. But this was irrelevant.

That there is no requirement that the violation be obvious to all voters can also be seen in the facts of the *Bachowski* case, in which the court likewise applied the rule that the losing candidate should be credited with essentially all the votes in elections in which ballot-secrecy violations occurred. *See Bachowski*, 413 F. Supp. at 150–51; *see also Dunlop v. Bachowski*, 421 U.S. 560 (1975) (discussing the underlying facts). In *Bachowski*, ballot-secrecy violations occurred in a number of different union locals during an election, but there was no indication that the violations were necessarily

obvious to all voters. For example, in one local, the facts were merely that *one* member saw how another had voted and that ballots were marked "in such proximity to the registration table that secrecy of the ballot *may* have been compromised." *Bachowski*, 421 U.S. at 584 (emphasis added). In another local, the violation was that ballots were marked on tables by voters in close proximity who were able to observe how other members were voting. *Id.* at 586. In neither instance was it determined that ballot secrecy was in fact compromised as to all votes, or even that a possible secrecy violation was obvious to all the voters at the time the ballots were cast. *See id.* at 584, 586. Presumably the question of "obviousness" would have depended on the specific facts of when each member voted and if other voters were nearby at the time, but the court did not require any evidence about these matters or indicate that they would have made any difference. *See Bachowski*, 413 F. Supp. at 150–51. This shows that no such "obviousness" requirement exists under the LMRDA.

Third, the APFA's proposed focus on whether it is "obvious" to voters that there is a secrecy violation would run afoul of the rule that union members cannot be questioned about their individual voting decisions, including the decision whether or not to vote. *See District Lodge 720*, 11 F.3d at 1504. The APFA *says* that it would have been obvious to all union members in the *CSEA* case that the ballot forms failed to preserve secrecy, but that is simply an assertion. By the logic of the APFA's argument, if this were the relevant inquiry, then the union defendant in *CSEA* would have been entitled to subpoena union members during the litigation to question them about what was going through their minds when they were voting, what was "obvious" to them when making their voting

decisions, and how whatever was "obvious" to them affected their voting choices. That is not proper under the LMRDA, though. *See id.*

Finally, even on its own terms in the context of the instant case, the APFA's argument is not supported by the record and is contrary to the principle that it need only be possible under a "maximum theoretical possibility" that the violation may have affected the outcome of the election. (*See* Doc. 32 at 35 (discussing this principle).) Although the APFA suggests that any ballot-secrecy problem in the BallotPoint system is not obvious, the APFA cannot conclusively rebut the possibility that some of its members may have perceived a ballot-secrecy problem. As noted in the Secretary's response to the APFA's summary-judgment motion:

> What the APFA's members were able to see and perceive about the voting system was: (1) that they were required to use access codes supplied by the union and printed on pieces of paper with their names on them—thus suggesting that the union knew which codes were assigned to which voters; and (2) that the access codes had to be entered into the voting system, either over the internet or by phone, in order for members to vote. It is not outside the realm of possibility that voters could have perceived a secrecy problem under these circumstances.

(Doc. 35 at 28.) Furthermore, while it is true that the APFA's members may not have been privy to the specific inner workings of the BallotPoint system, that would not prevent them from possibly believing that the system was not secret.[2] At least one union

---

[2] The Secretary has also already addressed, in response to the APFA's motion, the argument that the testimony of OLMS official Stephen J. Willertz somehow establishes that the APFA's members could not possibly have perceived any possible secrecy problem. As discussed in the APFA's brief, this is not what Willertz said. (*See* Doc. 35 at 25–30.)

member is known to have had such a belief (the complainant who protested the election), and the APFA cannot rebut the possibility that other members had similar beliefs.

2. The APFA also says that the Secretary has mischaracterized the LMRDA by asserting that the ballot-secrecy requirement is violated when "it is possible to link voters to their choices." (Doc. 37 at 8.) Arguing against this standard, the APFA cites language from the *Local Union 12447* case to the effect that a union must "take all reasonable steps to assure that every voter marks his ballot in secret." (Doc. 37 at 9 (quoting *Marshall v. Local Union 12447*, 591 F.2d 199, 204 (3d Cir. 1978)).) This, in the APFA's view, means that the LMRDA mandates only a reasonableness inquiry into the "steps" that the union took to guard against a ballot-secrecy violation. (*See* Doc. 37 at 8–11.)

But there are two principal flaws in the APFA's argument. First, it is not faithful to the actual statutory text that establishes the requirement of a "secret ballot." This term is defined in the LMRDA as a vote "cast in such a manner that the person expressing [the voting] choice cannot be identified with the choice expressed." 29 U.S.C. § 402(k). If a voter instead *can* be identified with his or her voting choice, then the ballot is not a "secret ballot" within the meaning of the LMRDA. The proper focus is thus whether it is possible to identify voters with their votes. If so, the ballot is not secret.

Second, the APFA is reading too much into the *Local Union 12447* court's reference to taking "reasonable steps" to ensure ballot secrecy. The context of that statement was that the union in *Local Union 12447* was arguing that it had complied with the ballot-secrecy requirement because it had provided some cardboard boxes at the

polling place that were taped to a table in such a way that voters could use them "to shield their votes if they desired privacy." *Id.* at 201. The court rejected the argument that merely having these boxes available was sufficient, explaining that the union had not informed members to use the boxes and had in fact admitted more voters into the voting area at a time than there were boxes available. *Id.* at 203. The court explained that in addition to simply providing the boxes, the union was also required to "take all reasonable steps to assure that every voter marks his ballot in secret," which in the context of the *Local Union 12447* election would have been accomplished by instructing members to use the boxes and limiting the number of voters at any given time to the number of available boxes. *Id.* at 204.

The *Local Union 12447* court's reference to "reasonable steps" therefore does not supplant and replace the overriding principle of the statutory "secret ballot" requirement, which is that it should not be possible to link voters to their votes. Indeed, it is clear from other LMRDA cases that a ballot-secrecy violation occurs if ballots are marked with sequential numbers or other identifiers that allow for voters to be linked with their votes *after* the voting process is concluded. (*See* Doc. 32 at 20–22 (discussing these cases).) Under the APFA's theory, so long as voters who are supplied with such secrecy-violating ballots are nonetheless instructed to mark their choices on them in a private setting— using the cardboard boxes noted in *Local Union 12447*, for example—the union would have discharged its duty to take "reasonable steps to assure that every voter marks his ballot in secret." *See Local Union 12447*, 591 F.2d at 204. But that is not all the LMRDA requires, because it would be an illusory protection if voters could be required

to cast their votes on ballots with identifying marks, so long as the voters were allowed to do so in private. There also must not be any other mechanism that allows for voters to be linked to their votes even after the ballots are cast. *See Bachowski*, 413 F. Supp. at 150 (explaining that the "requirement of secrecy would seem to include not only the right to vote in secret . . . but also the right to secrecy after the ballots are cast" and that "[a]ny post-voting device by which it can be determined how a particular voter voted would be a violation of secrecy"). That is the tenet of ballot secrecy that was violated in this case.

3.  Finally, on the issue of whether a violation of the LMRDA's observer requirement may have affected the outcome of the election, the APFA argues that testimony from its two expert witnesses conclusively negates any possibility that the results of the election could have been affected by the fact that observers were not able to verify that votes were recorded correctly and tallied accurately. (Doc. 37 at 16.) However, these experts have focused on the issues of whether the votes that were recorded in the BallotPoint system were counted correctly at the conclusion of the election or could have been tampered with while stored on BallotPoint's system. (*See, e.g.*, APFA App. 110–14, 152–53.) The experts have not testified, and could never testify, that there is no possibility that votes could have been tampered with prior to the time they were recorded on the BallotPoint system. (For example, a union member might think that he or she was casting a vote for the candidate of the member's choice, but the vote through some malicious actor or software bug could be altered prior to the time it is ever recorded on the BallotPoint system. The "vote" might then be stored without incident on the BallotPoint system and counted as such at the conclusion of the election,

but it would not have been the vote that was intended to be cast by the voter.) As the APFA's retained expert conceded, the absence of "client side" protection in the BallotPoint system leaves this key vulnerability open, (*see* Doc. 32 at 43–44), and there is no way that the APFA can conclusively negate the possibility that it might have been exploited to change the outcome of the election.

\* \* \* \* \*

For these reasons, and for those given in the Secretary's other summary-judgment briefing, the Court should grant summary judgment in favor of the Secretary and should enter a judgment voiding the APFA's election and directing that a new election be conducted under the Secretary's supervision.

       Respectfully submitted,

       JOHN R. PARKER
       United States Attorney

       */s/ Brian W. Stoltz*
       Brian W. Stoltz
       Assistant United States Attorney
       Texas Bar No. 24060668
       1100 Commerce Street, Third Floor
       Dallas, Texas 75242-1699
       Telephone:  214-659-8626
       Facsimile:   214-659-8807
       brian.stoltz@usdoj.gov

       Attorneys for Plaintiff,
       the Secretary of Labor

## Certificate of Service

On September 22, 2017, I served the foregoing document on defendant, the Association of Professional Flight Attendants, by mailing it by prepaid first-class mail to defendant's counsel of record, addressed as follows:

Andrew D. Roth
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth St., N.W., Tenth Floor
Washington, D.C. 20005

       */s/ Brian W. Stoltz*
       Brian W. Stoltz
       Assistant United States Attorney